**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ONEX AMERICAN HOLDINGS, LLC, | ) |
| | ) |
| Appellant, | ) Civil Action No. 07-CV-263 (SLR) |
| | ) |
| v. | ) |
| | ) |
| RICHARD M. KIPPERMAN, as Trustee of | ) |
| the MAGNATRAX LITIGATION TRUST | ) |
| | ) |
| Appellee. | ) |
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| MAGNATRAX CORPORATION, | ) Case No. 03-11402 (KG) |
| | ) |
| Reorganized Debtor. | ) |

## APPENDIX TO ANSWERING BRIEF OF APPELLEE RICHARD M KIPPERMAN

| | | |
|---|---|---|
| Christopher P. Simon (No. 3697) | Catherine L. Steege | Peter W. Ito |
| CROSS & SIMON LLC | Joel T. Pelz | BAKER & HOSTETLER LLP |
| 913 North Market Street, | Andrew S. Nicoll | 303 East 17th Avenue, |
| 11th Floor | JENNER & BLOCK LLP | Suite 1100 |
| P.O. Box 1380 | 330 N. Wabash Avenue | Denver, CO 80203 |
| Wilmington, DE 19899-1380 | Chicago, IL 60611 | Tel.: (303) 861-0600 |
| Tel.: (302) 777-4200 | Tel.: (312) 222-9350 | |

*Counsel for Richard M Kipperman, Trustee of the Magnatrax Litigation Trust*

**APPENDIX TO ANSWERING BRIEF OF APPELLEE RICHARD M KIPPERMAN**

**Tab**        **Description**

1              Transcript of Hearing on Motion to Re-Open Bankruptcy and Motion to
               Enforce Bankruptcy Plan, before the Bankruptcy Court on April 13, 2007

2              Order of the Bankruptcy Court re Motion of Onex American Holdings,
               LLC, For Order Reopening Chapter 11 Case for Limited Purpose and
               Motion for Order Enforcing Chapter 11 Plan, dated April 16, 2007

3              Magnatrax Litigation Trust's Objection to Onex American Holdings, LLC's
               Motion for Order Enforcing Chapter 11 Plan

4              Magnatrax Litigation Trust's Objection to Onex American Holdings, LLC's
               Motion for Order Reopening Chapter 11 Case for Limited Purpose

5              Transcript of Confirmation Hearings, before the Bankruptcy Court on
               November 13, 2003

# TAB 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          . Case No. (03-11402KG)
                                .
    MAGNATRAX CORPORATION,       .
                                . 824 North Market Street
                                . Wilmington, DE  19801
                    Debtor.      .
                                .
                                .
                                . April 13, 2007
. . . . . . . . . . . . . . .. 2:00 p.m.


TRANSCRIPT OF ORAL ARGUMENT
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              Cozen O'Connor
                             By:  JEFFREY R. WAXMAN, ESQ.
                             1201 N. Market Street, Suite 1400
                             Wilmington, DE  19801

                             Paul Weiss & Rifkind Wharton
                               & Garrison
                             By:  ALAN W. KORNBERG, ESQ.
                                  MARIA T. VULLO, ESQ.
                                  STACEY SHORTALL, ESQ.
                                  JEREMY S. GLADSTONE, ESQ.
                             1285 Avenue of the Americas
                             New York, NY  10019



Audio Operator:              Matt Yovino


Proceedings recorded by electronic sound recording, transcript
Produced by transcription service.

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609)586-2311    Fax No. (609) 587-3599

2

APPEARANCES:  (Cont.)

For the Trustee:            Jenner Block, LLP
                           By:  CATHERINE L. STEEGE, ESQ.
                                JOEL T. PELZ, ESQ.
                           333 N. Wabash Avenue
                           Chicago, IL,  60611-7603

                           Baker & Hostetler
                           By:  PETER W. ITO, ESQ.
                           303 East 17th Avenue
                           Suite 1100
                           Denver, CO  80203-1264
                           (Telephonic)

                           Cross & Simon
                           By:  CHRISTOPHER P. SIMON, ESQ.
                           913 North Market Street
                           11th Floor
                           Wilmington, DE,  19801

For Richard M. Kipperman:  By:  RICHARD M. KIPPERMAN, ESQ.

3

1              THE COURT:  Counsel, good afternoon.  Please be

2  seated.  Welcome, everyone, and we also have Mr. Ito on the

3  telephone, I believe.

4              MR. ITO:  Good afternoon, Your Honor, Peter Ito on

5  behalf of Richard M. Kipperman, Litigation Trustee.

6              THE COURT:  Yes.  Welcome, Mr. Ito.  Good afternoon,

7  Mr. Waxman.

8              MR. WAXMAN:  Good afternoon, Your Honor.  Your Honor,

9  there are three things on the agenda for today.  There is the

10  motion to reopen the case.

11              THE COURT:  Yes.

12              MR. WAXMAN:  And then, there is the motion to enforce

13  the plan.  And then, Your Honor, yesterday we filed a motion

14  for relief to file a supplemental reply.

15              THE COURT:  And that, of course, I'm granting.

16              MR. WAXMAN:  Thank you, Your Honor.

17              THE COURT:  My philosophy is I'd rather parties file

18  replies and put me at least at the advantage of knowing what

19  their arguments are going to be.  So, I'll be very liberal on

20  something like that, and I am granting that.

21              MR. WAXMAN:  Thank you, Your Honor.  Your Honor, to

22  my left is my co-counsel, starting with Alan Kornberg.

23              THE COURT:  Welcome.

24              MR. WAXMAN:  Maria Vullo.

25              THE COURT:  Hello.

4

1          MR. WAXMAN:  Jeremy Gladstone and Stacey Shortall.

2          THE COURT:  Yes.

3          MR. WAXMAN:  Mr. Kornberg will be handling the two

4    motions which are going to be addressed today.

5          THE COURT:  Thank you.

6          MR. WAXMAN:  So, with that, I'll turn it over.

7          THE COURT:  Thank you, Mr. Waxman.  Mr. Kornberg,

8    welcome.

9          MR. KORNBERG:  Good afternoon, Your Honor.  Thank

10   you.

11         THE COURT:  I have read these papers several times,

12   even most of the appendices.  And, let me just talk up front

13   about what my concern is and probably people won't be

14   surprised.  Why isn't this an advisory opinion at this point,

15   that you're seeking from the Court?  The thought being, if

16   there's no recovery then these issues don't even -- won't even

17   come before -- wouldn't even come before me for a decision.

18   And, that kind of is my thinking so I thought I would at least

19   alert the parties for where I am on the matters.

20         MR. KORNBERG:  Well, I appreciate that, Your Honor,

21   and --

22         THE COURT:  And, I'm not trying to foreclose your

23   arguments at all, or shortcut them, but at least you'll know

24   what's in the back of my mind.

25         MR. KORNBERG:  I understand, Your Honor.  I

5

1  appreciate that.  If we can start with the motion to reopen the

2  Chapter 11 case, Your Honor, I think that logically is the

3  first matter to be heard.  Obviously, we're here today to

4  reopen this Chapter 11 case for a very limited and specific

5  purpose and that is for the Court to hear and determine Onex's

6  motion for an order enforcing the Chapter 11 plan against the

7  litigation trust and the litigation trustee.

8           THE COURT:  Yes.

9           MR. KORNBERG:  Your Honor may recall that the Court

10 closed the cases of all of the affiliated debtors other than

11 Magnatrax Corporation by order dated June 23, 2006.  And, that

12 order is Exhibit 10 in our voluminous appendix.

13          THE COURT:  Yes.

14          MR. KORNBERG:  The Court thereafter closed the

15 Magnatrax Corporation case by order dated November 8, 2006 and

16 that appears as Exhibit 11.  Notably, in the November 8th order

17 the Court specifically provided that it would retain

18 jurisdiction, and this is a quote, "over any and all orders

19 entered in the reorganized debtors Chapter 11 case including

20 but not limited to the confirmation order."  That's in the

21 fourth decretal paragraph.  And, in the fifth decretal

22 paragraph the Court expressly retained jurisdiction over the

23 litigation trust, the litigation trust agreement, and the plan.

24 So, the Court has the power and the discretion to reopen these

25 Chapter 11 cases, not only because of this Court's prior

6

1   orders, but because Section 350(b) of the Bankruptcy Code says

2   it may do so for cause, and under Bankruptcy Rule 5010 a case

3   may be reopened by the debtor or another party in interest, and

4   Onex, of course, was a shareholder in the Chapter 11 case and

5   therefore has standing to seek to reopen the case.

6          The Third Circuit has made it clear that the decision

7   to reopen a Chapter 11 case is permitted to the discretion of

8   the Court, that's <u>In Re:  Zinchek</u> (sic).  And, that decision,

9   which is from 2005, makes clear also that the Court has broad

10  discretion in deciding whether to reopen the case.  And, if

11  there are similar proceedings pending elsewhere that case tells

12  us the Bankruptcy Court should make a determination as to which

13  is the most appropriate forum to adjudicate the issues raised

14  by the motion to reopen.  And, this may go to the concern that

15  Your Honor expressed at the outset that the reason that we are

16  here is that we want the confirmation order issued by this

17  Court to be enforced as written and to maintain the integrity

18  of what took place during the Chapter 11 case.

19         There can be no question that the Court retains the

20  power to enforce its own orders.  And that, of course, is what

21  we are seeking today.  But, in this case the Bankruptcy Court

22  specifically retained jurisdiction to determine exactly the

23  kind of controversy that we have present today.  I'll be

24  referring a lot to the Chapter 11 plan in this case.  That is

25  Exhibit 1 in our appendix.  And, in Article 10 which is the

7

1  Retention of Jurisdiction, there are a number of provisions

2  starting at Page 54.  Specifically, Your Honor, Article 10D, as

3  in David, provides that the Court retains exclusive

4  jurisdiction to "hear and determine any dispute arising under

5  the plan, arising under any of the plan documents" and plan

6  documents is defined to include the litigation trust agreement,

7  or the confirmation order, or the interpretation,

8  implementation, or enforcement of the plan in any of the plan

9  documents and the confirmation order.  Yet under Article 10I at

10 Page 55 the Court retains jurisdiction to restrain interference

11 by any person with the implementation or enforcement of the

12 plan, the confirmation order, or any other order of the

13 Bankruptcy Court.  In Article 10J, to issue such orders as may

14 be necessary or appropriate to construe, enforce, implement,

15 execute, and consummate the plan, or maintain the integrity of

16 the plan following the consummation.

17         And, Your Honor, the confirmation order itself, which

18 is Exhibit 2, in Decretal Paragraph 5 on Page 21 provides that

19 the Court retain exclusive jurisdiction over all matters

20 relating to, leaving out some text, but includes the plan,

21 including those specified in Article 10 of the plan.  And,

22 those are the provisions that we just went through a moment

23 ago.

24         As was the case in <u>Zinchek</u>, the Bankruptcy Court is

25 well suited to provide the best interpretation of its own

8

order.  And, not surprisingly, many other cases observed that
the Bankruptcy Court is the best Court to determine the meaning
of its own confirmation order.  Even though we have litigation
pending in the District Court, and Your Honor is quite right,
that is the Court that will determine if there's any liability.
On a related question concerning the trustee's standing as a
representative of the estate, which was litigated there, the
District Court recognized that the amount of damages
recoverable by the litigation trustee rested upon, "Bankruptcy
principles."  And, Your Honor, we submit that this is the best
Court to determine and elucidate those principles, particularly
because they turn on interpretation and implementation of the
Bankruptcy Code's cram down powers, which very much were at
stake and at issue in the confirmation.

THE COURT:  Now, I understood though when he was
talking about Bankruptcy principles that he was talking more
about the substantive law as opposed to if you -- well, not
that is -- I'm not suggesting that this is simply procedural,
your issue, but that he wasn't talking about the principles of
the confirmation plan, or the plan of confirmation, or this
Court's order, that he was talking about, you know, the
substance surrounding the lawsuit before him.

MR. KORNBERG:  No, Your Honor, I think the question
was the question whether the trustee can recover more than that
which was owed to unsecured creditors was the issue.  And, we

1  read that language and I think it's clearly intended to go to

2  this very issue, which is under Bankruptcy Law principles, and

3  frankly, I mean, the Bankruptcy Law principles as they were

4  applied in this case, can creditors recover in a Chapter 11

5  case 50 times what they were owed when they went into the

6  Bankruptcy case?  And, Your Honor, the best Court to determine

7  the cram down principles, the best Court to determine how those

8  principles were played out in this case is this Court.  And,

9  that is one of the reasons this Court, as any Court would do,

10  would retain jurisdiction to determine the effect of its own

11  confirmation order.

12           And, Your Honor, I would submit that the trustee

13  himself has recognized that this is the appropriate Court in

14  which to resolve issues relating to the litigation trust.  As

15  Your Honor may recall, the trustee filed on November 1, 2006,

16  not all that long ago, a motion which he ultimately chose not

17  to pursue to expand the litigation trust agreement so that all

18  unsecured creditors, not just the opt ins, could benefit from

19  any recoveries he sought in the Georgia litigation.

20  Implicating some of the same issues, frankly, that are before

21  the Court today.  So, I think the trustee's recognized that

22  these are the sorts of issues that this Court, which confirmed

23  the plan and is in the best position to interpret its meaning,

24  is the right Court.

25           With respect to the objections that the trustee has

1  lodged to reopening the case.  First, he argues that Onex does

2  not have standing.  And, we believe mistakenly relies on the

3  case of In Re: Alpex Computer Corp., that's A-l-p-e-x.  It's a

4  Tenth Circuit decision from 1995.  In that case a patent

5  infringer who's a defendant in litigation, but that was not a

6  party to the Chapter 11 case, was not a party in interest,

7  wanted the case reopened to promote a particular construction

8  of the Chapter 11 plan.  Very different circumstances.  Here,

9  Onex has standing because it was a shareholder.  Indeed, as

10 described in Footnote 3 of Onex's substantive motion it

11 invested more than 117 million dollars in cash in these

12 debtors.  The plan completely wiped out that investment relying

13 upon cram down powers, and it's not credible to argue that Onex

14 doesn't have standing to make sure that those cram down

15 protections that the law provides to it are enforced.  The

16 trustee also mistakenly relies on In Re: Commercial Loan

17 Corporation.  Thereto, the defendant, the unlucky law firm, was

18 a stranger to the Bankruptcy case.  It was not a creditor, it

19 did not represent the debtor, it was simply not a party in

20 interest.  And so, the Court was reluctant to permit a stranger

21 to the Bankruptcy case to come back after the fact and reopen

22 it for their own purposes.  And, in that case also the Court

23 acknowledged that unlike the Third Circuit the Seventh Circuit

24 did not have post-confirmation jurisdiction to consider the

25 claims at issue because of the constricted interpretation

1 related to jurisdiction employed by the Seventh Circuit.

2        And, finally, the trustee makes an argument that Onex

3 American Holdings, the name of the movant here, filed a

4 certificate of dissolution and therefore it has no standing.

5 Well, that certainly did not stop the trustee from suing Onex

6 American Holdings for 600 million dollars in Georgia. And,

7 anyway, it's irrelevant because under Delaware liability law,

8 of course, the assets of that entity are distributed to its

9 members, in this case Onex Corporation, I think the trustee

10 refers to that himself in his papers. And, in any event, if

11 there is any doubt about standing we have four unlucky

12 employees, Messrs. Schwartz, Hilson, Wright, and Gauvin, who

13 are individual shareholders, therefore parties in interest in

14 the Chapter 11 case. And, not only did they lose their stock

15 as well, but they are named defendants in the trustee's action.

16        In sum, Your Honor, we would urge the Court to

17 exercise its discretion to reopen the case to hear these

18 important issues. Your Honor is the best suited to interpret

19 the confirmation order and the plan. The plan and the

20 confirmation order specifically reserved jurisdiction for those

21 purposes. Onex was a party in interest in the Chapter 11 case,

22 with standing to invoke Your Honor's jurisdiction. And, as we

23 will describe in the main motion to be heard before the Court

24 today, we need your assistance to maintain the integrity of the

25 Chapter 11 plan and the confirmation order. There are

1  important issues at stake concerning the disclosures made to

2  the Court during confirmation, upon which Onex, other parties,

3  and the Court relied, and we'd like Your Honor to compare that

4  to the trustee's inconsistent positions now taken in the action

5  he brought against Onex and others in Georgia.  So, for those

6  reasons we would respectfully request that Your Honor reopen

7  the case for the limited purpose we seek.

8            THE COURT:  Thank you, Mr. Kornberg.  Mr. Ward.

9            UNIDENTIFIED ATTORNEY:  Simon.

10            THE COURT:  Mr. Simon, forgive me.

11            MR. SIMON:  That's okay, I used to work with Mr.

12  Ward, Your Honor, he's much better looking than I am.

13            THE COURT:  That's right.  No, not true.

14            MR. SIMON:  Your Honor, --

15            THE COURT:  He's (indiscernible) and he's a lot

16  older.

17            MR. SIMON:  Your Honor, it's good to see you.  At

18  this time I want to see the podium to Ms. Steege.

19            THE COURT:  Thank you.

20            MR. SIMON:  Thank you.

21            THE COURT:  And, is that pronounced Steege?

22            MS. STEEGE:  Steege, Your Honor.

23            THE COURT:  Steege.  Welcome, Ms. Steege.

24            MS. STEEGE:  Thank you, Your Honor.

25            THE COURT:  Now, just as I kind of announced where my

13

1 thinking was on the -- I suppose the advisory opinion aspect, I

2 have to tell you that depending upon where we get on the second

3 motion, I think that there's an awfully valid reason for this

4 Court to be deciding the ultimate issues, should they come

5 before me when it's appropriate, and I'm not saying that's not

6 right now, but at such time as it's appropriate, this Court

7 ought to be enforcing its confirmation order, and interpreting

8 it it seems to me as opposed to a District Court in Georgia.

9      MS. STEEGE:  Your Honor, we don't disagree that the

10 Court would be the Court to enforce the confirmation order, if

11 that's what this motion's are about.  That's not really what

12 they're about.  What we think the main event about, their main

13 motion about, is seeking to ask you to revoke the confirmation

14 order that the Bankruptcy Court entered three plus years ago.

15 With respect to the motion to reopen the case, the first

16 question any Federal Court has to ask itself, obviously, is if

17 it has jurisdiction to hear on that.  And, notwithstanding the

18 laundry list of retention of jurisdiction provisions found in

19 the plan and in the Court's confirmation order, the case law is

20 clear that those provisions don't create jurisdiction if it

21 doesn't otherwise exist in connection with the underlying

22 dispute.  The Court can't write its own jurisdictional ticket

23 is how I think the Appellate Courts referred to that.

24      And, here, I think there's two independent reasons

25 why this Court should not be reopening this case, because there

1  isn't cause, because there isn't jurisdiction at this

2  particular point in time for Your Honor to get into these

3  issues.  And, as Your Honor correctly pointed out, you may

4  never get there.  We certainly hope you do, we certainly hope

5  that there is 600 million dollars to fight over, but we're not

6  there yet.  And, the first reason is the reason that Your Honor

7  stated, as a Federal Court you can't issue advisory opinions.

8  Now, you have to ask yourself, if this Court was the Court to

9  decide that issue in the first place, the Onex defendants

10 raised the issue of the cap on damages and how it intersected

11 with fraudulent conveyance law of this Court's confirmation

12 order, and the like.  They raised that in the first instance in

13 the Georgia Court.  And, the Georgia District Court said, "I'm

14 going to deal with that when and if it's appropriate to deal

15 with a damage award."  And, I would agree with Your Honor that

16 his statement about Bankruptcy principles was dealing with

17 things like principles under Section 548 and 547, and Section

18 550 of the Recovery Provisions, and how he might deal with

19 those things.  But, he correctly I think recognized that that

20 wasn't really an issue that was to be decided on a motion to

21 dismiss and to be decided at that point before liability was

22 determined.  So, I think coming here after the fact I think

23 creates -- if connote's (sic) the correct word when you're

24 dealing with two Federal Courts, it creates a real question

25 about why they had moved the dispute to another forum, and I

15

think that's inappropriate, out of a matter of respect between
the two sister Courts.  But, in addition, I think it also
raises the point that Your Honor made which is that they're
seeking an advisory opinion at this juncture in the litigation.

          I also think that there is a serious question about
the standing of Onex American Holding to file this motion.
Onex American Holding is a party that has filed this motion.
It's not just generally Onex, all four individual directors
that we sued.  They're not here today.  It's Onex American
Holding.  And, the starting point to figure out who can bring a
motion to reopen a case is Rule 5010 of the Federal Rules of
Bankruptcy Procedure.  And, that rule states that a debtor has
a right to seek to reopen a case.  The debtor is not here
asking that this case be reopened, has not joined in this
motion.  And, it indicates that a party in interest may seek to
reopen a case.  Typically, and that Tenth Circuit case that we
cite in our responsive papers talks about the fact that
generally a party in interest is a creditor who has some
dispute that comes up after confirmation that needs to be
addressed with respect to the debtor's Bankruptcy.  They say,
well, they have standing because they were shareholders.  Well,
Onex American Holding dissolved in December of 2002.  They
don't dispute that.  Under Delaware Limited Liability Law,
Section 18203, because they did not condition the effectiveness
of this dissolution on a later date or a later event it was

16

1  gone.  So, it was not a shareholder as of the petition date.

2  It was never a party in interest in these Bankruptcy

3  proceedings.

4        Now, maybe members of that entity somehow succeeded

5  to the equity interests but those members are not here and we

6  don't really have any evidentiary base.  They say it's Onex

7  Corporation, I don't know that for a fact, I speculate it is

8  somebody within the Onex family.  But, I don't know and I

9  haven't seen the papers.  We discovered this dissolution quite

10  after the fact after we had named them out as party, and after

11  they had appeared on their behalf without raising the issue, we

12  then found out about it through some documents that were as I

13  understand it produced in discovery.  So, that entity never

14  existed, wasn't a party in interest at the start of the

15  Bankruptcy case.

16        So then, they say, well, okay, let's just ignore all

17  that and pretend somebody else filed this motion.  We don't

18  think Your Honor should do that, we think that's inappropriate,

19  particularly given the other jurisdictional issues.  But, if

20  Your Honor was to do that and say, "Okay, we'll pretend that

21  this was Onex Corporation that filed this motion or one of the

22  individuals who had some money or equity interest they say at

23  the time of the filing of the Bankruptcy," although I will

24  note, Your Honor, with respect to those four individuals they

25  were not disclosed as shareholders of Magnatrax Corporation on

17

1  the initial filing listing who were the shareholders.  The

2  shareholders were listed as Onex American Holdings, a CIBC

3  entity, and then a teacher's pension fund out of Ontario.  But,

4  in any event, if we pretend they're here, they're no longer

5  here as shareholders, Your Honor.  The Court confirmed a plan

6  that became effective on January 20th of 2004 that extinguished

7  the interests of all shareholders of Magnatrax Corporation.

8  So, they are no longer today an equity holder in this case.

9  So, they can't rest their standing on the status that they no

10 longer had.  And, just parenthetically, in the Bankruptcy --

11 pardon me, in the District Court, when we have pointed out that

12 they were actually the parties managing Onex, they were the

13 sponsors of Onex, they had, you know, claimed that they had

14 nothing to do with it, they weren't really involved.  So, I

15 mean it's interesting that they're taking a different position

16 here.

17        So, if they don't have standing as an equity holder,

18 which I don't think they do, then they must be resting their

19 standing on the fact that they're a defendant in this lawsuit

20 that's pending in Georgia.  And, that's where I think the Tenth

21 Circuit case that we cite, the Alpex Computer case, comes into

22 play.  Because there the effects of that case were that the

23 defendant in a lawsuit was coming into Bankruptcy Court and

24 saying, "Since the disclosure statement described these patent

25 infringement actions and the value of claims in the case" in a

18

1 particular amount, I think it was two million dollars there,

2 "we, Nintendo, we're going to be nice, we're going to toss in

3 3.9 million dollars," and Bankruptcy Judge made them take that.

4 The Bankruptcy Court opened the case but then denied the

5 motion.  When they were on their way up to the Court of Appeals

6 the debtor's estate, the trust struck it rich, they got a 200

7 million dollar judgment out of the New York Court.  They're up

8 in the Tenth Circuit and Nintendo is still arguing, "Well, the

9 Court should have granted our motion," and the Court I think

10 said that they have quite a bit of chutzpah in asking for that,

11 and found that they really did not have standing to come in and

12 reopen the case, and went through I think a fairly careful

13 analysis of why a defendant in litigation with a trust formed

14 out of a bankruptcy doesn't really have standing.  Whatever

15 their rights are to defend themselves, whatever Onex American

16 Holdings, if it has any rights since it doesn't exist, or Onex

17 Corporation, or these other individuals, those rights are being

18 recognized by the District Court in Georgia and they're, you

19 know, very vigorously defending themselves there.  And so, this

20 Court shouldn't be interjecting itself at this point in this

21 (indiscernible).

22        And so, we would submit that there's a jurisdictional

23 problem with reopening the case, and given that we think the

24 motion ought to be denied and we ought not to get to the

25 question of whether what they're asking for today is some form

1  of interpretation of Your Honor's order or as we would submit

2  really a request that you vacate that order and start all over

3  again.  Thank you, Your Honor.

4         THE COURT:  Thank you.  Mr. Kornberg, I assume that

5  your individuals are shareholders because of the dissolution,

6  because that was --

7         MR. KORNBERG:  No, they were actually shareholders.

8         THE COURT:  They were at the time?

9         MR. KORNBERG:  Directly.  Yes, Your Honor.

10         THE COURT:  Okay.

11         MR. KORNBERG:  And, indeed, again, I think to make a

12  big point of the dissolution that took place, it's okay for

13  them -- for Onex American Holdings to be sued for 600 million

14  dollars, it's just not okay for Onex American Holdings to come

15  to this Court and say, "You know, my rights were taken away

16  under Bankruptcy plan because of a record and representations

17  made and now I can't enforce the plan according to the record

18  that was made."  I mean, Your Honor, it really sticks in our

19  craw to suggest that there's no standing because we were at the

20  receiving end of a cram down plan which eradicated those

21  interests based on a very specific record made by not only the

22  debtor but by the creditor's committee, and the same counsel

23  that represents the litigation trust made affirmative

24  representations which enabled the Court to find that a Section

25  1129(b) was complied with.  That was the mechanism that

20

1  resulted in the equity interests, 117 million dollars of them

2  being wiped out.  To suggest that we don't have standing

3  because that was effectuated and now the parties are changing

4  their positions about whether the plan confirmed with cram down

5  is really I think outrageous.  There are many, many situations

6  where after the fact parties in interest are before the Court

7  to make sure that the integrity of the Chapter 11 process is

8  respected and a confirmation order enforced.  That's all we're

9  asking be done here.

10        But, let me also point out that the party in interest

11 cases that were cited most often do involve creditors coming

12 back into court, but we all know that Section 1109 of the

13 Bankruptcy Code does not define party in interest selectively.

14 It includes specifically equity security holders, and that's

15 what we have here.

16        Your Honor, I heard two conflicting things.  On the

17 one hand the trustee apparently believes that the Judge in the

18 District Court in Georgia was concerned about the applicability

19 of Section 548.  Well, if that's the case, and I think Your

20 Honor expressed his view that perhaps that he was going to --

21        THE COURT:  Yes, that was a concern.

22        MR. KORNBERG:  Then the specific question we have

23 here today is not before the Georgia Court.  It hasn't been

24 addressed by the Georgia Court.  We have never gone into the

25 Georgia Court and said, "Please interpret the Chapter 11 plan

21

1  for us."  What we did, so there's no mystery about it, is we

2  filed a motion to dismiss the entire case.  That motion was

3  granted in part and denied in part.

4          THE COURT:  Right.

5          MR. KORNBERG:  We were hoping the whole litigation

6  would go away.  Obviously, that didn't happen.  We are now

7  coming into this Court to say, "Well, there's an aspect of

8  their litigation that is violating, in direct violation of the

9  plan that was confirmed and of the record that was made and we

10 think this Court should be vitally interested in maintaining

11 the integrity of the process," frankly, just the way Judge

12 Walsh did in the forklift case that we submitted to the Court

13 and parties on Wednesday night.  So, we think there can be no

14 question that there is discretion here to open this case and

15 that it should be exercised.  These are vitally important

16 issues in terms of what took place in this Court with respect

17 to a cram down plan.

18          And, we just also add that our interest, and this is

19 not theoretical and it's not premature, for the Onex entities

20 to be facing a 600 million dollar lawsuit, and the

21 extraordinary expense and scope of that litigation, versus what

22 should be properly a 12 million dollar lawsuit, is like night

23 and day.  This would have an enormous practical effect on Onex.

24 But, in any event, Your Honor, we believe that the plan should

25 be enforced.  It's not an advisory opinion to say there's a

22

1  controversy about what the plan means.  And, this is I think

2  under all of the authorities and particularly in the Third

3  Circuit which does have a different view of its retained

4  jurisdiction, there can be no dispute that Your Honor has the

5  jurisdiction to interpret the Court's own orders.  That is

6  <u>Black Letter Law</u> and that's all we're seeking.

7          THE COURT:  And, I don't think the litigation trust

8  is disagreeing with you on that, that this Court has

9  jurisdiction.  I think their issue is the timing and whether or

10 not Onex has the standing to assert.

11         MR. KORNBERG:  Well, as to the standing issue, Your

12 Honor, we were a party directly agreed by the confirmation

13 order.  And, that's the point of time that you should look at

14 this.  There was a record made and specific findings made that

15 said, "Onex, sorry, but because this debtor is hopelessly

16 insolvent and because no creditors are going to be paid in

17 full, you have to give up your stock."  I can't imagine a more

18 aggrieved party by the entry of that confirmation order.  Now,

19 we didn't object to the confirmation because a record was made.

20 We can talk about that a little later in some detail.  But, we

21 certainly were a party aggrieved by the confirmation order, our

22 interests were wiped out.  That's number one.

23         Number two, frankly, Your Honor, we filed a motion to

24 dismiss in the Georgia action, we've already recited what the

25 history was.  If we sit back and do nothing and wait for the

23

1  years that it may take to resolve that litigation and come back

2  into this court, I assure you that the litigation trustee will

3  say what he has already said in his papers, which is it's too

4  late to come back to this Court.  So, Your Honor, we brought

5  this at we think the appropriate time.  It will very much

6  affect the conduct of the litigation in Georgia.  It is not a

7  hypothetical, it's not an advisory opinion.  I can't really

8  fathom the argument that says there may be a plan violation

9  but, you know, we don't have to deal with it now.  I think we

10 do, Your Honor.

11            THE COURT:  Well, I'm going to do something a little

12 bit unusual.  And that is, I'd like you to proceed with your

13 argument as to why this is timely to be brought at this point,

14 your motion.  And, I'm talking about Item Number 2 on the

15 Agenda, which is your motion to enforce the confirmation plan.

16 Because, for example, part of your argument was, you know, if

17 this was a 12 million dollar lawsuit it would be one thing,

18 but, in fact, it may turn out to be a zero dollar lawsuit,

19 depending on what happens in Georgia, in which case all of the

20 consequences of what I might decide on a motion would be

21 meaningless.  At the same time if it's a 600 million dollar

22 recovery it creates a whole different set of issues including

23 perhaps the revocation of the confirmation order and bringing

24 into play other interested parties who might be entitled to

25 share in the recovery.

24

1          MR. KORNBERG:  Your Honor, I don't believe, and I

2     think the trustee has argued this, that the Court has the power

3     to revoke the confirmation order.  I think it is, frankly, too

4     late in the day to do that.  We didn't seek that relief.  I

5     don't know under what theory one could possibly at this point

6     seek revocation.  And, we don't need revocation, what we need

7     is enforcement.  Your Honor, again, how a litigation is

8     conducted, whether it's 12 million dollars at stake versus 600

9     million, it is just day and night.  There is a huge difference.

10          THE COURT:  Well, is there any question in your mind

11     that the litigation trust has the authority to bring

12     litigation?  In other words, from the Court's standpoint what

13     I'm hearing is, "Your Honor, they have the power to bring

14     litigation, they're just not allowed to collect."

15          MR. KORNBERG:  Your Honor, let me put it in my words.

16          THE COURT:  Yes.

17          MR. KORNBERG:  The Court in Georgia has ruled that

18     they can bring the litigation and the debtor's claims were

19     assigned to them.  That's one issue.  The issue then is what

20     are they entitled to recover in that litigation?  And, there is

21     obviously a vast difference.  We say that on the record

22     presented and the plan confirmed it's limited to the allowed

23     amount of the trust beneficiaries, which is approximately 12

24     million dollars.  They say, "No, we," and let me just say that

25     I think what is very, very troubling and another reason why the

1  Court needs to intervene now is after the Chapter 11 case was

2  over, years after it was over, almost two years to the day,

3  they filed a complaint saying, "Only kidding about the gross

4  amount of the claims, we really want 600 million dollars,"

5  which is in our view a clear violation of the confirmation

6  order, a clear violation of the representations that were made,

7  and clear violation of the record that Judge Walsh relied on.

8  So, that the violation that's occurring under the Chapter 11

9  plan is here and now and should be addressed now.  And, we

10 think, frankly, it is the Court's responsibility in the

11 interest of maintaining the integrity of its own proceedings to

12 enforce those orders now under both principles of judicial

13 estoppel and equitable estoppel.

14         So, there is a violation going on now, Your Honor,

15 and I don't think it is fair to Onex to say, "Oh, well, why

16 don't you wait and see how the whole thing turns out in two

17 years."  I don't think that we should be put through the

18 expense and aggravation and uncertainty of having to postpone

19 this to another day when we believe that the plan is being

20 violated now.  And, I hope I will be able to convince Your

21 Honor of that.

22         THE COURT:  Thank you.  Ms. Steege, come back up and

23 again give me the trust's position on the timing.  Here's

24 what's troubling me and perhaps I'm not articulating it very

25 well, but you have a right to bring the litigation.

1            MS. STEEGE:  Yes, Your Honor.

2            THE COURT:  But, we're being told that you only have

3     the right to bring the litigation to recover 12 million

4     dollars.  And, I don't know that it's this Court's -- it's

5     proper for this Court to be telling a Georgia Court that the

6     litigation will be brought but you can only award damages up to

7     a certain amount, and that's what I would be doing.

8            MS. STEEGE:  Yes, Your Honor.  And, what they're

9     really asking you to do is to give them the release that Judge

10    Walsh -- if Your Honor saw, and you mentioned you went through

11    the lengthy appendix, the confirmation transcript was there, I

12    mean, it's a lot of discussion about the releases, and one of

13    the things Judge Walsh really was not that comfortable with was

14    the notion of granting releases in the context of this case

15    where parties really weren't contributing very much for those

16    releases.  And, it was very plainly made clear that the Onex

17    parties were being carved out of any releases, and now they're

18    coming in and they're saying, "We actually really do think

19    we're entitled to that release and we're going to argue that we

20    should get that release by virtue of this plan enforcement,"

21    which we would contend is really revocation of confirmation,

22    modification of the plan, whatever you want to call it, it's

23    changing what the playing was, and a plan that clearly assigned

24    all of the causes of action over this to this trust for

25    pursuit.  Debtor's counsel said it.  We've put it in the trust.

27

1  They can spend their money to investigate it, pursue it, and

2  collect whatever's available.  His words were, "whatever is

3  available."  So, all of this pounding on the table about

4  enforcing their right to only have a 12 million dollar claim

5  brought against them, that is not anything that's remotely

6  close to what is in this plan of reorganization, what was said

7  at the confirmation hearing.  There is no basis under which one

8  would construe what occurred here as some creation by the

9  Bankruptcy Court of a cap on liability or a personal release of

10  Onex's liabilities to the trust, whatever they may be

11  determined to be, by the Georgia District Court.

12          And, I think, Your Honor, all of the table pounding

13  aside about enforcing this plan you have to ask yourself, the

14  lawsuit was filed in May of 2005, they filed a motion to

15  dismiss, they filed several motions to dismiss in the Georgia

16  Court.  The Georgia Court addressed this issue, issued an

17  opinion in September of this past year, 2006.  If this was such

18  a clear violation of the plan and the Court's confirmation

19  order, why have we waited, why have we put the Georgia Court

20  through all of this?  And, in point in fact, they asked the

21  Georgia Court to interpret the plan.  They asked the Georgia

22  Court to find that the confirmation order which created the

23  litigation trust was inappropriate under Section 1129 and 1123

24  because they contended that not all unsecured creditors opted

25  into it, that that somehow voided it and made it inappropriate

28

1    under a variety of cases that they discuss.  Now, the Georgia

2    Court rejected that.  But, they have, in fact, gone to that

3    Court and sought rulings from that Court which would have had

4    the effect of interpreting what this Court has done previously.

5            So, I don't think they're really coming here in a

6    timely manner and saying, "You've got to enforce your order

7    because they've just gone out and done something that we don't

8    like."  Which is what I think gets back to the whole question

9    that Your Honor asked to begin with.  Which is, why are we

10   doing this now?  You really should not be doing it now.

11   Anything you would be doing would be advisory, it would be in

12   effect interjecting into the Georgia litigation, there is a

13   District Court Judge who is presiding over it and making

14   rulings, some for them, some for us, it's how it goes in these

15   things.  And, that's really the Court that ought to get there.

16   And then, at some point we hope hopefully when there is a

17   judgment for the benefit of creditors here, if they really

18   believe that there is an enforcement issue with respect to the

19   plan, they can always bring that back in front of Your Honor.

20   We'll probably have many of the same arguments we have here

21   today, but then at that point it'll be appropriate for Your

22   Honor to decide that from a jurisdictional perspective and Your

23   Honor can have the satisfaction of knowing that what you're

24   doing is actually going to make a difference as opposed to

25   ruling hypothetically about what may or may not come to pass.

29

1            THE COURT:  Thank you, Ms. Steege.  Mr. Kornberg,

2  yes.

3            MR. KORNBERG:  Your Honor, I have just one brief

4  point.

5            THE COURT:  Please.

6            MR. KORNBERG:  And, I'm sorry, I normally don't like

7  to keep popping up.

8            THE COURT:  No, no, I'm fine with it.

9            MR. KORNBERG:  I just want to be clear, we are not

10 asking this Court to tell the Georgia Court to do anything.

11 Let me be very clear.

12           THE COURT:  Okay.

13           MR. KORNBERG:  And, let me also be very clear that we

14 filed, when we filed the motion before Your Honor we filed it

15 with the District Court in Georgia to make sure that the Judge

16 was aware of what we had done.  We're not in any way saying

17 that the Bankruptcy Court should tell the District Court what

18 to do, but we are asking Your Honor to tell the litigation

19 trustee what to do.  And, if we get to the merits of the motion

20 I'll take Your Honor through the litigation trust agreement

21 which makes it very, very, very clear that the plan determines

22 what goes on here, not the litigation trust agreement.

23           And so, we are asking Your Honor to correct a

24 violation that is ongoing by the trustee and to order the

25 trustee to do or not do something.  We're not asking you to

30

1  interfere with the Georgia action.

2        And, finally, Your Honor, I'm not sure I understand

3  the trustee's position.  Are we too early?  Or are we too late?

4  I think in a way it doesn't really matter.  We contend there's

5  a plan violation going on now.  We did try to get rid of the

6  whole litigation.  We filed that motion in Georgia, just to

7  give you a sense of the time frame, we filed our motion to

8  dismiss in August 2005.  They brought -- well, the plan was

9  confirmed in 2003, November 17, 2003.  The litigation trustee

10  waited two years, well not quite two years, waited until may

11  10th, 2005 to bring the Georgia action.  We filed a motion to

12  dismiss on August 1.  The Court didn't rule in Georgia until

13  September of 2006.  And, I don't think, Your Honor, we'd have

14  to be challenging their lawsuit in any multiple jurisdictions

15  at one time but we're here now because the trustee is in our

16  view clearly violating this Chapter 11 plan.  This would not be

17  an advisory opinion nor would it be an improper encroachment

18  upon the Georgia Court's jurisdiction.

19        THE COURT:  So, just to kind of summarize, you're not

20  seeking, clearly, to enjoin the prosecution of the Georgia

21  litigation?

22        MR. KORNBERG:  Clearly not, Your Honor.  In fact, let

23  me be clear that in the notice that we filed with the Georgia

24  Court we said we will conduct that case, it will not interfere

25  at all, discovery is raging.  We will continue with that.  We

31

1 are not trying to enjoin enforcement, we're saying just enforce

2 the plan against the trustee so that when the trustee gets to

3 distribute whatever he may recover it will be the amount of the

4 allowed claims and no more.

5          THE COURT:  But, isn't that the whole point here?

6 The word "when"?  And, when is not now.

7          MR. KORNBERG:  But, Your Honor, they've already said

8 we're too late to seek the relief before Your Honor.

9          THE COURT:  Well, they may say that but I'm not

10 necessarily saying that, in fact, as I've indicated my concern

11 is that you're too early.

12          MR. KORNBERG:  Well, but, Your Honor, I think that

13 the Third Circuit cases are clear that there is an interest

14 that the Court has, aside -- let me just say, the fact that we

15 --

16          THE COURT:  In the integrity of the order.

17          MR. KORNBERG:  Exactly.  And, there is on file an

18 amended complaint by the trustee that says, "I want 600 million

19 dollars from these folks."  That is a violation of the

20 confirmation order, the plan, and the litigation trust

21 agreement.  And, that violation exists today.  The fact that

22 the trustee may not make his recovery for awhile I think is

23 really neither here nor there from the stand point of this

24 Court maintaining the integrity of its orders and its rulings.

25 And, I assure you that we'll have all kinds of complaints later

32

1  on that we waited too long if we don't seek and obtain this

2  relief today.  But, again, it would not interfere with the

3  conduct of the Georgia action in any way.

4          THE COURT:  So, what Onex is basically saying is, "Go

5  forward with the litigation with the understanding that the

6  recovery is limited to 12 million dollars"?

7          MR. KORNBERG:  Correct.  That the recovery is limited

8  by the terms of the plan.  And, to the extent that you think

9  the litigation trustee, that you are not bound by the plan

10  we'll have a Bankruptcy Court order that makes that clear.  It

11  will have a practical effect I think on the litigation in the

12  sense that if the parties believe they're litigating over 12

13  million versus 600 million it may be quite a different lawsuit

14  and the expense may be quite different.  And, I would be

15  lacking candor if I didn't say that that is obviously one of

16  the things that motivates us.

17          THE COURT:  Yes.

18          MR. KORNBERG:  We've had horrific, horrific expense

19  here.

20          THE COURT:  And, I suspected, obviously, that it

21  would -- that part of Onex's concern was the parameters of the

22  litigation and the dynamics and how to settle the case and how

23  to resolve the case short of trial and that sort of thing.

24          MR. KORNBERG:  Clearly.  But, in terms it would be we

25  are not asking for this Court to in any way to restrain the

1  conduct of that litigation.

2          THE COURT:  Thank you, Mr. Kornberg.  Ms. Steege, I'm

3  happy to hear anything further that you would like to state, or

4  nothing.  I mean, I think you've covered the points.  But, if

5  there's anything else I don't want you to feel foreclosed from

6  speaking.

7          MS. STEEGE:  No, Your Honor.

8          THE COURT:  Thank you.  Okay.  I think what I'd like

9  to do because I find it helpful to me, let's take a 15-minute

10  recess and then I can kind of gather my thoughts a little bit

11  and come back.  And, if I'm able to rule I will, and if not

12  then I'll so indicate that we'll proceed with, you know, an

13  under submission ruling.  So, I'll be back in a few minutes.

14  Fifteen minutes.  Let's just say 3 o'clock.  Thank you,

15  counsel.

16                          (Recess)

17          THE CLERK:  Please rise.

18          THE COURT:  Please be seated.  Thank you very much. I

19  appreciate your indulgence because the case has been presented

20  well by both sides and one of my problems and something that I

21  have to guard against I think is that I love to decide things

22  and on occasion I have to be careful not to decide something

23  that I shouldn't and I do think that that is the situation

24  here.  I do think that a decision as to whether or not this

25  case can proceed would be an advisory opinion.  I am troubled

34

by the effect that a 600 million dollar recovery or a recovery

significantly in excess of the dollar amount of the claims of

the beneficiaries of the liquidation trust that a large

recovery would impact the integrity of the plan.

      But, at the same time at this point with a case

proceeding I think it would be an inappropriate interference by

this Court in pending litigation in Georgia.  Having said that,

and ruling that it is inappropriate for the Court to reach the

merits at this time, I do think that under the proper

circumstances the Court would reopen the case to consider the

merits of the arguments that Onex has made.  So, I'm certainly

not foreclosing that.  I am a little bit concerned about the

status of the movant here as a dissolved limited liability

company whose charter in effect has been canceled at this

point.  But, because I'm not addressing the merits at this time

and therefore am not reopening the case at this time for the

limited purpose that Onex sought to reopen it, I don't have to

reach that issue.  But, I wanted to go back and look at the

Delaware Code because I think there are some issues that might

make it difficult if not impossible for the LLC itself to raise

the issues that it has raised in this proceeding at this time.

      So, I mean the Third Circuit has said on occasion,

there is a case, the In Re:  Combustion Engineering case where

the Court said, "You know, people can sue, in effect, but that

doesn't mean that they'll collect."  And, in the

1  <u>Combustion Engineering</u> on case it was addressing indemnities

2  and it wasn't clear at that time in that case that the

3  indemnification provisions would ever be invoked because there

4  had not been a recovery at that time in that case that

5  implicated those indemnities.  And, I think that's the

6  situation that we have here and I'm not trying to avoid a

7  decision, but I think it would be inappropriate for this Court,

8  with litigation pending in the District Court in Georgia, to

9  make a ruling that would impact that case which is properly

10 proceeding at this point.  What impact and ultimate judgment

11 recovery will have on what has transpired previously in this

12 Court and on the confirmation plan and the confirmation order,

13 I think there are some issues that have been raised that

14 interest the Court very much, but this isn't the time for the

15 Court to be making that decision.

16      So, I'm going to at this point deny the motion for

17 reopening without prejudice and I'm going to rule that the

18 merits of the motion to compel the compliance with the plan is

19 not right for adjudication.  And, accordingly, I've leave the

20 parties to proceed with the litigation in the District Court in

21 Georgia, and when and if appropriate to return to this Court

22 for further proceedings.  Any questions?  Okay.  Then I'll

23 issue an order in accordance with the ruling and I thank

24 counsel and we'll stand in recess, perhaps for good, and if not

25 then I'll see you back here.  Thank you very much, counsel.

36

```
 1          ALL:  Thank you, Your Honor.
 2          MR. ITO:  Thank you, Your Honor.
 3          THE COURT:  Thank you.
 4                    * * * * *
 5
 6
 7             C E R T I F I C A T I O N
 8
 9          I, Marlene A. Fattore, certify that the foregoing is
10  a correct transcript from the official electronic sound
11  recording of the proceedings in the above-entitled matter, and
12  to the best of my ability.
13
14  /s/ Marlene A. Fattore        Date:   April 18, 2007
15  MARLENE A. FATTORE
16  J&J COURT TRANSCRIBERS, INC.
17
18
19
20
21
22
23
24
25
```

# TAB 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, | ) | Case No. 03-11402(KG) |
| | ) | |
| Reorganized Debtor. | ) | **Re: D.I. 1762** |

## ORDER RE MOTION OF ONEX AMERICAN HOLDINGS, LLC, FOR ORDER REOPENING CHAPTER 11 CASE FOR LIMITED PURPOSE AND MOTION FOR ORDER ENFORCING CHAPTER 11 PLAN

WHEREAS:

1.      On April 13, 2007, the Court heard argument on the Motion of Onex American Holdings, LLC, for Order Reopening Chapter 11 Case for Limited Purpose (D.I. 1739) ("the Motion to Reopen"); and to a limited extent as it related to the Motion to Reopen, the Motion of Onex American Holdings, LLC for Order Enforcing Chapter 11 Plan (D.I. 1737) ("the Motion to Enforce") (collectively, "the Motions").

2.      The Motions brought by Onex American Holdings, LLC ("Onex") arise from litigation brought against Onex and others by the Trustee for the Magnatrax Litigation Trust ("the Trust"), which was created pursuant to Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (D.I. 478) ("the Plan") and the Order confirming the Plan which this Court entered on November 17, 2003 (D.I. 694)("the Confirmation Order").

3.      The Court entered a Final Decree closing the Chapter 11 case on November 8, 2006 (D.I. 1713).

4.      Under the Plan, causes of action were assigned to the Trust whose beneficiaries include those unsecured creditors who elected to become beneficiaries and who funded the

Trust's expenses by contributing a portion of their distributions under the Plan. The claims in the bankruptcy case of the Trust's beneficiaries total approximately $12 million.

5.    The Trust brought suit against Onex Corporation and affiliates which is pending in the United States District Court for the Northern District of Georgia ("the Litigation" and "the District Court") in which the Trust seeks damages of $600 million.

6.    Onex now seeks to reopen the Chapter 11 case for the limited purpose of enabling the Court to consider the Motion to Enforce, in which Onex argues that the Trust's effort to recover $600 million in the Litigation violates the Plan and the Confirmation Order. The stated grounds for the Motion to Enforce are, in short, that by seeking $600 million in the Litigation, the Trust violates the absolute priority rule since such a recovery would result up to 50 times the Trust beneficiaries' claims when the Plan was "crammed down" on Onex and other equity holders in violation of 11 U.S.C. 1129(b).

7.    The Litigation is proceeding and the District Court issued a lengthy opinion on motions to dismiss whereby the District Court dismissed some counts and sustained others. In connection with the motions to dismiss, Onex and the other defendants contested the Trust's ability to recover in excess of $600 million on behalf of creditors holding approximately $12 million in claims. The District Court ruled that (Opinion at 15):

> Finally, Defendants [Onex] ask this court to rule that [the Trust] is entitled only to recover the amount of injury to the creditors who opted into the [Trust]. This court declines to narrow the case on the issue of recovery at this time. Whether, under bankruptcy principles, a plaintiff representing a class of unsecured creditors has or does not have the right to recover more than the amount of the actual damages of those unsecured creditors is an issue that is better determined after liability issues.

2

8.    Onex does not seek a ruling that the Trust violated the Plan by filing the Litigation but, rather, that the violation consists of its seeking $600 million or an amount in excess of the Trust beneficiaries' claims. However, as the District Court ruled implicitly if not directly, the serious issues Onex has raised may never be ripe for decision because the Trust first must obtain a judgment in an amount Onex believes would violate the Plan. The "if and when" of such a result establishes that a decision on the Motion to Enforce would be premature.

9.    Onex already raised the ability of the Trust to seek an amount in excess of the dollar amount of the Trust beneficiaries' claims with the District Court. It is inappropriate for the Court to interfere with the District Court's disposition of the Litigation

IT IS THEREFORE ORDERED THAT in the exercise of its discretion, the Court denies the Motion to Reopen without prejudice on the ground that the issues Onex raises are not ripe for adjudication. A decision on the Motions would constitute an ill-advised advisory opinion and would interfere with the jurisdiction of the District Court in violation of the principle of comity and contrary to the best interests of justice. *In re Zinchiak*, 406 F.3d 214, 225 (3d. Cir. 2005) (the decision to reopen is within the Court's discretion and an important consideration is the pendency of another litigation).

Dated: April 16, 2007

Kevin Gross, U.S.B.J.

3

# TAB 3

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, et al., | ) | Case No. 03-11402 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 1737** |
| | ) | |
| | ) | |

**MAGNATRAX LITIGATION TRUST'S OBJECTION TO
ONEX AMERICAN HOLDINGS, LLC'S MOTION FOR
ORDER ENFORCING CHAPTER 11 PLAN (DOCKET NO. 1737)**

Richard M. Kipperman, not individually but solely in his capacity as Trustee (the "Trustee") for the Magnatrax Litigation Trust (the "Trust"), respectfully submits his Objection to Onex American Holdings, LLC'S ("Holdings") Motion for Order Enforcing Chapter 11 Plan (the "Motion").

**INTRODUCTION**

The Order confirming the Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan")[1] is more than three years old. In fact, the Debtors' Plan has been completely consummated and the Debtors' cases are all closed. Despite the obvious untimeliness of its Motion, Holdings asks this Court to re-write the plain language of the Plan and create a limitation on the amount the Trust can recover in the causes of action assigned to it under the Plan (as defined in the Plan, the "Assigned Causes of Action"). Holdings' not so thinly-veiled attempt to do an end run around the District Court overseeing the litigation between the Trust and the Onex Corporation defendants ought to be summarily denied for several reasons.

---

[1] The Plan was attached as tab 1 to the appendix to the Motion.

As an initial matter, this Court lacks jurisdiction to consider the Motion because Holdings lacks standing to bring it. Holdings has no standing here for two reasons: (1) Holdings no longer exists as a legal entity and thus has no right to bring a motion in this Court; and (2) assuming Holdings ever had standing because all former equity interest holders of the Debtors (that Holdings now purports to represent) already have received all they are entitled to under the Plan, they have no stake in these cases or in any dispute over how the Plan's provisions relating to the Trust are interpreted or enforced.

But even if the Court glosses over the lack of standing, the Motion should nonetheless be denied for several additional reasons. First, there is no basis for this Court to limit the damage recovery another Court might award to the Trust based upon the Plan because the Plan clearly granted the Trust the ability to pursue the Assigned Causes of Action to their fullest recovery. Second, Holdings has waived any ground for challenging the Plan and the order confirming the Plan (the "Confirmation Order")[2] because it failed to object to the confirmation of the Plan or to appeal the Confirmation Order. Accordingly, Holdings is barred by *res judicata* from raising such challenges. Third, as the Court found in the Confirmation Order, the Plan complied with the absolute priority rule because those unsecured creditors that opted to become beneficiaries of the Trust did not receive more than 100% of the value of their claims on the Plan's effective date by virtue of the Plan's uncapped grant of the Assigned Causes of Action to the Trust. Finally, because neither the Trustee nor the Official Committee of Unsecured Creditors of Magnatrax Corporation (the "Committee") made any representation that limits the Trust's recovery, Holdings' request that the Trust be judicially estopped from pursuing the Assigned Causes of Action in their full, uncapped amount is without merit.

---

[2] The Confirmation Order is attached as tab 2 to the appendix to the Motion.

# BACKGROUND

The above-captioned debtors (the "Debtors") were manufacturers and sellers of pre-engineered metal building and other diversified construction products and services. Prior to their bankruptcies, and at the direction of Onex Corporation (the ultimate shareholder of the Debtors), the Debtors pursued a risky strategy of growth through leveraged buyouts (the "LBOs"). The LBOs were structured to give Onex Corporation the benefit of the Debtors' upside potential, as ultimate shareholders of the Debtors, while limiting its downside exposure by forcing the Debtors to repay the costs associated with those acquisitions. As a result of the large debt-load incurred in the LBOs, the Debtors were unable to sustain their operations during the moderate downturn in the construction market in 2002. (Disclosure Statement p. 41).[3]

On May 12, 2003, the Debtors filed for bankruptcy. Thereafter, the United States Trustee appointed the Committee. Consistent with its duties pursuant to 11 U.S.C. § 1103(c)(2), the Committee investigated potential causes of action relating to the LBOs and ultimately concluded that the Debtors' bankruptcy estates had valid causes of action against Onex Corporation and its affiliates, including Holdings.

To facilitate a reorganization, the Committee supported a plan that assigned the causes of action against Onex Corporation and its affiliates to a litigation trust for the benefit of those unsecured creditors that chose to become beneficiaries of the Trust. Those beneficiaries agreed to have a portion of their distribution given to the Litigation Trust to fund its expenses. This agreement served as the basis for the Plan, which, as confirmed by the Court, provides for: (i) the Debtors to enter into a trust agreement (the "Trust Agreement") creating the Trust (Plan § 4.21(c)), (ii) the Debtors to  transfer to the Trust any and all causes of action that the Debtors

---

[3] The Disclosure Statement is attached as tab 3 to the appendix to the Motion.

may have against Onex Corporation or its affiliates (Plan § 4.21(b)); and (iii) the Debtors to pay to the Trust a portion of the cash distribution that would otherwise have been due to those general unsecured creditors that opted to become beneficiaries of the Trust. (Plan § 3.10(c).)

The Plan also provided for the treatment of the Debtors' equity interest holders. Pursuant to the Plan, "[o]n the Effective Date, all Magnatrax Equity Interests … shall be deemed cancelled and extinguished, and the holder(s) of Magnatrax Equity Interests will not receive any Distribution, or be entitled to retain any property or interest in property, on account of such Magnatrax Equity Interests." (Plan § 3.16.) On November 17, 2003, the Plan was confirmed. (Docket No. 694.) On January 8, 2004, the Debtors established the Trust by executing the Trust Agreement. (Trust Agreement p. 1.) On January 20, 2004, the Plan became effective. (Notice of Effective Date of Plan, Docket No. 847.)

Both the Plan and Trust Agreement describe the rights transferred to the Trust. The Plan directed that, "[o]n the Effective Date, the Magnatrax Debtors shall irrevocably transfer the Assigned Causes of Action to the Litigation Trust, for and on behalf of the Trust Beneficiaries." (Plan § 4.21(b).) The Assigned Causes of Action are defined to include "*all* right, title and interest of the Magnatrax Debtors and the Reorganized Magnatrax Debtors to pursue, litigate, settle or otherwise resolve *any Cause of Action* against Onex Corporation or any Onex Affiliate …." (Plan § 1.20) (emphasis added). The Plan defined Cause of Action as:

> without limitation, *any and all* actions, causes of actions, liabilities, obligations, suits, debts, indebtedness (for borrowed money or in the nature of a guarantee), dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, trespasses, damages, rights, executions, claims (as that term is defined in section 101(5) of the Bankruptcy Code), objections to claims, judgments and demands whatsoever, *whether known or unknown*, choate or inchoate, existing or hereafter arising, *suspected or unsuspected*, in law, equity or otherwise.

(Plan § 1.31) (emphasis added).

The Trust Agreement provided that "the Magnatrax Debtors hereby irrevocably transfer to the Litigation Trust … *all* the right, title and interests of the Magnatrax Debtors in the Litigation Trust Assets, to have and to hold unto the Litigation Trust and its successors and assigns forever." (Trust Agreement § 2.2.)  The Trust Agreement defined the Trust Assets to include the Assigned Causes of Action, as that term was defined by the Plan.  (Trust Agreement § 1.1, Plan § 1.86.)  Furthermore, the Trust Agreement declared that the primary purpose of the Trust is "maximizing the value of the Litigation Trust Assets for distribution … to Trust Beneficiaries."  (Trust Agreement § 2.3.)

This uncapped grant[4] to the Trust of all the Debtors' causes of action against Onex Corporation and its affiliates was clearly what the Debtors and Committee intended and communicated to all parties-in-interest, including Holdings.  As Debtors' counsel explained at the Plan's confirmation hearing:

> [I]n a spirit of compromise, to allow this case to move forward to confirmation on a consensual basis, the parties agreed … there would be certain causes of action … transferred to a litigation trust to be controlled by the litigation trustee who would be nominated by the Creditors' Committee.  And that that litigation trust would be financed by the creditors.  That if they felt there was a cause of action worth pursuing or that they -- if they were willing to contribute approximately 25 percent, roughly, of their distribution to this trust, that they would get the benefit of *whatever* this trust would produce.

(Confirmation Hearing Transcript ¶ 68-69) (emphasis added).[5]

Similarly, the Debtors' disclosure statement (the "Disclosure Statement") provided that "the Litigation Trust is being formed to pursue the Assigned Causes of Action, which represent

---

[4] The only limitation placed on the Trust's ability to pursue the Assigned Causes of Action found in the Confirmation Order, the Plan, the Trust Agreement, or the Disclosure Statement was that the Trust could not recover from parties released by the Plan.  (Plan § 4.21(f).)

[5] The Confirmation Hearing Transcript is attached as tab 7 to the appendix to the Motion.

the rights of the Debtors to pursue and litigate *any* claims against Onex and the Onex Affiliates."

(Disclosure Statement p. 97) (emphasis added).  The Disclosure Statement further provided that:

> The Litigation Trustee will have full authority to take any steps necessary to administer the Litigation Trust Agreement, including, without limitation, the duty and obligation to liquidate Litigation Trust Assets, transfer, sell, dispose of or otherwise resolve or compromise the Litigation Trust Assets, to make distributions therefrom to the Trust Beneficiaries, to pursue and settle any of the rights and claims with respect to the Litigation Trust Assets[.]"

(*Id.* at 103), and, that:

> On the Effective Date, the Magnatrax Debtors will irrevocably transfer to the Litigation Trust, for and on behalf of the Trust Beneficiaries, all of the Magnatrax Debtors' and the Reorganized Magnatrax Debtors' rights and standing to litigate, settle and otherwise resolve the Assigned Causes of Action.

(*Id.* at 104.)

Finally, in its Confirmation Order, this Court reiterated the expansive nature of the Assigned Causes of Action to be transferred to the Trust, stating:

> "[O]n the Effective Date, the Reorganized Magnatrax Debtors will transfer and assign, or cause to be transferred and assigned, to the Litigation Trust, *all their right, title and interest* in and to the Assigned Causes of Action.  The transfers of the Assigned Causes of Action by the Debtors to the Litigation Trust … (a) are or shall be legal, valid and effective transfers of the Assigned Causes of Action, (b) vest or shall vest the Litigation Trust with good title to such Assigned Causes of Action free and clear of all Liens, charges, Claims or encumbrances except as expressly provided in the Plan or this Confirmation Order …."

(Confirmation Order ¶ 7) (emphasis added).

## ARGUMENT

### I.     Holdings Lacks Standing To Seek The Relief Set Forth In The Motion.

This Court should not reach the merits of Holdings' Motion because Holdings does not have standing to bring the Motion for two reasons:  (i) Holdings is not a legal entity, and (ii) if it ever had any interest in these cases, those interests have been extinguished under the Plan.

Holdings was a Delaware limited liability company.  Delaware law provides that "[a] limited liability company formed under this chapter shall be a separate legal entity, the existence of which as a separate legal entity shall continue until cancellation of the limited liability company's certificate of formation."  Del Code Ann. tit. 6 § 18-201.  On December 13, 2002, Holdings filed with the Delaware Secretary of State a certificate of cancellation, canceling its certificate of formation and terminating its existence as a legal entity.  *See* Exhibit A hereto; *see also* Exhibit B (reflecting Holdings' status as a cancelled LLC).[6]  Holdings cancelled its status as a Delaware limited liability company prior to the filing of these cases.  It was not a legal entity at the commencement of the Debtors' bankruptcy and is not a legal entity now.  Because it is not a legal entity, Holdings cannot appear before this Court and bring the instant Motion.  *Olympic Coast Inv., Inc. v. Seipel*, No. 05-36170 , 2006 WL 3431874, *1 (9th Cir. November 29, 2006) ("It is fundamental that a suit brought in the name of that which is not a legal entity is a mere nullity."); *In re Midpoint Development, L.L.C.*, 466 F.3d 1201 (10th Cir. 2006) (where purported debtor, an Oklahoma limited liability company, did not file for Chapter 11 relief until after it had ceased to be a legal entity, its bankruptcy filing was a nullity and subject to dismissal).  Accordingly, the Court should find that Holdings does not have standing and deny the Motion.

Even if Holdings could legally bring the Motion, it still would not have standing to bring this Motion because the adjudication of the Motion, regardless of how the Court rules, will not disturb any of Holdings' rights under the Plan.  "Although bankruptcy courts are not Article III courts, they enforce constitutional limitations on standing."  *In re Tascosa Petroleum Corp.*, 196 B.R. 856, 863 n.5 (D. Kan. 1996); 7 Collier on Bankruptcy § 1109.04[4][a] (Alen N. Resnick &

---

[6] The Trustee discovered the dissolution and cancellation of Holdings after unsuccessfully attempting to serve Holdings with a summons.  Despite Onex Corporation's active involvement in these cases, and the specific reference to Holdings in the Plan, to the best of the Trustee knowledge, Holdings never informed this Court of its dissolved and cancelled status.

Henry J. Sommer eds., 15th ed. 2004) ("[E]ven though section 1109(b) might appear to confer standing on any party in interest in any proceeding in a case, the section cannot be construed in a manner that would violate Article III's case or controversy requirement."). As the Supreme Court explained, Article III's standing requirements have been reduced to three elements:

> First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In this case, Holdings argues that "[a]bsent an order enforcing the Plan, pursuit of the Trust Beneficiaries' hoped-for litigation recoveries would trample upon the rights of Onex Holdings and other equity holders in flagrant violation of the Bankruptcy Code, the Confirmation Order and the Plan." (Motion ¶ 32.) That argument is absurd. No possible ruling on the Motion could effect Holdings' rights as a former equity interest holder of the Debtors.[7] The Plan provides that "[o]n the Effective Date, all Magnatrax Equity Interests … shall be deemed cancelled and extinguished, and the holder(s) of Magnatrax Equity Interests will not receive any Distribution, or be entitled to retain any property or interest in property, on account of such Magnatrax Equity Interests." (Plan § 3.16.) The Plan's effective date was January 17, 2004, and

---

[7] Arguably, Holdings was not an equity interest holder of the Debtors during these cases given that it did not legally exist and could not, therefore, own any property. Del. Code Ann. tit. 6 §§ 18-203, 18-804(a) (providing that the cancellation of an LLC requires the distribution of all of the LLC's assets). When it existed, Holdings was, however, an affiliate of Onex Corporation (Plan § 1.110) and the Trustee assumes that Onex Corporation, which is a defendant in the Trust's pending District Court action, is the real movant here. The fact that Onex Corporation might like this Court to create a defense for it which does not presently exist, however, is not a legally-cognizable right or interest sufficient to create standing for its shill, the now-defunct Holdings.

Holdings' equity interest, if any, in the Debtors has been extinguished.  Holdings no longer has any rights against the Debtors or the Debtors' estates.  As a result, even if the Motion were granted, Holdings would not, and could not, receive any benefit.  The only result would be to reduce recoveries to the creditors that hold beneficial interests in the Trust, and Holdings is not one of those creditors.

On the other hand, if the Motion is denied, Holdings would not be injured in any way, as its interests have long been extinguished.  Indeed, it is quite telling that Holdings does not ask to have the beneficiaries of the Trust expanded to include additional creditors or equity holders.  Instead, it asks that the existing beneficiaries' rights to recovery be reduced.  This interesting request underscores what the real purpose of this motion is -- to provide a defense to Holdings' former affiliate, Onex Corporation -- but it also underscores why Holdings has no standing here.[8]  Because (i) old equity holders' rights have been extinguished and they have no interest in the Trust; (ii) they will not suffer any injury if the Trust is allowed to pursue the Assigned Causes of Action in their uncapped amount; and (iii) any alleged injury cannot be redressed by granting the relief requested in the Motion, Holdings lacks Article III standing to bring the Motion and the Motion should be denied.[9]

**II.    If Granted, The Motion Would Require The Court To Enforce The Plan Contrary To Its Plain Language.**

---

[8] This Court also lacks subject matter jurisdiction to rule on the Motion.  As the court held in *In re Commercial Loan Corp.*, No. 06 A 1530, 2007 WL 756382, at * 5 (March 14, 2007), once an estate asset is transferred to a post-confirmation trust, that asset is no longer property of the estate and subject to the jurisdiction of the bankruptcy court.

[9] It is noteworthy that when the Trust moved to extend its existence, Onex Corporation objected and as this Court noted in overruling that objection, Onex Corporation had no standing to object to the administration of the Trust.  *See* Transcript of 10/19/06 Hearing at 6 (attached hereto as Exhibit C).  The pending Motion ought to be denied on the same grounds.

The Motion should be denied because granting the Motion would require the Court to interpret the Plan contrary to its plain language. The Plan, the Confirmation Order, and the Disclosure Statement all provide that, in cases of any discrepancies, the Plan's terms shall govern. (Plan § 11.19, Confirmation Order ¶ 46, Disclosure Statement p. iii.) As a general principal, Chapter 11 plans are subject to interpretation "according to the rules governing the interpretation of contracts." *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004). Here, the Plan specifically provided that "the rights, duties and obligations arising under the Plan shall be governed by, and *construed and enforced* in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof." (Plan § 11.11) (emphasis added).

> Under Delaware law,
>
> When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning." *E.g., Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). Only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties. *E.g., Citadel Holding Corp., v. Roven*, 603 A.2d 818, 822 (Del. 1992); *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).
>
> In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning. *E.g., Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent some ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it. *Id.* When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented. *Id.*

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

In this case, the Plan is clear, and Holdings has failed to identify any ambiguity. Acknowledging the Plan's clarity on this issue, Holdings tellingly did not cite to the Plan's language granting the Trust the right to pursue the Assigned Causes of Action. The Plan's

language granting the Assigned Causes of Action to the Trust is unambiguous and contains no limit to the amount of damages the Trust may seek. The Plan provided that "the Magnatrax Debtors shall irrevocably transfer" "all right, title and interest of the Magnatrax Debtors and the Reorganized Magnatrax Debtors to pursue, litigate, settle or otherwise resolve" "any and all actions, causes of actions, ... suits, ... sums of money, ... damages, ... executions, ... judgments and demands whatsoever, whether known or unknown, choate or inchoate, existing or hereafter arising, suspected or unsuspected, in law, equity or otherwise" "against Onex Corporation or any Onex Affiliate." (Plan §§ 1.20, 1.31, 4.21(b) (substituting definitions in place of defined terms).)

Contrary to Holdings' allegations, the Plan did not limit the amount the Trust could seek as recovery on account of the Assigned Causes of Action. (*See* Motion p. 14.) Rather, the Plan grants the Trust the Debtors' rights to receive any and all sums of money, damages, executions, and judgments. (Plan §§ 1.20, 1.31, 4.21(b).) The Plan does not limit the recovery to the amount the Committee believed could be recovered at the Plan's confirmation hearing. (*See* Motion p. 22.) Instead, the Trust received rights to any and all known, unknown, suspected or unsuspected causes of action. (Plan §§ 1.20, 1.31, 4.21(b).)

By its Motion, Holdings asks the Court to rewrite the Plan and insert a requirement that "under no circumstance may [the Trust] collect more than the aggregate amount of the Trust Beneficiaries' Allowed Claims." (Motion p. 24.) But if the Court were to grant this relief at this very late date, the Court would not be enforcing the plain language of the Plan, but contravening it. Such an "interpretation" is contrary to the Plan's plain language, and in the absence of any ambiguity, is not permitted.

Moreover, to the extent that the Motion could be read to be a request to modify the terms of the Plan, that request would be untimely. It is well established that after a plan has been substantially consummated, a plan may no longer be modified. 11 U.S.C. § 1127(b). Here the plan not only has been substantially consummated, it has been completely consummated and the Debtors' cases are now closed. Thus, there is no basis at this late date for the Court to modify the Plan's language.

### III. Holdings' Challenges To The Plan's Plain Language Are Waived And Barred By The Doctrine Of *Res Judicata*.

While Holdings couched its Motion as a motion to enforce the provisions of the Plan, the Motion is actually a challenge to the Plan. But having failed to raise any objection to the Plan's plain language at the Confirmation Hearing, or to appeal the Confirmation Order, Holdings has now waived any right it might have previously held to challenge the Plan and its current challenge is barred by the doctrine of *res judicata*.

The case law is well established that "[i]f a [party] fails to protect its interests by timely objecting to a plan or appealing the confirmation order, the [party] is foreclosed from challenging any of the plan's provisions, even if such a provision is inconsistent with the Code." *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004) (quoting *In re Pardee*, 193 F.3d 1083, 1086 (9th Cir. 1999)); *In re Andersen*, 179 F.3d 1253, 1258 -1259 (10th Cir. 1999) ("Absent timely appeal, the confirmed plan is *res judicata* and its terms are not subject to collateral attack. … Although the provision at issue did not comply with the [Bankruptcy] Code, it is now too late for [a party in interest] to make the argument that [it earlier] failed to timely raise."); *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3rd Cir. 1997) ("It is true that 'a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation.'" (quoting *In re Szostek,* 886 F.2d 1405, 1408 (3d Cir. 1989)); *In re*

*Varat Enterprises, Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) ("[F]ederal courts have consistently applied *res judicata* principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order."); *see also In re Travelstead*, 227 B.R. 638, 653 (D. Md. 1998) (holding that party in interest had waived all objections to chapter 11 plan of confirmation on the basis of the absolute priority rule by failing to raise them prior to confirmation of the plan).

Onex Corporation was intimately involved with these cases, the Plan, and formation of the Trust. Through the course of these cases, Onex Corporation had six attorneys from two law firms appear on its behalf. Onex Corporation filed an objection to an early version of the Disclosure Statement (Docket No. 427), and was permitted to include five pages of comments in the Disclosure Statement specifically dealing with the formation of the Trust and the Assigned Causes of Action, which is a greater volume than the Debtors or Committee devoted to the subject. (Disclosure Statement pp. 5, 6, 99-102). Not once did Onex Corporation (or Holdings for that matter) argue that the Assigned Causes of Action must be capped in order to comply with the absolute priority rule. Given Onex Corporation's intimate involvement in the bankruptcy and its failure to object to or appeal from the confirmation of the Plan, Holdings has waived any challenge to the Plan's propriety, and *res judicata* prevents Holdings' current collateral attack on the Plan and the Confirmation Order.

## IV. The Uncapped Grant Of The Assigned Causes Of Action Does Not Violate The Absolute Priority Rule.

Even if Holdings' collateral attack on the confirmed Plan were timely and not barred by the doctrine of *res judicata*, it would still fail as the Plan does not violate the absolute priority rule. The premise of Holdings' argument is that the Trust must be limited to a recovery equal to the claims of the creditors that received beneficial interests in the Trust because if the Trust's

recovery is not so limited these creditors will receive more than the amount of their claims, in violation of the absolute priority rule. (Motion ¶ 39) The fundamental problem with Holdings' argument, however, is that the each of the creditors that opted into the Trust have already received their distributions under the Plan -- a distribution of a percentage of the beneficial ownership in the Trust. *Cf. Commercial Loan Corp.*, 2007 WL 756382, at *5. Under the Code, that distribution had to be valued "as of the effective date of the plan," and not some later future date when the Trust might recover from the Defendants in the pending action. 11 U.S.C. §§ 1129(b)(2)(B)(i) & (2)(C)(i); *see also* H.R. Rep. No. 95-595, 95th Cong., 1st Sess., at 415-16 (1997) (advising that to comply with section 1129(b) of the Bankruptcy Code "the holder of an unsecured claim is not permitted to receive property of a value as of the effective date of the plan on account of such claim that is greater than the allowed amount of such claim").

Indeed, requiring that distributions under a plan be valued as of the effective date keeps the bankruptcy court from having to value property distributed to creditors throughout the property's entire future existence and recognizes that the value of some types of property will appreciate or fluctuate in value. For example, many chapter 11 plans, including this Plan, result in new equity being issued to senior classes. Holdings' method of waiting until property appreciates and then claiming such appreciation causes the plan post-effective date to violate the absolute-priority rule would make such stock plans unworkable. Indeed, granting the Motion could result in Holdings (or unsecured creditors) having the right to demand that the Plan's Class 6 Claimants return a portion of their stock should its value exceed the amount of the Class 6 Claimants' allowed claim.

Indeed, nowhere in its Motion has Holdings attempted to value the Assigned Causes of Action *as of the effective date* of the Plan. To undertake such a valuation requires the

recognition that the Assigned Causes of Action were (and currently are) merely unliquidated claims entirely dependant upon a future successful judgment or settlement and collection and, as such, are contingent assets.   In determining the present value of contingent assets, like the valuation of contingent liabilities, the potential future asset must be discounted to account for the possibility that the future contingency may never occur.  *In re Total Technical Services, Inc.*, 150 B.R. 893, 900-01 (Bankr. D. Del. 1993) ("The court will determine the fair value of Services' assets within a realistic framework, and a contingent liability or asset will be discounted according to the validity and collectibility of the liability."); *In re Taylor*, 228 B.R. 491, 502 (Bankr. M.D. Ga. 1998) (in determining the value of contingent assets and liabilities "the value of such assets or liabilities must be reduced to present value based on the likelihood that the contingency will occur.").   The following explanation from the Seventh Circuit regarding the valuation of contingent liabilities equally applies to the valuation of contingent assets.

> There is a compelling reason not to value contingent liabilities on the balance sheet at their face amounts, even if that would be possible to do because the liability, despite being contingent, is for a specified amount (that is, even if there is no uncertainty about what the firm will owe *if* the contingency materializes). By definition, a contingent liability is not certain- and often is highly unlikely-ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real.

*In re Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir.1988) (emphasis in original).  *See also F.D.I.C. v. Bell,* 106 F.3d 258, 264 (8th Cir. 1997) ("To correctly value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real."); *In re Chase & Sanborn Corp.,* 904 F.2d 588, 594 (11th Cir. 1990) ("It is well established, however, that a contingent liability cannot be valued at its potential face amount; rather, it is necessary to discount it by the probability that the contingency will occur and the liability become real."); *In re Davis*, 169 B.R. 285, 302 (E.D.N.Y. 1994) ("In order to

value a contingent liability, a bankruptcy court must determine the likelihood that the contingency will occur, and multiply the total debt guaranteed by that probability."); *In re WRT Energy Corp.*, 282 B.R. 343, 400 (Bankr. W.D. La. 2001) ("The court concludes that the fair value of a contingent liability is properly determined by multiplying total debt guaranteed by the probability that the debtor would be required to make good on the guarantee.").

In valuing causes of action, courts must consider the likelihood of success, the amount of the potential judgment if successful, and the collectibility of such a judgment. *See, e.g., In re Apex Automotive Warehouse, L.P.*, 238 B.R. 758, 771-72 (Bankr. N.D. Ill. 1999). Furthermore, in valuing property as of a date that has already occurred, courts should not use hindsight because information unknown until later would not affect a property's value on the valuation date. *In re WRT Energy Corp.*, 282 B.R. 343, 400 (Bankr. W.D. La. 2001) ("The court further concludes that this evaluation must be made as of the date of the valuation and without the benefit of hindsight.").

In this case, as this Court found in the Confirmation Order, the Plan was fair and equitable to rejecting classes of interest holders as required by 11 U.S.C. § 1129(b)(1). To the extent that such a holding required the Court implicitly to find that the transfer of the Assigned Causes of Action would not result in unsecured creditors receiving, as of the Plan's effective date, more the 100% of the value of their claims as Holdings argued (Motion pp. 19-20), such a holding was well supported given the unknown scope of the potential causes of action against Onex Corporation and its affiliates.

In fact, according to Onex Corporation's own representations included in the Disclosure Statement, the Assigned Causes of Action were worthless on the Plan's effective date. Onex Corporation stated:

(i) Onex adamantly denies any and all allegations that it is liable in any way whatsoever to the [Magnatrax] Debtors' estates or to creditors or interest holders in the [Magnatrax] Debtors' chapter 11 cases, (ii) Onex declines to provide any for111 of payment under the Plan or otherwise, in respect of any such purported claims, (iii) Onex reiterates that it will vigorously defend against any claims by the Creditors' Committee (or anyone else) arising out of the unfortunate economic circumstances that led to these chapter 11 filings, and (iv) Onex expressly reserves all of its rights, claims and defenses in connection with any such purported claims, including its right to seek affirmative relief against any person that asserts claims that lack factual basis. *For these reasons, no value can he ascribed to the claims asserted by the Creditors' Committee, or to the Litigation Trust or its contemplated recoveries.*

…

*There is no basis for any recovery against Onex or the Onex Affiliates*, let alone the $8 million to $24 million range suggested by the Creditors' Committee.

(Disclosure Statement pp. 99-102) (emphasis added).  Furthermore, Onex Corporation specifically refuted several allegations that might have given rise to liability.  (*Id.*)

Though the Creditors' Committee took a more measured approach to the valuation of the Assigned Causes of Action, it still recognized their contingent nature.  Its statement included in the Disclosure Statement read:

The value of the claims against Onex and the Onex Affiliates is difficult to ascertain with any reasonably certainty because of the amount of discovery and investigation yet to be completed. *Based upon the limited discovery* obtained to date, the Creditors' Committee estimates that the gross amount of claims against Onex and the Onex Affiliates could range from approximately $8 million to approximately $24 million.  Of course, in light of the uncertainty and risks associated with litigation, the amount of the actual recovery on such claims is uncertain. Those Class 9 General Unsecured Creditors (other than a holder of an Insured Claim and a holder of a Senior Lender Deficiency Claim) who elect to fund the Trust will share in the recovery, if any, resulting from the contemplated litigation.

…

Ultimately, the Litigation Trustee will have to further review the potential causes of action and decide whether to commence litigation against Onex.

(Disclosure Statement pp. 98-99, 103 (emphasis added).)

In light of Onex Corporation's representation that the Assigned Causes of Action were worthless, and its intent on doggedly defending itself, the Court was justified in finding a lower probability, as of the Plan's effective date, of a recovery on the Assigned Causes of Action. Accordingly, the Court had ample support to find, by a preponderance of the evidence, *In re Armstrong World Industries, Inc.*, 348 B.R. 111, 120 (D. Del. 2006), that, given the chance of recovery, the value of the Assigned Causes of Action was such that no unsecured creditor was receiving more than 100% of the value of its claim as of the Plan's effective date by virtue of such creditor's receipt of a beneficial interest in the Trust.

## V.    The Trust Should Not Be Judicially Estopped From Pursuing The Assigned Causes of Action In Their Full, Uncapped Amount.

There is no basis for Holding's argument that the Trust should be judicially estopped from pursuing the Assigned Causes of Action in their full, uncapped amounts.  In its Motion, Holdings cited several inapposite cases holding that debtors who fail to fully disclose causes of action as property of their bankruptcy estates are judicially estopped from pursuing such causes of action after their bankruptcy cases have concluded.  Holdings interprets those inapplicable cases to support its incorrect conclusion that because the Committee allegedly failed to fully disclose the nature of the Assigned Causes of Action transferred to the Trust by the Debtor, the Trust and its beneficiaries are estopped from asserting the Debtors' Assigned Causes of Action to their fullest extent.  Holdings is wrong on both the law and the facts.

The cases Holdings cites are based on the fact that prepetition causes of action are rightfully property of a debtor's bankruptcy estates, and that a debtor should not be able to cheat his or her estate out of its rightful property by failing to fully disclose such property during the bankruptcy case.  *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314 (3d Cir 2003); *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.

1988); *Rosenshein v. Kleban*, 918 F. Supp. 98 (S.D.N.Y. 1996); *In re Okan's Foods, Inc.*, 217 B.R. 739 (Bankr. E.D. Pa. 1998). Such cases are not dispositive here for several reasons. First, unlike those cases cited by Holdings, the Assigned Causes of Action in this case were not retained by the Debtors, but rather administered for the benefit of the Debtors' creditors under the Plan through distribution of the Assigned Causes of Action to the Trust. Second, the cited cases impose the disclosure requirement on the plan proponent, and neither the Committee nor the Trust nor the Trust's beneficiaries were proponents of the Plan. Thus, they had no disclosure obligations under the Plan and made no representations in the Plan or Disclosure Statement. *See generally* 11 U.S.C. § 1125. Furthermore, Holdings fails to cite to any cases where a party has been judicially estopped from pursuing a cause of action on account of a representation that the party did not itself make.

Finally, in alleging that "repeated representations were made to creditors, Onex Holdings and this Court that the Assigned Causes of Action were worth approximately $8 million to $24 million[,]" (*see* Motion at 22), Onex Holdings severely perverts the statements of the Creditors Committee. The Creditors' Committee fully explained that:

> [t]he value of the claims against Onex and the Onex Affiliates is difficult to ascertain with any reasonably certainty because of the amount of discovery and investigation yet to be completed. *Based upon the limited discovery* obtained to date, the Creditors' Committee estimates that the gross amount of claims against Onex and the Onex Affiliates could range from approximately $8 million to approximately $24 million. *Of course, in light of the uncertainty and risks associated with litigation, the amount of the actual recovery on such claims is uncertain.* Those Class 9 General Unsecured Creditors (other than a holder of an Insured Claim and a holder of a Senior Lender Deficiency Claim) who elect to fund the Trust will share in the recovery, if any, resulting from the contemplated litigation.
>
> …
>
> Ultimately, the Litigation Trustee will have to further review the potential causes of action and decide whether to commence litigation against Onex.

(Disclosure Statement pp. 98-99, 103 (emphasis added).)  The Committee repeatedly warned that it was providing only a rough estimate of the expected recovery based upon its limited discovery and that further investigation would be required by the Trustee.  Now Holdings, a party which when it was still actually in existence was intimately involved with the fraudulent LBOs and thus, possessed infinitely more information regarding Onex Corporation's potential liability than the Committee could ever have had, argues that they were deceived.  The Committee simply did not make the representations Holdings claimed were made, and the representations it did make clearly indicate that the Assigned Causes of Action had an uncertain value.  Such representations were true and do not provide any basis to limit the Trustee's recovery in Assigned Causes of Action.

To the extent Holdings' Motion can be read to be an attempt to revoke confirmation of the Plan, Holdings' Motion also is without merit.  The Code is clear that a confirmation order may be revoked "if and only if" the order was procured by fraud and the motion to revoke is made within 180 days after the entry of the confirmation order.  Apart from the lack of any fraud, Holdings' Motion is clearly untimely and therefore must be denied.  *See, e.g.*, *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 460 (7th Cir. 1988); *In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 733-34 (D. Del. 2006).

## CONCLUSION

For all of the foregoing reasons, the Magnatrax Litigation Trust respectfully requests that

the Court deny the Motion and grant such further relief as is proper and just.

Dated:  March 20, 2007
      Wilmington, Delaware            CROSS & SIMON, LLC


                          By:   /s/ Christopher P. Simon
                              Christopher P. Simon (No. 3697)
                              913 North Market Street, 11th Floor
                              P.O. Box 1380
                              Wilmington, DE 19899-1380
                              (302) 777-4200
                              (302) 777-4224 Facsimile

                              -and-

                              Peter W. Ito, Esquire
                              BAKER & HOSTETLER LLP
                              303 East 17th Avenue, Suite 1100
                              Denver, CO 80203
                              (303) 861-0600

                              -and-

                              Catherine L. Steege
                              Joel T. Pelz
                              Peter A. Siddiqui
                              JENNER & BLOCK LLP
                              330 N. Wabash Avenue
                              Chicago, IL 60611
                              (312) 222-9350

                              *General Counsel for Richard M Kipperman,*
                              *Trustee of the Magnatrax Litigation Trust*

Exhibit  A

CERTIFICATE OF CANCELLATION
OF
ONEX AMERICAN HOLDINGS  LLC

1.    The name of the limited liability company is Onex American Holdings LLC (the "Company").

2.    The certificate of formation was originally filed on March 23, 1999.

3.    This certificate of cancellation is being filed because the Company has been dissolved by the vote of its Shareholders.

IN WITNESS WHEREOF, the undersigned has executed this Certificate on this _13_ day of December, 2002.

Donald West
Director

Doc #30575497_V2.WPD

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 12/13/2002
020768577 - 3020127

MLT 0128416

# EXHIBIT B

Westlaw.

```
Information Current
Through:

Update Frequency:            As Current As SOS

Source:                      Secretary of State

Search DUNBR to retrieve list of Available Dun & Bradstreet Reports
```

### COMPANY INFORMATION

```
Name:                        ONEX AMERICAN HOLDINGS LLC

Entity Agent Info:

Agent Name:                  UNITED CORPORATE SERVICES, INC.

Agent ID Number:             9001653

Agent Phone:                 877-734-8300

Agent Fax:                   302-734-8961

Address:                     874 WALKER ROAD, SUITE C


                             DOVER, DE 19904
```

### FILING INFORMATION

```
Residency:                   Domestic

Entity Kind:                 Ltd. Liability Company

State of Incorporation:      Inactive Delaware Co.

Date of Incorporation:       03-23-1999

Status:                      Cancelled 12-13-2002

Expiration Date:             Not Available

State ID Number:             3020127

FEIN:                        Not Available
```

### GENERAL COMMENTS & TAX INFORMATION

```
Classification:              General

Tax Information:

Current Tax Estimate as of   03-15-2007 : .00
date:

Tax Area & Code:             Annual L.L.C. Tax
```

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply.

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                          . Case No. 03-11402 (KG)
                                .
                                .
  MAGNATRAX CORPORATION,        .
                                . 824 Market Street
                                . Wilmington, Delaware  19801
                Debtor.         .
                                . October 19, 2006
. . . . . . . . . . . . . . . . . 2:51 p.m.

TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT


APPEARANCES:

For R. Kipperman, Trustee for
Magnatrax Litigation Trust:        Cross & Simon, LLC
                                   By:  CHRISTOPHER SIMON, ESQ.
                                   913 North Market Street
                                   Wilmington, DE  19899

                                   Baker & Hostetler, LLP
                                   By:  PETER W. ITO: ESQ.
                                   303 East 17th Avenue
                                   Denver, Colorado  80203

For Onex Corporation:              Cozen O'Connor
                                   By:  JEFFREY R. WAXMAN, ESQ.
                                   Chase Manhattan Centre
                                   1201 North Market Street
                                   Wilmington, DE  19801


Audio Operator:                    Brandon McCarthy

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

1          THE COURT:  Please be seated.  I really apologize,

2  people, for holding you over.  I didn't anticipate that we

3  started at nine o'clock this morning, I thought we'd be done by

4  noon.

5          MR. SIMON:  Your Honor, when I saw Mr. Demmy and Mr.

6  Werkheiser, I knew I was in trouble.

7          THE COURT:  That's right.

8          MR. SIMON:  We'll keep this short.  I'm here as local

9  counsel and my co-counsel, Peter Ito, is going to take the lead

10 on this, so without further ado, I'll introduce Mr. Ito.

11         THE COURT:  Thank you.  Good to see you.

12         MR. SIMON:  Thank you, nice to see you.

13         THE COURT:  Hello, Mr. Ito, how are you?

14         MR. ITO:   Your Honor, good afternoon.

15         THE COURT:  Good afternoon to you.  Thank you.

16         MR. ITO:  It's a pleasure to be here, Your Honor.

17 Congratulations on your appointment.

18         THE COURT:  Thank you, thank you.  It's good to have

19 you.

20         MR. ITO:  Thank you.  Your Honor, I'm here on behalf

21 of Richard M. Kipperman, who is the Trustee for the Magnatrax

22 Litigation Trust.  We're here specifically to request an

23 extension on the existence of the trust which is currently set

24 to expire on January 20th of 2007.  A matter of a couple

25 months.

3

1          We've asked for a three year extension of that time

2   frame, based primarily and solely on the fact that we do have

3   litigation that is pending in the federal district court in the

4   Northern District of Georgia.  That is litigation commenced by

5   the Litigation Trust against, among other defendants, Onex

6   Corporation.

7          THE COURT:  Yes.

8          MR. ITO:  We drew one and only one objection to a

9   motion which was from the defendant, Onex Corporation,

10  specifically, although they raised many issues, I think at the

11  heart of it, there's really just one issue and that is, are we

12  entitled to a one year extension, are we entitled to a three

13  year extension.  And, Your Honor, from the Trust's perspective,

14  looking at the trust agreement itself, we believe the language

15  is clear, specifically paragraph 12.3 of the trust agreement

16  which says one or more, one year terms, I asked for three

17  years, perhaps I should have asked for three one year terms, I

18  don't think there's really any difference here, Your Honor.

19          In response to the objection that was raised, we

20  don't believe that Onex has any standing to raise an objection,

21  they're not a beneficiary under the trust.  But even if they

22  did have standing to object, there's no prejudice that's going

23  to be suffered here by Onex, or by any other party by extending

24  the existence of the trust and we'd simply ask the Court to

25  grant the motion as requested.

**J&J COURT TRANSCRIBERS, INC.**

4

1          THE COURT:  Thank you, Mr. Ito, I appreciate that.

2 Mr. Wasserman, good afternoon.  Welcome -- Waxman, Mr. Waxman,

3 I'm sorry.

4          MR. WAXMAN:  Good afternoon, Your Honor.  That's

5 quite all right, Your Honor, I know you've had a long day

6 already, so I will try not to wax prolix and I will keep it

7 short.

8          Your Honor --

9          THE COURT:  Do you think you have standing?

10          MR. WAXMAN:  Yes, we do, Your Honor, and, in fact, my

11 understanding, I have not been living the Northern District of

12 Georgia case but I do understand that there have been

13 representations which were made in pleadings down there which

14 agree that we have standing and, further, Your Honor, I believe

15 that based upon the underlying bankruptcy case we have standing

16 to be heard as a party in interest.

17          I don't think that's a significant issue, and I think

18 really, the issue is, as Mr. Ito correctly pointed out, is the

19 reading of Section 12.3 and I think as Mr. Ito said, I think

20 it's pretty clear, based upon the language there, that it is

21 limited to a one year at a time term.

22          Reading it in statutory construction terms, Your

23 Honor, it would have been very simple for the proponents of the

24 trust to say, the court may extend it, and not have any

25 limitation in terms of one year terms or one three year, you

5

1  know, multiple three year terms.  Your Honor, this Court has an

2  obligation to oversee the bankruptcy, including the Litigation

3  Trust and just to make it clear, we are not doing this to be

4  onerous.  If it had been a one year term, it most likely would

5  have been a motion which had a certification of no objection.

6  It's a fairly low standard, it seems, to me reading 12.3 and,

7  again, I have not been living the underlying case, but they

8  just need to show that an extension is necessary for the

9  Litigation Trust to continue the Litigation Trust assets.  It's

10  a fairly simple motion, we're not seeking to come in today and

11  make things too burdensome, but just extend it one year at a

12  time so that this Court can continue to monitor the Litigation

13  Trust and the underlying bankruptcy.

14          THE COURT:  Thanks, Mr. Waxman.

15          MR. WAXMAN:  Thank you, Your Honor.

16          THE COURT:  Here's what I think.  I think that

17  technically, the provision is for one year extensions.  I think

18  it's kind of silly that we're here on this kind of an

19  objection, but at the same time, I don't want to do anything

20  that would somehow prejudice the trust later on and down the

21  line where somebody comes along and says, look, there was no --

22  the Court was wrong to have entered this order making a three

23  year extension an, therefore, they're now acting without

24  authority or something to that effect.

25          I don't think that Mr. Waxman's client has standing,

**J&J COURT TRANSCRIBERS, INC.**

6

1 so what I'm going to do is, I'm going to grant a one year

2 extension, and the way we're going to proceed in the future is,

3 that you will provide me with a brief status report on the

4 case, just, you know, the case is still pending.  I'm not

5 talking about how many depositions and all that sort of thing,

6 with an order and I'll enter the order for the additional one

7 year extensions.

8        It does enable me to maintain some supervision, if I

9 saw something in the status that concerned me, you know, I

10 would call you into court and get a little bit more of a report

11 or find out what the problem might be, but I don't think Mr.

12 Waxman's client has standing in this and that's why -- I don't

13 want to see an objection next year from a defendant in the case

14 objecting on such a basis as this.

15        MR. ITO:  That's fine, Your Honor, and to clarify, we

16 did submit an order but we'll need to revise that order,

17 pursuant to the Court's instructions this afternoon.  What I

18 would anticipate doing, subject to the Court's approval is,

19 obviously, revise the order so it provides for a one year

20 extension, also provides for the submission of a short status

21 report summary as to the ongoing litigation, what's happening

22 there and do so, I would say, sometime about this time next

23 year?

24        THE COURT:  Yes.

25        MR. ITO:  Okay.  So, I'm going to provide for about

**J&J COURT TRANSCRIBERS, INC.**

7

1  approximately 90 days prior to the expiration of the trust, and

2  simply request in that order or status report, for another one

3  year renewal.

4          THE COURT:  Exactly.  And I'm going to put it on my

5  calendar, too, just so between all of us, we won't forget.

6          MR. ITO:  All right.

7          THE COURT:  And I think that's probably the best way

8  to deal with this.  One year at a time.

9          MR. SIMON:  Your Honor, I just also want to make

10  sure, because I have a duty to give Mr. Ito advice, but do we

11  have any notice requirements on that -- do we need to copy

12  anybody on that or just submit it to the Court?

13          THE COURT:  I think you ought to give notice, just to

14  be on the safe side.

15          MR. SIMON:  Okay.

16          THE COURT:  It's going to be a filing with the Court,

17  so give notice and file it, but I'm not going to require a

18  hearing and bring people in from out of town and that sort of

19  thing.

20          MR. SIMON:  Okay.  We'll take care of the notice, I

21  just wanted to -- I don't want to do anything ex parte, but I

22  also don't want --

23          THE COURT:  I appreciate that, thank you for

24  clarifying it.  Yes, Mr. Waxman?

25          MR. WAXMAN:  Your Honor, Jeff Waxman, Cozen O'Connor,

8

1  again, and this is not to beat a dead horse.  My co-counsel is

2  not here and they really, I believe, are more able to address

3  the matters of standing, including res judicata or judicial

4  estoppel, based upon other statements.

5         I will, of course, strongly advise that there be no

6  objection next year, however, I would ask that we reserve our

7  rights to come back to the Court if an issue does arise to

8  clarify our position on the fact that Onex does have standing.

9         THE COURT:  Well, I'll never foreclose anyone, but

10 this was an order of this Court, so I think it's my prerogative

11 to determine who has standing to object or interpose an

12 objection, and if your co-counsel is insistent upon doing

13 something like that, then I can't foreclose it.  But I think

14 they'll be wasting their time.

15        MR. WAXMAN:  I certainly appreciate that, Your Honor,

16 and I will certainly make that known but, I did have to ask it.

17        THE COURT:  And, tell them the Judge might not be

18 happy about it.

19        MR. WAXMAN:  I certainly will, Your Honor.

20        THE COURT:  Okay, thank you.

21        MR. WAXMAN:  Thank you for your time, Your Honor

22        MR. ITO:  Thank you, Your Honor.

23        THE COURT:  Thank you, we'll stand in recess.

24        MR. SIMON:  Thank you, Your Honor.

25        THE COURT:  Good day everyone.

**J&J COURT TRANSCRIBERS, INC.**

9

## CERTIFICATION

    I, ELAINE HOWELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.


/s/ Elaine Howell                    Date:  October 30, 2006

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|                                |   |                        |
|--------------------------------|---|------------------------|
| In re:                         | ) |                        |
|                                | ) | Chapter 11             |
| MAGNATRAX CORPORATION,         | ) |                        |
|                                | ) | Case No. 03-11402 (KG) |
| Debtor.                        | ) |                        |

## CERTIFICATE OF SERVICE

I, Peter W. Ito, hereby certify that I am not less than 18 years of age, and that service of the foregoing Magnatrax Litigation Trust's Objection to Onex American Holdings, LLC's Motion for Order Enforcing Chapter 11 Plan (Docket No. 1737) was made on March 20, 2007 upon the parties listed below in the manner indicated:

*Via FedEx and Electronic Mail:*

Matthew Lunn, Esq.
Joel A. Waite, Esq.
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
mlunn@ycst.com
jwaite@ycst.com

Andrew Kress, Esq.
Kaye Scholer LLP
425 Park Avenue
New York, NY  10022
akress@kayescholer.com

Alan W. Kornberg, Esq.
Maria T. Vullo, Esq.
Paul, Weiss, Rifkin,
    Wharton & Garrison, LLP
1285 Avenue of the Americas
New York  10019
akornberg@paulweiss.com
mvullo@paulweiss.com

*Via Hand Delivery:*

Office of the United States Trustee
844 North King Street, Suite 2207
Wilmington, DE  19801

Mark E. Felger, Esq.
Jeffrey R. Waxman, Esq.
Cozen O'Connor
1201 N. Market Street, Suite 1400
Wilmington, DE  19801
mfelger@cozen.com
jwaxman@cozen.com
(and via Hand Delivery)

      Under penalty of perjury, I declare that the foregoing is true and correct.


Dated:  March 20, 2007

                                                  Peter W. Ito

# TAB 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MAGNATRAX CORPORATION, <u>et</u> <u>al.</u>, | ) Case No. 03-11402 (KG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: 1739** |
| | ) |
| | ) |

**MAGNATRAX LITIGATION TRUST'S OBJECTION TO
ONEX AMERICAN HOLDINGS, LLC'S MOTION FOR ORDER
<u>REOPENING CHAPTER 11 CASE FOR LIMITED PURPOSE (DOCKET NO. 1739)</u>**

Richard M Kipperman, not individually but solely in his capacity as Trustee (the "Trustee") for the Magnatrax Litigation Trust (the "Trust"), respectfully submits the following Objection to Onex American Holdings, LLC's ("Holdings") Motion for Order Reopening Chapter 11 Case for Limited Purpose (Docket No. 1739) (the "Motion"). The Motion asks this Court to reopen these cases for the limited purpose of entering an order to limit the amount the Trust can recover on the causes of action assigned to it under the Fifth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").

**OBJECTION**

The Motion should be denied because: (1) Holdings does not have standing to bring the Motion, and (2) the proper forum in which to resolve the issue is the United States District Court for the Northern District of Georgia (the "Georgia District Court"). Standing to bring a motion to reopen a case is "confined to debtors, creditors, or trustees, each with a particular and direct stake in reopening cognizable under the Bankruptcy Code." *In re Alpex Computer Corp.*, 71

F.3d 353, 356 (10th Cir. 1995).  Furthermore, "[i]n exercising its discretion to reopen, a bankruptcy court should consider whether similar proceedings are already pending in state court as well as make a determination as to which forum-state court or bankruptcy court-is most appropriate to adjudicate the issues raised by a motion to reopen.  *In re Zinchiak*, 406 F.3d 214, 225 (3d Cir. 2005); *see also In re Commercial Loan Corp.*, No. 06 A 1530, 2007 WL 756382, at *5 (Bankr. N.D. Ill. March 14, 2007) (holding that the Bankruptcy Court lacks jurisdiction to rule on motions affecting assets transferred through a plan to a post-confirmation trust).

As is set forth more fully in the Trustee's Objection to Onex American Holdings, LLC's Motion for Order Enforcing Chapter 11 Plan (filed contemporaneously with this objection) (the "Objection to Motion to Enforce Plan"), Holdings lacks standing because (i) it is not a legal entity with capacity to appear before this Court, and (ii) it has no stake in the outcome of the limited issue the Court would be called upon to resolve.  Furthermore, as set forth in the Objection to Motion to Enforce Plan, Holdings, by previously raising the issue of limitations on recovery from the assigned causes of action before the Georgia District Court, recognized that Court as the proper place to resolve this issue.  Holdings' efforts to approach this Court, after the Georgia District Court refused Holdings' requests for the same relief, should be rejected.

Accordingly, for the reasons stated herein and more fully in the Objection to Motion to Enforce Plan, the Motion should be denied.

## CONCLUSION

For the foregoing reasons, the Magnatrax Litigation Trust respectfully requests that the

Court deny the Motion and grant such further relief as is proper and just.


Dated: March 20, 2007
        Wilmington, Delaware            CROSS & SIMON, LLC


                            By: _/s/ Christopher P. Simon_____
                               Christopher P. Simon (No. 3697)
                               913 North Market Street, 11th Floor
                               P.O. Box 1380
                               Wilmington, DE 19899-1380
                               (302) 777-4200
                               (302) 777-4224 Facsimile

                               -and-

                               Peter W. Ito, Esquire
                               BAKER & HOSTETLER LLP
                               303 East 17th Avenue, Suite 1100
                               Denver, CO 80203
                               (303) 861-0600

                               -and-

                               Catherine L. Steege
                               Joel T. Pelz
                               Peter A. Siddiqui
                               JENNER & BLOCK LLP
                               330 N. Wabash Avenue
                               Chicago, IL 60611
                               (312) 222-9350

                               General Counsel for Richard M Kipperman, Trustee
                               of the Magnatrax Litigation Trust

# TAB 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              )   Case No. 03-11402
                                    )
MAGNATRAX CORPORATION, et al.,)
                                    )   Courtroom No. 2
                                    )   824 Market Street
                      Debtors.      )   Wilmington, Delaware 19801
                                    )
                                    )   November 13, 2003
                                    )   2:10 P.M.


TRANSCRIPT OF OMNIBUS and CONFIRMATION HEARINGS
BEFORE HONORABLE PETER J. WALSH
UNITED STATES CHIEF BANKRUPTCY JUDGE


APPEARANCES:

For the Debtors:          Young Conaway Stargatt & Taylor, LLP
                          By:  MATTHEW LUNN, ESQ.
                               JOEL WAITE, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          Wilmington, Delaware 19899-0391

                          Kaye Scholer LLP
                          By:  KEITH MURPHY, ESQ.
                               ANDREW A. KRESS, ESQ.
                               STEVEN WIRTH, ESQ.
                          425 Park Avenue
                          New York, New York 10022-3598

The U.S. Trustee:         Office of the U.S. Trustee
                          By:  DAVID KLAUDER, ESQ.
                          844 King Street
                          Wilmington, Delaware 19899


ECRO:                     Lesa Neal


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**TRANSCRIPTS PLUS**
**435 Riverview Circle, New Hope, Pennsylvania 18938**
e-mail courttranscripts@aol.com

**215-862-1115     (FAX) 215-862-6639**



2

**Appearances:**
(Continued)

| | |
|---|---|
| For the Creditors'<br>Committee: | The Bayard Firm<br>By:  MICHAEL VILD, ESQ.<br>     J.C. FINIZIO, ESQ.<br>222 Delaware Avenue, Suite 900<br>P.O. Box 25130<br>Wilmington, Delaware 19899-5130 |
| For CIBC, as agent: | Potter Anderson & Corroon, LLP<br>By:  LAURIE SELBER SILVERSTEIN, ESQ.<br>Hercules Plaza, P.O. Box 951<br>1313 N. Market Street<br>Wilmington, Delaware 19899-0951 |
| | Clifford Chance<br>By:  MADLYN GLEICH PRIMOFF, ESQ.<br>     WENDY ROSENTHAL, ESQ.<br>Met Life Building<br>Two Hundred Park Avenue<br>New York, New York 10166-0153 |
| For Hanna Steel and<br>St. Paul: | Cross & Associates<br>By:  MARK D. OLIVERE, ESQ.<br>100 N. West Street<br>Wilmington, Delaware 19801-1050 |
| For David Gould: | Cross & Associates<br>By:  RICHARD H. CROSS, JR., ESQ.<br>100 N. West Street<br>Wilmington, Delaware 19801-1050 |
| For GE Capital: | Duane Morris, LLP<br>By:  RICHARD W. RILEY, ESQ.<br>1100 North Market Street, Suite 1200<br>Wilmington, Delaware 19801 |
| | Husch & Eppenberger, LLC<br>By:  CHRISTOPHER J. ROCKERS, ESQ.<br>     MARCUS HELT, ESQ.<br>1200 Main, Suite 1700<br>Kansas City, Missouri 64105 |
| For VicWest: | Richards Layton & Finger, PA<br>By:  REBECCA BOOTH, ESQ.<br>One Rodney Square, P.O. Box 551<br>Wilmington, Delaware 19899 |

3

**Appearances:**
(Continued)

For Kelsey Group:          Ferry Joseph & Pearce, PA
                                   By:   THEODORE TACCONELLI, ESQ.
                                   824 North Market Street, No. 904
                                   Wilmington, Delaware 19899

For the Internal         U.S. Attorney's Office
Revenue Service:         By:   ELLEN W. SLIGHTS, ESQ.
                                   1201 Market Street
                                   Wilmington, Delaware

4

INDEX

AGENDA ITEM                                                    Page

Items 1 and 2                                                   5*
Item 3, Motion for an order approving stipulation with
       Hanna Steel                                              5
Item 4, Motion by the debtors for an order authorizing
       assumption of executory supply contract with BASF        6
Item 5, Motion for relief from stay                             7
Item 6, Sale of Republic Builders                            7/76
Item 7, Sale of Windsor Doors                                7/83
Item 8, Confirmation Hearing                                    8

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| JOSEPH AHEARN | | | | |
| By Ms. Primoff | | 47 | | |

| EXHIBITS | | ID | EVID |
|----------|--|----|----|
| | Affidavit of Joseph Ahearn | 47 | 53 |
| A | Term sheet | 48 | 53 |

*Adjourned to December 17, 2003

5

1           THE COURT:   Please be seated.

2           MR. WAITE:   Your Honor, could we have just one

3   moment?

4           THE COURT:   Yes.

5                       (Pause)

6           MR. KRESS:   Good afternoon, Your Honor.   Andrew Kress

7   from Kaye Scholer on behalf of Magnatrax Corporation and its

8   affiliates as debtors and debtors in possession here.

9           And first, let me start the hearing, Your Honor, by

10  apologizing that we did not get to you sooner than last night

11  the confirmation order, the confirmation affidavit and the

12  confirmation memorandum of law.   I apologize, Your Honor.   We

13  were scurrying to make sure we were close enough with the exit

14  lenders so that we could be here today.   And advise -- so, that

15  set forth in Mr. Ahearn's affidavit that this plan is feasible

16  given where we are with the exit lenders.

17          And, once again, I just want to apologize, Your

18  Honor, for not having got these documents to you sooner rather

19  than later.

20          With respect to the calendar, we have two matters

21  which have been adjourned to December 17th.

22          The next two matters, Your Honor, are uncontested

23  matters with certificates of no objection.   First was a motion

24  to approve a stipulation between the debtors and Hanna Steel

25  Corporation.   That is similar to the stipulations Your Honor

6

1 has already approved in connection with U.S. Steel Corporation,
2 Steelscape, among others, those are the steel vendors of the
3 company pursuant to which the company has agreed to give them a
4 partial treatment of critical vendor status in return for which
5 we would be getting credit terms and continued shipments of
6 steel, which is the primary product of these debtors. And as I
7 said, Your Honor, it is consistent with the other stipulations
8 that have been previously submitted to the Court. There have
9 been no objections filed to that stipulation and I would ask
10 for approval of that, Your Honor.

11          THE COURT:    Okay.   I've already signed it.

12          MR. KRESS:    The second matter for which there was a
13 certificate of no objection was a motion to approve the
14 assumption of a supply contract with BASF Corporation.  That's
15 with respect to the Polymer Division of American Buildings
16 Company, which the Polymer Division basically coats the steel
17 products that Magnatrax and its related entities sells.  And
18 BASF supplies the material for that.  They've agreed to an
19 addenda, an amendment to the pre-petition existing agreement
20 which the debtors believe to be favorable.  The motion sets
21 forth the benefits by the amendment and the fact that this
22 agreement is essential for the continuation of the Polymer
23 business.

24          And, once again, Your Honor, there has been no
25 objections filed to the assumption of that agreement.  I would

7

1 ask for approval on that.

2          THE COURT:   Okay.  I've signed it.

3          MR. KRESS:   The next matter, Your Honor, is -- the
4 first contested matter is a motion for relief from stay.  I
5 believe that matter has been resolved, Your Honor.  And my
6 colleague, Mr. Waite, will address the Court on that issue.

7          MR. WAITE:   Your Honor, Joel Waite from Young Conaway
8 Stargatt and Taylor on behalf of the debtors.

9          Your Honor, we have resolved this matter.  I have a
10 stipulation to present to the Court that essentially lifts the
11 automatic stay to permit Mr. Gould to liquidate his claim in
12 the forum in which it is pending.  It provides any claim he has
13 will be treated in accordance with the plan and also provides
14 that it doesn't affect his rights against other parties that he
15 is suing in that litigation.

16          THE COURT:   Okay.

17          MR. WAITE:   If I may approach?

18          THE COURT:   Yes.

19                          (Pause)

20          THE COURT:   Okay.  Next?

21          MR. KRESS:   Next, Your Honor, is we have two proposed
22 sales.  One, a sale of the Republic Buildings subsidiary, and
23 the second was the sale of substantially all the assets of
24 Windsor Door.  With Your Honor's permission, what I'd like to
25 do is hold those to the end of the hearing and do the

8

1    confirmation hearing first.  Principally because of the rulings
2    of the 3rd Circuit dealing with the 1146(c) application.  So,
3    with Your Honor's permission, I'd like to do the confirmation
4    hearing first if that's all right with Your Honor.

5              THE COURT:  Okay.

6              MR. KRESS:  I would note, though, for the two sales,
7    that there were a number of objections to the debtors' notices
8    of cure.  And the debtor has either reached an agreement with
9    the lessor or the nondebtor party to the executory contract on
10   the cure amount or has elected not to proceed with the
11   assumption and assignment of that agreement and will be the
12   subject of a motion to reject.

13             So, that as a practical note, those were the only
14   objections filed to those two sales, Your Honor.

15             THE COURT:  Okay.

16             MR. KRESS:  With that, Your Honor, the only other
17   matter, I believe, that's on the calendar is the confirmation
18   hearing.  And with Your Honor's permission, I'd like to start
19   that at this time.

20             THE COURT:  Okay.

21             MR. KRESS:  It is almost, Your Honor, six months to
22   the day that we first appeared before you on first day orders,
23   including debtor in possession financing.  And I'm happy to and
24   pleased to report that we're now here six months later with
25   hopefully the emergence from Chapter 11.

9

1          By order of this Court dated September 17th, Your
2   Honor approved a disclosure statement that was filed with the
3   Court and set a voting deadline for October 22nd, an objection
4   deadline of October 22nd, a confirmation hearing originally for
5   October 28 and the mailing of the solicitation packages by
6   September 24th and a publication of the confirmation hearing
7   notice by October 3.

8          As set forth in the affidavit of Jeffrey Stein, who
9   is an Assistant Vice President employed by the Garden City
10  Group, which was sworn on or about October 1, 2003, which
11  affidavit has been filed with the Court, and I would ask the
12  Court to take judicial notice of the affidavit of service.  The
13  disclosure statement, the plan, the solicitation order, which
14  was Your Honor's order of September 17th, the confirmation
15  hearing notice, the letter by the debtors to creditors entitled
16  to vote to encourage them to vote in favor of the plan.  The
17  letter from the Official Committee of Unsecured Creditors
18  likewise encouraging creditors to vote in favor of the plan.  A
19  ballot, an appropriate ballot and a return envelop was mailed
20  to all impaired creditors on or before September 24th, which
21  was the deadline as set forth in Your Honor's September 17th
22  order.

23         For this purpose, Your Honor, in terms of voting,
24  we're focusing on four classes.  Class 6, Class 7, Class 8,
25  Class 9.  Class 6 are the claims of the senior lenders, that is

10

1  the pre-petition secured lenders of the company.  Class 7 is

2  the class of other secured claims.  Class 8 is the

3  administrative convenience class and I'll be going through this

4  in a little more detail later on in my presentation, Your

5  Honor.

6          The convenience class, which are general unsecured

7  creditors who have filed a proof of claim or were listed in the

8  schedules in amount equal to or less than $2,500, and then

9  Class 9.

10         Likewise, as set forth in the affidavit of service,

11 on the same -- on or before September 24th, the disclosure, the

12 plan, a notice of nonvoting status, the confirmation hearing

13 notice and a copy of Your Honor's September 17th solicitation

14 order was transmitted to all known holders of claims and equity

15 interest in the other classes which are principally the

16 priority and administrative expense classes which are Classes 1

17 through 3.  It includes the class of unimpaired creditors by

18 virtue of reinstatement of two bond issuances, we call them the

19 ABCO, A-B-C-O bonds.  And likewise, two classes of intercompany

20 claims, which are not receiving any treatment under the plan,

21 the class of the equity holders of the parent company,

22 Magnatrax Corporation, which likewise will not be receiving any

23 treatment under the plan.  And two classes of subordinated debt

24 who are subordinated in rights to the senior lenders and

25 likewise who will not be receiving any distributions under the

11

1 plan.

2    And as set forth in the certification of public --
3 the certificate of publication of Mike Henley, who is the
4 Principal Clerk of the publisher of the Wall Street Journal,
5 sworn to on or about September 25th. And, again, Your Honor,
6 that affidavit has been filed with the Court and I would ask
7 Your Honor to take judicial notice of that affidavit as filed
8 with the Court.  Mr. Henley swore that the confirmation hearing
9 notice was published in the Wall Street Journal national
10 edition on September 25, 2003, in fact, in advance of the
11 October 3 deadline that Your Honor had set in the September
12 17th order.

13    We then came before Your Honor on October 15th and
14 advised Your Honor that we would need to adjourn the
15 confirmation hearing due to the fact that while the parties had
16 been working diligently to complete the various plan
17 supplemental documents, we were not quite there yet.  And
18 likewise, we were in extensive negotiations with General
19 Electric Credit Corporation who, together with other lenders,
20 will comprise the exit credit -- the exit lenders in this case
21 and we're working diligently with them, as well, in arranging
22 for the exit financing.

23    And, therefore, we requested, Your Honor, that the
24 confirmation hearing be adjourned to today.  That the objection
25 deadline be extended from October 22nd to November 3.  That the

1 last day to vote on the plan would be extended from October
2 22nd to November 6th. And that we would have until October
3 30th to file the plan supplement.

4          As Your Honor entered an order to that effect and as
5 required by that order, we were required to give a notice of
6 the adjourned confirmation hearing, as well as all of the dates
7 by the next day, October 16th.

8          As evidenced by the affidavit of service Gina
9 Ziegler, who is the Senior Project Manager employed by the
10 Garden City Group, sworn to on or about November 5th, that
11 notice was, in fact, delivered to all known holders of claims
12 and equity interest in all of the classes on or before -- on
13 October 16th, 2003.

14          And, once again, Your Honor, I would ask, with Your
15 Honor's permission, to take judicial notice of that affidavit
16 of service which likewise was filed with the Court.

17                              (Pause)

18          MR. KRESS: In accordance with the October 15th
19 order, Your Honor, on October 30th, Your Honor, the debtors did
20 file the plan supplement for the fifth amended and restated
21 joint plan of reorganization. And that plan supplement
22 contained the following documents: A form of the amended
23 certificate of incorporation, form of the amended bylaws, the
24 exit credit facility commitment letter, the new stockholders'
25 agreement, a new term loan facility, a new convertible note.

13

1  And, again, Your Honor, I'll go through the significance of
2  those in the context of the plan later in my presentation.    The
3  Class 9 notes and the related indenture, the new stock option
4  purchase plan, the litigation trust agreement, we designated
5  the initial Boards of Directors of Magnatrax Corporation,
6  revised five-year projections were included principally to take
7  into account the fresh start accounting as -- which the prior
8  projections had not.  And likewise, a designation of the
9  litigation trustee and the schedule of rejected executory
10  contracts.  And as I said, Your Honor, that was filed with this
11  Court on October 30th.

12         In accordance with Your Honor's order of October
13  15th, there have been six objections filed to confirmation.    I
14  am pleased to announce that four of the objections have been
15  clearly resolved.  The fifth one I may need to take a break at
16  some point that's convenient for the Court just to confirm that
17  that one has been settled, as well.  And the last one which --
18  and actually we settled, I should say, five and a half of the
19  objections.  And that is with respect to the U.S. Trustee, we
20  did resolve their objection as it applied to substantive
21  consolidation but have not resolved their objection with
22  respect to the releases to be provided under the plan.

23         If I may suggest, Your Honor, what may be helpful as
24  we go through this is at the end, after we have had our proffer
25  as it applies to the releases, it may make some sense, Your

14

1  Honor, to take a break for a few minutes for us to talk to the
2  U.S. Trustee's representative to see where we go on that
3  objection.

4           THE COURT:  Okay.

5           MR. KRESS:  With respect to the objections, Your
6  Honor, I'm going to take them in a different order than perhaps
7  they are listed on your agenda, mainly because as I understand
8  it, a representative of the United States on behalf of the
9  Internal Revenue Service needs to be leaving here at 2:30.

10          With respect to the Internal Revenue Service, Your
11  Honor, maybe what may be of help, if I may, Your Honor, is we
12  have a black line draft of the confirmation order.  That is
13  black line from the draft you got last night.  If I may
14  approach and bring a -- and provide you with a copy, I'll show
15  you how some of these objections --

16          THE COURT:  Okay.

17          MR. KRESS:  Your Honor, I've handed you the black
18  line draft of the confirmation order, in particular Page 43,
19  because that sets forth the understanding and agreement in
20  resolution of the objection of the IRS.  And basically what it
21  does, Your Honor, is as follows.  The plan originally provided
22  for an interest rate of 4.5 percent with respect to priority
23  tax claims.  One of the objections raised by the Internal
24  Revenue Service was that they felt that they were entitled to
25  the interest rate provided under the applicable Internal

15

1  Revenue Code. We've agreed to that, Your Honor. And that is
2  in little I of Paragraph 48.

3        Number two, they would like -- the plan originally
4  provided for annual payments for the Internal Revenue Service.
5  They wanted quarterly payments. And, again, we accommodated
6  them on that. And that's in double little I.

7        Number 3, Your Honor, they wanted to make sure that
8  nothing in the plan or the confirmation order would adversely
9  effect their ability to exercise their rights of setoff to the
10 extent they have rights of setoff. We've agreed to that, Your
11 Honor, and that's in triple little I in Paragraph 48.

12       Number four, they raise the issue with respect to
13 trust fund taxes and whether or not directors and officers can
14 be released from trust fund taxes. We've agreed to -- as set
15 forth in paragraph little Romanette four of that -- of
16 Paragraph 41 to exclude that from the release. We feel
17 comfortable, Your Honor, that the debtors have been current
18 with all of their trust fund taxes. So, we had no problem
19 agreeing to that, Your Honor.

20       And last but not least, dealt with the resolution of
21 claims that they have filed in these proceedings. And what we
22 have agreed to do, Your Honor, is -- I'm sorry. And, number
23 five, dealing with -- withdrawal that.

24       Romanette number five in Paragraph 48 deals with
25 respect to the anticipated administrative expense claim bar

16

1  date.   And the Internal Revenue Service was concerned that
2  there may have been tax returns not yet filed, which would lead
3  to administrative tax claims, and that somehow they could be
4  forced to file a proof of claim within the period provided in
5  the plan.   And we've agreed with them that if we haven't filed
6  a post petition tax return yet, they have until 90 days after
7  the filing of such return to file their administrative expense
8  claim, notwithstanding the provisions in the plan dealing with
9  administrative expense claims and which are set forth in the
10 plan.

11         And last but not least, Your Honor,  we talked about
12 -- there was a concern with respect to the process for
13 objecting to claims.   And what we've agreed with the IRS, Your
14 Honor, is that with respect to claims they have filed with --
15 in accordance with the prior bar date, they -- and with respect
16 to refunds that the debtors had received, we will not commence
17 an objection proceeding with respect to those refund claims
18 prior to the earlier of the completion of their internal review
19 and audit process, which they are currently undertaking or
20 January 1, 2005.

21         And likewise, as a result, that is an exception to
22 the deadlines set forth in Section 6.1 of the plan.   And with
23 that, Your Honor, I believe that fully resolves the objection
24 of the Internal Revenue Service.

25         Counsel is here and maybe for the record she can so

1  confirm.

2         MS. SLIGHTS:  Good afternoon, Your Honor.  Ellen
3  Slights on behalf of the Internal Revenue Service.  Thank you
4  very much, Your Honor, for taking this objection out of order.

5         Mr. Kress is correct.  The insertion of language into
6  the confirmation order moots the IRS's objection to the plan.

7         THE COURT:  Okay.

8         MS. SLIGHTS:  Thank you, Your Honor.

9         MR. KRESS:  The next one I'd like to address, Your
10 Honor, if I may, is the objection that was filed by St. Paul
11 Fire and Marine Insurance Company.  They are the providers of
12 insurance to the debtors in a multitude of areas, and have been
13 for a number of years.  Those insurance policies are backed by
14 letters of credit which had been issued by the senior lenders,
15 that is the pre-petition lenders under the pre-petition
16 agreement.  And likewise, there was, I believe, one or more
17 letters of credit issued after the filing of the Chapter 11 by
18 the debtor in possession lenders to secure insurance.

19        What we have agreed to do with St. Paul, and they
20 have agreed, is that the plan already provides that we are
21 assuming and reinstating all of the insurance programs we have
22 with St. Paul.  And we had represented to St. Paul that, in
23 fact, the letters of credit were also expected to ride through
24 the Chapter 11 so that they would still have the letter of
25 credit protection.  And in order to confirm that, Your Honor,

18

1 we have entered into a stipulation with St. Paul.  And if I
2 may, Your Honor, hand up an original and a duplicate original.
3                THE COURT:    Okay.

4                MR. KRESS:    Now, there are some technical aspects of
5 the letters of credit which we will need to address between now
6 and the effective date, mainly because -- especially with
7 respect to the debtor in possession letters of credit as the
8 debtors in possession will be paid in full under the DIP
9 facility.  Their letters of credit will either be backed with
10 letters of credit under the exit or that they will actually --
11 the exit lenders will replace the DIP lender letters of credit.

12                Likewise, depending upon the effective date, we may
13 have some pre-petition letters of credit, which -- and for the
14 most part, these are evergreen letters of credit, Your Honor.
15 And if you don't give notice 30 days before the intended
16 expiration date that you are not renewing, they automatically
17 renew.  And the problem we may have -- and it's, again, a
18 technical problem -- is that because the pre-petition letters
19 of credit will be governed by the new credit agreement with the
20 senior lenders, and that doesn't become effective until the
21 effective date, we may have a timing issue which we'll work out
22 with St. Paul.

23                But the idea being that St. Paul will have the same
24 letter of credit protections that they currently have right
25 now.  And that's basically what the stipulation provides, Your

1 Honor.  And if I just quickly may summarize it for the record,
2 Paragraph 1 reaffirms what the plan already says, which is that
3 we are assuming all of the policies in agreement.

4            Paragraph 2, we are going to pay the ordinary course
5 of business in accordance with the terms of the policy and
6 agreements.  We've had that relief, Your Honor, as part of one
7 of our first day orders that Your Honor signed.  I believe it
8 was on May 14th.

9            And then likewise, Paragraph 2 also reaffirms that
10 there's nothing in the plan of a confirmation order that's
11 going to modify their insurance policies, which is a correct
12 statement of what the plan provides.  And that the last part of
13 Paragraph 2 deals with the continuation of the letters of
14 credit.  And as Your Honor may note in that third sentence, we
15 talk about and represent that the letters of credit, which are
16 defined as the outstanding letters of credit, shall remain in
17 place after the effective date in accordance with their terms
18 or shall be replaced by new letters of credit.  And, again,
19 that's to deal with the timing issue, Your Honor, and to deal
20 with letters of credit issued by the post petition lenders.

21            And with respect to cure amounts in the next
22 paragraph, again, we'll pay those in the ordinary course for
23 those that have yet to be invoiced, and obviously both parties
24 reserve their rights with respect to those amounts.

25            And last but not least, nothing -- again, a

20

1  reservation of rights, Your Honor, in terms of any claims of
2  defenses either party may have under the policy.  And that's in
3  sum and substance the stipulation which we have entered into
4  with St. Paul, Your Honor.

5       That, likewise, resolves their objection, I believe
6  counsel for St. Paul is here and can confirm that, as well.

7       MR. OLIVERE:  Good afternoon, Your Honor.  Mark
8  Olivere with Cross and Associates for St. Paul.

9       The recitation of the facts are correct and that does
10 resolve our issues.

11      THE COURT:  Okay.  Do you want this entered as an
12 order?

13      MR. KRESS:  How do we have it set up?  We just have
14 it as a stipulation?  Yes, I think --

15      THE COURT:  Well, it's captioned stipulation and
16 order.  But there's not a so ordered.

17      MR. KRESS:  Your Honor, if you can -- I apologize.
18 If you --

19      THE COURT:  Okay.

20      MR. KRESS:  -- could pen that in.  I thought it was
21 there but --

22                    (Pause)

23      THE COURT:  Okay.  Next?

24      MR. KRESS:  Okay.  Next, Your Honor, is -- there was
25 an objection filed by Fowler Energy Corporation.  And the

1 objection was really with respect to the schedule of contracts
2 to be rejected. One of which was a contract pursuant to which
3 Energy Fowler was to provide certain services which hopefully
4 would result in energy savings for the -- I believe it was the
5 Polymer -- again, the Polymer Division of American Buildings
6 Company. And -- which we took to mean really more that -- of
7 an objection to the rejection itself.

8      What we've agreed with Fowler is that we will remove
9 that contract from the schedule of contracts to be rejected,
10 file a motion to reject, they'll have a right to respond and
11 then your Court will make that decision. And we intend to have
12 that on for the next omnibus hearing date, which I think is
13 December 17th, Your Honor.

14      THE COURT: Okay.

15      MR. KRESS: And with that, if I may hand up an
16 original.

17           (Pause)

18      MR. KRESS: I apologize, Your Honor. Hopefully I'm
19 resolving -- we're in the process of resolving one last
20 objection.

21      Next, Your Honor, Highland Capital, which was a
22 member of the senior lender group had filed an objection
23 asserting a number of points, one of which the major point was
24 that they had not themselves agreed to waive their Class 9 -- a
25 distribution under the Class 9 since they have a lender

1 deficiency claim.  That objection, Your Honor, has been
2 withdrawn and it has been filed with the Court and I would ask
3 the Court to ask judicial notice of that withdrawal.

4         The only thing Highland Capital was provided is that
5 they were able to nominate a member of the new Magnatrax
6 Corporation Board of Directors.  And when I get to a summary of
7 the plan, I'll indicate to Your Honor where there was that one
8 change from that which was filed with the plan supplement on
9 October 30th.

10        Your Honor, with respect to the objection filed by
11 VicWest Corporation, maybe what we can do is come back to that
12 because I think there's just one issue that I believe the
13 senior lender's counsel will need to think about and get back
14 to us.  But if that issue is resolved, then the objection is
15 resolved.

16        So, if I may, Your Honor, if we can come back to
17 that, I would ask for Your Honor's indulgence on that.

18        THE COURT:  Okay.

19        MR. KRESS:  And with that, as I said, we have the
20 objection filed by the United States Trustee, it was a three-
21 prong objection:

22        First, they objected to substantive consolidation.
23 We have included -- and I will indicate where, Your Honor --
24                        (Pause)

25        MR. KRESS:  In Paragraph 28, Your Honor, on Page 33

23

1  of the black line of the confirmation order I handed you, there
2  was new language included at the request of Ms. Harrison on
3  behalf of the U.S. Trustee's Office.  And basically what she
4  wanted to protect against was that in the event of the
5  substantive consolidation, that they would not be precluded,
6  the U.S. Trustee's Office, from asserting an entitlement to
7  assess and collect quarterly fees from each individual debtor.

8          THE COURT:  I'm sorry, what paragraph?

9          MR. KRESS:  I'm sorry.  It's Paragraph 28, Page 33,
10  Your Honor.

11         THE COURT:  Okay.  I have it.

12         MR. KRESS:  Until the cases are closed.  And what we
13  have so provided on language that was agreed to by Ms. Harrison
14  was that nothing contained in the confirmation order shall
15  preclude the U.S. -- the United States Trustee from asserting
16  their entitlement to assess and collect quarterly fees from
17  each of the debtors until their respective Chapter 11 cases are
18  closed.  And I believe that satisfied that prong of their
19  objection which left the second prong of their objection, the
20  releases, which we'll address later in the presentation.

21         And the last one was to clarify -- and I'll represent
22  to the Court on the record that clearly nothing in the plan or
23  the confirmation order was meant to preclude the United States
24  Trustee from being able to object to any professional fees,
25  including final fee applications.

24

1          The provision in the plan specifically states that
2  all parties in interest have the right to object, and clearly
3  the United States Trustee, Your Honor, is a party in interest
4  for that purpose.  And there was no intent whatsoever to
5  preclude them.

6          And I think that would resolve their third prong, so
7  that just left the releases there, Your Honor.

8          Your Honor, that deals with all of the objections up
9  to now.  As I said, we'll circle back on VicWest and hopefully
10 be able to tell the Court that that objection has been
11 resolved, as well.  And then at the end of my presentation,
12 Your Honor, then we can deal with the releases why the debtors
13 believe that there is a sufficient factual predicate here for
14 the releases provided in the plan, given the plan structure, as
15 well as the settlement, which resulted in this plan.

16         Next I would like to address, Your Honor, is that
17 pursuant to the October 15th order, the last day to vote on the
18 plan was November -- was November 16th.  A voting reporting has
19 been filed by Jeffrey Stein, who is, again, the Assistant Vice
20 President of the Garden City Group which certifies the
21 methodology for the tabulation of votes and the results of
22 voting with respect to the fifth amended plan of
23 reorganization.  That is in Binder, I believe -- that is
24 Exhibit I in Binder -- we call it Number 5, it's probably the
25 smallest binder you have.

1         (Pause)

2    MR. KRESS:  It's 8K in your agenda binder.

3         (Pause)

4    THE COURT:  Okay.

5    MR. KRESS:  And, again, Your Honor, this declaration

6 has been filed, it was filed with the Court yesterday and I

7 would ask Your Honor to take judicial notice of the

8 declaration.

9    THE COURT:  Okay.

10    MR. KRESS:  The declaration sets forth the voting

11 results in two different manners.  First, it sets forth the

12 voting results on those ballots which were deemed valid in

13 accordance with the procedures set forth in Your Honor's

14 September 17th disclosure statement approval order,

15 solicitation order.  And then at the end of the certification,

16 Mr. Stein then declares what the results would have been had

17 all of the invalid ballots been included for the voting

18 purposes so that there would be no -- so, that it would not

19 matter, Your Honor, whether it was valid or invalid from that

20 point of view since those -- since even if the invalid ballots

21 counted, it would not make any difference and, in fact,

22 probably improve the voting results.  And I'll go through that,

23 Your Honor, in a minute.

24    I am happy to report there was an overwhelming

25 acceptance of the plan by the four voting classes.  First, with

1  respect to Class 6, which are the senior lenders on their
2  secured claims under their pre-petition credit agreement, 22
3  lenders voted, all voted in favor of the plan, so we had 100
4  percent acceptance by number.  And the total amount of claims
5  represented by the senior lenders was 68 -- approximately $68
6  million, Your Honor.  Again, 100 percent acceptance by dollar
7  amount, as well.

8        Just as a footnote, Your Honor, for purposes of the
9  senior lenders, their claims were bifurcated between their
10 secured claim, which was based on the valuation analysis
11 performed by Chanin and Company, which is fully disclosed and
12 set forth in the disclosure statement.  And then the balance of
13 their claim was classified as a senior lender deficiency claim,
14 a Class 9 claim.  And when I go through the plan, Your Honor, I
15 will make note of the fact that the senior lenders agree to
16 waive any distribution on account of their Class 9 senior
17 lender deficiency claim.

18        With respect to Class 7, which was the other secured
19 creditors, three creditors voted, all in favor of the plan,
20 again, 100 percent acceptance.  And those three creditors'
21 claims totaled $561,000 approximately.  And, again, you have
22 both 100 percent acceptance, both by dollar amount, Your Honor,
23 and by number.

24        Class 8 claims, Your Honor, were as indicated
25 earlier, are the general unsecured creditors who have claims of

27

1 $2,500 or less as set forth either in their proof of claim or
2 in the schedule -- in the schedules filed with the Court.

3    Four hundred thirteen -- I'm sorry -- 552 of the
4 Class 8 creditors voted in favor of the plan, 23 voted against.
5 That results in an acceptance by number of 96 percent, Your
6 Honor, with a four percent rejection rate. But perhaps even
7 more significant is when you look at the dollar amount that
8 those claims represented, four hundred -- approximately
9 $414,000 of claims accepted in Class 8, which was 96 and a half
10 percent acceptance, and only $15,000 of Class 8 claims
11 rejected, which is three and a half percent by dollar amount.
12 Again, an overwhelming acceptance by Class 8.

13    Class 9, Your Honor, as I indicated was the general
14 unsecured creditor body. And, once again, the acceptance here
15 was overwhelming. In terms of number of claims, 329 Class 9
16 claims accepted the plan, which represented approximately 93
17 percent acceptance. Only 25 rejected the plan, which is
18 approximately seven percent in number.

19    But dollar amount, likewise, Your Honor, is
20 overwhelming. Over 62 million of the 329 creditors who voted
21 in favor of the plan, that translated into over 60 --
22 approximately $62 million of dollar amount of claims accepting
23 the plan, which is 98 percent by dollar amount. And in terms
24 of the 25 who rejected the plan, Your Honor, that translates
25 into approximately $1,200,000, which is 1.87 percent of the

1  total dollar amount of claims that voted in Class 9.

2      And, therefore, Your Honor, it is clear that the four
3  impaired classes have overwhelmingly accepted the plan.   In
4  terms of whether or not there are any insiders within those
5  classes, clearly Class 6, Your Honor, the senior lenders do not
6  have any insiders.  And, therefore, there's at least one
7  impaired class that has accepted the plan according to the
8  certification without the inclusion of insiders.

9      Now, what about the ballots that were not accepted,
10 Your Honor.  And apparently -- approximately 132 ballots were,
11 in fact, being invalid pursuant -- in accordance with the
12 procedures that Your Honor approved on September 17th.  As
13 indicated in Mr. Stein's affidavit, 102 of these ballots were
14 invalidated because they were superseded by subsequently filed
15 valid ballots.  So, in that case, there was -- those creditors
16 did have a right to vote, it's just that they voted twice.

17     With the exception of one ballot in Class 8 that
18 rejected the plan, but then was superseded by their acceptance
19 of the plan in Class 9.  And Mr. Stein has concluded that if
20 these superseded process ballots had been processed as valid,
21 obviously the vote by numerosity, number of creditors in dollar
22 amount, the acceptances would have been much higher for Classes
23 6, 8 and 9.

24     Ten of the ballots, Your Honor, that were invalidated
25 were on the grounds they were unsigned.  All ten of the ballots

1  were for acceptance of the plan.  So, once again, Your Honor,
2  if those were to be accepted as validated ballots, the Class 9
3  vote would even have been higher for acceptance of the plan.

4         And last but not least, Your Honor, 19 ballots were
5  received after the voting deadline.  One ballot in Class 8,
6  which accepted the plan, 17 ballots in Class 9 that accepted
7  the plan in the amount of almost $58 million and one in the
8  amount of $3 million, which did not accept the -- did not
9  indicate either an acceptance or a rejection of the plan.  So,
10 even if you deem that to be rejected, Your Honor, given the
11 numbers we're talking about, your Class 9 vote would have been
12 even higher than what the result was by validated ballots.

13         And finally, Your Honor, there was one ballot in
14 Class 8 that neither said yes nor no.  Even if you deem that
15 one rejected, Your Honor, it would not have changed the voting
16 results for Class 8 in any material respect.

17         And, therefore, Your Honor, whether you just include
18 the validated ballots or you even include the invalid ballots,
19 in either case, Your Honor, as set forth in Mr. Stein's
20 affidavit, this plan has been overwhelmingly accepted by the
21 four impaired classes of creditors.

22         Yesterday, Your Honor, the debtors filed with this
23 Court a modification to their fifth amended and restated plan.
24 That is Exhibit 8L in your agenda binder.  And if I may, Your
25 Honor, I will summarize for the record the modifications that

1 have been made. What we have done, Your Honor, where we have
2 changed the provision of the plan, we've put the full provision
3 of the plan there and indicated where the change -- and I will
4 indicate where the changes were, Your Honor.

5        First, Your Honor, the first change was made to
6 Section 1.37 of the plan, which is the definition of Class 9
7 final distribution percentage. And that, Your Honor, was to do
8 nothing more than clarify that we were excluding -- that was to
9 include, I think, the words "final Class 9 distribution date,"
10 Your Honor, was the only change that was made there.

11        In Section 1.39 of the plan -- yes, that is correct,
12 Your Honor, the only change made in 1.37 was to add the words,
13 "On the final Class 9 distribution date" at the beginning of
14 that paragraph.

15        In Class -- in Section 1.39, we added a new
16 subsection, Romanette -- what we added, Your Honor, was a
17 reference to a Romanette 3 in the fourth line from the top of
18 the second page, Your Honor, where we talk about payments made
19 under Section 310(a)(2) and 310(a)(3) was newly added because
20 we added a new provision, Your Honor, which is in the next
21 modification, which is in Romanette 3 on the third page, Your
22 Honor, that is all new.

23        The reason for this change, Your Honor, is that there
24 was some ambiguity. Let me withdrawal that, Your Honor. The
25 plan provides two forms of payments in this section. First,

1  Your Honor, was a pro rata share of approximately $300,000 in
2  cash on the initial distribution day.  And then $4.7 million of
3  notes, which would be issued on the final distribution date.

4       The plan -- the contemplation was, Your Honor, that
5  it was unclear when the final Class 9 distribution date would
6  occur.  Because that required all disputed Class 9 claims to be
7  reduced to an allowed amount or disallowed in full, whatever
8  the case may be, before we would issue the notes given that,
9  you know, the size of the notes we're talking about.  And there
10 was some ambiguity, Your Honor, that if you had your final
11 distribution date prior to the third anniversary, because this
12 was a three-year note, Your Honor, with equal payments bearing
13 interest, if you had your final distribution date prior to the
14 third anniversary, when you issued the note at that point, does
15 that note include only the future anniversary payment or does
16 it also include all catch-up payments because your claim had
17 been disputed at the beginning, became allowed, you had not
18 received a catch-up payment yet, did you get your catch-up
19 payment in a note or cash.

20       And the agreement with the unsecured creditors was
21 they got it in cash.  The only thing the note was to represent
22 was the future anniversary payments.  And that is why we
23 included Paragraph -- triple I, Your Honor.  That when the
24 final distribution occurs prior to the third anniversary, the
25 second anniversary date, that any catch-up payments would be in

32

1 cash and the note would only be the future anniversary. And
2 likewise, Your Honor, the plan had already provided that if it
3 turned out the final distribution date was after the third
4 anniversary, it would be an all cash payment under the plan and
5 we would not issue any Class 9 notes.

6 THE COURT: When you say catch-up payments, you mean
7 payments --

8 MR. KRESS: Well, yeah --

9 THE COURT: -- which were money put in reserve for --
10 MR. KRESS: Yeah, we're really talking about disputed
11 claims. Exactly, Your Honor. We're talking about disputed
12 claims because they will be allowed at various points
13 presumably. They will be entitled to a catch-up payment. At
14 least that was our understanding it would be in cash. There
15 was some question of whether that had to wait until you got a
16 note, and that would be included in a note. But it was clearly
17 not the -- the agreement was it would be a cash payment, Your
18 Honor.

19 THE COURT: Okay.

20 MR. KRESS: I would like to skip, if I may, to
21 Paragraph 7, which is on the last page of the modification and
22 I'll go back to Paragraph 4, 5, and 6 because they all have the
23 same common theme, Your Honor. Paragraph 7 was to do two
24 things, Your Honor. As a result of the entry of the October
25 15th order, which would delay confirmation hearing from October

1 28th to November 13th, today, that necessitated a change in two
2 provisions of the plan. The first change was that there was a
3 condition precedent to confirmation that the confirmation had
4 to be entered no later than, I believe, it was October 29th in
5 the original plan.

6 Since we were adjourning the confirmation hearing to
7 today, obviously we could never meet that condition. So, in
8 Paragraph 8.1, we simply changed the -- I think it was October
9 29th to tomorrow for the entry of the order as a condition
10 precedent.

11 Likewise, as a condition to the effective date,
12 assuming we had an October 28th confirmation hearing, we had
13 provided for a November 14th effective date.

14 Given the fact we are confirming today, Your Honor,
15 we're not going to have an effective date tomorrow. We have
16 adjusted that to November 24th.

17 However, Your Honor, I should alert you that -- and
18 this provision, by the way, can be waived by the requisite
19 parties if there's a need to delay the effective date.

20 I will tell you today, Your Honor, it is highly
21 unlikely we will make the November 24th effective date. The
22 Creditors' Committee, the senior lenders are all aware of that,
23 Your Honor. A lot of it deals with the timing of sales of the
24 Windsor business, whether that will occur this year or next
25 year.

1           So, that it is likely, Your Honor -- more likely than
2   not that the effective date will occur either later this year
3   or, at the latest, hopefully the end of January.  And, again,
4   that's going to be tied to the timing of the closing of the
5   Windsor deal.  But at a full disclosure, Your Honor, I wanted
6   Your Honor to be aware of that, even though we changed it to
7   November 24th here, it is the expectation of all the parties
8   and our -- by the way, our exit lender is well aware of that,
9   as well, that the likelihood is we're not going to make the
10  November 24th deadline, although we will try as hard as we can
11  to have an effective date as soon as we can.

12          The last three changes that were made -- we're
13  dealing with executory contracts.  Given the timing of the
14  executive -- of the sales and the potential closings of the
15  sale, for example, we expect that republic will close on or
16  before November 24th, that's the expectation, that's what we're
17  all moving towards.  And I think the debtors believe that that
18  is achievable with the Windsor Door sale coming down the pike.

19          There was a concern with respect to executory
20  contracts in terms of rejection.  Should -- because we wanted
21  to be sure, obviously, Your Honor, that we close these deals
22  before rejections became effective.  Because if a deal doesn't
23  close and we're rejecting some contracts which we might not
24  have, Your Honor, if we had not sold the property, and one
25  example would be a -- since -- and I'm getting ahead of myself

1 obviously on the agenda, but Your Honor will be told later that
2 there's only one buyer for the two businesses.  Even though
3 we've gone through auctions on each one individually, it turned
4 out there was one buyer, Your Honor.  And ultimately we'll
5 probably end up in a unified purchase contract since it's only
6 one buyer.

7          And both businesses are related, Your Honor, in terms
8 of the nature of their businesses.  So, they may combine, for
9 example, manufacturing facilities.  They may combine, for
10 example, warehouse facilities.  And, therefore, you need the
11 closing of both before you can accomplish that.  And,
12 therefore, what we've done in the plan, Your Honor, is to
13 provide that with respect to the rejection or assumption of
14 contracts, we have between today and the effective date to file
15 those motions and have them heard by Your Honor to assume or
16 reject so that we're protected fully in those two instances,
17 Your Honor, from a premature rejection if a deal doesn't close,
18 which is a -- obviously a concern of the debtors.  And that's
19 what those three provisions provide for, Your Honor.

20          Now, we have filed the list of contracts to be
21 rejected.  We expect, you know, those will be rejected in
22 accordance with the plans.  We will -- we have a list of
23 contracts which I'll update Your Honor on for both Windsor and
24 Republic that are being assumed and we anticipate will be
25 assumed and assigned at the closing.

1        Likewise, there's a list of additional contracts that
2  were contemplated to be assumed, but which will now be
3  rejected.  Those parties got notice of that, Your Honor, prior
4  to today.

5        So, as they -- Desco (phonetic) completes its, you
6  know, and finalizes its thinking about how to consolidate these
7  two businesses, we just wanted to protect our -- the debtors
8  wanted to protect themselves against prematurely rejecting
9  contracts that would be -- would not make sense if we did not
10 go forward with Desco, Your Honor.  And that's what those
11 changes were meant to accomplish.

12       Yesterday the debtors filed with this Court -- and
13 maybe, Your Honor, at this point, can I ask for a five-minute
14 recess just to see where we are in VicWest so I can at least --
15 because I think that may -- that will address the balance of my
16 presentation, assuming that it's been settled.

17             THE COURT:  Okay.

18             MR. KRESS:  Okay.

19             THE COURT:  Five-minutes recess.

20             MR. KRESS:  Thank you, Your Honor.

21                  (Recess 3:02 P.M./Reconvene 3:11 P.M.)

22             THE COURT:  Please be seated.

23             MR. KRESS:  I thank Your Honor for granting us a
24 continuances.  We made good use of that time and I'm happy to
25 report, Your Honor, we have resolved the VicWest Corporation

1 objection to confirmation. And if I may indicate how we have
2 done so.

3 First, Your Honor, I would direct -- respectfully
4 direct your attention to -- on Page 19 of the black line of the
5 confirmation order --

6 THE COURT: Okay.

7 MR. KRESS: -- it's new Paragraph FF, and if I may
8 give you -- if I may, Your Honor, just one minute of background
9 as to how we got to this language. At the time the debtors --
10 U.S. debtors filed Chapter 11 here in front of this Court, the
11 Canadian debtors, which were affiliates of the U.S. debtors,
12 filed proceedings under the CCAA up in Canada. And from a
13 chart's point of view, Your Honor, the way the corporate
14 structure worked -- and, again, this is by way of background,
15 Your Honor, is that you have the parent company, Magnatrax
16 Corporation, and it owns 100 percent of the stock of its
17 primary operating company, which is called American Buildings
18 Company. The parent, Magnatrax, is solely a holding company.

19 And then American Buildings Company owns a number of
20 subsidiaries underneath, and each of which were operating
21 subsidiaries, there were a couple of subsidiaries that were
22 somewhat dormant. And one of the subsidiaries owned by
23 American Buildings Company was a company called Genesis
24 Engineered Products. You may recall, Your Honor, in the days
25 of fighting between the debtors and the Creditors' Committee

38

1 concerning discovery, they wanted to go to Canada to take
2 discovery requests up in Canada. Your Honor entered, I think,
3 as I recall letters of rogatory to allow them to do so. And
4 Genesis Engineered Products was mentioned at that time because
5 it is the owner of 100 percent of the stock of a company called
6 VicWest Corporation. VicWest Corporation is a Canadian
7 company, it is the parent of a number of operating companies in
8 Canada.

9           So, that VicWest Corporation and the -- its operating
10 subsidiaries all filed for proceedings up in Canada. And one
11 of the other companies owned by VicWest -- and the only one
12 who's not in any proceeding at this point is a company called
13 Black Raven, it's not in a U.S. proceeding, it's not in a
14 Canadian proceeding.

15          The Canadian debtors have confirmed/approved their
16 plan of arrangement in Canada. And I believe that they have
17 gone effective.

18          During the course of the Chapter 11 cases, Your Honor
19 -- and as a result of that, the stock of VicWest, which was
20 owned by Genesis, was canceled. And basically it was a
21 conversation of debt into equity with the bondholders up in
22 Canada becoming the 95 percent owners of VicWest Corporation.
23 So, now there is a complete separation, Your Honor, between --
24 from a corporate legal perspective between the U.S. debtors and
25 the Canadian debtors.

39

1    There were services, however, performed by the
2 Canadian debtors for the benefit of the U.S. debtors for which
3 they paid for and likewise there were operations in the United
4 States which benefitted the Canadian debtors.

5    So, during the course of the Chapter 11, the U.S.
6 debtors and the chief restructuring officer of Canada, likewise
7 the note -- and the note holders had been negotiating an
8 overall -- what we call a transition agreement, which, in
9 effect, Your Honor, will allow certain shared services to
10 continue between the equities for an interim period for which
11 we will pay.  Likewise, we've agreed as part of that to
12 transfer to the Canadian debtors a facility in North Dakota, we
13 call it the Fargo facility, which is principally used as a
14 warehouse U.S. operation for the Canadian debtor.

15    And finally, last but not least, a settlement
16 agreement which basically would include waivers of claims, that
17 is waiver of the claims that the U.S. debtors filed in Canada,
18 the Canada creditors in the United States and likewise a
19 release -- a limited release being given by the senior lenders
20 to the Canadian debtors and likewise a mutual release because
21 the one company that was not in Chapter 11, Black Raven, was
22 owed money by VicWest Corporation.  The U.S. lenders had a lien
23 on that asset.  The pledge of the stock because Black Raven was
24 a borrower under the original pre-petition credit facility, but
25 it was not in Chapter 11, it was not a member of the DIP

1  financing, nor was it a borrower under the DIP financing.

2         And likewise, the Creditors' Committee was given
3  permission by Your Honor this spring to file claims in Canada.
4  And the Creditors' Committee have agreed to withdrawal those
5  claims in Canada in consideration for which the monitor would
6  withdrawal its request, I believe it was to assess certain
7  costs against the Creditors' Committee.  So, there will be
8  releases between the Creditors' Committee and VicWest, as well.

9         All of that, Your Honor, we expect to be completed
10 within days and we'll be presenting it to Your Honor at the
11 December 17th hearing for approval.

12        However, it's a little bit like the cart leading the
13 horse.  Because we have a plan before Your Honor today that
14 provides with respect to the claims that the Canadian debtors
15 filed in the United States, we have separately classified them
16 as a form of an intercompany claim.  And if I may, Your Honor,
17 I believe that's Class 13.  And those were claims that were due
18 to -- due -- claims in favor of the Canadian debtors against
19 the U.S. debtors that arose prior to the filing of the Chapter
20 11, at which time there were affiliates of the U.S. debtors.
21 And we provided for no recovery.

22        And the reason for that, Your Honor, was that the
23 plan was structured, assuming we were going to have the
24 settlement agreement approved and the parties are intending to
25 do so.

41

1            So, VicWest Corporation has filed an objection to
2 confirmation, really arguing two things:  One, Your Honor, that
3 the releases that's provided in the plan currently should be
4 governed by the settlement agreement, and not by the plan
5 itself.  And, number two, Your Honor, that they were concerned
6 that they would be by virtue of confirmation of this plan,
7 would be receiving no property on account of their claims and
8 yet we still had outstanding claims against them which we would
9 withdrawal upon approval of the settled -- you know, the
10 execution approval of the settlement agreement.

11            So, what we've agreed to, Your Honor, is to add a
12 proviso, a new finding, Your Honor, which is Paragraph FF,
13 which states that in consideration for the debtors' commitment
14 to enter into a settlement agreement with the Canadian
15 Magnatrax debtors, pursuant to which the debtors will
16 withdrawal their claims filed in Canadian Chapter 11 --
17 Canadian reorganization proceedings, VicWest has agreed to
18 withdrawal its objection to confirmation of this plan, one of
19 which was that they were improperly classified and they should
20 be Class 9 creditors and get something, as opposed to getting
21 nothing, which is what the current plan provides.  So, that
22 there is a mutuality of consideration with respect to the
23 withdrawal of claims.

24            Likewise, Your Honor, what we've agreed to -- and I
25 -- we're going to have delineate this even in your black line

42

1 version of the confirmation order, is to add a paragraph in
2 lieu -- in place of Paragraph -- read Number 34, which is on
3 Page 36, Your Honor, of the black line.  And what it -- if I
4 may, Your Honor, what it does is it replaces the last new
5 sentence we've added.  But conceptually it's the same concept.
6 And what the language will provide for Your Honor is that
7 nothing in the plan or the confirmation order that provides for
8 the releases and injunctions contained in the plan and the
9 confirmation order and then referencing specifically the three
10 provisions, 411(a), (b) and (c) of the plan which deals with
11 releases and injunctions to enforce releases, and Paragraphs 32
12 and 35 of the confirmation order which memorializes the
13 releases and the injunction, the confirmation -- these
14 provisions shall not be binding upon or have application, and
15 then there's a litany of legal entities listed, those are the
16 Canadian debtors, Your Honor, and including Black Raven.

17          And accordingly, the VicWest Company shall not be
18 deemed to have released or shall not be enjoined from
19 commencing or continuing any action against any of the release
20 parties in respect of any released action.  So, the idea being,
21 Your Honor, that whatever the releases are going to be, they're
22 going to be governed by the settlement agreement not by the
23 provisions of this plan, Your Honor.

24          I should note for the record that the one release we
25 are not getting is the release of the debtors, officers and

43

1 directors by VicWest. And on a Board conference call we had
2 today, the Board agreed to that. They didn't think they had
3 done anything wrong, Your Honor, and -- but they will agree so
4 that this plan can go forward.

5 So, that's the provision that will be -- a new
6 provision that will be added to the confirmation order, Your
7 Honor.

8 THE COURT: Well, you already have the absence of a
9 waiver for the Canadian Magnatrax debtors.

10 MR. KRESS: Yeah, that's going to replace, Your
11 Honor, that last sentence. So, the last sentence will come out
12 that we thought we -- that would have solved the problem, to be
13 replaced by now but I've just described on the record, Your
14 Honor.

15 THE COURT: And tell me, again, what it's going to
16 say?

17 MR. KRESS: What it --

18 THE COURT: Who is it going to identify?

19 MR. KRESS: It's -- what it's going to identify is
20 that nothing in the release provisions of the plan, which are
21 in Section 411, Your Honor, (a), (b) and (c) are the -- (a) and
22 (b) being the releases, (c) being the injunction to enforce the
23 release. And nothing in Paragraphs 32 and 35 of the
24 confirmation order which addresses the release and the
25 injunction. That will not be binding upon VicWest Corporation

1  and then there are another listing of companies which are all
2  of the Canadian debtors, Your Honor --

3         THE COURT:  Okay.

4         MR. KRESS:  -- as well as Black Raven, who is not in
5  any proceeding right now.

6         THE COURT:  Okay.

7         MR. KRESS:  And, therefore, Your Honor, the VicWest
8  Companies, which is their defined term, shall not be deemed to
9  have released, shall not been enjoined from commencing or
10 continuing in any action against any of the release parties in
11 respect of the release actions.  And, again, I'm representing
12 to the Court that that is because those releases will be
13 addressed separately as part of the settlement agreement.

14        THE COURT:  Okay.

15        MR. KRESS:  Yes, just as a clarification, Your Honor,
16 I've been reminded by counsel for VicWest, the actual claim
17 filed against -- that Black Raven filed, the amount it was owed
18 by VicWest was actually filed by the senior lenders who had an
19 assignment of that claim by way of security, as well as a -- I
20 believe a pledge of the stock of Black Raven.  So, that is why,
21 Your Honor, the senior lenders have to be a party to the
22 settlement agreement with their releases.

23        MS. PRIMOFF:  Excuse me.  The senior lenders were not
24 a party to the settlement agreement.

25        MR. KRESS:  I'm sorry.

45

1          MS. PRIMOFF:  The senior lenders will give --

2          MR. KRESS:  A release.

3          MS. PRIMOFF:  -- a waiver of the claim with respect

4   to Black Raven.

5          MR. KRESS:  That is correct, Your Honor.  I stand

6   corrected.  The settlement agreement is actually just between

7   the U.S. debtors and the Canadian debtors, the parties to the

8   settlement agreement.  They have exhibits separate releases

9   that are going between the Creditors' Committee and, for

10  example, the Canadian debtors, the banks and the Canadian

11  debtors, as well.

12         THE COURT:  Okay.

13         MR. KRESS:  So, with that, Your Honor, I believe that

14  counsel for VicWest would confirm that they are withdrawing

15  their objection to confirmation.

16         THE COURT:  Okay.

17         MR. KRESS:  On further clarification, before we have

18  a continuance, Your Honor, I was explaining the modification

19  that was made to the plan.  Obviously the key -- the main

20  reason for the changes in the plan that deals with the

21  assumption and rejection of executory contracts and having

22  those done -- be able to do those between now and the effective

23  date was focusing on Vic -- on the two sales that are presently

24  pending before your Court and the closing issues.  There will

25  be other contracts, as well, Your Honor, that if we cannot

46

1  renegotiate other debtors, we will likewise be filing the
2  motion to reject between now and the effective date. But all
3  of that will be done, I assure you, Your Honor, before the
4  effective date.

5      With that, Your Honor, I'm prepared now to turn to
6  the factual support that is required, Your Honor, in order for
7  Your Honor to make the findings set forth in the confirmation
8  order. And more importantly, the findings that the debtors
9  have complied with the provisions of Section 1129(a), and to
10 the extent applicable, Section 1129(b).

11     Your Honor, we have filed with the Court yesterday
12 the affidavit of Joseph Ahearn. He is the Chief Restructuring
13 Officer of the Magnatrax debtors. He's affiliated with Pilgrim
14 Advisors. Mr. Ahearn is an officer of the company and I would
15 proffer, Your Honor, his affidavit into evidence for the
16 factual support for the plan, in support of confirmation. Mr.
17 Ahearn is in court today and is -- and can be cross examined by
18 any party who wishes to do so, Your Honor. Or if Your Honor
19 has any questions, we can call him to the stand.

20     I will also not for the record, Your Honor, that a
21 copy of Mr. Ahearn's affidavit was sent both by fax and by e-
22 mail yesterday to all the parties who filed an objection to
23 confirmation. As I said, I'm happy to note that at least five
24 and a half of the objections have been resolved at this point.
25     And with that, Your Honor, I would offer Mr. Ahearn's

1  affidavit into evidence in support of confirmation of the plan.

2          THE COURT:  Okay.  It's in.  I've read it.  Does

3  anyone wish to cross examine Mr. Ahearn on his affidavit?

4          MS. PRIMOFF:  Yes, I do, Your Honor.

5          THE COURT:  Okay.

6          MS. PRIMOFF:  Madlyn Primoff, Your Honor, Clifford

7  Chance, US, LLP as counsel for Canadian Imperial Bank of

8  Commerce as agent for the pre-petition secured lenders and for

9  the DIP lenders.

10          THE COURT:  Okay.  Let's have him sworn in first.

11          CLERK:  State your name for the Court, spelling your

12  last name.

13          MR. AHEARN:  Joseph M. Ahearn, A-H-E-A-R-N.

14          JOSEPH AHEARN, DEBTORS' WITNESS, SWORN

15          CLERK:  You may be seated.

16                    CROSS EXAMINATION

17  BY MS. PRIMOFF:

18  Q    Mr. Ahearn, do you recall the meeting that took place at

19  Mr. Vild's offices on August 18th, the meeting among the key

20  constituencies here, the Creditors' Committee, the debtors and

21  the banks?

22  A    August 18th, yes, I recall that meeting.

23  Q    And were you present at that meeting?

24  A    I was present for the majority of the meeting.  I think

25  there was some discussion between the bank group and the

1  unsecured creditors before the debtor arrived, but I was there

2  for mostly all -- the whole meeting.

3  Q    And do you recall that the meeting culminated in the

4  preparation of a two-page term sheet?

5  A    Yes, I do recall that.

6  Q    And was it the parties understanding that that term sheet

7  would become the cornerstone for the plan of reorganization

8  that's currently before this Court?

9  A    It was certainly my understanding that the parties

10 understood that that would form the basis for the plan of

11 reorganization, yes.

12        MS. PRIMOFF:   I'd like to have this marked as Exhibit

13 A, please.

14                        (Pause)

15        MS. PRIMOFF:   May I approach, Your Honor?

16        THE COURT:   Yes.

17                        (Pause)

18 BY MS. PRIMOFF:

19 Q    Have you had an opportunity to look at the term sheet, Mr.

20 Ahearn?

21 A    Yes, I have.

22 Q    Are the terms reflected in the term sheet more or less

23 with some modification of the terms that are currently

24 reflected in the plan that's currently before this Court?

25 A    They're generally the same.   There were some

1  renegotiations on some of these terms and conditions after.
2  But by and large, these are primarily the terms and conditions
3  embodied in the reorganization and disclosure statement.
4  Q    And can I direct your attention, Mr. Ahearn, to Page 2 of
5  the term sheet, and specifically the third and fourth
6  paragraphs on Page 2.  And can I ask you to read those into the
7  record?
8  A    Certainly.  The third bullet point, the one I think you're
9  referring to, reads, "Full releases for all officers and
10 directors of Magnatrax, except solely to the extent that a
11 carve out from such releases is necessary, if at all, to
12 preserve claims against Onyx and its affiliates.  Directors and
13 officers to be indemnified to the extent and solely to the
14 extent such release is granted.  No personal liability to
15 officers and directors of Magnatrax."

16        The fourth bullet point that you referred to reads,
17 "Release in favor of debtors, pre-petition lenders, Canadian
18 Imperial Bank of Commerce as agent, CIBC WMC and its affiliates
19 and Ontario Teachers' Pension Fund and their respective
20 professionals release and/or exculpation of the members of the
21 Committee and its professionals."

22 Q    Thank you, Mr. Ahearn.  Is it your understand that the two
23 provisions that you just read into the record were integral to
24 this term sheet?
25 A    Yes, ma'am.

1  Q    And integral, as well, to the settlement that's embodied
2  in the plan before the Court.

3  A    That's certainly my belief.

4  Q    Thank you.  And with regard to the DIP lenders, Mr.
5  Ahearn, what is the total availability under the DIP, $20
6  million?

7  A    It's a $20 million DIP loan, correct.

8  Q    And how much has been drawn down through today, more or
9  less?

10 A    Round numbers is about $14 million drawn down on, and then
11 there is some availability against that $20 million that has
12 been reserved because of post petition letters of credit,
13 leaving us, round numbers, about $4 million of availability on
14 the DIP loan.

15 Q    And are you aware that the company and the DIP lenders
16 entered into a first amendment to the DIP that was dated July
17 11, pursuant to which the DIP lenders extended the deadline for
18 the debtors to file the plan from June 12th to June 19th, 2003?

19 A    I'm aware of that.

20 Q    And are you also aware, Mr. Ahearn, that on August 25th,
21 2003, the DIP lenders waived the minimum consolidated EBITDA
22 default for the month ended June 28th, 2003?

23 A    Yes, I am aware of that.

24 Q    Are you also aware that on September 5th, the DIP lenders
25 and the debtors entered into a second amendment and waiver

Ahearn - Cross                            51

1  which waived the minimum consolidated EBITDA for the fiscal
2  month ended June 28th?

3  A    Yes.

4  Q    It also -- are aware that it also waived the default
5  arising from the failure to have the disclosure statement
6  approved within 60 days of the May 12th filing date for these
7  cases?

8  A    Yes.

9  Q    And are you also aware that it extended the deadline for
10 approval of the disclosure statement to September 5th, and
11 extended the deadline for plan confirmation to August 17th?

12 A    Yes.

13 Q    Are you familiar with the limited waiver dated as of
14 September 8th, 2003, extending the disclosure statement order
15 deadline from September 5th to September 15th?

16 A    I know that was a waiver we requested and received.

17 Q    And did the -- and did the DIP lenders also extend the
18 deadline for the disclosure statement order from September 15th
19 to September 19th?

20 A    I believe they did.

21 Q    And are you familiar with the third amendment and waiver
22 dated October 14th, 2003 between the debtors and the DIP
23 lenders which, among other things, contained a waiver of the
24 minimum cumulative EBITDA default for the months ended August
25 2nd, 2003 an August 30, 2003?

1 A     Yes.

2 Q     And that that third amendment and waiver also included a
3 failure to deliver weekly -- a weekly cash budget for the month
4 of September, 2003?

5 A     Yes.

6 Q     And that that third amendment and waiver also included a
7 waiver by the DIP lenders of the debtors' covenant to deliver
8 quarterly financials?

9 A     I recall that being in a waiver, I'm not sure if I recall
10 it specifically being in that waiver, but I do recall that
11 waiver.

12 Q     And that there was also a waiver of certified unaudited
13 monthly balance sheets?

14 A     Yes.

15 Q     And finally, monthly reconciliations of cash expenditures,
16 cash receipts, cash disbursements and related various analysis.

17 A     Yes.

18 Q     And that that third amendment and waiver also waive the
19 failure to deliver the disclosure statement order by September
20 5th?

21 A     Yes.

22 Q     And that that waiver also extended the deadline for the
23 entry of the confirmation order to November 14th.

24 A     Yes.

25        MS. PRIMOFF:   Okay.   Thank you.   I have no more

53

1  questions for Mr. Ahearn.

2            THE COURT:  Any redirect?

3            MR. KRESS:  No, sir.

4            MS. PRIMOFF:  Can I move the entry of the exhibit

5  into evidence?

6            THE COURT:  Yes, it's admitted.

7            MS. PRIMOFF:  Thank you.

8            THE COURT:  You may step down.

9            MR. AHEARN:  Thank you, Your Honor.

10           MR. KRESS:  Your Honor, with your permission, if you

11 may require of the audience as to whether there's anyone else

12 who wanted to do a cross examination.  Because I think you only

13 asked if I wanted to do a redirect.

14           THE COURT:  Okay.  I just assumed that no one came

15 up.

16           MR. KRESS:  Okay.

17           THE COURT:  No one's interested.

18           MR. KRESS:  I just wanted the record to reflect that,

19 Your Honor.

20           And with that, Your Honor, I would move into evidence

21 Mr. Ahearn's affidavit.

22           THE COURT:  Okay.  It's admitted.

23           MR. KRESS:  Your Honor, I can summarize Mr. Ahearn's

24 affidavit for the record in terms of meeting the confirmation

25 criteria if Your Honor so desires, although it is in the record

54

1  right now as evidence. But it's Your Honor's -- it's Your
2  Honor's wish that I will comply with.

3              THE COURT: It's a complete explanation of 1129.

4              MR. KRESS: With that, Your Honor, then if I may move
5  to the releases.

6              The debtors filed a memorandum of law yesterday in
7  support of confirmation which not only addressed all of the
8  1129(a) issues and why the debtors believed that the plan meets
9  the legal requirements under 1129(a), but furthermore described
10 the basis and why they believe that the releases that are
11 contained in Sections -- Section 4.11 of the plan are
12 appropriate, given the facts of this case.

13             The case law, Your Honor, is there. It's Zenith,
14 it's Continental, Your Honor, it's Genesis, all of the cases
15 are cited in our memorandum of law. I don't think there's any
16 dispute as to what the applicable law is in this District.

17             So, what it really boils down to is a question of
18 fact, Your Honor. What are the facts in this case which leads
19 the debtors to conclude that the releases that are provided in
20 the plan are fair and appropriate. And what I would like to
21 first start with, Your Honor, and I am going to, therefore,
22 summarize some of the facts that are in Mr. Ahearn's affidavit
23 to highlight why we think that those facts supports the
24 releases is we start this Chapter 11 case, Your Honor, with the
25 predominant creditors being the senior lenders.

55

1            And Mr. Ahearn has set forth -- stated in his
2   affidavit that the company -- there was a valuation of the
3   company performed on a going concern basis by Chanin, Inc. --
4   Chanin Capital, who were the debtors' financial advisor, which
5   indicated a range of value between -- my recollection is $130
6   million up to as high as 170 or $180 million, the exact facts
7   are in Mr. Ahearn's affidavit.  But the key point there, Your
8   Honor, it was far south of the senior lender claims.  And as
9   Mr. Ahearn has stated in his affidavit, the total amount of the
10  senior lender claims are approximately $250 million.

11            Number two, Your Honor, is that the senior lenders,
12  as set forth in Mr. Ahearn's affidavit, as well as set forth in
13  the debtor in possession financing order which Your Honor
14  approved, indicates that the senior lenders had liens on all or
15  substantially all of the assets of all of the debtors,
16  including pledges of capital stock, of the various subsidiaries
17  of Magnatrax Corporation.

18            Pursuant to the debtor in possession financing order,
19  the debtors made representations, Your Honor, that they believe
20  those liens to be valid, perfected, fully enforceable and that
21  the amounts due and owing under the pre-petition credit
22  agreement were fully enforceable and valid and allowed.  And
23  Your Honor gave until August 20th any party in interest,
24  including the Creditors' Committee, to file any pleading they
25  wished to, in terms of challenging the validity, the

56

1 perfection, the enforceability of the claims, the validity
2 perfection of the liens. And that is a matter of record, Your
3 Honor. It is in the debtor in possession financing order,
4 which I would ask Your Honor to take judicial notice of. And
5 the legal docket of this case would reflect that no such
6 challenge was made as of August 20th.

7 As a result, pursuant to the debtor in possession
8 financing order, the lenders, the pre-petition lenders' liens
9 were found to be valid, perfected, fully enforceable liens.

10 So, what we have, Your Honor, as Mr. Ahearn's
11 affidavit clearly indicates, is we have a going concern value
12 of the debtors, which is far less than the valid enforceable
13 claims of the senior lenders who had liens on all of the
14 assets.

15 Under that scenario, Your Honor, the lenders could --
16 the senior lenders could very well have required, and if the
17 debtors failed to do so, could have moved to terminate
18 exclusivity to file their own plan which would have provided
19 for a recovery for the administrative and priority claims which
20 are required under the law and simply had all of the remaining
21 value of the debtors go to them. They were secured creditors,
22 they have perfected security interest, and the value was less
23 than. So, that's the first factual point I would like to make,
24 Your Honor.

25 Second of all, unlike most of the cases that are

57

1  cited both in our memorandum of law, as well as the objection
2  to the U.S. Trustee, generally speaking, these decisions come
3  about as a result of a creditor, a group of creditors or some
4  constituency that has an economic interest in the Chapter 11
5  case opposing the releases being provided in the plan.  In this
6  case, Your Honor, there is no creditor today whose objection
7  has not been resolved who is opposing the releases in the plan.

8        And I understand, Your Honor, that the United States
9  Trustee's Office is the administrative arm of this Court, they
10 are the watchdogs of the Chapter 11 process, but when it comes
11 to economic interest in the case, Your Honor, other than the
12 quarterly fees, the U.S. Trustee does not have an economic
13 interest in the case.

14       So, I just want to note the second key fact we
15 believe is relevant, and that is there is no creditor today
16 opposing the releases being given in the plan.

17       Number three, Your Honor, at the request of the
18 United States Trustee's Office, each of the ballots that were
19 sent had in bold print the fact that an acceptance of this plan
20 would constitute a -- would -- you would be deemed to give a
21 release in the event that you accept the plan.  And, in fact,
22 Your Honor, I believe -- if I may read into the record the
23 precise language that was requested by the Office of the United
24 States Trustee, and I'm reading from the Class 9 ballot, Your
25 Honor, which is on -- which is part of the record in a sense

58

1  that it was filed with the Court as part of the voting
2  procedures order.  And I would ask the Court to take judicial
3  notice of that.

4        What it says, Your Honor, under the two boxes, which
5  says, "Accept a plan or reject a plan," in bold, capitalized
6  print, "The plan provides that by voting to accept the plan or
7  by receiving a distribution under the plan, a claim holder will
8  be deemed to consent to the release of all released actions
9  against released parties, including nondebtor parties, see
10  paragraph below for additional detail."

11        And in Paragraph 5 below, Your Honor, if I may read
12  into the record, "The plan provides for releases by the debtors
13  and for releases by holders of claims in interest.
14  Furthermore, the plan provides that each person bound by the
15  releases is permanently, forever and completely stayed,
16  restrained, prohibited and enjoined from directly or
17  indirectly, derivatively or otherwise commencing or continuing
18  any released action against any released party."

19        The plan further provides that, "Nothing therein
20  shall prejudice any right, remedy, defense, claim, cross claim,
21  counterclaim or third party claim that any person may have
22  against any person other than with respect to the release
23  actions against released parties."  In capitalized terms, "Not
24  otherwise defined herein are defined in the plan and you should
25  refer to the plan for a more complete description of the

59

1 proposed releases and related injunction."

2 So, that when the creditors in this case were being
3 asked to vote, the ballot conspicuously set forth that by
4 voting to accept or by receiving a distribution, you are being
5 -- you will be deemed to have release -- it's in two places
6 before they can check the box, the language is right there, and
7 then in the instructions, again, a more detailed instruction.

8 So, creditors clearly were on notice, Your Honor,
9 when they were voting on this plan that by voting, it would be
10 deemed to be giving a release. And I think that is a third
11 significant point, Your Honor.

12 Point number four is the ultimate voting results in
13 this case. As I've indicated earlier and as evidenced by Mr.
14 Stein's declaration, Your Honor, the voting classes have
15 overwhelmingly accepted the plan, ranging from, in numbers, 92
16 percent and higher, and in dollar amount, likewise, Your Honor.
17 So, there's an overwhelming acceptance of a plan by creditors
18 who voted and voted on ballots that, again, clearly stated they
19 would be giving a release in the case. I think that's the
20 fourth relevant point, Your Honor.

21 Point number five is that one has to look -- Number 5
22 is that the Creditors' Committee has supported this plan. In
23 fact, wrote a letter to support the plan and supported the
24 releases being granted under the plan. And I think that is a
25 significant factor. Likewise, the senior lenders support the

1  plan and the releases being given under the plan.   Between
2  those two entities, Your Honor, you're talking about
3  substantially all of the constituencies.

4         And let's just go back to the plan for a second and
5  why it's important, looking at the voting results in this case.
6  As I said, Your Honor, in terms of the different classes, in
7  Classes 1, 2, and 3, we're focusing on administrative expense
8  claims, priority claims, priority tax claims.   Those creditors
9  will be paid in full the allowed amount of their claim, as
10 required by 1129(a)(9) of the Bankruptcy Code.

11        Class 4, Your Honor, are the claims of the debtor in
12 possession lenders.   They, likewise, will be paid in full under
13 the plan upon the effective date and entry into the exit
14 financing.

15        Class 5 is what we call the ABCO bondholder claims.
16 Those are two -- in essence, Your Honor, industrial revenue
17 bond issuances.   Those we are reinstating, Your Honor, and,
18 therefore, they're unimpaired under the plan.   And any default
19 that existed, they will be paid in full so that upon emergence,
20 it will be as if the companies did not file Chapter 11, that is
21 what's required under Section 1124 dealing with unimpairment,
22 Your Honor.

23        Then we have the next four classes, six, seven, eight
24 and nine, which are the voting classes.   And as I indicated,
25 Your Honor, they have overwhelming accepted.   Likewise, those

1  are the classes that are not getting paid 100 percent, Your
2  Honor.

3          Classes 10 and 11 are the subordinated claims in
4  connection with the acquisition of the Canadian operations by
5  the U.S. debtors in 2000.  Those claims are subordinated to the
6  claims of the bank lenders, the senior lenders, Your Honor,
7  contractually.  And, therefore, they're not entitled to a
8  recovery under the plan.  And upon the entry of the settlement
9  agreement that I had referred to earlier, Your Honor, with
10 VicWest, these claims will be, in effect, released by the
11 Canadian debtors, as well.

12         That brings us to Class 12, so we're talking about
13 and as -- and the releases there, Your Honor, again, just to
14 reemphasize for the Canadian debtors, are being governed by a
15 settlement agreement, consensual arrangement.

16         We then get to Class 12, Your Honor, those are the
17 U.S. intercompany claims.  From a release point of view, I
18 don't think it makes any -- that is not a factor to be
19 considered here, Your Honor.  Likewise, Class 13, which are the
20 Canadian intercompany claims, that's the company, if Your Honor
21 may recall, VicWest had objected to that classification.  Their
22 releases, once again, will be consensual pursuant to the
23 settlement agreement.

24         And then Class 14, subsidiary equity interest, Your
25 Honor, the releases I don't think are relevant from that

62

1  perspective.

2          And then last but not least, we have the Magnatrax

3  equity interest. And they will be deemed to have given a

4  release. They are not receiving any recovery under the plan.

5  Their interest will be wiped out. They have not opposed the

6  granting of the releases, Your Honor. And as I will further

7  detail in the next fact, which I think is very important, that

8  will support why, from their perspective, Your Honor, the

9  release provisions are appropriate.

10         And let me get to --

11         THE COURT:  I'm sorry.  I --

12         MR. KRESS:  Yeah?

13         THE COURT:  I missed something.  I thought you said

14  the releases was only if you voted for the plan or you got a

15  distribution.

16         MR. KRESS:  If you -- right.  That is correct, Your

17  Honor.  That is correct.

18         THE COURT:  And the equity didn't vote and they're

19  not getting a distribution.

20         MR. KRESS:  That is correct, Your Honor.  That is

21  correct.

22         THE COURT:  So, there is no release.

23         MR. KRESS:  There is no release.

24         THE COURT:  Okay.

25         MR. KRESS:  That's why I said it's not appropriate.

63

1        THE COURT:  Oh, okay.

2        MR. KRESS:  I didn't -- I apologize, Your Honor, I
3  wasn't clear on the record for sure.

4        The next fact I want to make, such is set forth in
5  Mr. Ahearn's affidavit is that one has to look at this plan in
6  the backdrop in terms of how did this plan develop.

7        When we filed -- when the debtors filed their Chapter
8  11 cases, Your Honor, the senior lenders were insistent that
9  this case had to move quickly.  And as Ms. Primoff indicated
10 through her cross examination of Mr. Ahearn, there were certain
11 waivers that had to be obtained from the debtor in possession
12 lenders because there were certain deadlines that could not be
13 met to move this case as fast as the senior lenders and the
14 debtors, by the way, Your Honor, wanted to move this case.

15       One of the reasons for the -- to move this case
16 quickly, Your Honor, is that the high point of the debtors'
17 season  -- the debtor does have a seasonality in its  business
18 -- begins in the spring.  And so what you'd like to do is be
19 able to emerge from Chapter 11 during the slow period, have
20 your exit financing in place so you can ramp up for the selling
21 season starting in the spring.  So, it's important to move this
22 company as quickly as possible.

23       Likewise, given the amount of debtor in possession
24 financing the debtors had, it was important to move the case
25 quickly, too, as well, it was enough the debtors believed to

64

1  carry them through a fairly rapid Chapter 11 proceeding any
2  prolonged delay would have created problems under the debtor in
3  possession financing and, in fact, Your Honor, six months is
4  fairly quick in today's days of Chapter 11s to go from filing
5  to confirmation.

6          But the point I would like to make is upon the filing
7  of the Chapter 11, in a plan that was filed within 30 to 45
8  days after the Chapter 11 case was filed, the Unsecured
9  Creditors' Committee decided it was important for them to
10  protect the interest of their clients to engage in a extensive
11  investigation into the financial affairs of the debtors, into
12  the conduct of the directors and officers of the companies,
13  into the conduct of the senior lenders.

14          And Your Honor may recall, and the legal docket would
15  so reflect, on several times -- occasions during the spring, we
16  came before Your Honor on discovery disputes, arguments that
17  the debtors had turned over hundreds, if not thousands of
18  documents, to the Committee.  Committee wanting to pursue
19  claims up in Canada, pursued discovery in Canada.

20          In addition to all that, Your Honor, there were
21  numerous depositions that were taken in this case.  For
22  example, Your Honor, Messrs. Wright and Hilson, two directors
23  of Magnatrax Corporation, who are also Onyx employees, Onyx
24  being the equity sponsor and the majority shareholder of the
25  company, were deposed.  Mr. Capsuto, the Chief Financial

1 Officer of the company, as well as a director of the parent
2 company was deposed.  Mr. Blackman, the former Chief Financial
3 Officer of the company was deposed.  Ms. Anne Savage, who's the
4 Treasurer -- Treasurer/Controller of the company was deposed.
5 Both of those latter two individuals were with the company at
6 the time of the transactions to which the Committee was
7 focusing on, Your Honor.  Whereas Mr. Capsuto joined the
8 company in November of last year, after the acquisitions which
9 were being focused on took place.

10        Mr. Rizack, who is an employee of the Magnatrax
11 debtors and who acted as the Chief Restructuring Officer of the
12 Canadian debtors during the course of their Canadian
13 proceedings was deposed.

14        And finally, Your Honor, Mr. Pauker (phonetic), of
15 Gold and Associates (phonetic), who was the former financial
16 advisor to the debtors, likewise, he was deposed.

17        And as I indicated to you, Your Honor, there were
18 literally thousands of documents that were provided, both
19 consensually as well as through the formal discovery process.

20        And the Committee, it's fair to say, Your Honor, and
21 Your Honor may recall back in August, I guess it was, at the
22 time we had announced there was an agreement, there was an
23 issue concerning -- this may have been the September 9th
24 hearing, I apologize, Your Honor, it's either the September 9th
25 hearing or the August hearing, there was an issue as to the cap

66

1  that was contained in that two-page term sheet that Ms. Primoff
2  introduced into evidence. And that dealt with the amount of
3  its fees and expenses incurred by the Committee in connection
4  with that investigation which, at that time, was approximately
5  thought to be a million five. It ultimately -- and there was a
6  dispute, that it turned out it really was closer to a million
7  eight. And I would say while not 100 percent of that was spent
8  in the investigation, I would say a substantial portion of that
9  million eight was spent by the Creditors' Committee in their
10 investigation.

11     So, there was a lengthy extensive time consuming
12 costly investigation conducted by the Creditors' Committee so
13 that they could satisfy themselves, Your Honor, as to whether
14 or not there was impropriety here and whether or not there
15 would be a need to bring causes of action.

16     That culminated, Your Honor, after that investigation
17 was very far along, and I won't say it was completed, Your
18 Honor, because I think it's fair to say it wasn't 100 percent
19 completed, but it went very far.

20     At the conclusion of that, Your Honor, there was an
21 all hands meeting prior to what was scheduled to be the
22 disclosure statement hearing in August, and that's the meeting
23 that Ms. Primoff referred to during her cross examination of
24 Mr. Ahearn, August 18th, at which point the senior lenders, the
25 debtors, the creditors and Committee reached a consensus as to

1 a settlement of this case. The stopping of the investigation,
2 the incurring of significant costs to this estate of such an
3 investigation and the ability to move quickly through the
4 Chapter 11 process. And that resulted, Your Honor, and the
5 plan sets it forth, and Mr. Ahearn's affidavit so states, that
6 the banks, the senior lenders who technically did not have to
7 give anything to the unsecured creditors because of their lien
8 position and the amount of their claims versus the valuation of
9 the debtors, agreed to increase the recovery for the unsecured
10 creditors in the plan.

11        Likewise, the senior lenders, however they were going
12 to part with that consideration, Your Honor, wanted to ensure
13 that they had a release. And likewise from the Magnatrax
14 debtors, officers and directors, they, too, -- if they were
15 going to move this process, the work they have done during the
16 Chapter 11 to stabilize this business and would be required of
17 them beyond confirmation, that they felt it was appropriate
18 that they, too, be given a release. And as a result, the term
19 sheet was negotiated, the parties were getting releases.

20        But there was a recognition, Your Honor, at the same
21 time that one could not get a release for everyone in this
22 case. The Creditors' Committee simply would not have supported
23 a plan that released everyone.

24        Likewise, the banks wanted to move this case forward
25 as a consensual deal. And, therefore, an ultimate compromise

68

1 and a very difficult one, I will tell you, Your Honor, for the
2 Board of Directors of Magnatrax -- because, as I indicated
3 earlier, two members of Onyx are on the Board of Directors,
4 Your Honor.  Mr. Capsuto, the Chief Financial Officer and Mr.
5 Kay, K-A-Y, who is the Acting Chief Executive Officer, is --
6 comprises the four-member Board of Magnatrax.

7           The Creditors' Committee stood fast, and I'm sure Mr.
8 Build (phonetic), who is here, would so support, that they were
9 not going to allow a release for the Onyx entities.  The Onyx
10 entities believed, Your Honor, that they had done nothing wrong
11 here.  They don't -- they didn't think that any of the
12 transactions the company had entered into were either
13 fraudulent, fraudulent conveyances or that there was any
14 impropriety by Onyx or its affiliates.

15           But nonetheless, in a spirit of compromise, to allow
16 this case to move forward to confirmation on a consensual
17 basis, the parties agreed, including the Magnatrax Board of
18 Directors, which had to approve this plan and including two of
19 its members who, one could say, was indirectly affected by this
20 provision.  It was agreed that there would be certain causes of
21 action carved out of the releases and transferred to a
22 litigation trust to be controlled by a litigation trustee who
23 would be nominated by the Creditors' Committee.  And that that
24 litigation trust would be financed by the creditors.  That if
25 they felt there was a cause of action worth pursuing or that

1 they -- if they were willing to contribute approximately 25
2 percent, roughly, of their distribution to this trust, that
3 they would get the benefit of whatever this trust would
4 produce.

5 So, as a result, Your Honor, in the Class 9 ballot,
6 there is an opt in which allows the unsecured creditor if he
7 wishes -- he or she wishes, to contribute a portion of their
8 distribution under the plan to fund a litigation trust for
9 which they will then get a recovery.

10 So, how does this case from that -- just that
11 perspective, Your Honor, differ from the cases cited in the
12 memorandum of law, as well as the U.S. Trustee's objection.
13 The fact is, number one, there was an extensive investigation
14 in the record by way of the fee applications that have been
15 filed by the Committee, which I would ask Your Honor to take
16 judicial notice. And Mr. Ahearn's affidavit clearly makes --
17 it makes clear there was an intensive, extensive investigation.

18 There were releases which were negotiated as part of
19 an overall settlement of this case and a recognition that not
20 everyone could get a release here. And as a result, there was
21 a carve out from the release, Your Honor, there is something
22 called the assigned causes of action, which are being
23 transferred to the trust, and those are defined in the plan
24 relating to causes of action against Onyx and its affiliates,
25 Your Honor. And they will not be getting a release here.

1          So, this is not a case where the debtors have come
2   before Your Honor, say I want a release for everyone, you know,
3   just give me the blanket release, we've got a financial
4   restructuring, that's good enough. Here, there was extensive
5   investigation, animosity, Your Honor. Your Honor may recall
6   some of the hearings we had in the spring, and the transcripts
7   will reflect it. It would be a very difficult period of time
8   for these debtors who are trying to reorganize, restructure
9   their business, as well as the same time under an intense
10  investigation by the Creditors' Committee, which resulted in a
11  settlement. And it's not a perfect settlement, I will tell you
12  from the debtors' perspective or the Board of Directors'
13  perspective, in that there are parties that have been isolated
14  here in terms of a release to feel they've done nothing wrong.
15  But nonetheless, Your Honor, I guess only time will prove that.

16          And I think that is an important factor which does
17  distinguish this case from others, maybe brings it closer to
18  the Bruno's case, Your Honor, which I think is P.W.S. Holdings
19  is the technical name, where there was actually an examiner
20  appointed in the case who concluded in connection with a -- in
21  connection in Kohlberg, Kravis, Roberts leverage buyout of
22  Bruno's that there was nothing inappropriate done and they gave
23  a very low -- a very low success percentage to any causes of
24  action that the dissident bondholders wanted to bring.

25          And I would also note in that case that the

1 bondholders were not receiving any consideration under the
2 plan. The four classes who were being asked to give releases
3 are receiving consideration under the plan, ranging from
4 approximately 8.8 percent for the general unsecured creditors
5 up to approximately 48 percent for the senior lenders who are
6 fully perfected in all of the assets of the company.

7 Mr. Ahearn's affidavit makes clear that there -- he
8 believes there is an appropriate -- appropriate reasons why the
9 debtor in possession lender and its agents should be given
10 releases, as well. They have provided financing to allow this
11 company to operate its business during the Chapter 11 to give
12 it the opportunity to reach an ultimate agreement in this case.
13 And as Ms. Primoff demonstrated during her cross examination of
14 Mr. Ahearn, there's -- the debtor in possession lenders went
15 beyond that by granting waivers when necessary to allow these
16 companies to operate.

17 The senior lenders, Your Honor, are clear that under
18 the law, they could have requested a plan to be filed or filed
19 it themselves if Your Honor had terminated exclusivity, which
20 could have absorbed all of the value of these companies for
21 their benefit. But, again, in an attempt to compromise, they
22 were prepared to allow some of the value that would otherwise
23 likely -- they would be -- legally entitled to to flow to the
24 unsecured creditors.

25 And I would just also note that on the convenience

72

1  classes, we're talking about a 25 percent recovery.

2      For all those reasons, Your Honor, I believe that
3  this case and the facts of this case as set forth in Mr.
4  Ahearn's affidavit as reflected in the legal docket of this
5  Court as -- in terms of proceedings that have been held before
6  Your Honor, fee applications which have been filed to
7  demonstrate the scope and breadth and extent of the
8  investigation done by the Creditors' Committee and the recovery
9  for all classes that are being asked to give releases, Your
10  Honor, and the overwhelming acceptance by those classes, I
11  think, stands for the proposition, Your Honor, that the
12  releases are appropriate as set forth in Section 4.11.  They
13  are measured, Your Honor, in a sense that not all parties in
14  this transaction are getting releases, to the extent that the
15  Creditors' Committee thought that there was -- that they
16  insisted upon certain causes of action, they've been given
17  those, Your Honor.  And there has been a litigation trust
18  that's been formed for that purpose.

19      And, therefore, Your Honor, I would ask that Your
20  Honor confirm this Chapter 11 plan and including the releases
21  that are provided therein.  And unless Your Honor has any
22  further questions, I will cede the stage to whoever else wishes
23  to be heard.

24      And what I would suggest perhaps, Your Honor, is --
25      THE COURT:  Well, why don't we hear from the only

73

1  objector on the issue?

2          MR. KRESS:  Well, can we -- I apologize.

3                      (Pause)

4          MR. KRESS:  Your Honor, could we have about two

5  minutes to discuss it with the objectors?

6          THE COURT:  Okay.

7          MR. KRESS:  Thank you, Your Honor.

8          THE COURT:  Two minutes.

9              (Recess 4:03 P.M./Reconvene 4:07 P.M.)

10         THE COURT:  Please be seated.

11         MR. KRESS:  We've -- again, Your Honor, I thank you

12 of indulging us and having a brief recess.  And I think, once

13 again, it has been productive.  In discussions with the Office

14 of the United States Trustee, and based on the record we have

15 established before this Court, and further providing that the

16 releases be limited as it applies to the professionals of the

17 debtors and the Creditors' Committee so as to limit and not

18 provide releases for wilful misconduct or gross negligence,

19 which I think is the standard that's been used in the _P.W.S._

20 case, I believe that would constitute a fair settlement of the

21 Committee's objection to the release provisions in the plan.

22         UNIDENTIFIED ATTORNEY:  U.S. Trustee's.

23         MR. KRESS:  U.S. Trustee's, I apologize, Your Honor.

24 The U.S. Trustee's objection to the release language.

25         THE COURT:  Run it by me once more.

74

1        UNIDENTIFIED ATTORNEY:  I'm sorry.

2        THE COURT:  Because I was focusing on a different
3   issue.

4        MR. KRESS:  Okay.  The releases would be as they are
5   except that with respect to the professionals for the
6   Creditors' Committee and the debtors, they would be held
7   accountable for wilful misconduct or gross negligence, very
8   much like the exculpation provision that was in front of the
9   3rd Circuit and Judge Robinson in the Bruno's case, Your Honor.

10       THE COURT:  Okay.  And with that, Your Honor, we
11  would ask that Your Honor agree -- confirm the plan, I'm sure
12  Your Honor probably has questions on the confirmation order.
13  And if you do, what may make the most sense at this stage, I
14  know you have another matter out there, Your Honor, and perhaps
15  what we can do is give you a fully delineated, using the
16  computer of court -- order with all the changes we've talked
17  about in there for Your Honor to review, and I can walk you
18  through it, while -- and while we're doing that, Your Honor, if
19  you wish to take the next matter so that they're not waiting
20  out there too much longer.

21       THE COURT:  Okay.  Depending on how long the other
22  one goes, what I'd like to do is actually just try to read it
23  sometime tomorrow.

24       MR. KRESS:  That's fine, Your Honor.  The only other
25  -- the one thing I would ask, because we do have two sales on,

75

1  if Your Honor is prepared to approve confirmation of the plan,
2  if you can state so on the record so that I can then do my two
3  sales?

4           THE COURT:  Okay.  Well, let's finish up with this
5  and then we'll do the two sales.

6           MR. KRESS:  Okay.  That's fine, Your Honor.  At this
7  point, we will then stand in recess for this matter while we do
8  the order for Your Honor, or do you want to go right to the
9  sales?

10          THE COURT:  Let's do the sales.

11          MR. KRESS:  Okay.  Okay, thank you.

12          THE COURT:  Before we leave the release issue, let me
13 just make a couple of observations and more or less for future
14 benefit.  I think that -- I had no difficulty with the release
15 for the banks because I think they're supported by
16 consideration.

17          The release that troubled me most was of the officers
18 and directors and according to your memorandum, you claim that
19 they made a substantial contribution, including, one,
20 stabilizing the operations of Magnatrax and, two, negotiating
21 the consensual plan of reorganization.  That's what they're
22 required to do.

23          MR. KRESS:  I understand.

24          THE COURT:  And so release of those people is, in my
25 view in this case, marginally appropriate.

76

1        And, quite frankly, I -- it reaches that margin only
2   because of the investigation the Committee did, which I think
3   is rather -- is a rather complete one insofar as I can see.
4   Okay.

5        MR. KRESS:  Okay.  With -- with Your Honor's
6   permission, we'll move on to the two sales then?

7        THE COURT:  Yes.

8        MR. KRESS:  And I think that would conclude the --
9   and for purposes of moving forward on the sales, Your Honor,
10  can I assume that the plan will be deemed confirmed at this
11  point?

12       THE COURT:  Yes.

13       MR. KRESS:  Thank you, Your Honor.

14       The first one, with Your Honor's approval, I'd like
15  to address is the sale of Republic Builders.

16       THE COURT:  Okay.

17       MR. KRESS:  And if I just can have a moment, I just
18  want to get my -- those notes.

19                         (Pause)

20       MR. KRESS:  On October 15th, Your Honor, we came
21  before Your Honor on the application of the debtors to
22  authorize the sale of Republic Builders to A.B. Siemer, S-I-E-
23  M-E-R, who had been chose as the stalking horse, for purposes
24  of -- for purposes of the sale of the Republic Builders for a
25  purchase price of approximately $10,222.

1    Attached to the motion, Your Honor -- and what the
2 motion sought to do was really bifurcated into two hearings.
3 The first hearing was to address the bidding procedures, set
4 forth the objection deadline for both objections to the sale
5 itself, as well as objections to the cure amounts with respect
6 to contracts to be assumed and assigned to the prospective
7 buyer. And likewise, Your Honor, approving a break-up fee of
8 under three percent, which Your Honor did in accordance with
9 the bidding procedures order.

10    Attached to that motion at the time was the affidavit
11 of Richard Morgner of Capital -- of Chanin Capital who set
12 forth in detail the process that led to the filing of this
13 motion. And, Your Honor, that affidavit is attached to the
14 motion. But just to highlight some of the salient terms:

15    They started with 111 prospective buyers, Your Honor,
16 both strategic and financial. They then contacted all 111
17 potential buyers. And that was done in June of 2003. Of the
18 111 buyers contacted, 51 indicated an interest in pursuing this
19 transaction by executing a confidentiality agreement. And that
20 51 included 11 strategic buyers and 40 financial buyers. A
21 confidential memorandum was delivered to each one of the 51
22 parties.

23    Of those 51 parties, Your Honor, the debtors received
24 a preliminary expression of interest from two strategic buyers
25 and four financial buyers which ranged anywhere from two

78

1 million to $14 million. And from those -- and those six
2 potential buyers were then permitted -- of those six, four were
3 permitted to go forward, Your Honor, on extensive due
4 diligence. That included onsite discussions with management,
5 onsite inspections of the facilities, inventory, assets, et
6 cetera.

7              And of those four, Your Honor, the highest offer that
8 was received for Republic was the $10,200,000 offer of A.B.
9 Siemer. And perhaps the most important aspect of it, as well,
10 was that the debtors had provided a form purchase agreement to
11 each of those four parties who were allowed to do the due
12 diligence. And of the four, A.B. Siemer was the only one, Your
13 Honor, who had relatively minor changes to the purchase
14 agreement, which included an assumption of underfunded pension
15 plans which would have thereby provided -- which thereby
16 allowed those pension plans not to be terminated, which
17 obviously would have greatly increased the liabilities of these
18 companies. And that was a significant concession by the buyer.

19             We then filed the application with Your Honor to
20 approve the sale, attached a copy of the proposed purchase
21 agreement, the proposed order approving the sale and the
22 bidding procedures order, which Your Honor did enter on
23 September 15th -- I'm sorry, I withdrawal -- October 15th. And
24 which set forth the following schedule.

25             First, that qualified bids were due, if any, on

1  November 3.   That an auction would be held, assuming there were
2  qualified bids on November 10th.   And that an objection
3  deadline of November 7th with respect to any cure amounts or
4  with respect to the sale itself, and a hearing for today to
5  approve the sale.  I think it's a testament, Your Honor, to the
6  purchase price that we were able -- that the debtors were able
7  to achieve with A.B. Siemer, the fact that no one else made a
8  qualified offer or a competitive offer any way, shape or form
9  in accordance with the bidding procedures, let alone received
10 any, Your Honor.

11           We held the auction as a technical matter on November
12 10th just on the chance that someone may not have made a
13 qualified bid, but would show up anyhow.  No one showed up,
14 Your Honor.

15           And, therefore, Your Honor, there have been no
16 objections filed to the proposed sale.  I would -- the sale is
17 supported by both the Creditors' Committee and the senior
18 lenders and they can obviously echo.

19           However, we did file -- we did receive certain
20 objections to cure amounts that were filed.  And the way this
21 was done, Your Honor, there was a notice of cure amount that's
22 sen to each party who have been identified in a schedule to the
23 purchase agreements, to whose contracts were proposed at that
24 time to be assumed and assigned to the buyer.  And based on
25 that, Your Honor, we received a number of objections.  And if I

1  may, in fact, there were a total of four objections.

2      And I say four, Your Honor, because General Electric
3  Capital Corporation, who was an equipment lessor, had a
4  multitude of different types of equipment leases. And the way
5  we have resolved them is as follows, Your Honor:

6      With respect to the Kelsey Group, who is a landlord
7  in Pennbrook, Florida, the debtors and the landlord have agreed
8  to a cure amount of $2,768.42. And I have a stipulation so
9  providing which, if I may, Your Honor, approach the Court with.

10     And the stipulations we will be providing, Your
11 Honor, are identical. The only difference being the amount of
12 the cure that has been agreed to, Your Honor. So, all of the
13 provisions will be identical, as I present them to Your Honor.

14          THE COURT:  Okay.

15          MR. KRESS:  The second objection was filed by
16 Majestic Realty Company with respect to real estate located in
17 Norwalk, California. The cure amount there that they asserted
18 was approximately 15,000. The debtors had listed in their
19 Exhibit F to their bankruptcy schedules, which set forth the
20 amount due and owing at the time of the filing of roughly
21 14,000. But in further due diligence, the buyer -- the
22 proposed buyer determined that this facility was not going to
23 be necessary to the ongoing business, especially in light of
24 the fact that its term expires on December -- I think it's 5 of
25 this year.

81

1    And, therefore, the debtors propose to eliminate that
2  contract from the contracts to be assumed.  A notice to the
3  landlord was sent advising them of that and, therefore, we will
4  be filing a motion to reject that contract, Your Honor.

5    With respect to GECC, we have bifurcated the various
6  leases they have.

7    With respect to their lease for the META (phonetic)
8  copier, and that's Lease Number 6947617001, the parties have
9  agreed to a cure amount of $140.02.  And with respect to the
10  Clark Forklift lease, that's Number 3560160, the cure amount
11  has been agreed to at $649.99.  And we have a stipulation, if I
12  may present to Your Honor on that, as well.

13    THE COURT:  Okay.

14    MR. KRESS:  With respect to a separate lease with
15  General Electric Capital Corporation, which is five various
16  META copiers, that lease -- the leases for those copiers will
17  be rejected, GECC has been so informed and this was discussed
18  as part of the overall resolution of their objections, Your
19  Honor.

20    THE COURT:  Okay.

21    MR. KRESS:  Last but not least was the objection
22  filed by North Shepard Business Center for a real estate lease
23  for Houston, Texas.  The parties have agreed to a cure amount
24  of $5,880.59.  And if I may approach, Your Honor, with a
25  stipulation so providing.

82

1          THE COURT:    Okay.

2                        (Pause)

3          THE COURT:    Okay.

4          MR. KRESS:    Your Honor, the motion sets forth in
5  detail the business decision by the debtors as to why this
6  business should be sold, that it is not a core -- part of the
7  core businesses that are going to be reorganized and move
8  forward.    The lender -- senior lenders and the Committee concur
9  in that conclusion, Your Honor.    We -- the debtors, through
10  Chanin, have gone through an extensive notice campaign and
11  extensive marking campaign to try to attract the best possible
12  price as witnessed by Mr. Morgner's affidavit attached to the
13  motion.    And all objections to cure amounts have either been
14  resolved or that the debtors have elected not to -- or the
15  buyer -- prospective buyers elected not to proceed with an
16  assumption and assignment of their contract.

17          Unless Your Honor has questions concerning the
18  approval order, I would ask that Your Honor approve the sale of
19  the Republic Builders Products Company business to A.B. Siemer.

20          THE COURT:    Okay.

21          MR. KRESS:    And if I may approach, same form of
22  order, Your Honor, no changes.

23          As I indicated, Your Honor, the parties are moving
24  forward to try to close this deal by November 24th, that's the
25  targeted date for the Republic sale, Your Honor.

83

1        And the other point I just want to reiterate, which I
2   think I stated earlier in the hearing, Your Honor, given the
3   fact that A.B. Siemer turns out to be the buyer for both sets
4   of businesses, we'll probably ultimately merge the two
5   contracts together because ultimately the two businesses will
6   be merged together, as well.

7        And obviously those form of contracts will be
8   submitted to the senior lenders' counsel and Creditors'
9   Committee counsel prior to the execution.

10        THE COURT:  Okay.

11        MR. KRESS:  With that, Your Honor, if I may turn to
12   Windsor Door and the sale of substantially all the assets of
13   Windsor Door, Rescom Overhead Doors and Smith Door
14   Distributing, those two latter entities are subsidiaries of
15   Windsor Door.

16        Once again, Your Honor, we appeared before Your Honor
17   on October 28th, at which time Your Honor entered a bidding
18   procedures order with respect to the sale of Windsor Doors.
19   Attached to the motion seeking approval of the sale was the
20   affidavit, again, of Richard Morgner of Chanin which set forth
21   in detail the marketing process that Chanin had engaged in
22   under -- with the concurrence and with the input by the senior
23   lenders who have liens on the assets of the equities, likewise
24   keeping the Creditors' Committee financial advisor up-to-date
25   on the sales process, as well.

84

1          In this case, Your Honor, Chanin had identified 119
2   prospective buyers, both strategic and financial.  Chanin
3   contacted each of the 119 prospective buyers that had been
4   identified.  And that was done in June of this year.

5          Of the 119 potential buyers, 57 indicated an interest
6   in the transaction and executed a confidentiality agreement
7   and, therefore, received a confidential memorandum --
8   information memorandum which described the seller's business,
9   which is -- and an overview of the garage door industry,
10  they're basically manufacturers of garage doors for commercial
11  buildings, and in some cases, residential.

12          During June and July, Chanin met, had discussions
13  with each of the 57 potential buyers that had signed the
14  confidentiality agreement.  And of those, preliminary interests
15  -- expressions of interest were received from 13 prospective
16  buyers.  Those 13 included six strategic buyers, and the
17  balance being financial buyers, indicating a range of value
18  between 2.7 million and 30 million, a wide range, if I may,
19  Your Honor.

20          Likewise, they indicated in those preliminary
21  indications of interest that some of the buyers -- prospective
22  buyers were willing to pay all cash, others wanted to pay a
23  combination of cash and notes and still others were looking at
24  perhaps including equity in the transaction.

25          And all of them, obviously, were subject to a due

1  diligence condition.

2          Of those 13, and after investigating the 13
3  preliminary expressions of interest and having had discussions
4  with the senior lenders' financial advisors, as well as the
5  Committee's -- Creditors' Committee's financial advisor, it was
6  agreed that five of those 13 parties would be authorized to
7  conduct a more detailed due diligence, just like in Republic,
8  that is visiting the sites, visiting management, having
9  managing discussions, investigating and conducting due
10 diligence onsite with respect to the assets of the company.

11          Likewise, of those five, prospective or draft
12 purchase agreements prepared by debtors' counsel, with the
13 input of counsel for the senior lenders and the Creditors'
14 Committee were then sent to those five prospective buyers with
15 a request that final bids be sent in September, which would
16 include any mark up of the purchase agreement.

17          And, once again, Your Honor, A.B. Siemer proposed
18 what the debtors believed to be the -- and turned out to be the
19 highest bid.  And, in addition, once again, did not --
20 submitted a proposed contract, which had very little change to
21 that which the debtors had prepared.  And their bid is for $22
22 million, Your Honor.  The range of bids we got from the buyers
23 was from 11 to 29 million.  And unfortunately, the highest one
24 had substantial modifications to the purchase agreement which
25 also included the potential rejection of a collective

86

1 bargaining agreement, which I don't need to emphasize to the
2 Court the difficulty one has in doing those and the time
3 consuming nature of getting that done and the prospective
4 disruption in the employee/employer relationships because of
5 that.

6          And, again, the A.B. Siemer contract agreed -- A.B.
7 Siemer agreed to the assumption of an underfunded pension plan
8 in the Windsor Door -- for Windsor Door.

9          We filed the application with the Court with a copy
10 of the purchase agreement, the proposed bidding procedures
11 order and the proposed order approving the sale.  As I
12 indicated, the purchase price was $22 million.  The only
13 objections that were received, Your Honor, were five landlords
14 where there were disputes on cure amounts and all five cases,
15 Your Honor.

16          After further analysis and recognizing at this point,
17 Your Honor, that we have one buyer for the two businesses which
18 are interrelated in some respect, and the consolidation that
19 this prospective buyer would anticipate, the debtor -- the
20 buyer had indicated that it does not wish to pursue as part of
21 the purchase agreement the assumption or assignment of those
22 five contracts.  Those, for the record, Your Honor, are with
23 the following landlords:  Hill Management Services, Lanier
24 Enterprises, 2400 Port Street Associates, WRI/Atlanta Park, and
25 Prologis, P-R-O-L-O-G-I-S.  And likewise, those -- counsel for

87

1  those landlords were notified, Your Honor, of the buyer's
2  decision not to pursue an assumption and assignment of those
3  contracts.  And there were no other objections to the cure
4  amounts.

5       Just for complete disclosure, Your Honor, there have
6  been additional contracts listed on the schedule to the
7  purchase agreement, which set forth the contracts to be assumed
8  or rejected.  There were additional contracts, Your Honor, that
9  the debtor listed that the buyer has decided not to pursue and
10 likewise, notice to those buyers has been given, as well.  In
11 all of these cases, Your Honor, we will follow-up with a more
12 formal motion to reject and give them the opportunity to file
13 their rejection claims, Your Honor.

14      And with that, Your Honor, unless Your Honor has
15 questions concerning the proposed order, I would ask Your Honor
16 for approval of the sale of Windsor Doors to A.B. Siemer, and I
17 have a proposed order.

18      And as I said, Your Honor, it is identical to the
19 form of order that was attached to the motion.  There were no
20 changes made, Your Honor.

21                     (Pause)

22      MR. KRESS:  With that, Your Honor, I think that
23 completes the calendar.

24      Now, in terms of process with the confirmation order,
25 with Your Honor's permission, what we'd like to do is submit to

88

1  you a new version of the confirmation order which will be black
2  line to that which you saw last night to reflect everything
3  we've talked about today, as well as resolutions that have been
4  made with the various objecting parties.  And then we will
5  submit it to Your Honor for your consideration with a clean
6  copy and -- I don't know if Your Honor wanted to proceed by a
7  telephone hearing or Your Honor will issue the confirmation
8  order as you --

9           THE COURT:  Well, send it over under cover of
10  certification --

11          MR. KRESS:  Right.

12          THE COURT:  -- as to the changes.  And if I have a
13  problem, I'll call you.

14          MR. KRESS:  Thank you, Your Honor.  And I -- I want
15  to thank Your Honor very much for your indulgence today.   And,
16  again, I do want to apologize for getting the documents to Your
17  Honor as late as we did yesterday.

18          THE COURT:  Okay.  We stand in recess.

19                    (Conclusion 4:32 P.M.)

20

21

22

23

24

25

89

1

2

3                   C E R T I F I C A T I O N

4

5           I, Karen Hartmann, certify that the foregoing is a

6   correct transcript to the best of my ability, from the

7   electronic sound recording of the proceedings in the above-

8   entitled matter.

9

10                                        Date:    November 28, 2003

11   TRANSCRIPTS PLUS

12

13

14

15

16

17

18

19

20

21

22

23

24

25