**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ONEX AMERICAN HOLDINGS, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-CV-263 (SLR) |
| | ) | |
| RICHARD M. KIPPERMAN, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, | ) | Case No. 03-11402 (KG) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## MOTION OF ONEX CORPORATION TO INTERVENE

Onex Corporation ("Onex Corp."), by and through its undersigned counsel, files this motion (the "Motion")[1] to intervene as an appellant in the above-captioned proceeding as a "person aggrieved" by the order on appeal and pursuant to Rule 2018(a)[2] of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), applicable caselaw and this Court's inherent power over this proceeding.[3]

---

[1]    Pursuant to D. Del. L.R. 7.1.2, Onex Corp. reserves its right to file a reply memorandum.

[2]    The Bankruptcy Rules apply to bankruptcy appeals. *See Halbet* v. *Yousif* (*In re Yousif*), 201 F.3d 774, 778 (6th Cir. 2000) (court applies Bankruptcy Rules to the appeal); *Sec. Corp.* v. *Nat'l Gypsum Co.* (*In re Nat'l Gypsum Co.*), No. 3:94-2452, 1999 WL 20952, at *3 (N.D. Tex. Jan 8, 1999) (same).

[3]    Onex Corp. files this motion as a precaution, given the Trustee's argument that Onex American Holdings, LLC ("Onex Holdings") lacks standing to pursue this appeal. As

## JURISDICTION

This Court has jurisdiction over this matter pursuant to section 158(a)(1) of title 28 of the United States Code.

## BACKGROUND

The background of this appeal and the underlying chapter 11 case is set forth in pages 4-12 of the Opening Brief, which is incorporated herein by reference.

## RELIEF REQUESTED

By its Motion, Onex Corp. seeks the entry of an order granting it the right to intervene in the above-captioned appeal.

## ARGUMENT

### A.    Onex Corp. May Intervene as a "Person Aggrieved."

1.    The law is clear that a "person aggrieved" – one whose pecuniary interests are affected adversely by the challenged order of the bankruptcy court – has standing to appeal from a bankruptcy court ruling. *Int'l Trade Admin.* v. *Rensselaer Polytechnic Inst.,* 936 F.2d 744, 748 (2d Cir. 1991) ("person aggrieved" has standing to appeal whether or not it intervened in the bankruptcy case); *Giddens* v. *Kreutzer* (*In re Kreutzer*)*,* No. 06-5127, 2007 WL 2891064, at *1 (10th Cir. Oct. 3, 2007) (bankruptcy appellate review only available to "persons aggrieved"); *Enterprise Bank* v. *Young* (*In re Fryer*)*,* 235 Fed.Appx. 951, 2007 WL 1667198, at **2 (3rd Cir. June 11, 2007) (appellant lacked standing as a "person aggrieved" because it never filed a claim). The "person aggrieved" retains "standing to appeal whether or not they sought intervention" in the bankruptcy court. *Int'l Trade,* 936 F.2d at 748.

---

demonstrated in the Opening Brief of Appellant Onex American Holdings, LLC (the "Opening Brief"), Onex Holdings has standing. Should the Court determine otherwise, Onex Corp. seeks to intervene to pursue the Appeal.

2.    A party with standing to appeal may intervene in another's appeal.  In *Derivium* v. *United States Trustee,* No. 05-10845, 2006 WL 1317021 (S.D.N.Y. May 12, 2006), borrowers of the debtor bank sought to intervene in the debtor's appeal of an order converting the case from chapter 11 to chapter 7 of the Bankruptcy Code.  *Id.* at \*6-7.  The borrowers, who were parties in interest in the bankruptcy case but not involved in the appeal, sought to intervene to protect their interests in certain pre-petition transactions that could be affected by conversion of the chapter 11 case.  Recognizing the borrowers' need to protect their interests in the appeal, the court granted their motion to intervene.  *Id.*

3.    The situation is almost identical in this Appeal.[4]  Onex Corp., like the borrowers in *Derivium,* is a "person aggrieved."  The Bankruptcy Court's Order denying the Motion to Reopen significantly affects Onex Corp.'s pecuniary interests as it, along with the other defendants in the Georgia Action, will be forced to continue to defend a $600 million lawsuit brought in violation of the Plan.  Onex Corp.'s share of the more than $100 million equity investment in the Debtors was wiped out.  As in *Derivium*, Onex Corp.'s standing as a "person aggrieved" provides this Court sufficient basis to allow it to intervene in the Appeal.

**B.    Onex Corp. May Intervene Permissively Pursuant to Bankruptcy Rule 2018(a).**

4.    Bankruptcy Rule 2018 provides that "[i]n a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."  In exercising this discretionary authority, courts have looked to whether (i) the intervenor's interests are adequately represented, (ii) the intervenor has an economic interest in the matter, (iii) denial of

---

[4]    Capitalized terms not otherwise defined shall have the meanings ascribed to them in the Opening Brief.

intervention will adversely affect the intervenor's interests, and (iv) intervention will cause undue delay. *In re First Interregional Equity Corp.*, 218 B.R. 731, 736 (Bankr. D.N.J. 1997). Here, Onex Corp. satisfies each of these requirements.

5.    *First,* Onex Corp.'s interests will not be adequately represented by Onex Holdings if the Trustee prevails in his challenge to Onex Holdings' standing. Though representation is presumed adequate if the intervenor and the existing party have identical interests (as Onex Corp. and Onex Holdings have here), *see McClune* v. *Shamah*, 593 F.2d 482, 486 (3d Cir. 1979), the existing party's lack of standing overcomes such a presumption. *Mission Hills Condominium Ass'n* v. *Corley,* 570 F.Supp 453, 462 (N.D. Ill. 1983) (court allowed intervention because plaintiff lacked standing). As set forth in its Opening Brief, Onex Holdings asserts that it has standing to pursue the Motion to Enforce. Seeking to avoid the merits of his ongoing violation of the Plan and Confirmation Order, the Trustee has made standing a central point of his argument. To the extent that this Court may find that Onex Holdings lacks standing, Onex Corp. would not be adequately represented because *no party* would be representing its interests. *See id.*

6.    *Second,* Onex Corp. has a substantial economic stake in the litigation. Onex Corp. was a shareholder of the Debtors whose equity was wiped out in the chapter 11 case. Further, pursuant to Onex Holdings' Plan of Complete Liquidation and Dissolution, all of Onex Holdings' property and assets were distributed to its sole shareholder Onex Corp. Onex Corp. is also a co-defendant in the Georgia Action. An order reopening the chapter 11 case to enforce the Plan would protect Onex Corp.'s rights under the Plan by ensuring that it receives the protection of the absolute priority rule contained in section 1129(b) of the Bankruptcy Code.

7.    *Third,* as a co-defendant in the Georgia Action and recipient of Onex

Holdings' assets, a denial of Onex Corp.'s Motion would adversely affect Onex Corp.'s interests.

The Court's ruling on appeal directly affects the scope of the Georgia Action in which Onex

Corp. has a significant interest as a co-defendant.  Reopening the chapter 11 case to enforce the

Plan would appropriately limit recovery in the Georgia Action to the amount of the Allowed

Class 9 Claims held by the Trust Beneficiaries, approximately fifty times less than the improper

$600 million jackpot sought by the Trustee.  Although finding against Onex Holdings on

standing, and possibly on the merits, may not necessarily preclude Onex Corp. from litigating the

reopening of the chapter 11 case independently, the Third Circuit has adopted a "policy

preference which, as a matter of judicial economy, favors intervention over subsequent collateral

attacks." *Brody* v. *Spang,* 957 F.2d 1108, 1123 (3d Cir. 1992).  Denying intervention may lead

to piecemeal litigation and a multiplicity of suits, as well as delay in enforcement of the

Bankruptcy Court's Confirmation Order, something courts seek to avoid.  *See Alvan Motor*

*Freight, Inc. v. Trustees of the Cent. States, Se. and Sw. Areas Pension Fund,* No. 4:05 CV 125,

2007 WL 1657400, at *2 (W.D. Mich. June 6, 2007).

8.    *Fourth,* intervention will not cause undue delay and, in actuality, will

reduce delay.  There will be no delay to the Trustee from any intervention by Onex Corp. since

Onex Corp. would merely continue to assert the same rights and positions as Onex Holdings

already has.  Instead of delaying the Appeal, intervention will have the opposite effect by

facilitating the Court's ruling on the substance of the Appeal, which involves important

principles of judicial estoppel and the integrity of court orders.  It is the Trustee that seeks to

elevate form over substance and achieve delay, while he continues to violate the Plan and

Confirmation Order.  If the Appeal were dismissed for Onex Holdings' lack of standing, Onex

Corp. would be forced to initiate its own proceedings to vindicate its rights under the Plan and

the Bankruptcy Code, a result that would only delay resolution of these issues and create

unnecessary additional litigation and expense.

WHEREAS, for the reasons stated above, Onex Corp. respectfully requests that it

be permitted to intervene in this Appeal and that it be granted such other relief as may be proper.

Dated: November 30, 2007                     COZEN O'CONNOR

_____

Mark E. Felger (No. 3919)
Jeffrey R. Waxman (No. 4159)
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Maria T. Vullo
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Counsel for Onex Corporation, Intervenor*

# EXHIBIT 1

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 20952 (N.D.Tex.), 13 Tex.Bankr.Ct.Rep. 30
**(Cite as: Not Reported in F.Supp.2d)**

**H**

In re National Gypsum Company
N.D.Tex.,1999.

United States District Court, N.D. Texas, Dallas
Division.
In re NATIONAL GYPSUM COMPANY, Debtor,
DONALDSON, LUFKIN & JENRETTE
SECURITIES CORPORATION, Appellant,
v.
NATIONAL GYPSUM COMPANY, Appellee.
**No. Civ.A.3:94-CV-2452-R.**

Jan. 8, 1999.

*MEMORANDUM OPINION AND ORDER*
BUCHMEYER, Chief J.
*1 Before this Court are Motions to Intervene filed
by Jeff. P. Prostok ("Prostok") and the Trustees of the
NGC Settlement Trust ("Trust") (collectively
"Proposed Intervenors"), filed on March 20, 1998
and March 30, 1998, respectively. The Proposed
Intervenors also filed Motions to Vacate Agreed
Order and Remand Case to Bankruptcy Court
("Motions to Vacate and Remand"). For the reasons
stated below, the Proposed Intervenors' Motions to
Intervene are DENIED. Because the Proposed
Intervenors are denied intervention, their Motions to
Vacate and Remand are DISMISSED as moot.

I. BACKGROUND

The Proposed Intervenors seek leave to intervene in
this matter because Donaldson, Lufkin & Jenrette
Securities Corporation ("DLJ") is allegedly
attempting to use a determination on its final fee
application as a basis for asserted res judicata or
collateral estoppel defenses to the Proposed
Intervenors' claims against DLJ in a class action
lawsuit pending in state court. The Proposed
Intervenors also seek to vacate the Agreed Order
entered by this Court on March 10, 1998, awarding
DLJ $2,400,000.00 for services rendered to the
National Gypsum Corporation ("NGC") and Aancor
Holdings, Inc. (collectively, "Debtors"), and to
remand the determination of DLJ's fees to the United
States Bankruptcy Court for the Northern District of
Texas in light of the Proposed Intervenors' claims
against DLJ in state court.

DLJ was the financial adviser to the Debtors, which
were forced into bankruptcy because of asbestos
liability and three levels of publicly traded debt from
a 1986 leveraged buyout. Their plan of
reorganization created a trust for resolving and
paying victims of NGC's asbestos liability,
transferred remaining assets to a new corporation
("New NGC") and distributed varying levels of
securities in New NGC to holders of publicly traded
debt and other creditors. Under the reorganization
plan, New NGC also assumed certain obligations of
the Debtors, including the obligation to pay DLJ's
fees.

The reorganization plan was confirmed by the
Bankruptcy Court on March 9, 1993 in the Order
Confirming the First Amended and Restated Joint
Plan of Reorganization of National Gypsum
Company and Aancor Holdings, Inc. ("Confirmation
Order"). The Confirmation Order ordered final fee
applications to be filed no later than 90 days after the
entry of the Confirmation Order and any objections
to such applications to be filed no later than 150 days
after the entry of the Confirmation Order. *See* Ex. 1
at 38-39.[FN1]Notice of the Confirmation Order was
served on all creditors and interestholders of the
debtors, the indenture trustees, the Legal
Representative for Unknown and Future Asbestos
Disease Claimants ("Legal Representative") and all
other persons listed on the Debtors' master service
list, including then-existing representatives of
persons holding asbestos-related claims.[FN2]*See id.* at
58.The notice was also published in several major
newspapers. *See id.*

> FN1. "Ex." refers to Exhibits to
> Memorandum of Donaldson, Lufkin &
> Jenrette Securities Corporation in
> Opposition to Jeff P. Prostok's Motion to
> Intervene and Memorandum in Opposition
> to Motion to Vacate Order Approving Final
> Fee Award for Donaldson, Lufkin &
> Jenrette Securities Corporation, filed with
> this Court on April 9, 1998.

> FN2. Asbestos claimants were represented
> during NGC's bankruptcy case by the
> Committee of Asbestos Claimants of
> National Gypsum Company (the "Asbestos

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 20952 (N.D.Tex.), 13 Tex.Bankr.Ct.Rep. 30
(Cite as: Not Reported in F.Supp.2d)

Committee"), which represented known claimants, and the Legal Representative, who represented unknown or future claimants. The Asbestos Committee and the Legal Representative represented the beneficiaries of the Trust in DLJ's final fee application process.

**\*2** Pursuant to the Confirmation Order, DLJ filed its final fee application on June 7, 1993. On July 1, 1993, the Trust was established pursuant to NGC's reorganization plan. The administrators of the Trust were appointed by the Bankruptcy Court upon the unanimous recommendation of the Legal Representative and the co-chairman of the Asbestos Committee. While the Asbestos Committee, New NGC, the Bond and Trade Creditors' Committee [FN3] (the "BT Committee") and the Legal Representative each objected to DLJ's final fee application, no objection was filed by the Proposed Intervenors. *See* Ex. 3 at 1. DLJ negotiated with the objecting parties and agreed to reduce its final fee application from \$2.8 million to \$2.4 million in exchange for the parties' withdrawal of their objection to DLJ's final fee application. *See id.*DLJ then presented the Bankruptcy Court with the uncontested \$2.4 million final fee application, but the Bankruptcy Court elected to hold an evidentiary hearing on DLJ's final fee application on May 25, 1994.

> FN3. The BT Committee was the statutory representative for creditors like Prostok.

On August 17, 1994, the Bankruptcy Court issued a Memorandum Opinion and Order setting DLJ's final fees at \$2 million, not \$2.4 million as submitted by DLJ. The Bankruptcy Court concluded that DLJ had rendered reasonable services, worked reasonable hours and achieved more than satisfactory work. *See id.* at 6. However, pursuant to 11 U.S.C. § 330, the Bankruptcy Court reduced DLJ's final fee to \$2 million as its determination of reasonable fees under prevailing market rates. DLJ appealed the Bankruptcy Court's order awarding \$2 million in fees to this Court, arguing that the Bankruptcy Court incorrectly determined DLJ's fees under § 330, rather than under § 328. This Court agreed with the Bankruptcy Court that § 330 controlled over § 328 and affirmed the Bankruptcy Court's order on March 6, 1996. *See* Ex. 4. DLJ appealed to the Fifth Circuit, which reversed this Court's order and remanded for an order complying with § 328 on October 8, 1997. *See In re National Gypsum Co.,* 123 F.3d 861 (5th Cir.1997).

Meanwhile, Prostok had filed a class action lawsuit on October 5, 1995 against DLJ and other parties in Texas state court, alleging fraud, gross negligence and breach of fiduciary duties while advising NGC and Aancor in their bankruptcy proceedings. On the same day Prostok also filed a declaratory judgment action in the Bankruptcy Court seeking a declaration that a unique fee shifting provision in the Confirmation Order did not apply to Prostok's state class action. The Trust also filed a motion on September 17, 1997 in Prostok's declaratory judgment action seeking the same declaration regarding the fee-shifting provision as sought by Prostok. The Trust then filed a lawsuit in the Bankruptcy Court against DLJ and other parties on October 6, 1997, alleging similar claims as Prostok's case. In September 1997, DLJ argued in the declaratory judgment action that the Confirmation Order and the May 25, 1994 final fee application constituted res judicata or collateral estoppel barring the Proposed Intervenors' claims against DLJ.

**\*3** On January 26, 1998, the Bankruptcy Court issued a Memorandum Opinion and Order holding that the fee shifting provision did not apply to the state class action. The Bankruptcy Court also rejected DLJ's res judicata argument because it concluded that the Fifth Circuit's reversal of this Court's order on DLJ's final fee application rendered the matter not final.

On January 28, 1998, the Proposed Intervenors filed an objection to DLJ's fee application in the underlying NGC bankruptcy case,[FN4] alleging that DLJ's fraud, gross negligence and breach of fiduciary duties-the claims alleged in his state class action case-justified a complete forfeiture of its fees. At hearings on February 2 and March 4, 1998, the Bankruptcy Court noted again that the Fifth Circuit's reversal of this Court's order precluded the application of res judicata as to DLJ's fees. On March 6, 1998, DLJ filed an unopposed motion with this Court to enter an order awarding DLJ \$2.4 million as mandated by the Fifth Circuit. This Court entered the Agreed Order Approving Final Fee Award for Donaldson, Lufkin and Jenrette Securities Corporation awarding DLJ \$2.4 million on March 10, 1998. The Proposed Intervenors now seek to intervene under Fed.R.Civ.P. 24(a) or (b) to vacate the Agreed Order and to remand the determination of DLJ's fees to the Bankruptcy Court.

> FN4. While the Trust claims to have filed such objection to DLJ's fee application, only

Not Reported in F.Supp.2d                                                                     Page 3
Not Reported in F.Supp.2d, 1999 WL 20952 (N.D.Tex.), 13 Tex.Bankr.Ct.Rep. 30
(Cite as: Not Reported in F.Supp.2d)

Prostok's objection is docketed with the Bankruptcy Court.

## II. ANALYSIS

### A. Intervention of Right

Federal Rule of Civil Procedure 24 governs intervention:

(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

(b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common.... In exercising its discretion the court shall consider whether he intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Under Rule 24(a) or (b) a proposed intervenor must make "timely application" for intervention. In determining whether or not an application for intervention is "timely", several factors are examined:(1) the length of time the proposed intervenor knew or should have known of its interest in the case, (2) the extent of the prejudice that existing parties may suffer by the proposed intervenor's delay in moving to intervene, (3) the extent of the prejudice that the would-be intervenor would suffer if intervention is denied, and (4) any unusual circumstances that bear upon the timeliness of the application.

*4 Save Our Springs Alliance Inc. v. Babbitt, 115 F.3d 346, 347 (5th Cir.1997) (holding that while the absolute measure of time elapsed is not relevant, a three-month delay in applying for intervention is untimely); Stallworth v. Monsanto Co., 558 F.2d 257, 264-66 (5th Cir.1977).

In this case, the Proposed Intervenors' Motions to Intervene are untimely. The Proposed Intervenors argue that the timeliness of their applications for intervention should be measured from September or

early October 1997, the time when DLJ gave notice that it intended to assert that a determination of its fees gave rise to a preclusion defense to the Proposed Intervenors' claims for fraud, breach of fiduciary duty and gross negligence. Even if this argument is valid, it does not excuse the Proposed Intervenors for their failure to seek intervention in this case until March 20 and 30, 1998, more than five months after learning of DLJ's preclusion defense.[FN5] See Babbitt, 115 F.3d at 347;Sierra Club v. Espy, 18 F.3d 1202, 1206 (5th Cir.1994) ("A better gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties"). Although the absolute time elapsed is irrelevant, such delay is inexcusable considering the history of this case and the Proposed Intervenors' knowledge of DLJ's fee application. It is difficult to believe that while Prostok filed a class action against DLJ in state court October 5, 1995, and while the Trust filed an adversary proceeding against DLJ in the Bankruptcy Court in October 1997, they did not see fit to intervene in the determination of DLJ's fees until March 1998, especially when DLJ's services for which the fees were awarded are the same services that the Proposed Intervenors claim to have been tainted with fraud, breach of fiduciary duty and gross negligence.

> FN5. Although Prostok and the Trust objected to DLJ's fees in the Bankruptcy Court in January 1998, they offer no reason why they did not seek intervention as soon as they learned of DLJ's preclusion defense-in September or October 1997.

The timeliness of the Proposed Intervenors' applications for intervention is measured from the time they knew or should have known of the determination of DLJ's final fee application, and not when DLJ asserted a preclusion defense. See Engra, Inc. v. Gabel, 958 F.2d 643, 645 (5th Cir.1992). This is because the Proposed Intervenors have an interest in whether or not how much DLJ receives in fees. Although the Proposed Intervenors claim that they do not have such interest, and that their interest is solely in preventing any preclusion defense asserted by DLJ, it is difficult to reconcile the Proposed Intervenors' position in light of their lawsuits against DLJ-actions seeking damages and the complete forfeiture of DLJ's fees-and their knowledge of DLJ's final fee application process.

The Proposed Intervenors should have known of their

Not Reported in F.Supp.2d                                                                                                      Page 4
Not Reported in F.Supp.2d, 1999 WL 20952 (N.D.Tex.), 13 Tex.Bankr.Ct.Rep. 30
**(Cite as: Not Reported in F.Supp.2d)**

interest in this case several years ago. The earliest date is May 25, 1994, when DLJ filed its final fee application with the Bankruptcy Court. As a creditor and active participant in NGC's bankruptcy proceedings, Prostok and the Trust, respectively, knew or should have known of their interest in the determination of DLJ's fees at that time. If Prostok was unaware of his interest at that time, then he should have known of his interest in October 1995, when he filed the state class action and the declaratory judgment action; if the Trust was unaware of its interest in May 1994, it should have been aware of its interest in October 1997, when it filed an adversary proceeding against DLJ and a motion in Prostok's declaratory judgment action. At these times, DLJ was appealing the Bankruptcy Court's determination of its fees to this Court and the Fifth Circuit. The Proposed Intervenors knew that the case was on appeal, and could have sought intervention. Regardless of which date is proper for determining the timeliness of the Proposed Intervenors' Motion to Intervene, their Motions are untimely because they should have known of their interest in this case long ago.

*5 In addition, DLJ would suffer prejudice if the Proposed Intervenors were permitted to intervene and to relitigate this case. DLJ's fees have been litigated for more than three years, and was ultimately determined by this Court on March 10, 1998. To permit intervention now to examine DLJ's fees in light of the Proposed Intervenors' claims would be reexamining issues previously addressed at length by DLJ before three courts. Moreover, intervention would be prejudicial to DLJ because it would be contrary to the Fifth Circuit's mandate to enter an appropriate fee award under 11 U.S.C. § 328. The Bankruptcy Court had approved the fee agreement between the Debtors and DLJ, found that DLJ rendered reasonable services but reduced the amount because it used a different prevailing market rate. This Court affirmed the Bankruptcy Court's findings as to the reasonableness of DLJ's services and the reduction in amount. The Fifth Circuit reversed this Court because once the Bankruptcy Court approved the fee agreement, § 328 applied and the Bankruptcy Court could only modify it in light of circumstances not capable of being anticipated at the time the agreement was approved. To permit intervention now and remand this case back to the Bankruptcy Court would be too prejudicial to DLJ, which would be forced to relitigate the reasonableness of its fees, a determination it justifiably relied upon since 1994, when it sought its final fees without opposition. *See Engra, Inc.,* 958 F.2d at 645.

However, denying intervention in this case would not prejudice the Proposed Intervenors. The only effect a denial of intervention would have on the Proposed Intervenors is the *potential* that DLJ will pursue the finality of its fee determination as a preclusive defense against the Proposed Intervenors' pending claims.[FN6] While citing no authority for this argument, the Proposed Intervenors nonetheless claim that such preclusion theory is meritless. If that potential materializes and the Proposed Intervenors are precluded from prosecuting their claims, any prejudice arises from their own delay in failing to object to DLJ's final fee application and to seek timely intervention.

> FN6. This Court expresses no view on the issue of whether a final determination on DLJ's fees collaterally estops any claim that DLJ engaged in fraud, breach of fiduciary duty and gross negligence. *But see In re W.J. Services, Inc.,* 139 B.R. 824, 826 (Bankr.S.D.Tex.1992).

The Proposed Intervenors cannot reveal any unusual circumstances that can affect the untimeliness of their Motions to Intervene. DLJ points out that in the May 1994 evidentiary hearing on DLJ's final fee application, Prostok's statutory representative and the representatives of the Trust beneficiaries raised the same issue that the Proposed Intervenors now wish to relitigate-more than four years ago, and ultimately supported an award of $2.4 million in fees to DLJ. Such circumstances only highlight the untimeliness of the Proposed Intervenors' Motions to Intervene.

### B. Permissive Intervention

As an alternative to intervention of right under Rule 24(a), the Proposed Intervenors seek permissive intervention under Rule 24(b). Like Rule 24(a), a motion to intervene under Rule 24(b) must also be timely. *See Stallworth,* 558 F.2d at 263. As discussed above, the Proposed Intervenors' motions are untimely and would be too prejudicial to DLJ if granted. Thus, permissive intervention is denied.

### III. CONCLUSION

*6 For the reasons stated above, The Motions to Intervene filed by Proposed Intervenors Jeff P. Prostok and the Trustees of the NGC Settlement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 20952 (N.D.Tex.), 13 Tex.Bankr.Ct.Rep. 30
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

Trust are DENIED. The Motions to Vacate Agreed Order and Remand to Bankruptcy Court filed by the Proposed Intervenors are DISMISSED AS MOOT.

It is so ORDERED.

N.D.Tex.,1999.
In re National Gypsum Company
Not Reported in F.Supp.2d, 1999 WL 20952 (N.D.Tex.), 13 Tex.Bankr.Ct.Rep. 30

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                         Page 1
Slip Copy, 2007 WL 2891064 (C.A.10 (Okla.))
(Cite as: Slip Copy)

# H

In re Kreutzer

C.A.10 (Okla.),2007.

Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,Tenth Circuit.
In re Rebecca KREUTZER; Michael Kreutzer, Debtors,
Jimmy Giddens, M.D., Appellant,
v.
Rebecca Kreutzer; Michael Kreutzer; Felicia S. Turner, as U.S. Trustee, Appellees,
Katherine M. Vance, Bankruptcy Trustee; Steven W. Soule, Trustees.
No. 06-5127.

Oct. 3, 2007.

Ben D. Catterlin, Tulsa, OK, Christopher M. Hunt, Grove, OK, Chris M. Hunt, PLLC, for Debtors.

Dan Wesley Ernst, Matthew B. Free, Amy Ellen Kempfert, Best & Sharp, Tulsa, OK, Tara Leigh Grove, U.S. Department of Justice, William Kanter, Civil Division, United States Department of Justice, Washington, DC, David Wayne Newman, Tulsa, OK, for Trustee, Appellees.

Before McCONNELL, McKAY, and TYMKOVICH, Circuit Judges.

## ORDER AND JUDGMENT[FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R.App. P. 32.1 and 10th Cir. R. 32.1.MONROE G. McKAY, Circuit Judge.

*1 Rebecca and Michael Kreutzer petitioned for Chapter 7 bankruptcy relief after post-surgical complications allegedly caused Mrs. Kreutzer to lose her employment and incur extensive medical bills. At the time they filed their bankruptcy petition, the Kreutzers failed to list their accrued but not-yet-filed medical malpractice claim against Appellant, Dr. Jimmy Giddens, as a potential estate asset. Even after later filing a malpractice action against Dr. Giddens, the Kreutzers neglected to supplement their bankruptcy petition to include the malpractice claim. They thereafter received a no-asset discharge, and their bankruptcy case was closed.

In defending the state court malpractice action, Dr. Giddens filed a motion to dismiss arguing, *inter alia,* that the Kreutzers should be judicially estopped from pursuing the malpractice claim. According to Dr. Giddens, by not listing the malpractice claim as an asset in the bankruptcy case, the Kreutzers manipulated the courts by taking inconsistent positions and prejudiced Dr. Giddens.

In an apparent attempt to undercut the force of Dr. Giddens' motion to dismiss, the Kreutzers returned to the bankruptcy court and filed a motion to reopen their bankruptcy case in order to add the malpractice claim as an unadministered asset of their estate while simultaneously arguing for its exemption. Dr. Giddens objected to that motion, but his objection was overruled. He appealed the bankruptcy court's decision to reopen the Kreutzers' bankruptcy case to the district court. The district court, following the magistrate judge's detailed report and recommendation, concluded that Dr. Giddens lacked standing to appeal and, in the alternative, that judicial estoppel did not apply to the bankruptcy proceedings. Dr. Giddens now appeals to this court.

## ANALYSIS

We review issues of standing de novo. *Vermejo Park Corp. v. Kaiser Coal Corp. (In re Kaiser Steel Corp.),* 998 F.2d 783, 788 (10th Cir.1993). While the Bankruptcy Code does not articulate a standard for appellate standing, the Tenth Circuit consistently has adopted the "person aggrieved" standard, under which appellate review is available only to "those persons whose rights or interests are directly and adversely affected pecuniarily by the decree or order of the bankruptcy court."*Holmes v. Silver Wings Aviation, Inc.,* 881 F.2d 939, 940 (10th Cir.1989) (internal quotation marks omitted). This narrow standing requirement "is more stringent ... than the 'case or controversy' standing requirement of Article

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

III.,"*Nintendo Co. v. Patten (In re Alpex Computer Corp.), 71 F.3d 353, 357 n. 6 (10th Cir.1995)* (internal quotation marks omitted), because it is designed to limit appellate standing "in order to avoid endless appeals brought by a myriad of parties who are indirectly affected by every bankruptcy court order,"*Lopez v. Behles (In re Am. Ready Mix, Inc.), 14 F.3d 1497, 1500 (10th Cir.1994)* (internal quotation marks omitted).

**\*2** Accordingly, to qualify as a person aggrieved, Dr. Giddens would have to show that the bankruptcy order at issue "diminish[ed his] property, increas[ed his] burdens, or impair[ed his] rights."*Id* . (internal quotation marks omitted). Dr. Giddens argues that he qualifies as a "person aggrieved" because "the bankruptcy court's order directly impaired" [his] substantive right to present a judicial estoppel defense in the underlying [medical malpractice] litigation."(Aplt.'s Opening Br. at 18.) However, "[t]he mere act of reopening a closed bankruptcy ... is a purely ministerial act with no legal significance for the underlying bankruptcy,"*Quarles v. Malloy (In re Quarles), 2007 WL 171913, at \*5 (N.D.Okla. Jan. 18, 2007),* let alone for an independent tort action. Moreover, while "[t]he bankruptcy court's decision to reopen the case has an indirect effect on [Appellant's] defense in a separate lawsuit, ... this does not mean that [he has] a 'particular and direct stake' in the underlying bankruptcy proceedings."*Id.; see Riazuddin v. Schindler Elevator Corp. (In re Riazuddin), 363 B .R. 177, 183 (B.A.P. 10th Cir.2007)* ("Under the analysis of *[In re Alpex, 71 F.3d 353],* Appellee's claim that its defense in the personal injury case may be affected by the reopening is insufficient to give it a direct interest in the Debtors' bankruptcy case, and therefore, it lacked standing to oppose the motions to reopen."); *see also Lopez v. Specialty Rests. Corp. (In re Lopez), 283 B.R. 22, 27 n. 9 (B.A.P. 9th Cir.2002)* (expressing doubt that defendant in sexual harassment claim that was not listed in bankruptcy filing would have standing to intervene on motion to reopen).

Rather, Dr. Giddens' judicial estoppel defense was properly presented to the state court, which must resolve the matter after the bankruptcy court decides whether the claim is an asset of the estate and after the Chapter 7 trustee decides whether or not to pursue the claim. And while the trustee's decision may affect the viability of that defense,[FN1] Dr. Giddens has failed to show that reopening the Kreutzers' bankruptcy case "will disrupt any defense to the merits" of the medical malpractice claim. *In re Quarles, 2007 WL 171913, at \*5.* Indeed, at this time Dr. Giddens'

liability is undetermined, rendering him "at most, a *potential* 'debtor of a debtor.' " *In re Riazuddin, 363 B.R. at 183* (emphasis added). We conclude that the bankruptcy court order will have no direct effect on Dr. Giddens and that he therefore fails to qualify as a "person aggrieved." We accordingly do not decide whether the Kreutzers should be judicially estopped in either the bankruptcy court or state court proceedings. We note that the bankruptcy court order merely reopened the case; the bankruptcy court maintains the authority to assess any penalties it deems appropriate for the Kreutzers' failure to inform the court of the medical malpractice claim.

> FN1. Depending on the trustee's decision, Dr. Giddens' supplemental citation to *Eastman v. Union Pac. R.R. Co., 493 F.3d 1151, 2007 WL 1954031 (10th Cir. July 6, 2007),* may impact the state court tort litigation.

**\*3** Lastly, we find no merit to Dr. Giddens' contention that the Kreutzers lack standing to reopen their own bankruptcy case. *See*Fed. R. Bankr.P. 5010; *In re Alpex, 71 F.3d at 356.* The order of the district court is affirmed.

C.A.10 (Okla.),2007.
In re Kreutzer
Slip Copy, 2007 WL 2891064 (C.A.10 (Okla.))

END OF DOCUMENT

Westlaw.

235 Fed.Appx. 951
235 Fed.Appx. 951, 2007 WL 1667198 (C.A.3 (Pa.))
**(Cite as: 235 Fed.Appx. 951)**

Page 1

In re Fryer
C.A.3 (Pa.),2007.
This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,Third Circuit.
In Re: Jean E. FRYER, Debtor
Enterprise Bank, a/k/a Enterprise Bank, Inc.
v.
Jean Young, an individual; Harry Young, an individual; Robert Fryer, an individual, in his individual capacity and as Co-Executor of the Testamentary Estate of Jean E. Fryer; David Fryer, an individual, in his individual capacity as Co-Executor of the Testamentary Estate of Jean E. Fryer; Stanley G. Makoroff, Chapter 7 Trustee of the Bankruptcy Estate of Jean E. Fryer; And All Other Persons Or Entities Having Or Claiming An Interest in Certain Premises Generally Known As The Fryer Funeral Home And An Adjacent Dwelling House (723 and 729-31 Washington Avenue, Bridgeville, PA)
Robert B. Fryer, Appellant.
No. 06-4866.

Submitted for Possible DismissalUnder 28 U.S.C. § 1915(e)(2)(B)May 24, 2007.
Filed: June 11, 2007.

**Background:** The Bankruptcy Court ruled that bank had valid and enforceable first priority mortgage lien on deceased debtor's property, and entered order distributing assets in bankruptcy estate. Debtor's son appealed. The United States District Court for the Western District of Pennsylvania, Thomas M. Hardiman, J., dismissed appeal, and son appealed.

**Holdings:** The Court of Appeals held that:

(1) appeal was untimely, and

(2) son lacked standing to appeal distribution of assets.

Dismissed.
West Headnotes
**[1] Bankruptcy 51 ⟜3774.1**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3774 Notice of Appeal; Time
                51k3774.1 k. In General. Most Cited Cases

**Bankruptcy 51 ⟜3778**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3778 k. Dismissal; Hearing. Most Cited Cases
Appeal of bankruptcy court order finding that bank had valid and enforceable first priority mortgage lien on debtor's property was untimely, and thus dismissal of appeal was warranted, even if deadlines for filing appeal were merely non-jurisdictional claim-processing rules, where notice of appeal was not filed until six months after order issued, and bank moved to dismiss appeal to district court on timeliness grounds. 28 U.S.C.A. § 158(c)(2); Fed.Rules Bankr.Proc.Rule 8002, 11 U.S.C.A.

**[2] Bankruptcy 51 ⟜3771**

51 Bankruptcy
    51XIX Review
        51XIX(B) Review of Bankruptcy Court
            51k3771 k. Right of Review and Persons Entitled; Parties; Waiver or Estoppel. Most Cited Cases
Deceased debtor's son lacked standing to appeal bankruptcy court's order distributing assets in bankruptcy estate, where son never filed formal or informal proof of claim identifying himself as creditor. Fed.Rules Bankr.Proc.Rule 3002, 11 U.S.C.A.

**\*952** On Appeal From the United States District Court For the Western District of Pennsylvania (D.C. Civ. No. 06-cv-00550), District Judge: Honorable Thomas M. Hardiman.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Fed.Appx. 951
235 Fed.Appx. 951, 2007 WL 1667198 (C.A.3 (Pa.))
(Cite as: 235 Fed.Appx. 951)

Page 2

William E. Kelleher, Jr., Cohen & Grigsby, Pittsburgh, PA, for Enterprise Bank.
Robert B. Fryer, Pittsburgh, PA, pro se.

Before: RENDELL, SMITH and JORDAN, Circuit Judges.

OPINION

PER CURIAM.

**\*\*1** Robert Fryer, proceeding *pro se* and *in forma pauperis*, appeals an order of the United States District Court for the Western District of Pennsylvania dismissing his appeal of three orders issued by the United States Bankruptcy Court for the Western District of Pennsylvania. For the following reasons, we will dismiss the instant appeal pursuant to 28 U.S.C. § 1915(e)(2)(B).

Appellee, Enterprise Bank, instituted an adversary proceeding in the Bankruptcy Court for the purpose of determining the validity, priority, and extent of its lien on real property in the bankruptcy estate of Fryer's late mother, who filed for bankruptcy protection shortly before her death in 2002. On August 26, 2005, the Bankruptcy Court ruled that Enterprise Bank had a valid and enforceable first priority mortgage lien on the property. Fryer, who was a co-defendant in the adversary proceeding and actively challenged the validity of Enterprise Bank's lien, did not appeal the Bankruptcy Court's August 26 ruling within the prescribed ten-day period. On September 16, 2005, he filed a petition under FED. R. BANKR.P. 8002(c)(2) for leave to file an untimely appeal of the August 26 ruling. In that petition, Fryer explained that he did not file a timely appeal because, for reasons outside his control, he did not learn of the Bankruptcy Court's ruling until more than ten days after it was issued. On October 31, 2005, the Bankruptcy Court denied Fryer's petition for leave to file an untimely appeal on the grounds that he had failed to make the requisite showing of excusable neglect. Fryer nonetheless continued to file documents in the Bankruptcy Court in support of the unsuccessful petition. On March 30, 2006, the Bankruptcy Court ordered distribution of the funds from the bankruptcy estate to the creditors. The following day, Fryer filed a lengthy document in the Bankruptcy Court, captioned "A Petition To The United States Bankruptcy Court To Allow Robert B. Fryer To Appeal Its Recent Opinion In Favor Of Enterprise Bank To The United States District Court," which was docketed as a notice of appeal of the Bankruptcy Court's October 31, 2005 order and forwarded to the District Court. Shortly thereafter, Fryer filed a document requesting that the District

Court also review the Bankruptcy **\*953** Court's orders of August 26, 2005, and March 30, 2006.

The District Court granted Enterprise Bank's motion to dismiss the appeal, concluding that it lacked jurisdiction over Fryer's untimely challenge to the Bankruptcy Court's decisions of August 26 and October 31, 2005, and, alternatively, that the Bankruptcy Court did not abuse its discretion in denying Fryer's request for authorization to file an untimely appeal. The District Court also concluded that Fryer lacked standing to appeal the Bankruptcy Court's March 30, 2006 order of distribution, and that the challenge was moot because the assets in the bankruptcy estate had already been distributed. Fryer now appeals the entire judgment of the District Court. We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1). Because Fryer is proceeding *in forma pauperis*, we will dismiss the appeal if it lacks an arguable factual or legal basis. *See* 28 U.S.C. § 1915(e)(2)(B); *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

**\*\*2** We agree with the District Court that Fryer's appeal of the August 26 and October 31, 2005 orders was not filed in accordance with the procedural rules governing appeals from Bankruptcy Court decisions. Bankruptcy appeals are subject to the deadlines prescribed by FED. R. BANKR.P. 8002. *See* 28 U.S.C. § 158(c)(2). A party appealing a ruling of the Bankruptcy Court generally must file a notice of appeal within ten days after entry of the order being appealed. *See* FED. R. BANKR.P. 8002(a). The Bankruptcy Court may extend the time for filing a notice of appeal up to twenty days after expiration of the ten-day deadline upon a showing of excusable neglect. FED. R. BANKR.P. 8002(c)(2). But if more than thirty days have passed after entry of the challenged order, excusable neglect ceases to serve as a valid justification for a late appeal. *See Shareholders v. Sound Radio, Inc.,* 109 F.3d 873, 879 (3d Cir.1997). Fryer's challenge to the August 26 and October 31, 2005 orders is clearly untimely under Rule 8002 because he did not file his notice of appeal of these decisions until March 2006.

[1] We have held that a District Court lacks jurisdiction over an appeal of a Bankruptcy Court ruling that is untimely under Rule 8002. *See In re Universal Minerals, Inc.,* 755 F.2d 309, 310 (3d Cir.1985). However, that holding has been called into question by the United States Supreme Court's recent decisions in *Eberhart v. United States,* 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005), and *Kontrick v. Ryan,* 540 U.S. 443, 124 S.Ct. 906, 157

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Fed.Appx. 951
235 Fed.Appx. 951, 2007 WL 1667198 (C.A.3 (Pa.))
(Cite as: 235 Fed.Appx. 951)

Page 3

1 .Ed.2d 867 (2004). Rule 8002 might now qualify as a non-jurisdictional "claim-processing rule" that is mandatory when invoked by a party, but subject to waiver if no timeliness objection is raised. *See Eberhart,* 546 U.S. at 19, 126 S.Ct. 403. At this time, however, we need not resolve the issue of the jurisdictional significance of Rule 8002 because even if the deadlines prescribed under that rule are merely non-jurisdictional claim-processing rules, we note that Enterprise Bank moved to dismiss Fryer's appeal to the District Court on timeliness grounds and therefore properly invoked the rule. Accordingly, we conclude that the District Court correctly dismissed Fryer's untimely appeal of the Bankruptcy Court's orders of August 26 and October 31, 2005.

[2] We also conclude that the District Court properly found that Fryer lacked standing to appeal the Bankruptcy Court's March 30, 2006 order distributing the assets in the bankruptcy estate. Standing to appeal an order of the Bankruptcy Court is limited to "persons aggrieved" by the challenged decision. *In re Dykes,* 10 F.3d 184, 187 (3d Cir.1993). "Litigants are 'persons aggrieved' if the order diminishes **954** their property, increases their burdens, or impairs their rights." *Id.* Under this standard, an appealing party must do more than simply show that the contested order gives rise to a "case or controversy" under Article III. *See In re Combustion Eng'g, Inc.,* 391 F.3d 190, 215 (3d Cir.2004). "[O]nly those whose rights or interests are directly and adversely affected pecuniarily by an order of the bankruptcy court may bring an appeal." *In re PWS Holding Corp.,* 228 F.3d 224, 249 (3d Cir.2000) (internal quotation marks and citation omitted). Whether a litigant has standing to appeal a Bankruptcy Court ruling is ordinarily a question of fact to be resolved by the District Court, and we defer to the District Court's finding unless it is clearly erroneous. *See In re Dykes,* 10 F.3d at 185, 188.

**3 As explained by the District Court, the order of distribution could not have affected Fryer's interests as a creditor of the bankruptcy estate because he never filed a formal or informal proof of claim identifying himself as a creditor. *See generally* FED. R. BANKR.P. 3002 (stating requirements for asserting a claim to debtor's estate). Fryer does not dispute that he never filed a formal proof of claim, but he suggests that his numerous filings with the Bankruptcy Court somehow qualify as an informal proof of claim as to the property that was the subject of the adversary proceeding instituted by Enterprise Bank. The District Court soundly determined that these filings do not suffice as an informal proof of

claim because they do not assert a demand against the debtor's estate, but instead merely dispute the contents of the estate. *See In re Am. Classic Voyages Co.,* 405 F.3d 127, 131-32 (3d Cir.2005) (setting forth requirements for filing informal proof of claim). The District Court also noted that even if the Bankruptcy Court construed any of these filings as an informal proof of claim, the absence of Fryer's name from the list of creditors in the trustee's summary of proposed distribution is evidence that the Bankruptcy Court disallowed the claim and that Fryer is therefore not a "person aggrieved" by the order of distribution. We note that Fryer has not proffered any evidence that persuasively shows that the Bankruptcy Court's order of distribution had more than an indirect effect on his pecuniary interests. Thus, it is clear that the District Court acted within its discretion in finding that Fryer lacked standing to appeal this order.

For the foregoing reasons, we conclude that Fryer's appeal from the District Court's judgment is without arguable merit. We will therefore dismiss the appeal pursuant to 28 U.S.C. § 1915(e)(2)(B).

C.A.3 (Pa.),2007.
In re Fryer
235 Fed.Appx. 951, 2007 WL 1667198 (C.A.3 (Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
**(Cite as: Not Reported in F.Supp.2d)**

Derivium Capital LLC v. U.S. Trustee
S.D.N.Y.,2006.

United States District Court,S.D. New York.
DERIVIUM CAPITAL LLC, Appellant,
v.
UNITED STATES TRUSTEE, Appellee.
In re Derivium Capital LLC, Debtor.
**No. 05 Civ. 10845(CLB).**
**Bankruptcy No. 05-37491(CGM).**

May 12, 2006.

Steven A. Soulios, for Appellant.
Eric Jonathan Small, Albany, NY, pro se.

### *Memorandum and Order*
BRIEANT, J.

**\*1** Appellant Derivium Capital, LLC ("Derivium" or "Debtor") appeals from a November 4, 2005 Order of United States Bankruptcy Judge Cecelia G. Morris, which converted the Debtor's Chapter 11 bankruptcy proceeding into a Chapter 7 case. On March 13, 2006, four loan borrowers from Derivium ("Borrowers") filed a motion (Doc. 25) seeking leave to join Debtor's appeal or to file an *amicus* brief. Counsel for all parties appeared before the Court for oral argument on March 22, 2006.

The following information appears of record and is not disputed, except as noted below. Derivium began business in 1997 under the name of First Security Capital, LLC, and offered a financial product claimed to be proprietary, which it called a "90% Stock Loan," by which transaction a borrower would pledge certain eligible publicly traded stock to secure a non-recourse loan in the amount of 90% of the market value of the stock. The loan would typically mature after three years with interest accruing at 10% to 12% per annum. At maturity, the borrower had the choice either to pay the amount due on the loan with interest and the Debtor would return the stock pledged, or, if the value of the stock was less than the loan principal plus interest, the borrower could walk away from the transaction without any further obligation. A borrower could also sometimes extend the loan period by agreement. Derivium apparently did not itself fund the loans, but merely sold the product and arranged for funding originally by an

Irish corporation named Diversified Design Associates, and subsequently by Bancroft Ventures, Ltd. ("Bancroft"), an Isle of Man corporation located in Cyprus.

The lure by which the product was sold, was as a tax shelter. By entering into the transaction, as opposed to merely selling his stock at 100% of market value, the borrower could convert short term capital gain to long term gain, and postpone the recognition of the tax until the end of the loan period. Derivium approved each stock transaction, rejecting those involving thinly traded or highly volatile issues. Few blue-chip stocks appreciate more than thirty percent in value over a three year period. Even if a particular issue did so, the borrower, upon redeeming, would get the stock back at his original basis. Accordingly, there was little expectation that any borrower would ever redeem his stock at the end of the loan period.

From the period of 1998-2002, Derivium marketed approximately 1,700 loan transactions, in total worth approximately $1 Billion, and generated commissions (the 10% up-front discount) to Derivium of approximately $22 Million. The stock was sold in most cases shortly after receipt by the Debtor or the Debtor's off-shore lender, without consulting the Borrowers, and Debtor asserts that in doing so it acted under the direction of its then-lender, Bancroft. The Debtor entered into hedging transactions, mostly in real estate investments, relying on profits for the ability ultimately to return the stock to those clients at the end of the loan term, who might seek to repay the loan. Administrative overhead and sales commissions exceeded the immediate 10% economic benefit flowing to the Debtor when the transaction was booked. Debtor, in order to earn enough to remain solvent, claims it had a proprietary hedging program for investing which its lender controlled.

**\*2** As might be expected, and as discussed *infra,* the Internal Revenue Service ("IRS") commenced an investigation into the Debtor's business in 2004, and in letters sent by the IRS to borrowers under the program, it indicated that it believed, among other things, that the borrowers' stock pledged to Derivium was sold *before* the borrowers received their funds, and that the proceeds were actually the source of the funds Derivium then loaned to the borrowers. The IRS has taken the litigation position that the sales

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
(Cite as: Not Reported in F.Supp.2d)

were closed transactions for tax purposes in the year the loan was made.

Debtor ceased doing business toward the end of 2001 because of litigation brought by the State of California's Corporations Commissioner ("California") against Debtor and related defendants. California sought to enjoin Derivium from marketing the 90% Stock Loan, claiming *inter alia:* 1) that the transactions were sales of securities and thus required a broker/dealer license under California Corporations Code § 250210(a); and 2) that the Debtor acted as an unlicensed finance lender or broker in making consumer or commercial loans in violation of California Finance Lenders Law.

On November 5, 2003, the Superior Court of California, County of Sacramento, granted summary judgment to Derivium on the issue of whether the transactions constituted sales rather than loans pursuant to the Corporations Code, and concluded that Derivium's 90% Stock Loans were bone fide loans. It denied summary judgment to Derivium on the question of whether Derivium acted as a broker without a license for a finance lender making consumer or commercial loans, in violation of the Financial Code. *See App. 109 -114.*The Superior Court of California noted that while "the immediate liquidation of the security may have many untoward impacts upon the parties to the transaction, those potential impacts have no apparent relevance to the bone fide nature of the primary transaction."*App. 110.*The Superior Court found that the "Commissioner has presented no authorities to support the proposition that a pledgee of [fungible] stock as security, or its agent, cannot liquidate the pledged securities absent a default, or that the fact of such liquidation affects the bona fide nature of the secured transaction" and that "[i]n the end, [Derivium's] initial contention that the transaction were loans was the only position supported by evidence in the record."*App. 110, 112.*Obviously, these legal conclusions are not binding on the IRS.

Debtor asserts that notwithstanding the Superior Court's finding that the transactions were true loans, the pendency of the litigation had a devastating effect on Derivium's business, including necessitating the total cessation of business activities in California since late 2001, and the termination of its relationship with its source lender, Bancroft, which was named as a party to the California action. In December 2002, Derivium and Bancroft executed a termination and settlement agreement in which Bancroft agreed to indemnify Derivium for claims asserted by any

borrowers under the 90% Stock Loan program.

*3 In 2003, Derivium became the subject of lawsuits in various states instituted by a number of borrowers seeking to redeem their stock upon loan maturity. Upon election by the borrowers to receive back the number of shares pledged, Derivium could not perform, Bancroft did not perform and the borrowers instituted suit. Debtor asserts that due to Bancroft's failure to honor its indemnification agreement, Debtor has been found liable in several arbitration awards totaling approximately $75 million.

In December 2004, the IRS issued information document requests followed by summonses, seeking information about the Stock Loan program as part of a Section 6700 investigation. The IRS notified certain known borrowers, including the Borrowers seeking to intervene in this appeal, of their possible liability for capital gains taxes and penalties, should a determination be made that the transactions were sales of securities at the date made rather than bone fide loans. On October 15, 2005, the IRS commenced an action in the United States District Court for the Southern District of New York against Charles Cathcart, Ph.D., Managing Director of Derivium, seeking to enforce the summonses. In its court filings, the IRS disclosed that the Section 6700 investigation could result in the assessment of civil penalties against the Debtor, tax liabilities to the Borrowers, and a requested injunction from marketing the 90% Loan. On September 1, 2005, Derivium filed a voluntary petition under Chapter 11 of the United States Bankruptcy Court for the Southern District of New York. Debtor claims that the actions in California and by the IRS, as well as the loss of Bancroft as its sole lending source, forced it to shut down its business and precipitated its filing for relief under Chapter 11 of the Bankruptcy Code. Derivium claims it was forced to cease operations until it could obtain a final determination as to the legitimacy of the 90% Stock Loan program and thereafter secure a new lending partner, while obtaining a reprieve from the customer litigation. The Debtor's stated intention as a Chapter 11 Debtor was the filing of a motion pursuant to 11 U.S.C. § 505, to obtain a determination that the transactions were actually bone fide loans and not securities sales, which determination would enable the Debtor to resume its operations, but this was never done.

On September 21, 2005, five (5) days after the September 16, 2005 date by which Derivium's Schedules and Statement of Financial Affairs were due to be filed under 11 U.S.C. § 521 and the

Not Reported in F.Supp.2d                                                                                                                          Page 3
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
(Cite as: Not Reported in F.Supp.2d)

Federal Rules of Bankruptcy Procedure 1007(b), the United States Trustee for the Southern District of New York ("US Trustee") filed a motion to convert the Chapter 11 case to a Chapter 7 case, or to dismiss the Chapter 11 case ("Motion to Convert"), claiming that the delayed filing "demonstrate[d] bad faith and an unreasonable delay that is prejudicial to creditors, which constitutes cause to convert or dismiss this case pursuant to 11 U.S.C. § 1112(b)" and that the "failure to file schedules of assets and liabilities and statements of financial affairs and executory contracts independently constitutes cause to convert or dismiss the case pursuant to 11 U.S.C. § 1112(e)."*App. 19.On October 27, 2005, the U.S. Trustee filed a Supplemental Memorandum of Law and Statement in Further Support of the Motion to Convert.

*4 On November 3, 2005, the Bankruptcy Judge held a hearing by way of telephonic conference call on the Motion to Convert. On November 4, 2005, Judge Morris entered an order for conversion ("Conversion Order") of Debtor's Chapter 11 case to a Chapter 7 case, finding that cause existed for the relief requested, and specifically relying on all the following factors: 1) Debtor's lack of insurance; 2) Debtor's lack of profit during its pre-petition period of operation; 3) Debtor's inability to effectuate a plan; 4) Debtor's failure to timely file [a] monthly financial statement, which when filed was not signed, verified, or prepared in compliance with the U .S. Trustee's Operating Guidelines; 5) Debtor's failure to provide the United States Trustee with a requested sworn statement regarding the amounts paid to the Debtor's principals (Debtor furnished only an attorney's letter); 6) The representation of the Debtor-in-possession by professionals retained without approval by the Court, in contravention of the bankruptcy laws; 7) Debtors's improper inclusion of an insider in the list of the twenty largest creditors filed with the Court; 8) A pattern of delay, including the untimely filing of schedules and the list of creditors, and the Debtor's principal being out of the country on the date of the Section 341(a) meeting; 9) The debtor's pattern of making determinations without required Court involvement, including the untimely filing of schedules without seeking an extension of time; the Debtor's principal making the decision to not appear at the initial Section 341(a) meeting without seeking leave of Court; and the representation of the estate [in South Carolina] by professionals not retained by Court order; 10) Debtor's failure to pay required quarterly fee pursuant to 28 U.S.C. § 1930(a)(6); and 11) Debtor's failure to adequately account for the $20 to $25 million in commissions allegedly earned

during its pre-petition operations. The Bankruptcy Court also concluded that the arguments of the Debtor-in-possession were not compelling because it has failed to file any documents with the Court to retain tax counsel, to seek a determination of tax liability under 11 U.S.C. § 505 or to seek approval of its purported financing during the pendency of the Chapter 11 case. *See App. 153-155.*

On the same day, November 4, 2005, the Bankruptcy Court also entered an order transferring venue to the District of South Carolina upon the motion of Mr. Richard Sabelhaus, the Chairman of the Creditors Committee. The transfer order is not apparently challenged although as discussed *infra,* the U.S. Trustee challenges this Court's current jurisdiction over this appeal, following the Bankruptcy Court's transfer of the case to South Carolina.

On November 7, 2005, Kevin Campbell was appointed as the Chapter 7 Trustee by the Bankruptcy Court for the District of South Carolina. According to Mr. Sabelhaus' counsel, two out of three members of the Creditors Committee supported the conversion to a Chapter 7 proceeding. The Chapter 7 Trustee, Mr. Kevin Campbell, requests that the Court dismiss the appeal or affirm the order converting the Debtor's case into a Chapter 7 case.

*5 Appellants moved timely for reconsideration of the Conversion Order under Rule 60(b) of the Federal Rules of Civil Procedure ("FRCP") for "mistake, inadvertence, surprise or excusable neglect" or "any other reason justifying relief." A telephonic conference call on the motion was conducted on November 29, 2005. On December 1, 2005, Judge Morris entered an order denying the motion for reconsideration, finding that the Debtor did not make the requisite showing that the Court either based its decision on a misapprehension or mistake of fact, that it overlooked material facts, or that the Debtor's failures properly to comply with the requests of the U.S. Trustee, certain provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, constituted excusable neglect.

Debtor appeals the Conversion Order and the denial of Reconsideration, arguing that the Bankruptcy Court erred in the following ways: 1) by finding that Derivium engaged in a pattern of delay; 2) by finding that Derivium is unable to effectuate a plan of reorganization; 3) by finding that Derivium failed to earn a pre-petition profit; 4) by finding that Derivium failed to adequately account for the $20 to $25 million in commissions earned by the Debtor during

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
(Cite as: Not Reported in F.Supp.2d)

its pre-petition operations; 5) by finding that Derivium failed to pay the quarterly fee pursuant to 28 U.S.C. § 1930(a)(6); 6) by finding that Derivium failed to provide a sworn statement concerning amounts paid to Derivium's principals pre-petition; 7) by finding that Derivium failed to file documents with the Court to seek a determination of tax liability; 8) by finding that Derivium's "inadvertent inclusion" of an insider on the list of twenty largest creditors, which was "promptly amended upon notification of the mistake by the U.S. Trustee," constituted cause for conversion; 9) by abusing its discretion in finding cause to convert the Chapter 11 case to one under Chapter 7; and 10) by misapprehending material facts or basing the conversion to a Chapter 7 case upon factors constituting excusable neglect or inadvertence, such that it was reversible error not to grant Derivium's motion for reconsideration. Appellant Debtor argues that conversion was not in the best interests of the creditors, that the Bankruptcy Court made manifold erroneous findings of fact, and that the Bankruptcy Court rushed to judgment in converting a Chapter 11 Debtor, which imperfectly, but nevertheless diligently and in good faith, prosecuted its case for reorganization, which it could have effectuated, if given the chance.

*Jurisdiction of this Court following Bankruptcy Court's Transfer of Venue to South Carolina*

The U.S. Trustee argues that this appeal should be dismissed because jurisdiction over the appeal of the conversion order is now solely in the United States District Court for the District of South Carolina, following the Bankruptcy Court's transfer of venue to that district.[FN1] The U.S. Trustee argues that the longstanding general rule in this Circuit is that the transferee court has jurisdiction over appeals of orders entered prior to transfer, citing to *In re: Adelphia Communications Corporations Securities and Derivative Litigation,* 03 MDL 1529, (S.D.N.Y.2003) (McKenna, J.). In that opinion, Judge McKenna cited to and relied upon *Magnetic Engineering & Mfg. Co. v. Dings Mfg. Co.,* 178 F.2d 866, 870 (2d Cir.1950), in which Judge Learned Hand held that "[t]he review of any order of the district court in a transferred cause, made before transfer, is within the jurisdiction of the court of appeals of the circuit to which the cause has been transferred." In so holding, the Court of Appeals held that a component of a Southern District of New York District Court order, which transferred the case to the Eastern District of Wisconsin, was reviewable by the by the Seventh Circuit Court of Appeals. In that same

decision, however, Judge Hand stated that the District Court's order "[i]n so far as it denied the temporary injunction, [ ] was of course appealable, and it [was properly before the Second Circuit Court of Appeals] on the merits." *Id. at 868.* In determining the propriety of its review as the appellate court of the transferor court, it appears that the Court of Appeals found a determinative difference in whether the order was substantive or procedural.

> FN1. The Debtor apparently also filed a timely notice of appeal in the U.S. Bankruptcy Court for the District of South Carolina, but did not ultimately perfect that appeal, which, upon motion of the U.S. Trustee, was dismissed without prejudice by the U.S. District Court of South Carolina.

*6 The Court does not agree with the U.S. Trustees' contention that a District Court of the Southern District of New York is divested of appellate jurisdiction over a Southern District of New York Bankruptcy Court Order, because the Bankruptcy Court transferred venue immediately after entering the Conversion Order. The Bankruptcy Court's Conversion Order and Denial of Reconsideration are substantive decisions, over which this District Court has appellate jurisdiction. Title 28 of the U.S.Code provides that "[a]n appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving." *28 U.S.C. § 158(a)(3).* Accordingly, the Southern District of New York is not divested of appellate jurisdiction over a Conversion Order entered by the Bankruptcy Court of this District, simply by a subsequent transfer of venue. But for that rule, a vast area for forum shopping would come into existence. The motion to dismiss this appeal on jurisdictional grounds is denied.

*Borrowers' Motion to Join Debtor's Appeal or file an Amicus Curiae Brief*

The Borrower-movants [FN2] are four of approximately 1,700 borrowers under the 90% Stock Loan program. They seek leave to join Derivium's appeal, contending that they are directly and adversely impacted by the conversion of Derivium's Chapter 11 proceedings into Chapter 7 proceedings. In the alternative, they seek leave to file an *amicus curiae* brief.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 5
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
(Cite as: Not Reported in F.Supp.2d)

FN2. Katherine Collings, Mark Parent, Alan Schreiber, and Dorairaju Thavaseelan are the named Borrowers and Movants in the Order to Show Cause.

The Second Circuit has adopted the general rule that "in order to have standing to appeal from a bankruptcy court ruling, an appellant must be a 'person aggrieved'-a person 'directly and adversely affected pecuniarily by the challenged order of the bankruptcy court.' " *International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 747 (2d Cir.1991) (citations omitted). "[P]ersons aggrieved" have a general right to appeal and need not formally intervene to preserve that right." *Id. at* 748.The Borrowers seeking leave to join the appeal did not appeal timely the Conversion Order independently because they did not receive IRS notifications until February 2006, and by this Order to Show Cause, they do not seek to institute a new appeal, but rather to join in or intervene in Debtor's appeal.

The Conversion Order prevents Derivium from acting as a Debtor-in-Possession, so it has thereby become unable to challenge the IRS' determination that the 90% Stock Loan Program transactions were not true loans, and that the borrowers are liable for capital gains taxes as of the date of the loan or sale of their stock by the pledgee. The Borrowers argue that they are aggrieved because they have now received notices from the IRS of the IRS' belief that the transactions were sales rather than loans, and that they may therefore be liable for capital gains taxes and penalties. They argue that their interests can only be adequately served by Derivium's challenge to the IRS allegation, in part because the Borrowers would not be able adequately to challenge many of the factual assertions made by the IRS, such as the IRS' preliminary allegation that: "Derivium sold the stock in order to fund the transaction. Derivium did not fund the transaction until you had transferred the stock to it."*Kaufman Decl.* ¶ 27.

*7 The IRS letters state the Government's conclusion that the Derivium transactions constituted sales in the initial year of each transaction, that the sales price was the amount at which Derivium sold each Borrower's stock, and that each Borrower's gain from the sale of stock was the sales price less the Borrower's basis. The Borrowers have been directed by the IRS to file amended tax returns and to execute forms to extend the time to assess tax liability. The IRS and presumably state taxing authorities are currently or will be imminently assessing capital gains taxes and related penalties against the Borrowers.

Counsel for the Borrowers represented to this Court that they are unaware of whether all Derivium transactions were conducted in the same manner, and it is conceivable that loans to some Borrowers were funded from pre-existing resources of either Derivium or Bancroft, while loans to other Borrowers were funded from the sale of the very stock which those Borrowers pledged under the 90% Stock Loan program. The assertion of the IRS to at least several of the Borrowers that their stock was sold prior to their receipt of loan money illustrates that the issue of whether the loan money distributed to each Borrower was obtained by the lender's sale of that Borrower's own stock, may be a substantially determinative fact issue going to a Borrower's potential tax liability, although it should not be, in this Court's view.

While the Borrowers would be entitled individually to obtain evidence of the facts surrounding their own loans, and would enjoy this right whether or not the case were converted, they undoubtedly have a substantial interest in seeking a single comprehensive determination of the validity of the loans *qua* loans and of the resulting tax implications. Clearly, there is substantial practical advantage to obtaining a unified and comprehensive determination on that question by way of Derivium's pursuit of a Section 505 determination in the context of a Chapter 11 reorganization proceeding. Without such a comprehensive determination, the Borrowers are necessarily left to individually pay or contest the IRS's assessments of liabilities against them.

Neither the United States Trustee nor the Chapter 7 Trustee is prejudiced by the grant of leave to intervene, as no separate appeal or review of the Conversion Order is requested. Accordingly, this Court grants leave to the Borrowers to join in or intervene in the appeal, *nunc pro tunc,* their arguments having already been heard on the record.

*The Conversion Order*

This Court reviews an order converting a bankruptcy case for cause, for an abuse of discretion. *See In re: Blaise,* 219 B.R. 946 (2d Cir.B.A.P.1998). The standard of review of a bankruptcy order denying reconsideration is the same. *National Petrochemical Co. v. The M/T Stolt Sheaf,* 930 F.2d 240, 244 (2d Cir.1991). A Bankruptcy Court's findings of fact are reviewed for clear error. *Federal Rules of Bankruptcy Procedure ("FRBP") 8013.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
(Cite as: Not Reported in F.Supp.2d)

**\*8** The United States Bankruptcy Code provides, in pertinent part, that any one of the following factors may be considered cause for the conversion or dismissal of a Chapter 11 case:

1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

2) inability to effectuate a plan;

3) unreasonable delay by the debtor that is prejudicial to creditors;

\* \* \* \*

10) nonpayment of any fees or charges required under chapter 123 of title 28.

11 U.S.C. § 1112(b)." 'The list contained in § 1112(b) is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.'House Report No. 95-595, 95th Cong., 1st Sess. at 405-6."*C-TC 9th Ave. Pshp. v. Norton Co. (In re C-TC 9th Ave. Pshp.),* 113 F.3d 1304, 1311, n. 5 (2d Cir.1997).

The Bankruptcy Court based its decision to convert this case on the totality of the circumstances earlier listed. The Debtor challenges several of the Bankruptcy Court's factual findings as clearly erroneous, asserting the following facts and arguments in contrast to the Court's findings of inexcusable bad faith delays and other findings.

Debtor challenges the Bankruptcy Court's finding of a pattern of delay as to the filing of schedules, list of creditors, and Dr. Cathcart's absence from the October 12, 2005 conference. It argues that the five day delay in submitting Schedules was not unreasonable or prejudicial to creditors. Debtor asserts that on September 23, 2005, two days after the U.S. Trustee made her Motion to Convert and Derivium filed its Schedules, Dr. Cathcart appeared before the Trustee in response to a request for an initial debtor interview ("IDI"), and answered questions about the Debtor's business and financial affairs and the events precipitating the Debtor's filing for relief and plans for reorganization, including evidence of a newly established Debtor in Possession ("DIP") bank account, in compliance with the U.S. Trustee guidelines.

Debtor asserts that Dr. Cathcart could not attend the First Meeting of Creditors on October 12, 2005, because he was attending a long-scheduled business meeting in China with the party that Derivium hoped

to secure (and ultimately did secure) as a new lending partner and source of Chapter 11 financing. The U.S. Trustee denied Derivium's request for consent to a short adjournment of the meeting and subsequently the Bankruptcy Court denied Derivium's follow-up motion for an adjournment. In Dr. Cathcart's absence, Derivium provided Yuri Debevc, a Director of Derivium and 25% owner, who was primarily responsible for administering the loans arranged by Derivium. The meeting was continued to October 21, 2005, on which day Dr. Cathcart was present and provided about 4 hours of testimony regarding the Debtor's business and financial affairs. Dr. Cathcart had also appeared before the Bankruptcy Court on October 18, 2005, in connection with an initial case conference scheduled by the Court.

**\*9** The findings of delays, even if more formally scrutinized than they might normally be in this district, are not clearly erroneous. Debtor admits, for example, that the schedules and statements of financial affairs were filed five days late. Although this Court might not classify this and the other delays as constituting a prejudicial pattern of delay, this Court cannot say that the finding concerning the delays was clearly erroneous. *See Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 619 (2d Cir.1991) ("The decision as to whose testimony to credit and as to which of competing inferences to draw was within the province of the district court as trier of fact.").

Debtor also argues that it was able to effectuate a plan of reorganization and that there was pre-petition a thriving business prospect in the stock loan product which had generated over a billion dollars of loans in a short period of time and approximately $20 to $25 million in commissions. It argues that Dr. Cathcart testified that going forward the company would operate differently, without the same overhead costs and that there would be fewer commissioned salespeople because the company would go directly to brokerage houses. Dr. Cathcart testified that the lack of profitability was based on the fact that there were substantial overhead expenses that reduced the net return.

The assertion of different conduct intended for the future, even if legitimately stemming from lessons learned, does not negate a finding of a lack of meaningful pre-petition profit success, especially in this case in which Debtor's tax returns reveal from 1998 to 2002, a cumulative loss of $2,461,799.00. This Court is not persuaded by the argument that there is some proprietary value to the Debtor's design or plan of stock pledges and loans, or its investment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 7
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
(Cite as: Not Reported in F.Supp.2d)

practices concerning the proceeds. As a matter of law, the business conducted by Derivium could have been conducted by anyone,. Also, Appellant's brief explains the distribution only of approximately $16-17 million of the estimated $20 to $25 million in receipts. Debtor argues that any deficiencies of explanation are in part due to the fact that the Debtor hasn't had access to all of the books and records, which are under court order in South Carolina. The Court again cannot find clear error in the Bankruptcy Court's finding of a failure to explain sufficiently and adequately what became of the earnings of Derivium during its operations.

Debtor argues that within a month or month and a half of its filing a Chapter 11 bankruptcy proceeding, it was able to secure the means to finance the litigation with the IRS pertaining to the validity of the loans upon which its survival depends. On Oct. 18, 2005, Dr. Cathcart advised the Bankruptcy Court of several developments regarding its Chapter 11 reorganization, including its agreement with a proposed lender to fund the § 505 tax determination action (and that a sum of $130,000 was advanced to proposed counsel, Mr. Edward Ord, of the law firm of Ord and Norman). Derivium argues that the funds were to be held in trust for Mr. Ord's services, pending Court approval. During that conference, counsel for Derivium informed the Bankruptcy Court that "Mr. Ord is a tax specialist and, with Court approval, will become engaged to address the debtor's tax issues, which were mentioned in our filing papers."*Tr., Oct. 18, 2005 at 5.*

*10 The Court acknowledges Debtor's verbalized deference to the Bankruptcy Court's approval of an attorney to litigate the tax issue during the conference call, but also notes that the retention funds were already advanced, and this Court cannot find clearly erroneous the Bankruptcy Court's finding that Debtor failed properly to receive approval of the Court *prior to* retaining or attempting to retain counsel to execute the Section 505 litigation.

Appellants also argue that the Bankruptcy Court Judge failed to appreciate the implications of the conversion and its effect on the IRS determinations as to whether the transactions were loans or sales, as well as Derivium's unusual position as a Chapter 11 estate in a holding pattern, with no assets depreciating and employees bleeding the company of cash. It claims its only significant expenses would have been costs related to the tax determination matter, which would have been borne by a third party, who was willing to fund that litigation with a prospective plan to be a new lender for the loan marketing business.

This Court agrees that the parties share an interest in seeing the tax determination successfully prosecuted to their hoped for determination that the 90% Stock Loan is a bona fide loan and not a sale of a security, as well as the determination as to whether the IRS or a state taxing authority is prior over the Borrowers and other unsecured creditors. The Debtor's interest is in saving its business and the Borrowers have an interest in avoiding capital gains taxes and penalty interest accumulations. The Debtor argues that a Chapter 7 Trustee, has no similar interest or incentive, and by implication argues that the Chapter 7 Trustee is unlikely to use limited resources to achieve such a determination. The Court notes Derivium's argument that the outcome of an IRS' audit spanning the years 1998, 1999, and 2000, resulted in no Section 6700 investigation or challenge to the 90% Stock Loan, and that this further indicates the likelihood of prevailing on the merits of a tax determination. While the outcome of the audit and the limited success in the California Court might seem to bode well for Derivium, neither precludes a different outcome of an actual Section 6700 investigation at this later date, based on further developed evidence of the business practices and procedures employed by Derivium, and the IRS will not be bound by such a conclusion. The Chapter 7 trustee, if so advised, and with the approval of the supervising Bankruptcy Judge remains free to litigate some or all of these issues with the IRS just as the Debtor-in-Possession would be.

The Bankruptcy Court stated in the Conversion Order that "the arguments of the debtorin-possession are not compelling, in that it has failed to file any documents with the Court to retain tax counsel, to seek a determination of tax liability under § 505 or to seek approval of its purported financing during the pendency of the Chapter 11."*See App. 154.*The Bankruptcy Court did not abuse its discretion in concluding that the likelihood of success and viability of the company arguments were not sufficiently compelling to render a different outcome on the question of conversion. Indeed, this Court agrees with the Bankruptcy Judge that there is little or no feasibility here for a successful Chapter 11 reorganization of this Debtor. So long as the IRS dispute remains undecided, Derivium cannot do business or reorganize. If it is resolved in the Debtor's favor, anybody, as noted earlier, can sell the financial product offered by Derivium, including new entries in the market not burdened by prior losses, debts,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582
(Cite as: Not Reported in F.Supp.2d)

legal fees and pending customer litigation. While the definition of an abusive tax shelter is elusive, generally a prepackaged transaction which is sold as a tax shelter, which no rational person would enter into but for non-economic (tax) considerations, is likely to be found by the courts to be an abusive tax shelter. In this case, the buyer of the financial product is selling an asset for 10% less than its market value with a right to redeem which is of illusory value. A court may well find tax consequences the sole motivating factor. In so finding, a court may conclude reasonably that the Derivium loan constituted "mere formalities designed to make the transaction appear to be other than it was in order to avoid tax liability," quoting *Commissioner of Int. Rev. v. Court Holding Co., 324 U.S. 331, 333 (1945)*, i.e. a loan rather than a sale, and that "the incidence of taxation depends upon the substance of a transaction" *Id. at 334.See also Raymond v. United States, 355 F.3d 107, 108 (2d Cir.2004)* (substance rather than form determines tax consequences); *Green v. United States, 13 F.3d 577, 581 (2d Cir.1994)*.

*11 This Court recognized that under the unusual facts of this case the Borrowers' interests are closely aligned with those of the Debtor insofar as concerns the claims of the IRS. The Borrowers can be considered for current purposes to be unsecured creditors. Whether the IRS or unsecured creditors will enjoy priority is naturally a concern of the Debtor and the Borrowers. There is a public policy preference in favor of a Debtor-in-possession remaining as such, and in a Chapter 11 context, it is possible but by no means certain that the parties could, together, litigate more favorably with the IRS. Notwithstanding this valid argument, on the totality of this record, and faced with all of the acts and failures to act, the Bankruptcy Judge did not abuse her discretion in ordering conversion. Not disputed by the Appellants are the lack of insurance coverage, failure to seek Court approval prior to appointment of professionals, and failure to seek extensions of time. In addition to the failure to adhere to deadlines, the fact that the Debtor is not operating and cannot do so in the near future, which in turn makes reorganization impractical, supports the Bankruptcy Court's decision to covert the case.

Finding no abuse of discretion, the Conversion Order is affirmed.

*Motion for Reconsideration*

In the telephone conference conducted on the motion for reconsideration, Debtor's counsel communicated that certain of the facts relied upon by the Court were either incorrect or the result of an inadvertent mistake or misunderstanding. Acknowledging that the Debtor did not know which factors weighed more heavily in the Bankruptcy Court's decision, it argued that "the most substantial ones deserve reconsideration."*See App.* 255.

The Bankruptcy Court did not abuse its discretion in denying reconsideration. The transcript of the telephonic conference on the motion reveals that the Bankruptcy Judge was understandably not satisfied that there had been actual misunderstandings of fact or mistakes warranting Rule 60 Reconsideration.

Finding no abuse of discretion, and concluding that there were no material misunderstandings on the part of the Bankruptcy Court, this Order appealed from is affirmed.

### Conclusion

The motion to intervene is granted. The Order appealed from is affirmed in all respects.

SO ORDERED.

S.D.N.Y.,2006.
Derivium Capital LLC v. U.S. Trustee
Not Reported in F.Supp.2d, 2006 WL 1317021 (S.D.N.Y.), 97 A.F.T.R.2d 2006-2582

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                          Page 1
Slip Copy, 2007 WL 1657400 (W.D.Mich.)
**(Cite as: Slip Copy)**

**H**
Alvan Motor Freight, Inc. v. Trustees of the Central
States, Southeast and Southwest Areas Pension Fund
W.D.Mich.,2007.
Only the Westlaw citation is currently available.
United States District Court,W.D. Michigan,Southern
Division.
ALVAN MOTOR FREIGHT, INC., Plaintiff,
v.
TRUSTEES OF THE CENTRAL STATES,
SOUTHEAST AND SOUTHWEST AREAS
PENSION FUND, et al., Defendants.
**No. 4:05 CV 125.**

June 6, 2007.

Lawrence M. Brenton, Early Lennon Crocker &
Bartosiewicz P.L.C., Kalamazoo, MI, for Plaintiff.
Albert M. Madden, Timothy Craig Reuter, Central
States Legal Department, Rosemont, IL, Michael J.
Mills, Bloomfield Hills, MI, Gerry M. Miller, Nathan
D. Eisenberg, Previant Goldberg UelmenGratz Miller
& Brueggeman S.C., Milwaukee, WI, Michael L.
Fayette, Pinsky Smith Fayette & Kennedy L.L.P.,
Grand Rapids, MI, for Defendants.

*ORDER*
JACK ZOUHARY, U.S. District Judge.
**\*1** This matter is before the Court on Plaintiff's
appeal (Doc. No. 108) of the Magistrate Judge's
Order granting the Motion to Intervene by TNFINC
(Doc. No. 105). Other briefing regarding this
"appeal" followed (Doc. Nos.111-114).

Plaintiff objects to the Magistrate Judge's Order
granting intervention because the Order "significantly
exceeds the limited scope of the proposed Order that
had been [previously] prepared and served" (Doc.
No. 111 at p. 2). Specifically, Plaintiff contends that
certain issues currently pending on cross Motions for
Summary Judgment were decided in the Order
without an opportunity for all parties to be heard.

The intervention by the Teamsters National Freight
Industry Negotiating Committee (TNFINC) is
unopposed so long as its intervention does not disrupt
the currently pending summary judgment motions
and the Scheduling Order in the case. There is further
no dispute that the TNFINC negotiated with Plaintiff
a new collective bargaining agreement which is the

subject of this lawsuit and that it would be helpful to
have the TNFINC as a party.

The Court agrees that the Order granting the Motion
to Intervene should not establish as the law of the
case facts which **may** be central to the pending
Motions for Summary Judgment, such as the specific
role of TNFINC in negotiations, and whether all the
defendants unilaterally share the same interests. Such
fact finding is unnecessary to the limited issue of the
Motion to Intervene.

Intervention is guided by Federal Civil Rule 24
which states in part:
(a) **Intervention of Right.**Upon timely application
anyone shall be permitted to intervene in an action: ...
(2) when the applicant claims an interest relating to
the property or transaction which is the subject of the
action and the applicant is so situated that the
disposition of the action may as a practical matter
impair or impede the applicant's ability to protect that
interest, unless the applicant's interest is adequately
represented by existing parties.
(b) **Permissive Intervention.**Upon timely application
anyone may be permitted to intervene in an action: ...
(2) when an applicant's claim or defense and the main
action have a question of law or fact in common ...
In exercising its discretion the court shall consider
whether the intervention will unduly delay or
prejudice the adjudication of the rights of the original
parties.

The Order granting the Motion to Intervene does not
indicate under which section (or both) intervention is
appropriate. However, given some of the Court's
findings, the Order suggests that intervention was
granted under Civil Rule 24(b)(2) (permissive
intervention), which requires the Court, in exercising
its discretion, to consider any undue delay or
prejudice in granting intervention. Pursuant to Civil
Rule 24(b)(2), the Magistrate correctly determined
that TNFINC's timely Motion to Intervene satisfied
the required commonality of issues, and did not delay
or prejudice the original parties. *See, e.g., U.S. ex rel.
Fry v. Guidant Corp.,* 2006 WL 1102397, \*5
(M.D.Tenn.2006) (parties may intervene "if their
interests are appropriately related").

**\*2** The Court agrees that intervention would not
prejudice any of the parties nor cause delay; that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1657400 (W.D.Mich.)
**(Cite as: Slip Copy)**

Page 2

TNFINC was involved in the underlying proceedings which led to this lawsuit; and, that in the interest of judicial economy and to avoid piecemeal litigation, it makes sense to have TNFINC participate in this lawsuit. *See Tacori Enterprises v. Rego Mfg.,* 2006 WL 2583401, *1 (N.D.Ohio 2006) (Rule 24 should be construed to "promote judicial economy"). Indeed, none of the Defendants then, or now, oppose the intervention in principle.

Finally, the Court has broad discretion to grant permissive intervention.*Usery v. Brandel,* 87 F.R.D. 670, 677 (D.C.Mich.1980), citing *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad,* 331 U.S. 519, 524, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947).

Therefore, the Court confirms the decision of the Magistrate Judge to grant intervention but, because the Order (Doc. No. 105) went beyond what was necessary to make that decision, any findings other than those made in this Order are stricken and therefore do not bind any future decision on the pending Motions for Summary Judgment.

IT IS SO ORDERED.

### ORDER GRANTING MOTION TO INTERVENE

HUGH W. BRENNEMAN, JR., United States Magistrate Judge.
Pending before the court is a motion by the Teamsters National Freight Industry Negotiating Committee (TNFINC) to intervene in this action as a party defendant (docket no. 78), pursuant to Rules 24(a) (2) and (b) of the Federal Rules of Civil Procedure.

TNFINC is a multi-union bargaining committee to which the various Teamsters Local Unions which are defendants in this action delegated their bargaining authority to negotiate a collective bargaining agreement, known as the National Master Freight Agreement (NMFA). TNFINC is responsible for the enforcement of NMFA and negotiating interpretations of it. TNFINC negotiated the NMFA at issue in this case, as well as the collective bargaining agreement between plaintiff Alvan Motor Freight and its various Local Unions, which is tied to NMFA.

All defendant Local Unions in this action are (once again) represented by TNFINC's attorney, James A. McCall. Attorney McCall has informed the court that

if TNFINC is allowed to intervene, he will continue to represent all of the defendant Local Unions and TNFINC through completion of this litigation. Accordingly, the interests of all these parties may now be considered identical.

TNFINC's counsel has also assured the court that no delay would occur in the proceedings if TNFINC were allowed to intervene at this stage. Mr. McCall has also agreed TNFINC will not request additional time to file any pleading, and he will not file any additional motions for summary judgment, although he may seek to withdraw one of the pending motions for summary judgment previously filed by several of the Local Unions. TNFINC will also not request further mediation but is amenable to participating in further settlement negotiations.

None of the defendants now oppose TNFINC's request to intervene.

*3 For the reasons more fully stated on the record at the hearing held on this matter, the court finds that TNFINC does more than simply supply the attorney for the defendant locals. Although the Local Unions were parties to Alvan's collective bargaining agreement, TNFINC negotiated this agreement on behalf of the locals and tied the collective bargaining agreement into the NMFA, which it had previously negotiated. Since TNFINC represents, negotiates on behalf of, and now (once again) speaks for all the defendant Local Unions in this action, it is already a *defacto* party to these proceedings, and because of its responsibilities regarding the consistent application of NMFA generally, and its representation of all locals similarly situated, its immediate interest in the subject matter of the present litigation is more sweeping than that of any single local. Were TNFINC not providing counsel for the locals, it is doubtful any single local would adequately protect all of TNFINC's interests.

The court further finds that the intervention will not prejudice any of the parties nor cause delay. Finally, because of TNFINC's extensive involvement in the proceedings leading to this action, as well as its dominant role in litigating the matter, the court finds that TNFINC ought to be bound in its own name by any final resolution of this case.

Accordingly, the motion to intervene is GRANTED. TNFINC shall be deemed an additional party defendant effective this date, and shall be deemed to be a signatory to the pleadings previously filed by the defendant locals.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1657400 (W.D.Mich.)
**(Cite as: Slip Copy)**

Page 3

IT IS SO ORDERED.

W.D.Mich.,2007.
Alvan Motor Freight, Inc. v. Trustees of the Central
States, Southeast and Southwest Areas Pension Fund
Slip Copy, 2007 WL 1657400 (W.D.Mich.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ONEX AMERICAN HOLDINGS, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-CV-263 (SLR) |
| | ) | |
| RICHARD M. KIPPERMAN, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, | ) | Case No. 03-11402 (KG) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I, Jeffrey R. Waxman, certify that I am not less than 18 years of age, and that service of the *Opening Brief of Appellant Onex American Holdings, LLC* was made on October 17, 2007 upon the parties listed below in the manner indicated.

### HAND DELIVERY

Richard L. Schepacarter, Esquire
Office of the United States Trustee
844 North King Street, Suite 2207
Wilmington, DE 19801

Joel A. Waite, Esquire
Matthew Lunn, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

Christopher P. Simon, Esquire
Cross & Simon, LLC
913 N. Market Street, 11th Floor
Wilmington, DE 19801

## FIRST CLASS MAIL

Peter W. Ito, Esquire
Baker & Hostetler LLP
303 E. 17th Avenue, Suite 1100
Denver, CO 80203

Andrew Kress, Esquire
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Catherine L. Steege, Esquire
Joel T. Pelz, Esquire
Peter A. Siddiqui, Esquire
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated:  November 30, 2007

COZEN O'CONNOR

Jeffrey R. Waxman (No. 4159)

8