**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ONEX AMERICAN HOLDINGS, LLC, | ) | |
| | ) | Civil Action No. 07-CV-263 (SLR) |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD M. KIPPERMAN, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 03-11402 (KG) |
| MAGNATRAX CORPORATION, | ) | |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

## REPLY BRIEF OF APPELLANT ONEX AMERICAN HOLDINGS, LLC

COZEN O'CONNOR
Jeffrey R. Waxman (4159)
Mark E. Felger (3919)
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 295-2000

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Maria T. Vullo
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000

*Attorneys for Onex American Holdings, LLC, Appellant*

Dated: November 30, 2007

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT............................................................................................................................. 2

    A.    The Georgia Action Is A Present Violation of the Plan, the Confirmation
        Order and Appellant's Rights. ................................................................................... 2

           1.    The Plan Prohibits the Trustee from Seeking to Recover More Than
                the Trust Beneficiaries' Claims ......................................................................... 3
           2.    The Trustee's Improper Conduct Is Enjoined by the Confirmation
                Order and Prohibited By Contract ...................................................................... 6
           3.    The Motion to Enforce is Ripe........................................................................... 8
           4.    Appellant Has Standing to Seek Relief.............................................................. 9

    B.    The Trustee Is Judicially Estopped by the Prior Assertions that the Plan
        Complies with the Absolute Priority Rule. .......................................................... 10

    C.    The Bankruptcy Court is the Proper Court to Hear the Motion to Enforce. ......... 12

CONCLUSION........................................................................................................................ 16

Doc#: US1:5110135v6

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abbott Lab.* v. *TorPharm, Inc.*, 503 F.3d 1372 (7th Cir. 2007)........................................................7

*Bank of Am. Nat'l Trust and Savings Ass'n* v. *203 N. LaSalle St. P'ship,*
    526 U.S. 434 (1999)..............................................................................8

*Burch* v. *Pennsylvania Dept. of Public Welfare,*
    2006 WL 2807033 (3rd Cir. Oct. 3, 2006) ...............................................8

*Caribbean S.S. Co., S.A.* v. *Sonmez Denizcilik Ve Ticaret A.S.,*
    598 F.2d 1264 (2d Cir. 1979)..................................................................10

*Day* v. *Case Credit Corp.,* 427 F.3d 1148 (8th Cir. 2005) ........................................4, 10

*Forklift LP Corp.* v. *iS3C, Inc.* (*In re Forklift LP Corp.*),
    363 B.R. 388 (Bankr. D. Del. 2007) ........................................................11, 12

*Gen. Elec. Capital Corp.* v. *Dial Bus. Forms, Inc.* (*In re Dial Bus. Forms, Inc.*),
    341 F.3d 738 (8th Cir. 2003) ..................................................................8

*Hometowne Builders, Inc.* v. *Atlantic Nat'l Bank*, 477 F.Supp 717 (E.D. Va. 1979) .....................6

*In re Amoakohene*, 299 B.R. 196 (Bankr. N.D. Ill. 2003) ..............................................3

*In re Antonious*, 373 B.R. 400 (Bankr. E.D. Pa. 2007)....................................................14

*In re Apex Oil Co., Inc.,* 406 F.3d 538 (8th Cir. 2005)....................................................14

*In re Carter,* 38 B.R. 636 (Bankr. Conn. 1984)............................................................14

*In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 6 F.3d 1184 (7th Cir. 1993)..................13

*In re Dabbs*, 72 B.R. 73 (Bankr. N.D. Ala. 1987) .........................................................14

*In re Forty-Eight Insulations, Inc.,* 115 F.3d 1294 (7th Cir. 1997)..................................5

*In re Iannacone*, 21 B.R. 153 (Bankr. D. Mass. 1982)....................................................14

*In re McNeil,* 13 B.R. 743 (Bankr. S.D.N.Y. 1981) ......................................................14

*In re Thomas Bros. Rest. Corp. One,* 195 B.R. 918 (Bankr. C.D. Cal. 1996)................................5

*In re United Telecomms., Inc.,* No. 90-2251, 1993 WL 100202 (D. Kan. March 4, 1993)..............9

Doc#: US1:5110135v6

*In re Zinchiak,* 406 F.3d 214 (3d Cir. 2005)..............................................................14

*Liberty Nat'l Enter.* v. *Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd. P'ship*),
    115 F.3d 650 (9th Cir. 1997) ...................................................................................3

*Lincoln House, Inc.* v. *Dupre,* 903 F.2d 845 (1st Cir. 1990) ............................................9

*McGhan* v. *Rutz* (*In re McGhan*), 288 F.3d 1172 (9th Cir. 2002) ....................................13

*New Nat'l Gypsum Co.* v. *Nat'l Gypsum Co. Settlement Trust* (*In re Nat'l Gypsum Co.*),
    219 F.3d 478 (5th Cir. 2000) ...................................................................................5

*Olde Disc. Corp.* v. *Tupman,* 1 F.3d 202 (3d Cir. 1993) .................................................8

*Pall* v. *KPMG, LLP,* No. 3:03-00842, 2006 WL 2800064 (D. Conn. Sept. 29, 2006)....................9

*Plantronics, Inc.* v. *United States,* No. 88-1892, 1990 WL 3202 (S.D.N.Y. Jan 9, 1990) ..............9

*Quenzer* v. *Advanta Mortg. Corp. USA,* 288 B.R. 884 (D. Kan. 2003)..........................................13

*Rahl* v. *Bande,* 316 B.R. 127 (S.D.N.Y. 2004)..............................................................5

*Reebok Int'l Ltd.* v. *McLaughlin,* 49 F.3d 1387 (9th Cir. 1995)........................................7

*Ryan Operations G.P.* v. *Santiam-Midwest Lumber Co.,* 81 F.3d 355 (3d Cir. 1996).................11

*Sandpaper Village Condo Ass'n, Inc.* v. *Louisiana-Pacific Corp.,*
    428 F.3d 831 (9th Cir. 2005) ...................................................................................13

*Texas* v. *United States,* 523 U.S. 296 (1998) ..............................................................9

*Underwood* v. *Student Aid Funds, Inc.* (*In re Underwood*),
    299 B.R. 471 (Bankr. S.D. Ohio 2003)....................................................................14

*Urban* v. *Bayer Corp. Pharm. Div.,* 2007 WL 2421798 (3rd Cir. Aug. 28, 2007) .......................8

*Waffenschmidt* v. *MacKay,* 763 F.2d 711 (5th Cir. 1985) ................................................8

*Washington Bancorporation* v. *Fed. Deposit Ins. Corp.* (*In re Washington
    Bancorporation*), No. 95-1340, 1996 WL 148533 (D.D.C. 1996) .........................................13

*Wyatt, Virgin Islands, Inc.* v. *Gov't of the Virgin Islands,* 385 F.3d 801 (3d Cir. 2004) ...............9

**STATUTES**

11 U.S.C. § 550........................................................................................................................15

11 U.S.C. § 1129.........................................................................................................3, 10, 11, 12

Doc#: US1:5110135v6

## PRELIMINARY STATEMENT

The record of this chapter 11 case makes clear, and the Trustee[1] does not dispute, that the Debtors and the Creditors' Committee represented to the Court, Appellant, creditors and other parties in interest that the Plan satisfied the requirements for a cram down. Cram down is an extraordinary feature of the Bankruptcy Code that facilitates reorganization when there aren't enough assets to go around; accordingly, what value is available for distribution must be allocated according to the absolute priority rule – senior creditors must get paid in full before junior creditors receive anything; conversely, no senior creditor may be paid more than it is owed. Where investments of stockholders such as Appellant are wiped out, no creditor can be paid more than the allowed amount of its claim. Key to that analysis here and to confirmation of the Plan was the affirmative representation that the *gross amount* of the claims being transferred to the Trustee and his Litigation Trust was between $8 and $24 million.

Having taken advantage of such record to obtain confirmation, including representations made not only by the Debtors but by one of the Trustee's own counsel in this appeal, the Trustee seeks in his Georgia Action to recover $600 million on account of (at most) $12 million of unpaid unsecured claims. Permitting such action, in flagrant violation of a plan and the Bankruptcy Code, would transform chapter 11 from a process to equitably allocate a debtor's property among prepetition creditors and shareholders to a get-rich scheme to benefit professional litigants and those who fund them. This situation cries out for the reopening of the chapter 11 case so that Bankruptcy Court may enforce the Plan it confirmed and put an end to the Trustee's perversion of the Plan, the Confirmation Order and the Bankruptcy Code. Appellant's need for such relief is real and it is immediate.

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in Appellant's Brief.

In trying to explain the unexplainable – how $8 to $24 million of claims described to the Bankruptcy Court morphed into $600 million when asserted in the Georgia District Court – the Trustee has barraged the Court with a host of unpersuasive arguments. These include (i) that Appellant has no capacity to bring this appeal, even though the Trustee sued it for $600 million; (ii) that there is no violation of Appellant's rights until the Trustee obtains a judgment, even though the mere bringing of a $600 million suit violates the Plan; (iii) that the Bankruptcy Court "rejected" Appellant's claims that the Trustee had violated the Plan, even though the Bankruptcy Court stated that Appellant had raised "serious issues" concerning the amounts the Trustee seeks to recover; and (iv) that the absolute priority rule is merely a "factual finding" required at confirmation, even though it is among the most fundamental protections offered by the Bankruptcy Code to those whose investments are to be wiped out.

None of these arguments, or others offered by the Trustee, should stand in the way of this Court reversing the decision below and directing the Bankruptcy Court to reopen the chapter 11 case so that that Plan, the Bankruptcy Code and Appellant's rights may be enforced.

## ARGUMENT

### A.    The Georgia Action Is A Present Violation of the Plan, the Confirmation Order and Appellant's Rights.

It is indisputable that the Bankruptcy Court confirmed a cram down plan and that cram down caps the Trust Beneficiaries' recoveries at 100% of their allowed claims. Appellant paid a high price for this protection – its more than $100 million equity investment was wiped out. Nonetheless, the Trustee argues that the Bankruptcy Court and Appellant may do nothing to prohibit the Trustee's perversion of the Plan and the Bankruptcy Code while he pursues a wholly improper $600 million recovery. This Court should not permit such a result and should reopen

2

the chapter 11 case to allow Appellant the opportunity to stop the Trustee's abuse of its rights and the bankruptcy process.

1.    **The Plan Prohibits the Trustee from Seeking to Recover More Than the Trust Beneficiaries' Claims**

The plain language of the Plan, the Confirmation Order, and Bankruptcy Code makes clear that the Trust Beneficiaries' recovery is capped at 100% of their Allowed Class 9 Claims. (*See, e.g.,* App. 2 at 12–14 ("*[T]he Plan is confirmable because the Plan satisfied section 1129(b) of Bankruptcy Code* with respect to the Rejecting Classes. . . . The Magnatrax Debtors presented *uncontroverted evidence* at the Confirmation Hearing, and the Bankruptcy Court hereby finds, that the Plan . . . is fair and equitable, with respect to each of the Rejecting Classes, as required by section 1129(b)(1) of the Bankruptcy Code. . . .").)[2]

It is equally plain that the Trust Agreement, which governs the Trust, is controlled by the cram down Plan. The Trust is "created by the Plan." (App. 9 at § 2.1.). The Trust's assets are held by the Trustee "under and subject to the terms and conditions set forth in th[e] Litigation Trust Agreement *and in the Plan*. . . . The distribution of Litigation Trust Recoveries shall be made in accordance with th[e] Litigation Trust Agreement *and the Plan*." (*Id.* at § 2.3.) The Trustee may exercise and control the Trust assets "except as otherwise *provided in the Plan*, and subject to the retained jurisdiction of the Bankruptcy Court as *provided in the Plan*." (*Id.* at § 6.3.A.) Finally, the Trustee has the power and authority to "distribute the Litigation Trust Recoveries in accordance with the terms of th[e] Litigation Trust Agreement *and the Plan*." (*Id.*

---

[2]    The absolute priority rule was not a mere "factual prerequisite" to confirmation of the Debtors' Plan (Appellee's Br. at 19 n.6); it was *the* basis for confirmation. *See* Bankruptcy Code §§ 1129(a)(8) & 1129(b)(1); *Liberty Nat'l Enter.* v. *Ambanc La Mesa Ltd. P'ship* (*In re Ambanc La Mesa Ltd. P'ship*), 115 F.3d 650, 653 (9th Cir. 1997) (if §1129(a)(8) is not satisfied the plan *must* satisfy the cram down provision to be confirmed); *In re Amoakohene,* 299 B.R. 196, 207 (Bankr. N.D. Ill. 2003) (cram down provision is one of the most important sections of the Bankruptcy Code).

Doc#: US1:5110135v6

at § 6.3.B(2).) Perhaps most significantly, the Trust Agreement provides that "[i]n the event of any inconsistency between the recitation of the duties and powers of the Litigation Trustee as set forth in the Litigation Trust Agreement and the Plan, *the Plan shall govern*." (*Id.* at § 2.3 (emphasis added).) The Plan controls the Trust Agreement, the absolute priority rule governs the Plan, and both end in the same result: the Trust Beneficiaries can recover no greater than 100% of their Allowed Class 9 Claims.

The Trustee posits that the assignment to the Litigation Trust of "all [the Debtors'] right, title and interest in the Assigned Causes of Action" against Appellant was "uncapped," and therefore his pursuit of over $600 million in the Georgia Action comports with the Plan. (*See* Appellee's Br. at 6.) Not so. *First*, the assignment clause does not state that recoveries are unlimited; it merely assigns to the Trust whatever rights the Debtors had. Indeed, if the Debtors had retained (rather than assigned) their causes of action, the absolute priority rule would have prohibited them from paying unsecured creditors cents on the dollar and eliminating shareholder interests while retaining hundreds of millions of dollars of litigation recoveries. Because the Debtors' recoveries would have been limited, so are those of the Litigation Trust, which asserts the Debtors' claims as assignee. *See Caribbean S.S. Co., S.A.* v. *Sonmez Denizcilik Ve Ticaret A.S.,* 598 F.2d 1264, 1266 (2d Cir. 1979) ("an assignee of a claim takes it with whatever limitations it had in the hands of the assignor"); *Day* v. *Case Credit Corp.,* 427 F.3d 1148, 1153 (8th Cir. 2005) (assignees' rights are subject to limitations imposed by the contract creating the right). *Second*, an uncapped assignment would result in a Plan that conflicts with the Confirmation Order and the Bankruptcy Code. Rather than being read in conflict, the Plan and Confirmation Order must be read in harmony with each other and with the Bankruptcy Code. (*See* App. 2 at 42 ("[t]he provisions of the Plan and of this Confirmation Order shall be construed

4

in a manner consistent with each other so as to effect the purpose of each . . . .").) *New Nat'l Gypsum Co.* v. *Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.),* 219 F.3d 478, 489 (5th Cir. 2000) (interpretation of a plan entails reading plan and all other related documents as a whole); *In re Forty-Eight Insulations, Inc.,* 115 F.3d 1294, 1302 (7th Cir. 1997) (faced with multiple possible plan interpretations, a court must prefer the one that is "at least consistent with the language of the plan"); *Rahl* v. *Bande,* 316 B.R. 127, 135 (S.D.N.Y. 2004) (court must interpret plan provision transferring claims in context of the entire plan); *In re Thomas Bros. Rest. Corp. One,* 195 B.R. 918, 920-21 (Bankr. C.D. Cal. 1996) (construction of plan provisions should be consistent with the terms of the plan as well as contractual and statutory interpretation). The only harmonious construction here is an assignment that complies with the absolute priority rule.

To feign compliance with the Bankruptcy Code, the Trustee also contends that the *value* of the Assigned Causes of Action – all of which are based upon transactions and events that occurred years before the Petition Date – somehow appreciated between Plan confirmation and commencement of the Georgia Action. (Appellee Br. at 30)  This suggestion is absurd. The Trustee has made clear that the Georgia Action is based on the Creditors' Committee's research and analysis completed during the chapter 11 case, and Creditors' Committee spent $1.8 million on such effort.

It is obvious that the Trustee knew exactly as much as the Creditors' Committee did when he filed his complaint. He does not explain how $8 to $24 million of claims turned into $600 million.[3] In fact, he conspicuously omits reference to the only significant intervening

---

[3] The Trustee's comparison of the Assigned Causes of Action to mineral enriched land is absurd. If there was gold to be struck in suing Onex, such possibility should have been disclosed during the bankruptcy case. Instead, specific representations were made that the

event between Plan confirmation and the filing of the Georgia Action: IML, an off-shore

funding source, purchased a 50% interest in the Trust's recoveries.

Further, the Creditors' Committee's representations to the Bankruptcy Court are

completely inconsistent with the Trustee's arguments. The Creditors' Committee disclosed that

"the *gross amount* of claims against Onex and the Onex Affiliates could range from

approximately $8 million to approximately $24 million." (App. 3 at 98 (emphasis added).) An

actual valuation would have resulted in a *lower* number, not a higher one, because a valuation

would have taken into account litigation uncertainties. Indeed, this is how such disclosure was

interpreted by the majority of unsecured creditors who elected not to become Trust Beneficiaries.

Finally, based on his misconstructions of the Plan, the Trustee claims Appellant

should have objected to the Plan. (Appellant Br. at 27-29.) Given the disclosures made

concerning the range of claims to be brought and the Plan's compliance with the cram down

rules, that is tantamount to arguing that Appellant should have anticipated that the Bankruptcy

Court and parties in interest were being misled, or that the Trustee would violate the

Confirmation Order.

### 2.    The Trustee's Improper Conduct Is Enjoined by the Confirmation Order and Prohibited By Contract

The Trustee suggests that because the Plan does not specifically enjoin the

Georgia Action he can proceed with impunity and violate a court order. He cannot. *See*

*Hometowne Builders, Inc.* v. *Atlantic Nat'l Bank*, 477 F.Supp 717, 719-21 (E.D. Va. 1979) (court

dismissed count of antitrust action because it sought damages exceeding the statutory limit).

---

range of claims was from $8 to $24 million and the Court and parties in interest relied on that
representation.

Appellant seeks to enforce the Confirmation Order, which prohibits the Trust Beneficiaries from recovering more than 100% of their claims.

Moreover, contrary to the Trustee's claim, the Confirmation Order *does* enjoin all actions in violation of the Plan. (*See* Appellant Br. 19.) The Disclosure Statement, Plan and Confirmation Order, as required by Federal Rules of Bankruptcy Procedure 2002(c)(3), 3016(c), and 3020(c)(1), explicitly warned parties that attempts to violate the Plan's implementation and consummation would be enjoined. Specifically, the Disclosure Statement notified creditors, including the Trust Beneficiaries, that "[t]he Plan provides that, upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest . . . will be enjoined from taking any action to interfere with the implementation or consummation of the Plan." (App. 3 at 108.) As advertised, in a section entitled "Injunction Against Interference With Plan," the Plan provides that "[u]pon the entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest . . . shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan." (App. 4 at § 9.3.) Finally, the Confirmation Order holds that "[a]ll holders of Claims and Equity Interests and other parties in interest . . . shall hereby be permanently and forever barred, restrained and enjoined from taking any actions to interfere with the implementation or consummation of the Plan." (App. 2 at 36-37.) The Confirmation Order indisputably enjoins any acts that violate, among other things, the distribution scheme implemented by the Plan. As discussed above, the Trustee's attempted recovery in the Georgia Action interferes with – indeed, completely undermines – the Plan's cram down provisions, an integral part of its distributional scheme. Such improper actions have been enjoined. *See Abbott Lab.* v. *TorPharm, Inc.*, 503 F.3d 1372, 1379 (7th Cir. 2007) (court has inherent power to enforce its injunctions); *Reebok Int'l Ltd.* v. *McLaughlin*, 49 F.3d 1387,

7

1391 (9th Cir. 1995) (same); *Waffenschmidt* v. *MacKay*, 763 F.2d 711, 716 (5th Cir. 1985)

(same).  The Bankruptcy Court clearly has the authority to enforce its own order.

In any event, the Trustee waived any argument he may have had to demand that

Appellant bring an adversary proceeding[4] to enjoin his improper conduct by not raising the issue

below in his response to the Motion to Enforce.  Having failed to do so, he cannot raise this

argument for the first time on appeal.  *Urban* v. *Bayer Corp. Pharm. Div.*, No. 06-5132, 2007

WL 2421798, *2 (3rd Cir. Aug. 28, 2007) (argument raised for the first time on appeal was

waived); *Burch* v. *Pennsylvania Dept. of Public Welfare*, No. 06-1429, 2006 WL 2807033, *1

(3rd Cir. Oct. 3, 2006) (same).

Moreover, Appellant has a contractual right to seek enforcement of the Plan.  The

Plan is a contract that binds all the parties to the chapter 11 case, including the Trustee and the

Trust Beneficiaries.  *Bank of Am. Nat'l Trust and Savings Ass'n* v. *203 N. LaSalle St. P'ship,* 526

U.S. 434, 471 (1999) ("a plan is binding upon all parties once it is confirmed"); *Gen. Elec.*

*Capital Corp.* v. *Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.)*, 341 F.3d 738, 743 (8th Cir.

2003) (a confirmed plan acts like a contract binding all parties).  And parties to a contract may

seek a remedy for its breach, which is what Appellant seeks here.  *See Olde Disc. Corp.* v.

*Tupman*, 1 F.3d 202, 215 (3d Cir. 1993) (parties may enforce their contractual rights, which

courts have a duty to protect).

### 3.   The Motion to Enforce is Ripe.

The Trustee's continued pursuit of a $600 million bankruptcy jackpot is a current

violation of Appellant's rights.  The cases the Trustee cites to argue otherwise are of no moment.

In each there was at least one contingency that had not occurred and therefore no actual violation

---

[4]   Bankruptcy Rule 7001(7) requires that an adversary proceeding be brought to obtain an injunction.

of the plaintiff's rights could be said to have occurred. *See Texas* v. *United States,* 523 U.S. 296 (1998) (government had not sought to enforce statute in manner potentially violating plaintiff's rights and possible violation was tenuous); *Wyatt, Virgin Islands, Inc.* v. *Gov't of the Virgin Islands,* 385 F.3d 801, 808 (3d Cir. 2004) (government's sending of cease and desist letters without seeking a court-ordered remedy did not violate plaintiff's rights); *Lincoln House, Inc.* v. *Dupre,* 903 F.2d 845, 847 (1st Cir. 1990) (plaintiff's claim contingent on being unable to recover state court judgment that had not been entered); *Pall* v. *KPMG, LLP,* No. 3:03-00842, 2006 WL 2800064, at *3 (D. Conn. Sept. 29, 2006) (contribution action contingent on finding defendant liable); *In re United Telecomms., Inc.*, No. 90-2251, 1993 WL 100202, at *3 (D. Kan. March 4, 1993) (directors' potential liability in derivative suit contingent on outcome of pending class action); *Plantronics, Inc.* v. *United States,* No. 88-1892, 1990 WL 3202, at *1 (S.D.N.Y. Jan 9, 1990) (indemnification action where indemnified party had not been found liable for any amounts). Unlike each of the Trustee's cases, no contingencies exist here; the Trustee has already violated Appellant's rights by seeking a recovery 50 times greater than that permitted by the Plan, and that violation is persisting now and should be stopped.

### 4.    Appellant Has Standing to Seek Relief.

Appellant's standing to pursue the Motion to Enforce is clear. Appellant has a strong pecuniary interest here: Appellant seeks to ensure that the protections given to it under the Plan and the Bankruptcy Code are enforced. It also seeks to limit substantially the scope of the lawsuit it must defend – at extraordinary cost – and potentially satisfy. Further, as discussed above, Appellant's harms are capable of being redressed by the Bankruptcy Court's entry of an

order enforcing the Plan. In fact, they demand it. Finally, the Trustee has already conceded

Appellant's standing – indeed, Appellant is involved here only because the Trustee sued it![5]

## B. The Trustee Is Judicially Estopped by the Prior Assertions that the Plan Complies with the Absolute Priority Rule.

Contrary to the Trustee's assertion, the Bankruptcy Court did *not adjudicate*

whether the Trustee is judicially estopped from pursuing his overstated claims in the Georgia

Action; it never reached the question. Had it reached the issue, the Bankruptcy Court could have

ended the Trustee's gambit because in addition to the Creditors' Committee's very specific

representations concerning the amount of the Assigned Causes of Action, the Debtor's own

statements estop the Trustee.

As assignee of the Debtors' causes of action, the Trustee must live with the

Debtors' representations to the Bankruptcy Court. The Trustee steps into the shoes of his

assignor, and is bound by its previous representations to the Court. *See Day,* 427 F.3d at 1153;

*Caribbean S.S. Co.*, 598 F.2d at 1266. In their brief in support of confirmation, the Debtors

asserted – as required for confirmation – that the Plan complied with the absolute priority rule.

(App. 6 at 12, 24, 25, 27-29 (section entitled "The Plan satisfies the 'Cram Down' Requirements

Under Section 1129(b) of the Bankruptcy Code").) Additionally, the affidavit of the Debtors'

Chief Reorganization Officer, Joseph Ahearn, offered in support of confirmation, specifically

states: "*Since the Debtors' unsecured creditors are not being paid in full,* the Magnatrax Equity

Interests are not entitled to a recovery." (App. 7 at 24 (emphasis added).) The Bankruptcy Court

relied upon the Debtors' assertions to confirm the Plan:

---

[5]   Though Appellant believes it has standing to bring the Motion to Enforce and this Appeal, to better focus this Court on the important substantive issues before it, Appellant's fellow equity investor in the Debtors and co-defendant in the Georgia Action, Onex Corporation, has moved contemporaneously to intervene in this Appeal.

> [T]he Plan is confirmable because the Plan satisfied section
> 1129(b) of Bankruptcy Code with respect to the Rejecting Classes.
> . . . The Magnatrax Debtors presented uncontroverted evidence at
> the Confirmation Hearing, and the Bankruptcy Court hereby finds,
> that the Plan does not discriminate unfairly . . . with respect to each
> of the Rejecting Classes, as required by section 1129(b)(1) of the
> Bankruptcy Code. . . .

(App. 2 at 12, 14.)

Consequently, just as the Debtors would be judicially estopped from seeking a recovery that would violate the absolute priority rule, so too is the Trustee. Estoppel is intended to prevent just the sort of abuse of the judicial process which is ongoing here. *Ryan Operations G.P.* v. *Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) ("The basic principle [of judicial estoppel] . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.") (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477 (1981)).

Indeed, a recent Bankruptcy Court decision in this District addressed an extremely similar situation and estopped a litigation trust from acting inconsistently with the debtors' representations and their plan. In *Forklift LP Corp.* v. *iS3C, Inc.* (*In re Forklift LP Corp.*), 363 B.R. 388 (Bankr. D. Del. 2007), the Court considered whether a claim should be paid in full or receive deferred distributions with a 10% estimated dividend. The Litigation Trustee, appointed pursuant to a confirmed plan, argued the latter. *Id.* at 392. The Bankruptcy Court found against the Litigation Trustee on several grounds. The court noted that in the debtors' memorandum of law submitted in support of confirmation, the debtors represented that their plan complied with section 1129(a)(9) of the Bankruptcy Code, which requires payment in full of administrative expense claims. *Id.* at 396. Perhaps more importantly, the Court noted that the confirmation

11

order, which was the paramount document, provided that the plan complied with section 1129(a)(9). As a result, he ruled against the litigation trust which, as here, was an assignee of the debtors' claims, on judicial estoppel grounds: "The Debtors' assertion that the Plan conforms with § 1129(a)(9)(A) allowed the Debtors to get the Plan confirmed. Plaintiff cannot now change the argument to its own advantage to avoid paying Defendant in full." *Id.* The situation here is precisely the same. The Creditors' Committee (of which the Trustee also claims to be a successor) made affirmative representations that the gross amount of claims to be brought was between $8 and $24 million, and its additional disclosure language suggested that recoveries were going to be even less because of litigation uncertainties. The Debtors affirmatively represented that the absolute priority rule was satisfied. Based on these disclosures, the Debtors wiped out shareholder interests and represented to the Bankruptcy Court that no creditors were being paid in full and that the Plan complied with section 1129(b). Now, the Trustee has flip flopped and maintains his claims aggregate $600 million. As in *Forklift*, the Bankruptcy Court should reopen the chapter 11 case to estop the Trustee's complete disregard of the record made below that is embedded in the Confirmation Order.

**C.    The Bankruptcy Court is the Proper
        Court to Hear the Motion to Enforce.**

        The Bankruptcy Court should adjudicate the Motion to Enforce. Indeed, it has exclusive jurisdiction over such Motion. Consequently, this Court should reopen the chapter 11 case to allow the Bankruptcy Court to exercise its jurisdiction.

        Because the Bankruptcy Court retained exclusive jurisdiction over, among other things, motions to enforce the Plan, it should hear the Motion to Enforce. The Plan grants the Bankruptcy Court "*exclusive jurisdiction:* . . . [t]o take any action, and issue such orders as may be necessary or appropriate, *to construe, enforce, implement, execute and consummate* the Plan

12

or *to maintain the integrity* of the Plan following consummation." (App. 4 at §10.j (emphasis

added). Similarly, the Confirmation Order provides that "the Bankruptcy Court shall retain

exclusive jurisdiction over all matters arising out of, and related to, the Magnatrax

Reorganization Cases and the Plan to the fullest extent permitted by law, including . . . those

items and matters set forth in Article X of the Plan . . . ." (App. 2 at 21.) When granted

exclusive jurisdiction to adjudicate an issue, that court has the duty to exercise it. *Sandpaper*

*Village Condo Ass'n, Inc.* v. *Louisiana-Pacific Corp.*, 428 F.3d 831, 839-42 (9th Cir. 2005)

(settlement agreement granted district court exclusive jurisdiction over its interpretation; court

enjoined state court from interpreting agreement); *McGhan* v. *Rutz* (*In re McGhan*), 288 F.3d

1172, 1182 (9th Cir. 2002) (bankruptcy court abused its discretion by not reopening the case to

exercise its exclusive jurisdiction where state court proceeding threatened that jurisdiction).

       In any event, because the Motion to Enforce necessitates interpretation of the Plan

and Confirmation Order, the Bankruptcy Court is properly poised to adjudicate the Motion to

Enforce. As the court that confirmed the Plan and entered the Confirmation Order, the

Bankruptcy Court is best positioned to analyze them. *In re Chicago, Milwaukee, St. Paul &*

*Pacific R.R. Co.,* 6 F.3d 1184, 1194 (7th Cir. 1993) (bankruptcy court is in the best position to

interpret its own orders); *Quenzer* v. *Advanta Mortg. Corp. USA*, 288 B.R. 884, 890 (D. Kan.

2003) (court remanded action to bankruptcy court because it has greater expertise in construing

its own orders); *see also Washington Bancorporation* v. *Fed. Deposit Ins. Corp.* (*In re*

*Washington Bancorporation*), No. 95-1340, 1996 WL 148533, at *7 (D.D.C. 1996) (bankruptcy

courts have expertise in determining issue unique to the Bankruptcy Code).

The cases cited by the Trustee to argue otherwise are distinguishable.[6] In such

cases, the bankruptcy court did not reopen the case because it could not grant any effective relief;

the parties had previously declined to permit the bankruptcy court to hear the issue; the

bankruptcy court had no experience with the underlying factual basis for the claim; or the issue

did not invoke a substantive matter of bankruptcy law. *See In re Apex Oil Co., Inc.,* 406 F.3d

538, 542-43 (8th Cir. 2005) (action in no way related to bankruptcy proceedings or same

underlying facts and would have no effect on bankruptcy estate or any of its creditors); *In re

Antonious*, 373 B.R. 400, 407-08 (Bankr. E.D. Pa. 2007) (relief sought in bankruptcy court

would be moot; subsequent actions would arise post-petition); *Underwood* v. *Student Aid Funds,

Inc.* (*In re Underwood*), 299 B.R. 471, 476-78 (Bankr. S.D. Ohio 2003) (parties previously

declined opportunities to resolve issues during bankruptcy case; simple issue of bankruptcy law

at issue); *In re Iannacone,* 21 B.R. 153, 155 (Bankr. D. Mass. 1982) (court unable to grant

creditor any relief); *In re Dabbs*, 72 B.R. 73, 74-75 (Bankr. N.D. Ala. 1987) (only issue was

factual question whether creditor received notice during bankruptcy case); *In re Carter,* 38 B.R.

636, 639 (Bankr. D. Conn. 1984) (only issue was dischargeability, which debtor chose not to

adjudicate during bankruptcy case); *In re McNeil,* 13 B.R. 743, 746 (Bankr. S.D.N.Y. 1981)

(court could not grant debtor relief by reopening case). Here, the Bankruptcy Court can and

should grant Appellant substantive relief by enforcing its rights; the Motion to Enforce is based

upon the Plan and Confirmation Order entered by the Bankruptcy Court; and the underlying

---

[6]    The exception is *In re Zinchiak,* 406 F.3d 214, 224 (3d Cir. 2005), where the court affirmed
the bankruptcy court's decision to reopen a case because the action required interpretation of
the bankruptcy court's orders and the effect of a substantive Bankruptcy Code provision.
Here, the Motion to Enforce raises similar issues and, under *Zinchiak*, the chapter 11 case
should be reopened.

14

substantive law, the absolute priority rule, is a cornerstone of the reorganization provisions of the Bankruptcy Code.

Finally, Appellant did not put the issues raised by the Motion to Enforce before the Georgia Court. The Georgia Court, on a motion to dismiss the Trustee's initial pleading, considered the Trustee's standing to recover on unsecured claims discharged by the Plan when his recovery would not benefit the estate, as required by section 550 of the Bankruptcy Code. Here, Appellant seeks to enforce its rights pursuant to the Plan and the absolute priority rule, which limits the Trust Beneficiaries' recoveries to 100% of their Allowed Class 9 Claims. In sum, the Bankruptcy Court is empowered and equipped to adjudicate Appellant's Motion and should do so.

15

## CONCLUSION

For the foregoing reasons and the reasons set forth in Appellant's Opening Brief, this Court should reverse the Bankruptcy Court Order and grant such other relief as may be proper.

Dated: November 30, 2007

COZEN O'CONNOR

_____
Mark E. Felger (No. 3919)
Jeffrey R. Waxman (No. 4159)
Chase Manhattan Centre
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000

-and-

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
Alan W. Kornberg
Maria T. Vullo
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Counsel for Onex American Holdings, LLC,*
*Appellant*

# EXHIBIT 1

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2421798 (C.A.3 (N.J.))
(Cite as: Slip Copy)

Page 1

**H**

Urban v. Bayer Corp. Pharmaceutical Div.
C.A.3 (N.J.),2007.
Only the Westlaw citation is currently available.This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. (Find CTA3 App. I, IOP 5.7) (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,Third Circuit.
Denise URBAN, Appellant
v.
BAYER CORPORATION PHARMACEUTICAL DIVISION.
No. 06-5132.

Submitted Under Third Circuit LAR 34.1(a) Aug. 28, 2007.
Filed Aug. 28, 2007.

On Appeal From the United States District Court For the District of New Jersey, (D.C.Civ. No. 05-cv-01305), District Judge: Honorable Katharine S. Hayden.

Denise Urban, Metuchen, NJ, pro se.
William H. Ewing, Eckert, Seamans, Cherin & Mellott, Philadelphia, PA, for Bayer Corporation Pharmaceutical Division.

Before SLOVITER, MCKEE and AMBRO, Circuit Judges.

OPINION

PER CURIAM.

*1 Appellant Denise Urban, proceeding *pro se,* appeals the entry of summary judgment in favor of Appellee. For the reasons that follow, we will affirm.

Appellant alleges that she was terminated from her job as a pharmaceutical sales representative based on her status as a single mother. Appellant bases her claims on her perception that David Cousins, her Division Sales Manager at Bayer Corporation ("Bayer"), changed his behavior toward her once he learned that she was a single mother. Appellant began working at Bayer in September 2000. She alleges that despite the fact that she received numerous awards based on her sales figures, once Cousins learned that

she was a single mother, he began to give her negative reviews and to critique her administrative, organizational and communication skills. In July 2002, she was placed on a "Work Plan for Success" which indicated that she needed to improve in three areas: administrative skills, territory management, and sales attainment. Consistent with Bayer's policy, Appellant was given ninety days to address the deficiencies identified in the Plan. Appellant received feedback regarding her progress over the next few months and, at the end of the ninety days, showed improvement in sales attainment, but not in the remaining categories. On October 29, 2002, she was placed on a sixty-day Final Work Improvement Plan. At the conclusion of that time period, Appellant's Final Plan was extended for an additional thirty days. By that time, Cousins had been replaced by a new Division Sales Manager, John Daly. Based on Daly's conclusions that she had failed to improve in the required areas, the decision was made to terminate Appellant's employment.

On February 12, 2004, Appellant filed a claim of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Appellant then initiated the underlying employment discrimination lawsuit on March 4, 2005 in the United States District Court for the District of New Jersey. Following a period of discovery, Appellee moved for summary judgment, arguing that because Appellant failed to timely file a charge with the EEOC, her federal claim of discrimination is time-barred. The District Court agreed and, after concluding that Appellant was not entitled to equitable tolling, entered summary judgment in favor of Appellee.[FN1] Appellant timely appealed.

> FN1. Despite its conclusion that Appellant's discrimination claim was time-barred, the District Court proceeded to analyze it on the merits, concluding that Appellant had not produced sufficient evidence to demonstrate that Bayer's decision to terminate her employment was based in whole or in part her status as a single mother, and therefore could not withstand Appellee's motion for summary judgment. Because we agree that Appellant's claim is time-barred, we do not reach its merits.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 2421798 (C.A.3 (N.J.))
**(Cite as: Slip Copy)**

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary, and we apply the same standard the District Court applied. *Stratton v. E.I. DuPont De Nemours & Co.,* 363 F.3d 250, 253 (3d Cir.2004). Summary judgment is proper only if it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c); *Carrasca v. Pomeroy,* 313 F.3d 828, 832-33 (3d Cir.2002).

Under Title VII, before a claimant may bring suit in federal court, she must exhaust her administrative remedies. *See Robinson v. Dalton,* 107 F.3d 1018, 1020-21 (3d Cir.1997). In this case, the required administrative remedy was the timely filing of a complaint with the EEOC. In Pennsylvania, a verified charge must be filed with the EEOC within 300 days of the alleged unlawful employment practice. *See*42 U.S.C. § 2000e-5(e)(1); *see also Watson v. Eastman Kodak Co.,* 235 F.3d 851, 854 (3d Cir.2000). For the purposes of filing a charge alleging unlawful termination, the limitations period is measured from the date on which the employee was advised of her termination, and not from her last day of employment. *See Delaware State College v. Ricks,* 449 U.S. 250, 258 (1980); *Watson,* 235 F.3d at 855.

*2 Appellee claims that Appellant was unequivocally informed of her discharge on February 21, 2003, and that her termination was effective on March 7, 2003. In the charge she filed with the EEOC, Appellant alleged that she was terminated on March 3, 2003.[FN2]Her verified EEOC charge was filed on February 12, 2004. As explained by the District Court, even if Appellant was notified of her termination on March 3, 2003, Appellant's verified EEOC charge, filed on February 12, 2004, was still untimely. In her notice of appeal, Appellant claims that she was discharged on March 14, 2003, which is the date of her last paycheck. However, she does not allege, and there is no basis in the record to believe, that this is the date on which Appellant was first notified of her termination; i .e., the date on which the alleged discriminatory act occurred. *See Watson v. Eastman Kodak Co.,* 235 F.3d 851, 855 (3d Cir.2000).

FN2. In her notice of appeal, Appellant claims that she was discharged on March 14, 2003, which is the date of her last paycheck. However, she does not allege, and there is no basis in the record to believe, that this is the date on which Appellant was first notified of her termination; i.e., the date on which the alleged discriminatory act occurred. *See Watson v. Eastman Kodak Co.,* 235 F.3d 851, 855 (3d Cir.2000).

In her notice of appeal, Appellant argues that her EEOC charge was filed on December 31, 2003, and is therefore timely. There are several problems with this argument. First, it appears to have been raised for the first time on appeal and is therefore waived. *See Bailey v. United Airlines,* 279 F.3d 194, 199 n. 2 (3d Cir.2002). Second, the document in question is actually Appellant's Intake Questionnaire, which was faxed to the EEOC on December 31, 2003, and received by mail on January 2, 2003. This document was not, as required under Title VII, verified, *see*42 U.S.C. § 2000e-5(b); *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir.2006), and accordingly, did not cause the EEOC to initiate its investigation. *See id.* at 265.It therefore does not constitute a "charge" for the purposes of the 300-day limitations period. *See id.*Third, even if we were to accept this date as the date of filing with the EEOC, Appellant's complaint would still be untimely. December 31, 2003 is 303 days after March 3, 2003.

On appeal, Appellant argues that the EEOC's issuance of a "Right to Sue" letter conclusively proves that she timely filed her EEOC charge. However, our case law is clear that "the EEOC's belief as to the timeliness of a charge is not determinative."*Kocian v. Getty Ref. & Mktg. Co.,* 707 F.2d 748, 754 n. 9 (3d Cir.1983), *overruled on other grounds by Colgan v. Fisher Sci. Co.,* 935 F.2d 1407, 1414 (3d Cir.1991) (en banc). In light of the foregoing, we agree with the District Court that Appellant's claim was time-barred and that she failed to demonstrate an entitlement to equitable tolling. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1387 (3d Cir.1994). Accordingly, we will affirm the District Court's entry of summary judgment in favor of Appellee.

C.A.3 (N.J.),2007.
Urban v. Bayer Corp. Pharmaceutical Div.
Slip Copy, 2007 WL 2421798 (C.A.3 (N.J.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

197 Fed.Appx. 101                                                                                    Page 1
197 Fed.Appx. 101, 2006 WL 2807033 (C.A.3 (Pa.))
**(Cite as: 197 Fed.Appx. 101)**

# H

Burch v. Pennsylvania Dept. of Public Welfare
C.A.3 (Pa.),2006.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please use
FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
Judith M. BURCH, Appellant
v.
PENNSYLVANIA DEPARTMENT OF PUBLIC
WELFARE.
No. 06-1429.

Submitted Under Third CircuitLAR 34.1(a) Sept. 13,
2006.
Filed: Oct. 3, 2006.

On Appeal from the United States District Court for
the Middle District of Pennsylvania (D.C. Civ. No.
05-cv-2032), District Judge: Thomas I. Vanaskie.

Judith M. Burch, Dickson City, PA, pro se.

BEFORE: BARRY, CHAGARES and COWEN,
Circuit Judges.

OPINION
PER CURIAM.
**1 Judith Burch appeals the dismissal of her pro se
complaint by the United States District Court for the
Middle District of Pennsylvania. For the reasons
below, we will affirm the District Court's judgment.

*102 On October 5, 2005, Burch filed a pro se
discrimination action against her former employer,
defendant Pennsylvania Department of Public
Welfare. She alleged that defendant violated the
Americans with Disabilities Act (ADA), 42 U.S.C. §
12201et seq., when it discriminated and retaliated
against her due to her alleged disability of, inter alia,
depression and anxiety. Burch sought front and back
pay, and "comprehensive" and punitive damages.
The District Court dismissed the complaint for lack
of subject-matter jurisdiction based on Pennsylvania's
sovereign immunity under the Eleventh Amendment.
Burch timely appealed.FN1

> FN1. Burch filed the notice of appeal within
> 30 days from the denial of her timely-filed
> motion to reconsider. SeeFRAP
> 4(a)(4)(A)(iv).

We have appellate jurisdiction pursuant to 28 U.S.C.
§ 1291. Our standard of review is plenary. See
Gould Elec., Inc. v. United States, 220 F.3d 169, 176
(3d Cir.2000).

In her complaint, Burch argued that defendant
discriminated and retaliated against her due to her
alleged disabilities. We agree with the District Court
that the threshold issue in this matter is whether
Burch may recover under Title I of the ADA for her
discrimination and retaliation claims against
defendant in federal court. She may not.
Defendant, as an instrumentality of the
Commonwealth of Pennsylvania, is entitled to
immunity under the Eleventh Amendment from a suit
for damages brought pursuant to the ADA. See Bd. of
Tr. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 360,
121 S.Ct. 955, 148 L.Ed.2d 866 (2001); Benn v.
First Judicial Dist. of Pa., 426 F.3d 233, 241 (3d
Cir.2005).FN2 This immunity functions as an absolute
bar to Burch's ADA claim. Accordingly, we will
affirm the judgment of the District Court.FN3

> FN2. Burch does not seek any non-monetary
> relief that might not be barred by the
> Eleventh Amendment. See Garrett, 531
> U.S. at 374 n. 9, 121 S.Ct. 955.

> FN3. To the extent Burch raises new
> constitutional and statutory claims, we note
> that arguments raised for the first time on
> appeal are deemed to be waived and not
> susceptible of review. See Brown v. Philip
> Morris, Inc., 250 F.3d 789, 799 (3d
> Cir.2001).

C.A.3 (Pa.),2006.
Burch v. Pennsylvania Dept. of Public Welfare
197 Fed.Appx. 101, 2006 WL 2807033 (C.A.3 (Pa.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                        Page 1
Slip Copy, 2006 WL 2800064 (D.Conn.), Fed. Sec. L. Rep. P 93,965
**(Cite as: Slip Copy)**

Pall v. KPMG, LLP
D.Conn.,2006.

United States District Court,D. Connecticut.
Allan PALL, Plaintiff,
v.
KPMG, LLP, Joseph T. Boyle, Michael Conway,
Anthony Dolanski, and Ronald Safran, Defendants,
andXerox Corporation, Nominal Defendant.
**Civ. No. 3:03CV00842(AWT).**

Sept. 29, 2006.

Panagiotis Katsambas, Seth M. Kean, Stuart J.
Baskin, Tai H. Park, Shearman & Sterling, David
Futterman, Arnold & Porter, Martin L. Perschetz,
Yocheved Cohen, Schulte, Roth & Zabel, LLP, New
York, NY, Thomas J. Murphy, Cowdery, Ecker &
Murphy, Hartford, CT, Bryan B. House, Kenneth B.
Winer, Samuel J. Winer, Foley & Lardner, Andrew
T. Karron, James W. Thomas, Jr., Kathy A. Ladun,
Scott B. Schreiber, Arnold & Porter, Washington,
DC, Thomas P. Krebs, Foley & Lardner, Chicago, IL,
Gary F. Bendinger, Richard W. Casey, Howrey, LLP,
Salt Lake City, UT, for Defendants.
Carolyn G. Nussbaum, Nixon Peabody, Rochester,
NY, Frank L. Amoroso, Nixon Peabody LLP,
Jericho, NY, for Nominal Defendant.

### *RULING ON MOTION TO DISMISS*
ALVIN W. THOMPSON, District Judge.
*1 The plaintiff, Allan Pall ("Pall"), a beneficial
owner of Xerox stock, brought this shareholder
derivative action on behalf of Xerox Corporation
("Xerox") against KPMG, LLP, Joseph T. Boyle,
Michael Conway, Anthony Dolanski, and Ronald
Safran (the "KPMG Defendants") and nominal
defendant Xerox. The defendants have moved to
dismiss the Derivative Complaint for lack of subject
matter jurisdiction. For the reasons set forth below,
their motions to dismiss are being granted.

### I. FACTUAL BACKGROUND

Pall initiated a similar action in this court, *Allan Pall
v. KPMG Peat Marwick, et al.,* No. 3:02cv00854, on
May 16, 2002. On March 27, 2003, this court
dismissed the action for lack of diversity jurisdiction.

The plaintiff then initiated this action on May 13,
2003, adding a contribution claim under the federal
securities laws.

The Derivative Complaint sets forth six claims for
relief. In Count I, the plaintiff alleges that the KPMG
Defendants are liable to Xerox for contribution
pursuant to the Securities Exchange Act and common
law for potential losses in pending federal securities
actions against Xerox and for fines and penalties paid
to the Securities and Exchange Commission (the
"SEC"). In Count II, the plaintiff alleges that the
KPMG Defendants were negligent and breached their
duties to Xerox. In Count III, the plaintiff alleges that
the KPMG Defendants made material
misrepresentations to Xerox. In Count IV, the
plaintiff alleges that the KPMG Defendants breached
contractual obligations to Xerox. In Count V, the
plaintiff alleges that the KPMG Defendants breached
their fiduciary duty to Xerox. In Count VI, the
plaintiff alleges that Xerox has a right to
indemnification from the KPMG Defendants.

KPMG served as Xerox's auditor from 1971 to in or
around October of 2001. Conway, Boyle, Dolanski,
and Safran are all former KPMG partners who
worked at KPMG during the relevant period.

On April 11, 2002, the SEC filed a civil complaint
against Xerox based on allegations that Xerox had
issued false and misleading financial statements from
1997 through 2000. As a result of that suit, Xerox
paid a $10 million fine to the SEC. On January 29,
2003, the SEC filed a civil fraud action against the
KPMG Defendants based upon KPMG's audits of
Xerox from 1997 through 2000. The plaintiff alleges
that KPMG's audits of Xerox were "repeatedly used
to fill a $3 billion gap."(Derivative Complaint, at ¶
14). This improper accounting resulted in Xerox
having to restate $6.1 billion of equipment revenue
and $1.9 billion of pre-tax earnings for the period
from 1997 to 2000. The plaintiff alleges that "the
KPMG Defendants were willing participants in the
scheme."(*Id.,* at ¶ 22).

The plaintiff alleges that during the period at issue in
the SEC action against Xerox, the KPMG Defendants
represented that the audits were completed in
conformity with professional standards, including
Generally Accepted Auditing Standards ("GAAS").
The plaintiff also alleges that the KPMG Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2800064 (D.Conn.), Fed. Sec. L. Rep. P 93,965
**(Cite as: Slip Copy)**

represented to Xerox that its financial reporting was in compliance with Generally Accepted Accounting Principles ("GAAP").

*2 As information concerning improper accounting practices at Xerox became public, purchasers of Xerox securities filed class action lawsuits against Xerox. The plaintiff alleges that these suits have subjected Xerox to potential liability amounting to millions, or even billions, of dollars.

## II. LEGAL STANDARD

The defendants have moved to dismiss the Derivative Complaint pursuant to Fed.R.Civ.P. 12(b)(1), for lack of subject matter jurisdiction. "[T]he standards for reviewing dismissals granted under 12(b)(1) and 12(b)(6) are identical."*Moore v. PaineWebber Inc., 189 F.3d 165, 169 n. 3 (2d Cir.1999).*"[T]he court must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff. The court may not dismiss a complaint unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief."*Jaghory v. New York State Dept. of Educ., 131 F.3d 326, 329 (2d Cir.1997)*(internal citations omitted).

## III. DISCUSSION

### A. Ripeness Challenge to Federal Contribution Claim

Article III of the United States Constitution requires that an action constitute a "case" or "controversy" before it can be heard by a federal court. To meet this requirement, a claim must "demonstrate sufficient ripeness to establish a concrete case or controversy."*Thomas v. Union Carbide Agr. Products Co., 473 U .S. 568, 579 (1985); Rothenberg v. Stone, 234 F.Supp.2d 217, 220 (E.D.N.Y.2002)* ("[t]o be justiciable under Article III, courts have long recognized that claims must be ripe.")."[R]ipeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."*Reno v. Catholic Social Services, Inc., 509 U.S. 43, 58 n. 18 (1993).* In considering whether a claim is ripe for review, courts should "evaluate both the fitness of the issues for judicial decision and

the hardship to the parties of withholding court consideration."*Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967).* The rationale for the doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements...."*Id. at 148.*

When resolution of the claim depends on "nebulous future events so contingent in nature that there is no certainty they will ever occur," a controversy is not ripe for resolution. *Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir.1998)* (quoting *In re Drexel Burnham Lambert Group Inc., 995 F.2d 1138, 1146 (2d Cir.1993)).* When determining whether a claim is ripe for review, an important consideration is "whether resolution of the tendered issue is based upon events or determinations which may not occur as anticipated."*A/SJ. Ludwig Mowinckles Rederi v. Tidewater Const. Co., 559 F.2d 928, 932 (1977)* (holding that indemnity claim was not ripe where there was no finding of liability or settlement in other legal actions).

*3 When a claimed injury is "contingent upon the outcome of a separate, pending lawsuit," courts generally "dismiss claims as premature." *In re United Telecommunications, Inc., Securities Litigation, No. 90-2251-EEO, 1993 WL 100202, at *3 (D.Kan. Mar. 4, 1993)*(dismissing claim as not ripe where the claim was contingent upon the outcome of other litigation); *see also Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir.1990)* (dismissing claim as not ripe where injury was contingent upon outcome of pending state court litigation); *Platronics, Inc. v. United States, No. 88 CIV 1892, 1990 WL 3202, at *1 (S.D.N.Y. Jan. 9, 1990)* (applying New York law, court dismissed action for indemnity where damages were "speculative" until state court action was resolved). Consistent with this line of cases, courts regularly dismiss contribution claims which are based on findings of liability and damages in a separate legal action. *See, e.g., In re Cendant Corp. Derivative Action Litigation, 96 F.Supp.2d 394, 397 (D.N.J.2000)* (dismissing contribution claim as not ripe even where Cendant had already set aside the proposed settlement amount because the settlement had not yet received the court's approval).

The plaintiff brings a contribution claim pursuant to Section 21D of the Securities Exchange Act. Under this section, Xerox only has a right to contribution against the KPMG Defendants if the trier of fact first finds that both that Xerox and KPMG are liable, and then "specifically determines that [the KPMG Defendants] knowingly committed a violation of the

Slip Copy                                                                    Page 3
Slip Copy, 2006 WL 2800064 (D.Conn.), Fed. Sec. L. Rep. P 93,965
**(Cite as: Slip Copy)**

securities laws."15 U.S.C. § 78u-4(f)(2)(A). Moreover, the KPMG Defendants could not be liable for contribution unless Xerox has to make payment in excess of its proportionate share pursuant to § 78u-4(f)(4). Also, as the plaintiff recognizes, if there is a settlement in the related actions, contribution claims against settling parties are barred. See15 U.S.C. § 78u-4(f)(7); Plaintiff's Memorandum Opposing the Motions to Dismiss Filed by Defendant KPMG LLP and Nominal Defendant Xerox Corporation on Subject Matter Jurisdiction Grounds ("Plaintiff's Opposition") (Doc. No. 62), at 14.[FN1]Thus, because there has been no determination of liability and damages in the related actions, the injury remains speculative. Furthermore, the right to contribution remains contingent upon the parties in the related actions *not* settling.

> FN1. The plaintiff argues that this bar is a reason to allow the plaintiff to bring the contribution action now, because it may not be available when the related actions are resolved. (Plaintiff's Opposition, at 13-15). However, the plaintiff cites no authority to support this position, which is contrary to Congress' intent as expressed in the plain language of § 78u4 (f)(7).

The plaintiff points to a line of cases which he claims support his contention that contribution claims can be considered ripe before underlying liability is established. (*See* Plaintiff's Opposition, at 10-13). However, these cases address contribution claims made by third-party defendants or third-party plaintiffs who are joined in the action in which liability will be determined.[FN2] As the court notes in *Ades v. Deloitte & Touche,* Nos. 90 Civ. 4959(RWS), 90 Civ. 5056(RWS), 1993 WL 362364, at *16 (S.D.N.Y. Sept. 17, 1993), contribution claims can be brought in an underlying action pursuant to Fed.R.Civ.P. 14. However, the availability of contribution claims in a related action has no bearing on the issue of the ripeness of the federal contribution claim brought in this action. Here, because the plaintiff is attempting to bring a contribution claim which is contingent upon a finding of liability in the related actions, the injury (and availability of a contribution claim) depends upon the results in the related actions, making the contribution claim not ripe.[FN3]

> FN2.*See Jordan v. Madison Leasing Company,* 596 F.Supp. 707, 710 (1984)

(third-party plaintiffs' contribution claims survived motion to dismiss before liability under Section 10(b) was determined); *In re The Leslie Fay Companies, Inc., Sec. Litig.,* 918 F.Supp. 749 (S.D.N.Y.1996) (defendant filed cross-claims and third-party claims against plaintiff and officers and directors of the plaintiff; claims survived motion to dismiss, even before defendant was found liable); *In re Crazy Eddie Securities Litigation,* 802 F.Supp. 804 (E.D.N.Y.1992) (defendant was allowed to assert claim for contribution against a third-party).

> FN3. Also, as the defendants point out, the plaintiff has cited no authority giving him a federal cause of action for contribution based on a fine paid to the SEC. (KPMG LLP's Memorandum in Support of its Motion to Dismiss the Derivative Complaint (Doc. No. 50), at 3-4, n. 5); Nominal Defendant Xerox Corporation's Memorandum of Law in Support of its Motion to Dismiss the Derivative Complaint for Lack of Subject Matter Jurisdiction ("Xerox's Memorandum") (Doc. No. 48), at 5, n. 3.

**B. Discretionary Exercise of Supplemental Jurisdiction**

*4 The plaintiff argues that the court should exercise supplemental jurisdiction over the remaining state law claims.[FN4]However, 28 U.S.C. § 1367(a) only allows federal courts to entertain claims over which they do not have original jurisdiction where the court has original jurisdiction over at least one claim. "Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy as long as the action is one in which the district courts would have original jurisdiction."*Exxon Mobil Corp. v. Allapattah Services, Inc.,* 125 S.Ct. 2611, 2620 (2005).

> FN4. The plaintiff points to *Common Fund for Non-Profit Organizations v. KPMG Marwick LLP,* No. 96 Civ. 255(MGC), 1996 WL 551605 (S.D.N.Y. Sept. 27, 1996) as authority for this court to exercise jurisdiction. (Plaintiff's Opposition, at 6-7). However, in *Common Fund,* there were two valid federal claims pertaining to one group of defendants, and the court exercised supplemental jurisdiction as to state law

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                              Page 4
Slip Copy, 2006 WL 2800064 (D.Conn.), Fed. Sec. L. Rep. P 93,965
**(Cite as: Slip Copy)**

       claims against another defendant. The court
       had original jurisdiction as to two claims
       brought in the action. Here, by contrast,
       there is no valid federal claim against any
       defendant.

Before filing this action, the plaintiff attempted to
bring a similar action in this court, which the court
dismissed for lack of diversity jurisdiction. Now,
having added a federal claim for contribution that is
not ripe, the plaintiff seeks to have his state law
claims heard in this court. The plaintiff will not be
allowed to circumvent the requirements for
jurisdiction by asserting an invalid contribution claim
based on federal law.

### IV. CONCLUSION

Accordingly, the defendants' motions to dismiss
(Doc. No. 47 and Doc. No. 49) are hereby
GRANTED.

The Clerk shall close this case.

It is so ordered.

D.Conn.,2006.
Pall v. KPMG, LLP
Slip Copy, 2006 WL 2800064 (D.Conn.), Fed. Sec.
L. Rep. P 93,965

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                      Page 1
Not Reported in F.Supp., 1993 WL 100202 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

**H**

In re United Telecommunications, Inc., Securities
Litigation
D.Kan.,1993.
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.
In re UNITED TELECOMMUNICATIONS, INC.,
SECURITIES LITIGATION.
Relates to All Actions.
**No. 90-2251-EEO.**

March 4, 1993.

Eric C. Sexton, Don R. Lolli, Beckett, Lolli,
Bartunek & Beckett, Kansas City, MO, Stephen D.
Ramos, Berger & Montague, Philadelphia, PA, Lee
S. Shalov, Milberg, Weiss, Bershad, Specthrie &
Lerach, New York City, Steven M. Steingard, Dianne
M. Nast, Kohn, Savett, Klein & Graf, Philadephia,
PA, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll,
Washington, DC, Arnold Levin, Levin, Fishbein,
Sedran & Berman, Philadelphia, PA, David
Jaroslawicz, Law Offices of David Jaroslawicz, New
York City, Richard Dannenberg, Lowey,
Dannenberg, Bemporad, Brachtl & Selinger, P.C.,
New York City, for plaintiffs.
Arthur L. Liman, Allan Blumstein, Paul, Weiss,
Rifkind, Wharton & Garison, New York City,
Stephen D. Oestreich, Patricia I. Avery, Wolf,
Popper, Ross, Wolf & Jones, New York City, for
William T. Esrey and Arthur B. Krause.
Lawrence Kill, Anderson, Kill, Olick & Oshinsky,
P.C., New York City, for Paul H. Henson.
Heather Suzanne Woodson, Stinson, Mag & Fizzell,
Overland Park, KS, Brant M. Laue, George E.
Feldmiller, Mark S. Foster, Stinson, Mag & Fizzell,
Kansas City, MO, Laura L. Ozenberger, Arthur A.
Chaykin, Kansas City, MO, for United
Telecommunications, Inc.

MEMORANDUM AND ORDER
EARL E. O'CONNOR, District Judge.
*1 This matter is before the court on defendants'
motion to dismiss Plaintiffs Second Amended
Consolidated Derivative Complaint (the
"complaint"). For the reasons stated below,
defendants' motion is granted, and the complaint is
dismissed without prejudice.

This derivative action is brought on behalf of United
Telecommunications, Inc. ("United"), asserting
claims against United's directors for breach of
fiduciary duty. Specifically, the complaint alleges
that the United directorate is responsible for gross
mismanagement of the company, and for
participating in and allowing dissemination by the
company of public statements that were fraudulent
and misleading. United is being sued in a related
class action for securities fraud arising out of the
same conduct that in this suit the directors are
charged with having committed or recklessly
disregarded. It is the position of the derivative
plaintiffs that the directors should answer for any
damage the corporation sustains as a result of the
class action. The class action, having withstood
defendants' motion to dismiss for failure to state a
claim, has been consolidated with the instant
derivative action and is pending before this court.

The allegations of the derivative complaint are
similar in many respects to those of the class action
complaint. The derivative complaint alleges that
United management, including the directors, made
optimistic predictions about the company's prospects,
which were fraudulent and misleading in light of
material, undisclosed information about United's
substantial financial difficulties. Derivative
plaintiffs allege that the directors participated in or
recklessly disregarded (and therefore failed to
prevent) issuance of the fraudulent public statements,
even though they were in possession of information
that revealed these statements were untrue or
misleading.

Plaintiffs allege that the directors' mismanagement
and breach of duty has damaged the corporation.
The complaint states that, as a result of the directors'
wrongful actions, "the company has been named as a
defendant in actions brought by purchasers of its
securities, who suffered as a direct consequence of
the individual defendants' conduct," and "[t]o the
extent that United Telecommunications is found
liable for the damages alleged by the purchasers of its
securities, such liability will be the direct
consequence of the acts and/or omissions of the
individual defendants." Complaint ¶ 173. In the
section of the complaint entitled "Futility of
Demand," the plaintiffs also assert that they are
excused from making demand on the board of
directors to bring the suit. One of the plaintiffs'
purported grounds for excusing demand on the board

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 100202 (D.Kan.)
(Cite as: Not Reported in F.Supp.)

Page 2

of directors is the allegation that "as a result of the acts of unfair competition against other, honest telecommunications companies, and because of the severe damage to United Telecommunication's credibility and ability to conduct business, United Telecommunications has suffered and will continue to suffer millions of dollars of lost revenue, increased expenses, and increased costs in gaining access to capital markets."

**\*2** Defendants argue that the complaint should be dismissed for failure to state a claim, in that the complaint fails to adequately plead damages. Defendants argue that because the class action is still pending, the derivative claim seeking recovery from the directors of a judgment the company has not yet been ordered to pay is premature. Defendants suggest that at this point, damage to the company is only speculative. Plaintiffs respond that where a defendant has caused the difficulty in assessing damages, it cannot defend on the grounds that damages are somewhat speculative.

In analyzing the issue presented, *i.e.,* whether or not the complaint must be dismissed for failure to adequately plead a claim for damages, the court will begin with the plaintiffs' allegations that United has suffered and will continue to suffer injury as a result of its own acts of unfair competition and from damage to its credibility and ability to conduct business. First, it is not at all clear from the complaint whether plaintiffs intend these statements to be a claim for damages. The allegations, which appear in a section of the complaint headed "Futility of Demand," occupy the fifth spot in a list of seven reasons offered to show why demand on the board to bring this suit would have been futile. Notwithstanding this ambiguity, and giving plaintiffs every benefit of the doubt, the court must still find that the allegations are deficient. With respect to the charge of unfair competition, the complaint pleads no facts which, if true, would support a finding that the company has been harmed by the supposed acts of unfair competition. *See Swanson v. Bixler,* 750 F.2d 810, 813 (all well-pleaded facts, as distinguished from conclusory allegations, must be taken as true). The plaintiffs' assertion that the company's acts of unfair competition have caused it to suffer lost revenue and increased costs is conclusory and, in the absence of factual allegations to back it up, insufficient to state a claim. Equally deficient is the allegation that United has been harmed by damage to its credibility and ability to conduct business. By way of comparison, we note that the court in *In re Symbol Technologies Securities Litigation,* 762

F.Supp. 510 (E.D.N.Y.1991), was asked to dismiss allegations very similar to those before the court today. The derivative plaintiffs in *Symbol* alleged that "the director defendants' acts have undermined Symbol Technologies' credibility in the securities market and have jeopardized the continued public acceptance and marketability of its stock to the injury of the Company." *Id.* at 517. Dismissing the complaint, the court held that "this type of boilerplate language is not sufficient to withstand a motion to dismiss. Defendants are entitled to know more specifically what damages are being claimed, as well as the extent of those damages." *Id.* In the instant case, plaintiffs' allegations that the company has suffered injury to its credibility and ability to conduct business are conclusory and not supported by pleaded facts that, if true, would demonstrate that United has indeed sustained injury, financial or otherwise, due to a loss of credibility or ability to conduct business. This sort of conclusory allegation, as the *Symbol* court observed, does not adequately apprise the defendants of the basis for the damages claimed or the extent of those damages. *See Conley v. Gibson,* 355 U.S. 41, 47 (1957) (complaint must give the defendant "fair notice" of the plaintiff's claim). As such, the allegations are insufficient to withstand defendants' motion to dismiss.

**\*3** The remaining claim for damages arises out of the plaintiffs' contention that the directors are responsible for any judgment the company might be ordered to pay in the class action. The amount of these damages is, obviously, contingent upon the outcome of the pending class action.

In order to invoke the jurisdiction of the federal courts, a party must meet the threshold requirement imposed by Article III of the Constitution that there be a case or controversy. "While more than an abstract injury must be shown, it is enough if the plaintiff ' "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged ... conduct and the injury must be both "real and immediate," not "conjectural" or "hypothetical." ' " *Professional Service Indus. v. Kimbrell,* 766 F.Supp. 1557, 1559 (D.Kan.1991) (alteration in original) (quoting *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02) (other citations omitted). Courts do not decide cases based upon " 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Id.* (quoting *Thomas v. Union Carbide Agr. Products Co.,* 473 U.S. 568, 580 (1985) (quoting 13A Wright & Miller, *Federal Practice and Procedure* § 3532 (1984))).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 3
Not Reported in F.Supp., 1993 WL 100202 (D.Kan.)
**(Cite as: Not Reported in F.Supp.)**

Courts routinely dismiss claims as premature if the alleged injury is contingent upon the outcome of a separate, pending lawsuit; one example is the case of *Lincoln House, Inc. v. Dupree*, 903 F.2d 845 (1st Cir.1990). In *Lincoln*, plaintiff's federal RICO claim was premised on allegations that the defendant diverted assets in an effort to avoid paying plaintiff on a judgment plaintiff was then seeking in a pending state court suit against the defendant. Thus, the only injury alleged was the defendant's inability to satisfy a prospective state court judgment against the defendant, *if* the plaintiff happened to succeed in its pending action. The court held that the damages were wholly contingent upon the plaintiff's success in a separate case, making the plaintiff's claim of damages, at that point, purely speculative and not ripe for resolution. *Id.* at 847. The court noted that since the only damages alleged could not yet be proved, having never been incurred, the plaintiff could hardly claim hardship if consideration of the case was presently withheld. The court affirmed dismissal of the complaint without prejudice.

In the instant case, plaintiffs assert on behalf of the corporation damages that are speculative and contingent upon the outcome of the class action. This conclusion is suggested even by the language of the complaint, which states that the director defendants should be held liable "*to the extent that* United Telecommunications is held liable for the damages alleged by the purchasers of its securities." Complaint ¶ 173. Additionally, the complaint asserts that the defendants, by their acts of mismanagement and misconduct, have exposed the company to "*potential* damages" in connection with the class action. Complaint ¶ 178(e). Where, as here, the claim of damages is contingent on the outcome of a separate, pending lawsuit, the claim is not ripe and the complaint must be dismissed. *Lincoln,* 903 F.2d at 847,accord *Banker's Trust Co v. Rhoades,* 859 F.2d 1096, 1106, (2d Cir.1988) (since alleged damages depend on the outcome of pending bankruptcy proceeding, claim for damages must be dismissed as premature); *In re: Symbol,* 762 F.Supp. at 516 (derivative plaintiffs claimed directors were liable for damages company might have to pay as a result of pending securities fraud class action; court held no injury had been sustained for which plaintiff could recover, cause of action had not yet accrued, and complaint must be dismissed); *Prosoco, Inc. v. Stonewall Surplus Linesinuane Co., Inc.,* 1989 WL 58989, at *1 (D.Kan 1989) (where all of plaintiff's claims arose out of pending state court action, damages were purely speculative and claim was not ripe). Accordingly, the court finds that the derivative action is not ripe and the complaint must be dismissed, without prejudice. With respect to the allegations of damage premised on unfair competition and loss of credibility and ability to conduct business, the court has found that the allegations are conclusory and insufficient to state a claim for these damages. Because plaintiffs have already taken two opportunities to amend their complaint, and because plaintiffs (with the benefit of discovery) have spared the court no detail in their pleadings to date, the court is of the view that further amendment to the unfair competition and business credibility allegations would be futile and the same will not be allowed. Plaintiffs should have been aware of the court's concerns about these allegations, which the court pointed out in its opinion dismissing the class action complaint for failure to plead fraud with particularity. *See In re United Telecommunications,* 781 F.Supp. 696, 703, n. 3 (D.Kan.1991).

*4 Finally, while this motion has been pending, the court has received correspondence from counsel in the form of letter-briefs, in which counsel present additional argument and authority pertaining to issues before the court. The parties are advised that the proper procedure for submitting additional argument and authority to the court is to file a pleading with the Clerk of the Court. See D.Kan.R. 206. While the court does not wish to deter counsel from submitting additional authority or argument when appropriate, counsel should be aware that from this point forward, the court will not consider any argument or authority presented by way of letter to the court.

IT IS THEREFORE ORDERED BY THE COURT that Defendants' Motion to Dismiss the Second Amended Consolidated Derivative Complaint is granted, and the derivative complaint is dismissed without prejudice.

D.Kan.,1993.
In re United Telecommunications, Inc., Securities Litigation
Not Reported in F.Supp., 1993 WL 100202 (D.Kan.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                                                    Page 1
Not Reported in F.Supp., 1990 WL 3202 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**


**H**
Plantronics, Inc. v. U.S.
S.D.N.Y.,1990.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
PLANTRONICS, INC., Plaintiff,
v.
UNITED STATES of America, Defendant.
**No. 88 CIV. 1892.**


Jan. 9, 1990.


OPINION AND ORDER

WOOD District Judge.
*1 Plaintiff Plantronics, Inc. ("Plantronics") brought this action for indemnity against the United States of America ("the United States"). Plantronics is a defendant in a state court, products liability action that was remanded to state court after being removed to federal court by Plantronics. *See Harris v. G.C. Servs. Corp.,* 651 F.Supp. 1417 (S.D.N.Y.1987). Plaintiff here moved for judgment on the pleadings, and defendant moved to dismiss. Finding that the issue of indemnification is not ripe for resolution, the Court dismisses the action.[FN1]

The right to indemnity or contribution under the Federal Tort Claims Act is governed by state law. *United States Lines, Inc. v. United States,* 470 F.2d 487 (5th Cir.1972). According to New York law, which applies in this case, an action for contribution or indemnification does not exist until the party seeking contribution or indemnification has made payment to a claimant. *Mars Assocs., Inc. v. New York City Educ. Constr. Fund,* 126 A.D.2d 178, 191, 513 N.Y.S.2d 125, 133 (1st Dep't), *appeal dismissed,* 70 N.Y.2d 747, 514 N.E.2d 391, 519 N.Y.S.2d 1033 (1987) (citing *McDermott v. City of New York,* 50 N.Y.2d 211, 216, 406 N.E.2d 460, 428 N.Y.S.2d 460 (1980)). *See also Alside, Inc. v. Spancrete Northeast, Inc.,* 84 A.D.2d 616, 444 N.Y.S.2d 241 (3d Dep't 1981), *Spitz v. Abrams,* 123 Misc.2d 446, 447-8, 473 N.Y.S.2d 931, 933 (Sup.Ct.), *aff'd,* 105 A.D.2d 904, 482 N.Y.S.2d 68 (3d Dep't 1984). New York law provides an exception to the general rule for third-party claims, so that all parties may establish their rights and liabilities in one action. *Mars Assocs.,* 126 A.D.2d at 191-92, 513 N.Y.S.2d at 133.

Plantronics here argues that, because it cannot implead the United States in the state court action, it should be allowed to bring this federal court action before it is adjudged liable or makes payment to a claimant in the state court action. However, unlike a third-party contribution or indemnity action, an independent action does not have the advantage of providing all parties with the opportunity to "establish their rights and liabilities in one action." *Mars Assocs.,* 126 A.D.2d at 192, 513 N.Y.S.2d at 133. *See Alside, Inc.,* 84 A.D.2d 616, 444 N.Y.S.2d 241 (court dismissed as premature a complaint in an independent action for indemnification and contribution where impleader was not possible in the primary action). In this case, any right to contribution or indemnification that Plantronics might have against the United States is contingent upon Plantronics' making payment to a claimant in the state court action. Thus, the case against the United States is hypothetical and Plantronics' damages are speculative until such time as the underlying products liability claims against Plantronics are decided in state court. In such a case, where the controversy is not ripe for resolution, the court must dismiss for lack of subject matter jurisdiction. *See, e.g., Augoustinakis v. United States I.N.S.,* 693 F.Supp. 1554, 1557 (S.D.N.Y.1988), *Bowman v. Abramson,* 545 F.Supp. 227, 228 (E.D.Pa.1982)

*2 Plantronics argues that this case should be stayed, rather than dismissed, if the Court finds that the action was brought prematurely. The United States argues against a stay, however, pointing out that Plantronics may never be found liable and may never have a cause of action against the United States. The Court will not grant a stay in this case. Rather, the Court will dismiss the action, without prejudice to plaintiff's right to file an action for indemnification should Plantronics be found liable and make payment to a claimant in the state court action. *See Spitz,* 123 Misc.2d at 447-8, 473 N.Y.S.2d at 933, *Bowman,* 545 F.Supp. at 231.


CONCLUSION

This action is hereby dismissed without prejudice.

SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 3202 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 2

FN1. After defendant answered, plaintiff moved for judgment on the pleadings under Rule 12(c). Defendant then moved to dismiss the Complaint pursuant to Rule 12(b)(6). Because defendant's Rule 12(b)(6) motion was filed after the pleadings in this case were closed, the Court will treat defendant's motion as a Rule 12(c) motion for judgment on the pleadings. *See* 5 C. Wright and A. Miller, *Federal Practice and Procedure,* § 1357 (1969). Judgment on the pleadings involves resolution of the substantive merits of the controversy. *See id.* at § 1369. In the case at bar, however, the Court finds that this case was brought prematurely and thus the Court does not reach the merits of the underlying controversy. Defendant has raised as affirmative defenses, *inter alia,* the Court's lack of subject matter jurisdiction and the unripeness of the plaintiff's claims. *See* Answer, ¶ 9. Because the Court agrees that the issues raised by the Complaint are not ripe for resolution, the Court dismisses this action pursuant to Rule 12(h)(3) which provides that the court shall dismiss an action "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter...."

S.D.N.Y.,1990.
Plantronics, Inc. v. U.S.
Not Reported in F.Supp., 1990 WL 3202 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

**H**
In re Washington Bancorporation
D.D.C.,1996.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
In re WASHINGTON BANCORPORATION,
Debtor.
WASHINGTON BANCORPORATION, Plaintiff
v.
FEDERAL DEPOSIT INSURANCE
CORPORATION, Defendant.
**Bankruptcy No. 90-00597.**
**Civil Action No. 95-1340.**

March 19, 1996.

*MEMORANDUM OPINION*
LAMBERTH, District Judge.
**\*1** This matter comes before the court on defendant's motions to dismiss the debtor Washington Bancorporation's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, for failure to state a claim under Rule 12(b)(6). These motions were filed separately by the Federal Deposit Insurance Corporation ("the FDIC") in both its corporate capacity ("FDIC-C") and its receivership capacity ("FDIC-R"). The court shall grant FDIC-R's motion to dismiss for lack of subject matter jurisdiction, and the court shall grant FDIC-C's motion to dismiss for failure to state a claim.

The court concludes, first, that the "claims" asserted against FDIC-C are in the nature of defenses to FDIC-C's claim against Washington Bancorporation's estate and hence are not barred by the provisions of 12 U.S.C. § 1821(d)(13)(D). The same cannot be said of FDIC-R, which no longer asserts a claim against the estate, although it played a role in the acquisition of FDIC-C's claims. Accordingly, § 1821(d)(13)(D) does bar Washington Bancorporation's complaint as to it. With respect to FDIC-C's Rule 12(b)(6) motion, the court finds that each count of Washington Bancorporation's complaint fails to state a claim, and thus shall be dismissed.

I.

BACKGROUND

Washington Bancorporation ("WBC") is a bank holding company that issued commercial paper sold through its subsidiary, the National Bank of Washington ("NBW"). On May 7, 1990, WBC defaulted on its commercial paper then outstanding, leaving unpaid the holders of approximately $36 million of such paper. On August 1, 1990, WBC filed its voluntary chapter 11 petition with the Bankruptcy Court.

Following WBC's default on the notes, the commercial paper holders sued NBW and other defendants in the United States District Court for the District of Columbia. In addition, the holders of the commercial paper filed proofs of claim in WBC's chapter 11 case in the Bankruptcy Court. On August 10, 1990, the Comptroller of the Currency declared NBW insolvent and appointed the FDIC as receiver. As NBW's receiver, FDIC-R succeeded to "all rights, titles, powers, and privileges ... with respect to the institution and the assets of the institution ...."12 U.S.C. § 1821(d)(2)(A)(i). Accordingly, FDIC-R was substituted as a defendant in the commercial paper litigation against NBW in the district court.

On December 19, 1990, FDIC-R, as receiver for NBW, filed a proof of claim in WBC's bankruptcy proceeding. FDIC-R asserted, in relevant part, contingent and unliquidated claims for "indemnity, contribution, or advancement with respect to actual and potential claims against NBW" arising from the commercial paper program, together with "any other relief allowed at law or equity from the debtor, for any damages that might be accessed [sic] or awarded against the FDIC in any of the Lawsuits."

In July of 1992, FDIC-R and WBC entered into a "Stipulation and Settlement to Compromise Certain Claims" ("WBC/FDIC-R Settlement") which the Bankruptcy Court subsequently approved. Under the WBC/FDIC-R Settlement, FDIC-R received an allowed general unsecured claim of $663,358.41 in WBC's bankruptcy case "in full and complete compromise and settlement" of all "FDIC-R Claims" (other than certain tax claims). The WBC/FDIC-R Settlement specifically released WBC from FDIC-R's claim for any liability arising out of the commercial paper litigation, providing:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 2
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

**\*2** the FDIC-R shall have no allowed claim, or right of payment, or ownership interest, in or against the [debtor] ... in any amount or of any nature, priority, or status, and upon entry of this Stipulation and Settlement, the FDIC-R is deemed to have released any and all such rights, claims, and interests of every kind and nature, based upon any act, fact, or omission from the beginning of the world to the date of the entry of this Stipulation and Settlement, and shall be barred from thereafter filing any proof of claim against [the debtor], or any amendment to proof of claim ....

The WBC/FDIC-R Settlement went on to stipulate that FDIC-R is deemed to have released WBC "from all debts, covenants, contracts, controversies, agreements, promises, damages, claims, demands, or breaches of duties of any kind whatsoever arising under law or equity."

The WBC/FDIC-R Settlement further included a provision under which "the FDIC-R represents and warrants that it has not transferred any portion or all of the FDIC-R Claims, either to the FDIC in its corporate or other capacity, or to any other person, as of the date of the execution of this Stipulation and Settlement by the FDIC-R."WBC alleges that FDIC-R favorably viewed its chances of success in the commercial paper lawsuit when it entered into the settlement with WBC.

But FDIC-R did not fare so well in the district court: FDIC-R lost a "test" case in the commercial paper litigation. In May of 1993, a settlement was also reached in the commercial paper holders' action against FDIC-R as receiver for NBW. The Settlement Agreement ("CP/FDIC Settlement") was entered into between the commercial paper holders, the FDIC in both its receiver and corporate capacities, and the other defendants, which did not include WBC. The CP/FDIC Settlement provided for the following payments to the commercial paper holders: the FDIC in its corporate capacity ("FDIC-C") purchased the commercial paper holders' claims against WBC for $15 million, and received an assignment of those claims; FDIC-R paid approximately $7.5 million to the plaintiffs; and the insurance carriers paid approximately $8.3 million to the plaintiffs. These payments totaled $30.8 million. The CP/FDIC Settlement resolved potential liability of FDIC-R to the commercial paper holders in the range of $36 million.

In July of 1993, FDIC-C filed notices of the assignments of the commercial paper claims in the Bankruptcy Court. The amount of the claims assigned to FDIC-C are estimated to exceed $32 million.

On March 1, 1994, WBC filed the complaint commencing this adversary proceeding against the FDIC in both its receiver and corporate capacities. WBC seeks a declaratory judgment that the FDIC is barred under the WBC/FDIC-R Settlement from asserting against WBC the commercial paper claims purchased pursuant to the CP/FDIC Settlement, alleging that the FDIC "structured the [CP/FDIC Settlement] in a manner designed to evade its obligation under the [WBC/FDIC-R Settlement] and to attempt to revive claims it previously waived against" WBC. In the alternative, WBC asks that: (1) to the extent that the FDIC exists in two legal capacities, FDIC-C is barred from asserting the commercial paper claims based on the doctrines of bad faith, estoppel, unclean hands, and privity; (2) in the event that FDIC-C is entitled to assert its claims, they must be reduced by all the amounts that the commercial paper holders have received in satisfaction of such claims; and (3) any claims surviving the first three claims for relief should be subordinated to the claims of the other general unsecured creditors under § 510(b) and (c) of the Bankruptcy Code.

**\*3** FDIC-C and FDIC-R moved on April 19, 1994, and April 22, 1994, respectively, to dismiss WBC's complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[FN1] FDIC-C and FDIC-R argue in their motions that WBC's failure to first exhaust the administrative process Congress created to deal with claims against failed financial institutions, see 12 U.S.C. § 1821(d)(3)et seq., leaves this court without jurisdiction to determine the validity of WBC's claims against FDIC-C and FDIC-R. 12 U.S.C. § 1821(d)(13)(D).[FN2]

In the alternative, FDIC-C and FDIC-R moved to dismiss WBC's first two claims under Federal Rule of Civil Procedure 12(b)(6). FDIC-C argues that it is separate and distinct from FDIC-R and hence is not bound by the WBC/FDIC-R Settlement. Thus, FDIC-C argues that it cannot be estopped from asserting the assigned commercial paper claims against WBC. Furthermore, FDIC-C argues that WBC has suffered insufficient harm from the assignment of the claims to have standing to challenge it. FDIC-C also challenges WBC's assertion that FDIC-C's claim should be reduced or subordinated. FDIC-R argues in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 3
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

support of its <u>Rule 12(b)(6)</u> motion that it is no longer a party in interest due to the WBC/FDIC-R Settlement.

Additionally, both FDIC-C and FDIC-R moved for a stay of discovery pending the resolution of the dismissal motions.

On April 29, 1994, WBC filed an objection to both the FDIC motions to dismiss for lack of subject matter jurisdiction, arguing that the FDIC is trying force WBC into an administrative process created by Congress to resolve claims against the FDIC, not claims by the FDIC against others. WBC also objected to the FDIC's <u>Rule 12(b)(6)</u> motions to dismiss on the grounds that factual disputes exist in the case making it premature to dismiss the complaints against either FDIC-R or FDIC-C.

On July 6, 1995, this court granted FDIC-C's motion to withdraw from the Bankruptcy Court the <u>28 U.S.C. § 157(a)</u> general reference of the case to the extent necessary for this court to hear this adversary proceeding. As a result, this court now considers FDIC-R and FDIC-C's motions.

## II.

## DISCUSSION

### A. *Motion To Dismiss For Lack Of Subject Matter Jurisdiction.*

The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") contains a jurisdictional bar, <u>12 U.S.C. § 1821(d)(13)(D)</u>, which is central to this case. That section provides: *Except as otherwise provided* in this subsection, no court shall have jurisdiction over -- (i) any claim or action for payment from or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

<u>12 U.S.C. § 1821(d)(13)(D)</u> (emphasis added). The subsection "otherwise provides" in <u>12 U.S.C. § 1821(d)(6)(A)</u> that a claimant must file an administrative claim with the FDIC before a suit can

be filed against the FDIC in court. Accordingly, <u>§ 1821(d)(13)(D)</u> has been "characterized ... as a statutory exhaustion requirement [under which the claimant] in order to obtain jurisdiction to bring a claim in federal court, ... must exhaust administrative remedies by submitting the claim to the receiver in accordance with the administrative scheme for adjudicating claims detailed in <u>§ 1821(d)</u>."*National Union Fire Ins. Co. of Pittsburgh v. City Savings, F.S.B.,* <u>28 F.3d 376, 383 (3d Cir. 1994)</u> (*citing <u>Rosa v. RTC,</u> 938 F.2d 383, 391-92 (3d Cir.), cert. denied,502 U.S. 981 (1991)*).[FN3]

**\*4** Both FDIC-C and FDIC-R argue that under <u>§ 1821(d)(13)(D)</u> this court is barred from hearing WBC's claims because WBC has not submitted its claims in this case to the FDIC's administrative claims process. There is no dispute between the parties about the fact that WBC never filed a claim with the FDIC concerning the issue before this court.

Thus, the court first must decide whether the jurisdictional bar of <u>§ 1821(d)(13)(D)</u> applies to WBC's claims against FDIC-C and FDIC-R before determining whether WBC's complaint is barred as an action or claim. As indicated in the statute, for the jurisdictional bar to apply, either the assigned commercial paper claims must be "assets" under <u>§ 1821(d)(13)(D)(i)</u> or the claims asserted by WBC must relate to "acts or omissions" of the Receiver under <u>§ 1821(d)(13)(D)(ii)</u>. If the commercial paper holders' claims assigned to FDIC-C are not covered by either clause (i) or (ii), then WBC's declaratory judgment action and affirmative defenses would not be barred under <u>§ 1821(d)(13)(D)</u>.*See <u>National Union Fire,</u>* 28 F.3d at 384. Although FDIC-C argues only the latter clause, the court will address both clauses.

### 1. *The Assigned Commercial Paper Claims are Not Assets Under <u>12 U.S.C. Section 1821(d)(13)(D)(i)</u>.*

The first question the court must consider is whether the commercial paper claims against WBC purchased by FDIC-C are "assets" of NBW as that term is used in <u>§ 1821(d)(13)(D)(i)</u>. Under <u>§ 1821(d)(13)(D)(i)</u>, actions seeking a determination of rights with respect to assets of the defunct institution are barred. <u>§ 1821(d)(13)(D)(i)</u>.

FIRREA does not provide a definition of "assets" as that term is used specifically in <u>§ 1821(d)(13)(D)(i)</u>. In the absence of a specific definition, other courts have looked at the definition of the term "assets" in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

common legal usage. *See National Union Fire,* 28 F.3d at 384. Black's Law Dictionary defines the term "assets" as:

Property of all kinds, real and personal, tangible and intangible .... The entire property of a person, association, corporation, or estate that is applicable or subject to the payment of his or her or its debts.

Black's Law Dictionary 117 (6th ed. 1990). The Third Circuit in *National Union Fire* used the above definition to support its decision that an insurance policy is an "asset" of the named insured under § 1821(d)(13)(D)(i).*National Union Fire,* 28 F.3d at 384.

The question confronted in this case is whether the commercial paper holders' claims purchased by FDIC-C qualify as assets of NBW, the depository institution for which FDIC-R has been appointed receiver. The court concludes that they do not.

Generally, an "asset of a failed depository institution" is anything formerly owned by a defunct bank, that the FDIC as receiver can liquidate for the purposes of reimbursing the failed bank's creditors. *Village South Joint Venture v. FDIC,* 733 F. Supp. 50, 51 (N.D. Tex. 1990); *see also NCNB Texas National Bank v. Cowden,* 895 F.2d 1488, 1498 (5th Cir. 1990).

**\*5** In order to be an asset of NBW, the commercial paper holders' claims purchased by FDIC-C pursuant to the CP/FDIC Settlement would have to represent some value *for* NBW available to pay its debts. In contrast, the claims in this case purchased by FDIC-C were claims *against* NBW asserted by the commercial paper holders. At no time have the commercial paper holders' claims been assets of NBW; rather, the claims have been liabilities of NBW arising out of the default on the commercial paper sold by NBW.[FN4]

The commercial paper holders' claims purchased by FDIC-C in this case are unlike the insurance policies held by the institutions under receivership in *National Union Fire.*In that case, the Third Circuit held that "[a]n insurance policy is of value to the owner and named insured of the policy, even though it is possible that the owner and named insured will ultimately be found not to be entitled to a particular recovery under the policy."*National Union Fire,* 28 F.3d at 384.[FN5]As discussed above, the note holders' claims against NBW did not have such value. Accordingly, the court concludes that the note holders' claims purchased by FDIC-C are not assets of FDIC-R for purposes of § 1821(d)(13)(D)(i).

*2. The Claims Asserted by WBC Relate to the Acts or Omissions of the Receiver Under Section 1821(d)(13)(D)(ii).*

Having found that the commercial paper claims purchased by FDIC-C are not "assets" under section 1821(d)(13)(D)(i), the court must next consider whether section 1821(d)(13)(D)(ii) deprives this court of subject matter jurisdiction. Under section 1821(d)(13)(D)(ii), this court has no jurisdiction over "any claim relating to any act or omission of the institution ..." or the FDIC as receiver. § 1821(d)(13)(D)(ii). This is very broad language. Clause (ii) of that section is not limited to claims against assets of the failed depository, as in clause (i). Rather, clause (ii) applies to claims arising from the actions of the depository institution or the FDIC itself while acting as receiver. *See e.g., Rosa,* 938 F.2d at 392-93;*RTC v. Ryan,* 801 F. Supp. 1545, 1557 (S.D. Miss. 1992).

The breadth of this language indicates that § 1821(d)(13)(D)(ii) would apply to WBC's "claims" against FDIC-R. WBC's claims against FDIC-R clearly arise from the actions of FDIC-R after it had been appointed receiver of NBW on August 10, 1990. Furthermore, WBC contends that FDIC-R has acted in bad faith by trying to evade its legal and contractual obligations to WBC pursuant to the WBC/FDIC-R Settlement by structuring the CP/FDIC Settlement to allow FDIC-C to assert the commercial paper claims. Hence, the court finds that the claims by WBC against FDIC-R relate to acts of the FDIC as receiver under § 1821(d)(13)(D)(ii).

The more difficult question is whether WBC's claims against FDIC-C also relate to acts of the FDIC as receiver. FDIC-C argues that because WBC's cause of action arose out of WBC's settlement with FDIC-R and the commercial paper holders' settlement with FDIC-R, WBC's claims relate to acts or omissions of the FDIC as receiver. WBC responds to FDIC-C's arguments indirectly by arguing that because WBC's actions are directed at the FDIC as a single entity, the jurisdictional bar under § 1821(d)(13)(D)(ii) does not apply. WBC cites to the "sue and be sued" provision of the FDIC's charter under 12 U.S.C. § 1819(a) and cases applying that provision.

**\*6** However, the court need not resolve this question[FN6] because even if § 1821(d)(13)(D)(ii) does encompass the claims asserted by WBC against FDIC-C, for reasons explained below, the court finds

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                          Page 5
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

that the jurisdictional bar under § 1821(d)(13)(D) does not deprive this court of jurisdiction over WBC's claims against FDIC-C.

### 3. Whether WBC's Complaint is an Action or a Claim Under Section 1821(d)(13)(D).

Having concluded that WBC's claims against FDIC-R relate to acts of the FDIC as receiver and assuming, *arguendo*, that the claims against FDIC-C do as well, the court must examine the definition of the term "claim" in section 1821(d)(13)(D) to determine whether it deprives this court of jurisdiction to hear WBC's claims against FDIC-C and FDIC-R.

Section 1821(d)(13)(D) has been held to apply only to actions or claims, including counterclaims, against the FDIC and not to defenses or affirmative defenses incident to the FDIC claims against debtors in bankruptcy. *National Union Fire,* 28 F.3d at 393-95;*In re Parker North American Corp.,* 24 F.3d 1145, 1152-56 (9th Cir. 1994); *RTC v. Midwest Federal Savings Bank of Minot,* 36 F.3d 785, 793 (9th Cir. 1993); *RTC v. Conner,* 817 F. Supp. 98, 102 (W.D. Okla. 1993). These courts support the conclusion that affirmative defenses are not covered by the § 1821(d)(13)(D) jurisdictional bar for several reasons.

The courts first support this interpretation with the plain language of § 1821(d).*National Union Fire,* 28 F.3d at 394;*In re Parker North American Corp.,* 24 F.3d at 1152-53;*Midwest Federal Savings Bank,* 36 F.3d at 792-93;*In re Purcell,* 150B.R. 111, 113-14 (D. Vt. 1993). Other courts looking at the plain language go even further to conclude that the FIRREA claims procedure does not apply to *any* debtor claims, whether or not they are defenses. FIRREA's administrative claims procedure does not discuss, mention, or reference[] debtors, their responsibilities and duties, or the FDIC's treatment of debtors upon taking receivership of a failed bank. Rather, the statute discusses "promptly publish[ing] a notice to the depository institution's *creditors* to present their claims" [§ 1821(d)(3)(B)]; "mail[ing] a notice ... to any *creditor* shown on the institution's books" [[§ 1821(d)(3)(C)]; and, "pay[ing] *creditor* claims which are allowed by the receiver ...." [§ 1821(d)(10)(A)].
Furthermore, reading 12 U.S.C. § 1821(d)(3), which discusses the FDIC's authority to determine claims, together with 12 U.S.C. § 1821(d)(13)(D), it is clear that the intent of the statute is to deal with the claims of *creditors,* not debtors. 12 U.S.C. § 1821(d)(3)(A) speaks of the FDIC's power to "determine claims,"

and 12 U.S.C. § § 1821(d)(3)(B) and (C) indicate which "claims" Congress was referring to by providing that only creditors were to receive notice .... Consequently, since the term "claims" should be interpreted consistently throughout the statute and 12 U.S.C. § 1821(d)(3) indicates that Congress meant *creditors*' claims, the reference to "claims" in 12 U.S.C. § 1821(d)(13)(D) should also be read to refer to creditors' claims.

*\*7 In re Parker North American Corp.,* 24 F.3d at 1152-53 (*quoting In re Purcell,* 150 B.R. at 113-14) (footnotes and citations omitted).

The courts also look to the legislative history of FIRREA to support the conclusion that affirmative defenses are not barred by § 1821(d)(13)(D).*In re Parker North American Corp.,* 24 F.3d at 1153;*Midwest Federal Savings Bank,* 36 F.3d at 793. "Congress intended FIRREA 'to dispose of the bulk of *claims against* failed financial institutions.'"*In re Parker North American Corp.,* 24 F.3d at 1153 (*quoting*H.R. Rep. No.54(I), 101st Cong., 1st Sess. 331, *reprinted in* 1989 U.S.C.C.A.N. 86, 215 (emphasis added)). There is "not a scintilla of a suggestion that Congress intended that debtors who owe money to FDIC should have to go through the FIRREA claims determination process, nor of any intent to deprive the Bankruptcy Court of jurisdiction to determine issues arising from FDIC's claims against those debtors."*In re All Season's Kitchen, Inc.,* 145 B.R. 391, 397 (Bankr. D. Vt. 1992).

The Third Circuit in *National Union Fire* went further, stating that "even if it could be argued that the jurisdictional bar of § 1821(d)(13)(D) could be fairly interpreted to bar jurisdiction over defenses or affirmative defenses, [the court] would not adopt the position ... because interpreting the jurisdictional bar in such a manner would ... result in an unconstitutional deprivation of due process."*National Union Fire,* 28 F.3d at 394.

Finally, the courts uniformly agree that not applying the jurisdictional bar to defenses is the most logical solution to this jurisdictional issue in a bankruptcy context. The courts reason that if the statute were read to include affirmative defenses, "'such a literal application of the statute would ... lead to the 'patently absurd consequence' of requiring presentment and proof to the [FDIC] of all potential affirmative defenses that might be asserted ....'"*Midwest Federal Savings Bank,* 36 F.3d at 793 (*quoting RTC v. Connor,* 817 F. Supp. 98, 101-02 (W.D. Okla. 1993)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 6
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Bankruptcy courts have expertise in determining [bankruptcy questions], which involve legal matters unique to the Code. The [FDIC], on the other hand, has no special skill in determining bankruptcy questions and, in fact would be under no obligation to apply bankruptcy law to a debtor's ... complaint. Rather, the receiver's skill lies in ascertaining and paying claims by *creditors* against failed institutions. A[n] ... action which arises incident to the [FDIC]'s *collection* efforts against a bankruptcy debtor simply does not fit within that framework.

*In re Parker North American Corp.,* 24 F.3d at 1153 (emphasis added).

Moreover, "[w]ithout jurisdiction to allow or disallow claims by FDIC against debtors, the whole [bankruptcy] process will grind to a catastrophic halt in a procedural gridlock, leaving debtors and other creditors mired with no possibility for relief in hundreds of cases."*In re All Season's Kitchen,* 145 B.R. at 399-400.

*8 This court joins this consensus of courts in concluding that the jurisdictional bar under § 1821(d)(13)(D) was not intended to apply to affirmative defenses asserted by defendants responding to claims against them by the FDIC.

Counterclaims, on the other hand, would fall under the jurisdictional bar under § 1821(d)(13)(D) because a counterclaim is a "claim" against the FDIC. *National Union Fire,* 28 F.3d at 394;*Midwest Federal Savings Bank,* 36 F.3d at 792-93. Although courts have been divided on the issue of whether to distinguish between affirmative defenses and counterclaims for purposes of applying the § 1821(d)(13)(D) jurisdictional bar, "[i]t appears that there is a forming consensus in the courts that counterclaims are jurisdictionally barred by § 1821(d)(13)(D), unless administrative remedies are exhausted."*National Union Fire,* 28 F.3d at 394 n.25.

The jurisdictional bar on counterclaims against the FDIC under § 1821(d)(13)(D) has been further held to include non-monetary, declaratory judgment actions. *National Union Fire,* 28 F.3d at 386. The Third Circuit found that section 1821(d)(13)(D)(ii) bars "any action seeking a determination of rights."*Id.* The court points out that the language does not "limit such actions to actions concerning creditors' claims."*Id.* Accordingly, the bar under clause (ii) acts as a broader jurisdictional bar than the bar under clause (i).*Id.*

It is not clear, however, that the FIRREA administrative claims procedure provides an alternative forum to resolve the declaratory judgment action. Nonetheless, referring to the "crisis facing failed banks" and the "extraordinary powers" the FDIC was given to cope with it, the Third Circuit concluded

it would be perfectly consistent for Congress to provide a scheme wherein a holder of a claim for payment from the assets of the failed institution would be provided an administrative remedy and *de novo* court review, while the holder of a claim not asserting a right to payment and who wanted only a *declaration* of rights against the failed bank would be provided no administrative remedy or court access.

The rationale for this treatment of actions which do not seek payment from the assets of the failed institution would be that if the RTC leaves the party wishing to bring an action not seeking payment alone, that party should also leave the RTC alone. Accordingly, a party wishing to bring an action not seeking payment cannot summon the RTC into court to adjudicate a declaration of rights against the RTC. Rather, the party wishing to bring an action not for payment must instead wait and see if the RTC will sue her. If it does, then she will be able to defend herself against the RTC's actions at that time.

*Id.* at 388.

Thus, the final step in the analysis is to determine whether WBC's claims against FDIC-C and FDIC-R in this case are an affirmative defense or, alternatively, claims that should be barred under § 1821(d)(13)(D).

*9 The court concludes that WBC's action versus FDIC-C is clearly an affirmative defense. WBC is simply disputing FDIC-C's proof of claim filed in its bankruptcy and expects no remuneration from FDIC-C's assets. Furthermore, WBC would have had no independent grounds for bringing the action against FDIC-C if FDIC-C had not filed a proof of claim in WBC's bankruptcy. See *RTC v. Schonacher,* 844 F. Supp. 689, 694 (D. Kan. 1994). Rather, it is WBC's responsive pleading to FDIC-C's assertion of the purchased commercial paper holder's claims. *In re Parker North American Corp.,* 24 F.3d at 1155. In contrast, a "claim" has been defined as "essentially an action which asserts a right to payment."*National Union Fire,* 28 F.3d at 394. WBC's action here does not permit affirmative relief of any kind.

The above conclusion is not so clear with regard to WBC's claims against FDIC-R. Although FDIC-R

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 7
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

filed a proof of claim in WBC's bankruptcy on December 19, 1990, FDIC-R has filed no claim prompting the instant matter. Furthermore, FDIC-R and WBC settled FDIC-R's claim in the WBC/FDIC-R Settlement resulting in FDIC-R receiving an allowed general unsecured claim of $663,358.41. FDIC-R contends that they are an improper party to WBC's action in this case and should be dropped from the suit, citing to the Third Circuit's decision in *National Union Fire*. This court agrees.

The simple fact that FDIC-R filed a proof of claim in WBC's bankruptcy does not permanently extinguish FDIC-R's jurisdictional bar protection. *See In re Parker North American Corp.*, 24 F.3d at 1152. Rather, any new claim WBC brings against FDIC-R is subject to the jurisdictional bar under section 1821(d)(13)(D) unless it is a defensive response to a claim asserted by FDIC-R against WBC. *See National Union Fire*, 28 F.3d at 394. In the instant action, FDIC-R has not asserted any new claim against WBC. Furthermore, WBC's action does not challenge or deny FDIC-R's allowed claim. Instead, WBC seeks a determination of rights relating to the commercial paper claims held by FDIC-C, to which FDIC-R has asserted no rights.

For apparent reasons of strategy, WBC urges the court to view FDIC-C and FDIC-R as a single entity, but when the complaint is recast as one against two entities, WBC's claims against FDIC-R come down to this: declare that FDIC-R acted improperly in entering into the settlement with the note holders and FDIC-C whereby FDIC-C improperly acquired its claims against WBC. But that claim is not a defense to any claim by FDIC-R. Accordingly, it is a claim relating to an act of FDIC-R and is barred by section 1821(d)(13)(D)(ii). While WBC can defend against the claim of FDIC-C by way of its complaint, including pointing to any improper collusion between FDIC-C and FDIC-R, WBC cannot sue FDIC-R for similar declaratory relief in the abstract situation in which it is defending against no claim by FDIC-R.

Thus, FDIC-C's motion to dismiss for lack of subject matter jurisdiction will be denied and FDIC-R's motion to dismiss will be granted.

### B. *FDIC-C Motion To Dismiss Under Rule 12(b)(6)*.

**\*10** FDIC-C asks the court to dismiss WBC's complaint on all counts for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The court shall grant a Rule 12(b)(6)

motion to dismiss only in the unusual case where "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *St. Paul Ramsey County Medical Center v. Pennington County, South Dakota*, 857 F.2d 1185, 1188 (8th Cir. 1988). The court must take the well-pleaded allegations of the complaint as true and construe the complaint and all reasonable inferences arising therefrom most favorably to the pleader. *Id.* Upon consideration of the record, the proffers of counsel, and the relevant authorities, the court shall grant FDIC-C's motion and dismiss all four counts of WBC's complaint.

Upon review of the WBC/FDIC-R Settlement, the court concludes that WBC's presumably competent counsel simply failed to anticipate the FDIC's use of its corporate capacity to pursue debts owed to the commercial paper holders in order to protect the deposit insurance fund. The court cannot agree with WBC's assertion that the FDIC is unfairly evading the terms of the WBC/FDIC-R Settlement Agreement through the use of its corporate capacity to collect debts that the FDIC in its receiver capacity is barred from collecting. Ultimately, WBC seeks, through this action, to avoid the payment of debts due on outstanding commercial paper; this court will not allow the manipulation of established doctrine to accomplish this task.

### 1. *The WBC/FDIC-R Settlement Agreement Does Not Bar FDIC-C's Claim as Assignee of the Commercial Paper Holders.*

The success of Count I of WBC's complaint that the FDIC as a whole is barred from pursuing its claim for the commercial paper debts turns on WBC's contention that FDIC-R and FDIC-C comprise a single juridical entity for the purposes of the Settlement. In other words, WBC maintains that the WBC/FDIC-R Settlement, which prevents FDIC-R from asserting a claim against WBC for the commercial paper debts, necessarily prevents FDIC-C from asserting that claim. The court does not agree.

#### a. *The Settlement Agreement.*

An examination of the WBC/FDIC-R Settlement Agreement indicates that the parties understood and contemplated that the FDIC exists in two, very different capacities. Thus, WBC's first claim for relief is negated by the very document that it relies upon to bar FDIC-C's claims. The plain language of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

Agreement demonstrates that the contract was between WBC and the FDIC "acting solely in its capacity as receiver."WBC/FDIC-R Settlement at 1.[FN7] FDIC-R executed the agreement as "receiver" for the NBW. As FDIC-C argues, the document on its face indicates that FDIC-C is not a party to the Agreement.

This conclusion is further reinforced by paragraph G of the Agreement that explicitly requires FDIC-R to promise that it has not transferred any of its claims against WBC to FDIC-C as of the date of the assignment:

*11 The FDIC-R represents and warrants that it has not transferred any portion or all of the FDIC-R Claims, either to the FDIC in its corporate or other capacity, or to any other person, as of the date of the execution of this Stipulation and Settlement by the FDIC-R.

WBC/FDIC-R Settlement Agreement at ¶ G. FDIC-C argues that this paragraph reflects WBC's unmistakable understanding that FDIC-C is not a party to the Agreement and would not be bound by the release. The court finds an inherent contradiction in WBC's current position that FDIC-C is bound by the Agreement when it obviously went to great pains to ensure that FDIC-R had not transferred any of its claims against WBC to FDIC-C.

Faced with the plain language of its own Agreement, WBC would now attempt to turn a blind eye to that language and argue that the Agreement, which clearly does not purport to bind FDIC-C, does just that. "Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties."_NRM Corp. v. Hercules Inc., 758 F.2d 676, 681 (D.C. Cir. 1985)_. WBC's litigation position is unfounded in light of the Settlement Agreement, and, as such, the court concludes that WBC's first claim for relief is undermined by the very document that serves as the basis for the claim.

b. *FDIC-C a Distinct Entity.*

In addition to the Settlement Agreement itself, WBC's first claim also fails because, as a matter of law, WBC cannot treat the FDIC as one entity in this instance. WBC argues that FDIC-R and FDIC-C are one juridical entity for the purposes of entering into settlement agreements such as the one at issue here. As one entity, WBC maintains, FDIC-C cannot assert

claims that are barred by the WBC/FDIC-R Settlement. FDIC-C argues, on the other hand, that it is an entity distinct from FDIC-C, charged with different objectives and duties, and it is not one juridical entity with FDIC-R under the Agreement.

FDIC-R and FDIC-C are distinct entities. "Because FDIC Corporate and FDIC Receiver perform two different functions and protect wholly different interests, courts have been careful to keep the rights and liabilities of these two entities legally separate."_Bullion Servs., Inc. v. Valley State Bank, 50 F.3d 705, 709 (9th Cir. 1995)_. The Ninth Circuit further explains that "depending on the interests implicated by a bank failure, FDIC Corporate and FDIC Receiver may pursue different legal strategies to effectuate their respective statutory goals."_Id._ (citing _FDIC v. Condit, 861 F.2d 853, 855-58 (5th Cir. 1988)_). In its corporate capacity, the FDIC insures bank deposits and undertakes an obligation to pay depositors when an insured bank fails. See _FDIC v. Nichols, 885 F.2d 633, 636 (9th Cir. 1989)_; _Lawson v. FDIC, 3 F.3d 11, 13 (1st Cir. 1993)_. In its receiver capacity, the FDIC manages the assets and liabilities of failed institutions. _Trigo v. FDIC, 847 F.2d 1499, 1502 n.4 (11th Cir. 1988)_. As receiver of a bank, FDIC-R can sell the right to sue for unpaid debts to FDIC-C. _Id._ at 636-37 (concluding that the sale of the right to sue by FDIC-R to FDIC-C was not a sham transaction or otherwise invalid).[FN8]

*12 WBC chides FDIC-C for its extensive citation to, and discussion of, cases describing the dual identity of the FDIC, agreeing that, "for certain purposes," the FDIC can act in two different capacities.[FN9]WBC then claims that notwithstanding this authority, the FDIC cannot act in different capacities under a settlement agreement such as the one between itself and FDIC-R.[FN10]To hold otherwise, WBC contends, would allow the FDIC to use its two capacities to "gain an unfair advantage over its adversaries or shield inequitable conduct ...." Pls. Opp'n at 11 (citing _Abney v. Patten, 696 F. Supp. 570, 573 (W.D. Okla. 1987)_).

The court finds, however, that WBC's view of the extent of the two capacities of the FDIC would unduly limit the FDIC's ability to act in those separate capacities, and WBC has failed to provide adequate authority to convince the court otherwise. At the outset, WBC attempts to analogize this case to a case decided in the Western District of Oklahoma, _Abney v. Patten, 696 F. Supp. 570 (W.D. Okla. 1987)_.*Abney* arose in the context of a district judge's determination of whether to sanction the FDIC's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 9
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

attorneys. Previously, the court had instructed the FDIC to attend settlement negotiations with someone who could both settle the case from a defense standpoint, that is, the FDIC as receiver, and someone who could release all claims against the plaintiff, that is, the FDIC in its corporate capacity. 696 F. Supp. at 573. However, only the FDIC receiver was a party to the plaintiff's suit in Oklahoma; the FDIC corporate was involved in litigation stemming from the same incident in different jurisdictions. As a result, the FDIC receiver refused to comply with the court's order, claiming that the court was attempting to assert authority over a non-party, the FDIC corporate. *Id.* Although acknowledging the two roles of the FDIC, the court refused to permit the FDIC avoid the order in this manner. Because of WBC's reliance on the language of the *Abney* court, the relevant portion is set out below:

Chapter 16 of Title 12 of the United States Code creates but one FDIC, with but one governance. FDIC in its corporate capacity is the yang and FDIC as receiver the yin of a single juridical entity. When the FDIC is being sued as receiver for a failed bank and asserts counterclaims based on assets held by the corporation, elementary considerations of fairness should preclude its being able to whipsaw its opponent on the pretense it is two entities, either of which is entitled to disclaim or repudiate the negotiation or litigation position of the other, or profess ignorance about the position or even the internal operation of the other.... The proposition that FDIC is two discrete juridical entities is, in the opinion of this Court, merely an FDIC *ipse dixit* without sound basis in law, even giving consideration to those cases that recognize procedural and substantive differentiations based upon particular functions.

**\*13** *Id.* at 573 (citations not omitted). This court is not persuaded by the reasoning in *Abney.*First, the considerations that gave rise to the trial judge's obvious frustration with the FDIC are not present in this case. This case does not involve the brokering of a global settlement; this case involves the exercise of statutory duties of the FDIC-C to collect valid debts to protect the deposit insurance fund. Additionally, WBC cannot claim that the FDIC "whipsawed" it in light of the clear language of the Settlement Agreement. Finally, this court does not take lightly the *Abney* court's failure to cite any authority in support of its conclusion. The substantial weight of authority requires an expansive view of the dual capacity of the FDIC. For example, as the First Circuit has noted, FDIC-C is not liable for

"wrongdoings" of the receiver, see *FDIC v. Roldan Fonseca,* 795 F.2d 1102, 1109 (1st Cir. 1986), nor is FDIC-C held responsible for the fraudulent acts of FDIC-R, see *id.*(*citing British Columbia Investment Co. v. FDIC,* 420 F. Supp. 1217, 1223-24 (S.D. Cal. 1976)). If this court reads the *Abney* holding to require that FDIC-C cannot assert claims barred by an agreement made with FDIC-R, this holding would run afoul of established precedent without so much as an acknowledgment of that precedent. It is no small point to say that not a single reported case has relied on *Abney,* or for that matter, even cited *Abney* in this context. The *Abney* opinion is without theoretical, doctrinal, or popular support, and this court will not, as WBC suggests it should, extend its "whipsaw" analogy to this case.

WBC's next contention that absent statutory authority, the FDIC cannot act in two different capacities is also incorrect. In support of this assertion, WBC relies on the Fifth Circuit case of *Dalton v. FDIC,* 987 F.2d 1216 (5th Cir. 1993). In that case, the court held that under the removal statute for the FDIC, 12 U.S.C. § 1819(b)(2)(B),[FN1] the FDIC does not get an additional opportunity to remove a case to federal court if FDIC-C is substituted for FDIC-R after the time for removal has run on FDIC-R. *Id.* at 1222.The court relied on the fact that although FDIC-C is distinct from FDIC-R for many purposes, the removal provision of the statute affords "the Corporation" but one opportunity to remove the case. *Id.* From this reasoning, WBC concludes (1) that FDIC-C can act in different capacities only when it is statutorily authorized to do so, and (2) because no statute authorizes the FDIC to evade its contractual obligations or court orders by acting in separate capacities, this court must find that it acted as one in this instance. The court does not agree.

First, even assuming the validity of the *Dalton* opinion, WBC unjustifiably extends its rationale to require explicit statutory authority for what it defines to be the actions taken by the FDIC in this matter. The authority of FDIC-C to pursue claims in order to preserve the deposit insurance fund is beyond question. *See, e.g., Trigo,* 847 F.2d at 1502. In arriving at its conclusion of a limitation on the distinction between the two FDIC capacities, the *Dalton* court found that the FDIC's claim that it receives a new opportunity to remove the case when FDIC-C is substituted for FDIC-R "runs counter to the clear and unambiguous wording of the statute that creates federal jurisdiction for cases involving the FDIC."*Id.* In the opinion of the *Dalton* court,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 10
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

Congress' use of "Corporation" rather than "Corporations" was dispositive. Ultimately, the Fifth Circuit found that when a statute clearly indicates that it encompasses the FDIC as a whole, the FDIC cannot subvert that explicit language. WBC, however, would invert this reasoning to conclude that if the FDIC cannot act as two entities when the statute requires that they be treated as one, then the FDIC cannot act as two entities in a given situation unless expressly authorized by statute. WBC would move from a restrictive conclusion, that is, if a statute prohibits an act, the act cannot be done, to the expansive conclusion that in order to perform an act, the statute must explicitly provide for it. As a matter of logic, this does not necessarily follow, and certainly *Dalton* does not speak to this conclusion.

*14 Moreover, the *Dalton* conclusion has been explicitly rejected by the Ninth Circuit in *Bullion Servs., Inc. v. Valley State Bank*, 50 F.3d 705, 709 (9th Cir. 1995). That court recognized that "there may be situations when either FDIC Corporate or FDIC Receiver, in an effort to protect their disparate interests, will act under FIRREA's removal authorization independently."*Id.* The Ninth Circuit also found that "depending upon the interests implicated by a bank failure, FDIC Corporate and FDIC Receiver may pursue different legal strategies to effectuate their respective statutory goals."*Id.* It then found the *Dalton* court's conclusion that Congress intended to give the FDIC but one opportunity to remove a case to be unwarranted. Not only did the Ninth Circuit remove the very foundation of the *Dalton* opinion, but it also obviously refused to read in WBC's further conclusion that the FDIC must act as one unless specifically authorized, in addition to its general statutory directives, to act in different capacities. To the contrary, the dual capacities of the FDIC stem from the pursuit of their respective statutory goals.

This court agrees that the FDIC can, in pursuit of its statutory objective, act in different capacities. FDIC-C, in an effort to protect the deposit insurance fund, may pursue the commercial paper claims, even though FDIC-R agreed not to seek contribution from WBC on those claims. The commercial paper holders have a claim against the failed NBW (and thus FDIC-R as receiver) and WBC on the commercial paper. FDIC-C has a duty to protect the insurance fund by acquiring and asserting valid claims. Thus, Count I shall be dismissed.

*2. Equitable Doctrines Do Not Defeat the Distinction*

*Between FDIC-C and FDIC-R.*

WBC argues that in the event that the court allows the FDIC to act in two different capacities, the inequitable conduct of both FDIC-R and FDIC-C estop FDIC-C from asserting the commercial paper claims.[FN12]WBC contends that equitable doctrines can overcome the legal distinction between FDIC-C and FDIC-R in order to remedy allegedly inequitable conduct on the part of the FDIC. However, the court finds that WBC's allegations of unclean hands, bad faith, privity, alter ego, and equitable estoppel cannot provide a basis for treating the FDIC as a single entity, and the court shall dismiss Count II.

*a. Equitable Defenses Fail.*

A judge of this court has previously rejected a similar challenge to the separate capacities of the FDIC in *Pageland 29 Limited Partnership v. FDIC*, No. 91-1858, 1992 WL 391377, at *2-4 (D.D.C. Dec. 14, 1992) (Oberdorfer, J.) [hereinafter *Pageland*].*Pageland*, like this case, arose out of the failure of the National Bank of Washington ("NBW"). Plaintiff in *Pageland*, a borrower of NBW, sued the FDIC in both capacities when FDIC-C attempted to collect on loans that plaintiff argued NBW had only partially funded. The court expressly found that FDIC-C cannot assume any responsibility for FDIC-R's obligations, namely, the obligation to fully fund the loan under plaintiff's agreement with NBW. *Id.* at *3 (*citing Patriot Square Assocs. Ltd. Partnership v. FDIC*, No. 92-1859, Mem. Op. at 4 (D.D.C. Sept. 28, 1992) (Johnson, J.)). In response to plaintiff's allegations that FDIC-C "directed the actions of FDIC-Receiver," the court found that even if FDIC-C had attempted to direct the actions of FDIC-R, these attempts would have no legal effect. *Id.* "'[Plaintiff's] argument that FDIC-Corporate may be held liable for actions of FDIC-Receiver conflicts with the roles established by FIRREA, and this Court joins the Eleventh Circuit in rejecting the argument.'" *Id.* (*quoting Patriot Square Assocs.*, No. 92-1859, Mem. Op. at 4). Moreover, the court in *Pageland* explicitly rejected plaintiff's respondeat superior theory for holding FDIC-C liable for the actions of FDIC-R, finding that plaintiff's had failed to "reconcile[] that theory with Congress' careful delineation of responsibilities between FDIC-Corporate and FDIC-Receiver."*Pageland*, 1992 WL 391377 at *4 (*citing Trigo*, 847 F.2d at 1502).

*15 This court agrees with the reasoning in *Pageland* and the authorities relied upon by the court; therefore,

Not Reported in F.Supp.

Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)

**(Cite as: Not Reported in F.Supp.)**

this court now finds that WBC cannot subvert the distinction between FDIC-R and FDIC-C through allegations of "inequitable conduct." Allegations of privity and alter ego fail as a matter of law. *See, e.g., FDIC v. Berry,* 659 F. Supp. 1475, 1483 (E.D. Tenn. 1987) ("FDIC/Corporation and [FDIC-R] are separate and distinct entities with no implicit or explicit agency relationship.") Indeed, this case presents a stronger argument for distinguishing between the two FDIC capacities than most cases addressing this issue. In this case, FDIC-C purchased the commercial paper claims directly from the claim holders; the other cases have found that FDIC-C is distinct and independent of FDIC-R when FDIC-R transferred claims to FDIC-C. *See, e.g., FDIC v. Nichols,* 885 F.2d at 636;*FDIC v. Roldan Fonseca,* 795 F.2d at 1109-10;*FDIC v. Ashley,* 585 F.2d 157, 163 (6th Cir. 1978). These cases explicitly found that the transfer to FDIC-C is not a sham transfer, and the cases find that FDIC-C is not barred by any actions of FDIC-R. Thus, any allegations by WBC of "inequitable conduct," privity, or alter ego would certainly have more force if FDIC-R had actually transferred the claims to FDIC-C, yet even this has been rejected. The court finds that to allow allegations of privity, alter ego, or inequitable conduct to link FDIC-C to FDIC-R "would render Congress's distinction between the FDIC's two capacities a mere formality."*Pageland,* 1992 WL 391377 at *3.

The court rejects WBC's reliance on equitable doctrines to relieve itself of liability on the commercial paper claims. WBC bargained for and entered a settlement agreement with FDIC-R. In that agreement, WBC was expressly assured that FDIC-R had not transferred its claims to FDIC-C. WBC was obviously aware of the two capacities of the FDIC, and it was obviously aware that FDIC-C typically asserts claims against debtors of the bankrupt in order to preserve the insurance fund. WBC's allegations of trickery and chicanery carry little weight in light of the knowledge of WBC and its counsel as evidenced by the Settlement Agreement with FDIC-R. Equity does not exist to correct the errors or oversight of litigants.

b. *Estoppel.*

In addition to the equitable defense of privity, alter ego, bad faith, and unclean hands, WBC also asserts a claim of equitable estoppel. The court finds that WBC has failed to adequately plead equitable estoppel and it has failed to allege the facts necessary

to support it. Therefore, to the extent that WBC relies on an estoppel theory, it shall also be dismissed.

This court notes that while this Circuit has stated that estoppel does apply to the government, "[t]he case for estoppel against the government must be compelling, and will certainly include proof of each of the traditional elements of the doctrine ...."*ATC Petroleum, Inc. v. Sanders,* 869 F.2d 1104, 1111 (D.C. Cir. 1988); *Heckler v. Community Health Serv.,* 467 U.S. 51, 60 (1984) ("[I]t is well settled that the Government may not be estopped on the same terms as any other litigant."). The elements of estoppel include: (1) a false representation; (2) a purpose to invite action by the party to whom the representation was made; (3) ignorance of the true facts by the party; (4) reliance; and (5) a showing of an injustice and a lack of undue damage to the public interest. *Sanders,* 869 F.2d at 1111.

*\*16* WBC maintains that it can show that "the corporation" engaged in affirmative misconduct by inducing WBC to rely on "the representation of the receiver that the claim it was releasing had not been transferred to the corporation."Pls. Opp'n at 14. This allegation is patently insufficient to withstand a motion to dismiss. *See Fleming v. Lind-Waldock & Co.,* 922 F.2d 20, 23 (1st Cir. 1990) (finding that in order to withstand a motion to dismiss, "each general allegation must be supported by a specific factual basis"). WBC fails to mention, much less allege facts to support, the elements of estoppel. This court will not permit a claim of estoppel against a government agency to go forward on such a minimal showing. Moreover, WBC has failed to allege that FDIC-C, the party that it seeks to estop, made an affirmative misrepresentation. By WBC's own pleadings, FDIC-R is alleged to have made the misrepresentation. This court has previously found that the actions of FDIC-R cannot be imputed to FDIC-C. Finally, WBC does not even address FDIC-C's argument that WBC has suffered no detriment because FDIC-C is simply seeking to collect on valid, unpaid debts as assignee of the commercial paper holders.

Ultimately, WBC has failed to make the necessary showing that would entitle it to assert a claim for estoppel against FDIC-C. Although estoppel may be available as a defense to a claim by a government agency, WBC has failed to make even the minimal showing necessary to estop a private party. This claim shall be dismissed and Count II shall be dismissed in its entirety.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 12
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

*3. The "Single Satisfaction" Rule Does Not Limit
FDIC-C's Claims Against WBC.*

In Count III of its complaint, WBC avers that in the
event that the court denies its first and second claims
for relief, FDIC-C is entitled to assert only that
portion of the commercial paper claims that remain
unsatisfied by (1) the proceeds of the CP/FDIC-R
Settlement paid to the commercial paper holders and
(2) by any other previous or subsequent recovery in
satisfaction of such claims. The commercial paper
claims asserted by FDIC-C are estimated to exceed
$32 million. Under the CP/FDIC-R Settlement
Agreement, WBC argues, the commercial paper
claimants recovered approximately $30.8 million in
satisfaction of their claims, consisting of $15 million
paid by FDIC-C, $7.5 million paid by FDIC-R, and
approximately $8.3 million from insurance carriers.
Accordingly, WBC believes that FDIC-C can only
assert the unsatisfied portion of the claims, that is, the
amount of the commercial paper claims less the $30.8
million already received by the commercial paper
holders.

WBC's desire to avoid double recovery is
understandable. WBC's desire to avoid payment on
all the commercial paper claims outstanding is also
understandable. WBC's view of the law, however, is
inaccurate. The court finds that FDIC-C is entitled to
assert the full amount of the commercial paper claims
purchased from the original holders against WBC's
estate. As a result, WBC's claim for a judgment
declaring a reduction in the amount that FDIC-C can
assert under the assigned commercial paper claims is
incorrect as a matter of law and shall be dismissed.

*17 WBC seeks to reduce FDIC-C's claim by both
the payment made by FDIC-C to the commercial
paper holders as well as the payment made by FDIC-
R and the insurance carriers to the commercial paper
holders. Thus, the court shall examine both sets of
payments to determine their impact on FDIC-C's
claim against WBC.

*a. FDIC-C Payment to the Commercial Paper Claim
Holders.*

WBC argues that FDIC-C's claim against WBC's
estate must first be reduced by the amount that FDIC-
C paid to the commercial paper holders to acquire
their claims. Only in exceptional circumstances,
however, will a court reduce the amount of an
assignee's claim against the debtor; fraud and breach
of fiduciary duty are examples of such exceptional

circumstances. *See, e.g.,* <u>In re Lorraine Castle
Apartments Bldg. Corp.,</u> 149 F.2d 55, 57 (7th Cir.
1945), *cert. denied,* 326 U.S. 728 (1945) (*citing*
<u>Security-First Nat. Bank v. Rindge Land and
Navigation Co.,</u> 85 F.2d 557, 561 (9th Cir. 1936),
*cert. denied,* 299 U.S. 613 (1937)). "In the absence of
some equitable reason, taking the case out of the
ordinary rule, the prices which security holders pay
for their securities in no wise affects the measure of
their participation in reorganization ...." *Id.* Moreover,
even when exceptional circumstances exist, the claim
asserted by the assignee may be limited to the
consideration paid to the assignor, not, as WBC
suggests, by reducing the assignee's total claim by the
consideration furnished to the assignor. *Id.*[FN13] The
assignment of a claim to a third party is premised on
the ability of the assignee to pay a discounted amount
to the assignor and subsequently collect the full
amount from the obligor on the underlying claims.
This is especially true here where FDIC-C was
virtually assured of a lawsuit when it went to collect
the debt. *Id.* at 58. Thus, the court finds that in the
absence of allegations of fraud or the breach of a
fiduciary duty in the acquisition of the assignment as
between the commercial paper holders and FDIC-C,
there is no basis for concluding that the commercial
paper claims now asserted by FDIC-C should be
reduced to the amount paid to the assignors. Also, no
basis exists whatsoever for reducing FDIC-C's claim
by the amount paid for the assignment.

*b. FDIC-R and Insurance Payment to the
Commercial Paper Holders.*

As part of the CP/FDIC-R Settlement Agreement,
FDIC-R and insurance carriers paid approximately
$15.8 million to the commercial paper holders. In
return, FDIC-R, as receiver for NBW, obtained a
release of any further claims stemming from the
commercial paper. On these facts, WBC claims that
FDIC-C, as assignee of the commercial paper claims,
can only assert against the WBC estate the value of
the commercial paper claims less the $15.8 million
already received on the claims by the commercial
paper holders. WBC seeks to invoke the "single
satisfaction" rule to prevent not only the recovery of
more than the ultimate value of the commercial paper
claims, but also to prevent FDIC-C from asserting the
full value of the claims in the bankruptcy proceeding.
WBC is incorrect. Although the single satisfaction
rule may prevent FDIC-C from ultimately collecting
more than the full value of the claims less the
amounts received by the commercial paper holders
from FDIC-R and the insurance carriers, FDIC-C is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 13
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

entitled to assert the full value of the claims in WBC's bankruptcy proceedings unless and until the debt is fully satisfied.

**\*18** The principle applied by the court in this case is simply that a bankruptcy claim is not reduced or impaired by subsequent payments received from third party obligors until such claim has been satisfied in full. *See, e.g., In re Realty Assocs. Securities Corp.,* 66 F. Supp. 416, 424 (E.D.N.Y. 1946) ("But it has been conclusively settled that ... the holder of a claim upon which several parties are liable may prove its entire claim against the estate of any who become bankrupt and recover dividends calculated on the basis of such entire claim as it existed when the petition was filed, without regard to partial payments made by other obligors until from all sources it has been paid in full."); *In re Coastland Chrysler Plymouth, Inc.,* 76 B.R. 212, 213 (Bankr. S.D. Fla. 1987) (applying the principle to claims against the bankrupt in the face of partial payment by surety); *In re Sacred Heart Hosp. of Norristown,* 182 B.R. 413, 417-18 (Bankr. E.D. Penn. 1995); *In re Gessin,* 668 F.2d 1105, 1107 (9th Cir. 1982). The commercial paper claims are in excess of $32 million; WBC does not dispute that FDIC-R and insurance carriers have paid approximately $15.8 million. Under no set of facts can WBC claim that the commercial paper claims have been satisfied. Thus, FDIC-C, as assignee of the commercial paper claimants, is entitled to assert the full amount of the commercial paper claims until it receives full satisfaction of the claims.[FN14]

### c. Commercial Paper Claims Not Extinguished by Settlement.

Despite the authority presented above, WBC contends that a factual and legal issue remains as to "whether the assigned claims were 'substantially satisfied' pursuant to the CPP Settlement [that is, the CP/FDIC-R Settlement] or otherwise."Pls. Opp'n at 28. Citing to a lone district court opinion, WBC argues that based upon the payment from FDIC-R, the insurance carriers, and FDIC-C, the commercial paper holders had no further claim to assign to FDIC-C as all their claims were extinguished by the CP/FDIC Settlement. *See In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation,* 636 F. Supp. 1138 (C.D. Cal. 1986) [hereinafter *In re National Mortgage*]. This legal conclusion is premised upon what WBC considers to be the remaining factual issues of whether FDIC-R and FDIC-C are considered a single entity for this

transaction and whether FDIC-C is the alter ego or is in privity with FDIC-R.

First, even assuming the validity of the application of the *In re National Mortgage* holding to this case, WBC's argument fails. As indicated in the discussion above, FDIC-C is separate and distinct from FDIC-R; FDIC-C is neither in privity with FDIC-R, nor is it the alter ego of the same. Therefore, FDIC-C was not liable to the commercial paper holders at the time it purchased the assignment of the claims. By its own terms, the holding in *In re National Mortgage* does not apply when a third party purchases a cause of action.[FN15]*Id.* at 1147.Thus, WBC is left with a claim that the debt on the commercial paper was at least partially extinguished by the payment from FDIC-R and the insurance carriers. However, this cannot present a basis for reducing FDIC-C's claim against WBC in its bankruptcy proceeding. If the commercial paper holders had not assigned their claims to FDIC-C, they would be entitled to assert the full amount of the claim against WBC in the bankruptcy proceeding. *See In re Realty Assocs. Securities Corp.,* 66 F. Supp. at 424. FDIC-C, as assignor of the commercial paper claims, steps into the shoes of the commercial paper holders and is thus entitled to assert the full amount of the claim.

**\*19** Second, the court cannot agree that *In re National Mortgage* applies to this case. When faced with claims from investors on which plaintiff believed itself to share joint liability with the debtor, plaintiff "purchased" the claims of the investors, admittedly "'stepp[ing] up to its responsibility and absolv[ing] the liability and t[aking] over the claims.'"*Id.* at 1147.The court found that plaintiff actually extinguished the investors' claims with the payment, and it held that plaintiff could only pursue claims for contribution and indemnification from its joint tort-feasors rather than asserting the investors' claims as assignee. *Id.* at 48-50.The court found the purchase of the assignment to be compensation in settlement of the tort claims. *Id.* From these facts, WBC would conclude that FDIC-C's payment, when coupled with the payment from the other liable parties, extinguished the commercial paper claims and left nothing for the holders to assign to FDIC-C. Aside from WBC's conspicuous reliance on one district court opinion to sustain its opposition to FDIC-C's motion, the holding simply does not apply to the facts of this case. FDIC-C is not a tort-feasor, least of all a joint tort-feasor with NBW or WBC on the commercial paper claims. FDIC-C is not even a co-obligor on the commercial paper claims. Thus, FDIC-C's payment to the commercial paper claimants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 14
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

cannot extinguish the debt in the manner described by *In re National Mortgage.* Finally, as noted above, the partial payment by the co-obligors (FDIC-R and the insurance carriers) neither extinguished the debt, nor can it cause a reduction of the claim asserted by FDIC-C as assignee of the commercial paper holders.

WBC's third claim for relief shall be dismissed.

### 4. *Subordination.*

Finally, WBC seeks a judgment declaring that any remaining claims of FDIC-C be subordinated, pursuant to the Bankruptcy Code sections 510(b) and (c) and "applicable state law," to the claims of other holders of general unsecured claims. The court finds that WBC's suoordination claims have no basis on the facts alleged in this case and shall be dismissed.

#### a. *Section 510(b).*

When an equity holder seeks to raise an equitable claim to the status of a general unsecured creditor by alleging a tort claim based upon the purchase of the security, section 510(b) requires that the tort claim be subordinated to all other unsecured claims. 11 U.S.C. § 510(b).[FN16] Section 510(b) prevents a security holder from "bootstrapping" an equity claim (subordinate to the claims of general unsecured creditors) to general unsecured creditor status simply by alleging fraud, rescission, or some other tort theory in the sale of the security. *See* 11 U.S.C. § 510(b); *In re Wyeth Co.,* 134 B.R. 920, 920-21 (Bankr. W.D. Mo. 1991);[FN17] *In re Blondheim Real Estate Co.,* 91 B.R. 639, 640-41 (Bankr. D.N.H. 1988).[FN18] 3 Lawrence P. King, *Collier on Bankruptcy* ¶ 510.04 (15th ed. 1994). Thus, in order to invoke the subordination provision of section 510(b), WBC must allege that FDIC-C now asserts a claim "for damages arising from the purchase or sale" of WBC's securities. 11 U.S.C. § 510(b).

*20 Assuming for the purposes of this motion that the commercial paper is a security, section 510(b) does not apply. FDIC-C seeks to recover solely on WBC's debt obligations under the commercial paper, rather than on a tort claim in the sale of the paper. *See In re Wyeth Co.,* 134 B.R. at 921 ("[A] [[[section 510(b)] claim must directly concern the stock transaction and not merely be a claim on a debt."). FDIC-C, as assignee of the original commercial paper holders, merely asserts the claim for the debt. *Id.* Apparently content to allow its complaint stand on its own, WBC

offers no opposition to FDIC-C's assertions regarding the inapplicability of section 510(b). Accordingly, WBC's claim for subordination based upon section 510(b) shall be dismissed.

#### b. *Section 510(c): Equitable Subordination.*

WBC's reliance on the doctrine of equitable subordination, as incorporated by section 510(c), also fails to provide a basis for subordinating FDIC-C's claims. 11 U.S.C. § 510(c).[FN19] Although incorporating the doctrine of equitable subordination, section 510(c) does not specify the circumstances under which it is to be applied, relying instead on the doctrines already developed in the courts. *In re CTS Truss, Inc.,* 868 F.2d 146, 148 (5th Cir. 1989) [hereinafter *CTS*] (*citing* S. Rep. No. 989, 95th Cong., 2d Sess., at 74 (1978)). Grounded in the prevention of inequitable results under the bankruptcy laws,[FN20] courts have developed three criteria for applying the doctrine of equitable subordination: (1) whether the claimant engaged in fraudulent or inequitable conduct; (2) whether the conduct resulted in harm to other creditors or in an unfair advantage to the claimant; and (3) whether the equitable subordination would be inconsistent with the bankruptcy law. *See In re Mobile Steel Co.,* 563 F.2d 692, 703 (5th Cir. 1977); *CTS,* 868 F.2d at 148.

As the Fifth Circuit notes, the three criteria listed above are perhaps "deceptively broad," especially in cases where, as here, the claim of equitable subordination is aimed at an outside creditor. *CTS,* 868 F.2d at 148. As a result, courts have confined equitable subordination to three general categories of cases: (1) cases in which a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) cases in which a third party exercises domination and control over the debtor to the disadvantage of others; and (3) cases in which a third party defrauds other creditors. *Id.* at 148-49.

As a matter of law, WBC cannot maintain a claim for equitable subordination. First, perhaps due to an oversight or a questionable tactical decision, WBC nowhere alleges that the facts give rise to the elements of equitable subordination. In both its complaint and its opposition to FDIC-C's motion to dismiss, WBC fails to mention the elements, and it fails to allege the facts that would prove the elements. The court agrees with FDIC-C that WBC's general "unfairness" arguments are insufficient to state a claim for equitable subordination. *See In re Badger Freightways, Inc.,* 106 B.R. 971, 977-78 (Bankr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

N.D. Ill. 1989).

**\*21** In addition to the problems with the pleadings, none of the situations in which courts have imposed equitable subordination are present in this case. FDIC-C is not a fiduciary of WBC. WBC does not allege that, prior to the bankruptcy, FDIC-C exercised control over it to the disadvantage of other creditors. Finally, WBC cannot show that any actions taken by FDIC-C, or for that matter, any actions taken by FDIC-R, worked to defraud other creditors. WBC has made no allegations that FDIC-C (or even FDIC-R) made misrepresentations to other creditors to their disadvantage. This analysis melds into a consideration of the second criterion for applying the doctrine, that is, whether the claimant's conduct has injured other creditors or given the claimant an unfair advantage. The original commercial paper holders held a valid claim against WBC for the debt; FDIC-C, as assignor, asserts the identical claim. There can be no injury to other creditors in this case as FDIC-C is merely substituted for the original commercial paper holders.[FN21]

Next, not only have courts never applied the doctrine of equitable subordination in a case such as this, but even the so-called "deceptively broad" criteria for applying the doctrine counsel against applying it to FDIC-C's claims. As noted, other creditors of WBC have sustained no injury as a result of the assignment and FDIC-C's assertion of the commercial paper claims.

Moreover, WBC has not alleged "fraudulent or inequitable conduct" on the part of FDIC-C of the type that would give rise to a claim for subordination. This court has already determined that FDIC-C is separate and distinct from FDIC-R; thus, FDIC-C's assertion of the commercial paper claims is not in contravention of the WBC/FDIC-R Settlement. FDIC-C's actions in seeking to recover on the commercial paper in order to enhance recovery for the insurance fund is not only non-fraudulent behavior, but it is also the duty of FDIC-C. See *Trigo*, *847 F.2d at 1502*. Ultimately, WBC's claims of fraud are merely dressed up claims of unfairness. However, unfairness is insufficient to invoke the doctrine of equitable subordination. *See, e.g., CTS*, 686 F.2d at 148-49. FDIC-C is entitled to assert the claims acquired from the commercial paper holders, even if it acquired them specifically to assert what FDIC-R could not assert. Although WBC perceives the conduct of FDIC-C to be inequitable, this court cannot agree that the vindication of contractual and statutory rights by FDIC-C is inequitable; the court

certainly cannot say that under the prevailing doctrine, this alleged behavior constitutes the type of fraud necessary to invoke the equitable subordination doctrine.

Equitable subordination is not a catch-all fairness doctrine that WBC can invoke to protect itself from its own errors in negotiating the WBC/FDIC-R Settlement. Accordingly, the court shall dismiss WBC's fourth claim.

### C. *Discovery.*

Previously, discovery was stayed in this action pending the court's determination of the FDIC's motions to dismiss. In light of the court's dismissal of this case, WBC's latest motion to conduct discovery shall be denied as moot.

### III.

### CONCLUSION

**\*22** For the reasons discussed above, the court shall grant FDIC-R's motion to dismiss for lack of subject matter jurisdiction, and the court shall grant FDIC-C's motion to dismiss all counts of plaintiff's complaint for failure to state a claim upon which relief may be granted.

An accompanying order shall issue this date.

> FN1. FDIC-C and FDIC-R have filed separate motions throughout this case, emphasizing that they are separate and distinct entities. WBC has responded with the opposite contention, refusing to admit or concede that FDIC-C and FDIC-R are separate entities for the purposes of this litigation. Indeed, WBC's central argument in this case is that the FDIC has attempted improperly to employ these dual capacities to structure the settlement with the commercial paper holders "for the purpose of evading its legal and contractual obligations to [WBC], and is seeking in bad faith to accomplish through its 'corporate' capacity what it is clearly barred from doing in its 'receiver' capacity."WBC's Response in Opposition to the FDIC's Motions to Dismiss the Complaint at 11-12.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

It is a "well accepted matter of law" that the FDIC is authorized to act in two distinct capacities and should be treated as separate entities for purposes of this litigation. *FDIC v. Dempster*, 637 F. Supp. 362, 365 (E.D. Tenn. 1986); *Lawson v. FDIC*, 3 F.3d 11, 13 (1st Cir. 1993); *Philadelphia Gear Corp. v. FDIC*, 587 F. Supp. 294, 298 (W.D. Okla. 1984), *aff'd in part and rev'd in part*,751 F.2d 1131 (10th Cir. 1984), *rev'd on other grounds*,476 U.S. 426 (1986).

As the court describes below, the FDIC is entitled to act in its two capacities in this case.

FN2. FDIC-C and FDIC-R also argued that even if WBC were to satisfactorily complete the required administrative process, the Bankruptcy Court would still be barred from hearing WBC's claim because exclusive jurisdiction for review of the FDIC administrative process is in the United Stated District Court for the District of Columbia. Any argument on this issue was mooted when this court granted FDIC-C's motion to withdraw the reference of this adversary proceeding on July 6, 1995.

FN3."The RTC as receiver is subject to the same provisions of FIRREA as the FDIC, with some exceptions. 12 U.S.C. § 1441a(b)(4)-(5)."*National Union Fire*, 28 F.3d at 383 n.5.

FN4. The additional language in § 1821(d)(13)(D)(i) barring jurisdiction over these assets, "including assets which the Corporation may acquire from itself as such receiver ..." may appear to apply to this case. However, this is merely illustrative language. The assets FDIC-C has "acquire[d] from itself as such receiver" are still required to be "assets of any depository institution for which the Corporation has been appointed receiver," in this case, assets of NBW. Furthermore, under the CP/FDIC-C Settlement, FDIC-C did not "acquire" the commercial paper holders' claims from FDIC-R; rather, FDIC-C purchased them directly from the commercial paper holders.

FN5. FIRREA's administrative claims exhaustion requirement does not bar the court from determining whether the res in question is an "asset" within the meaning of

§ 1821(d)(13)(D)(i).*See In re All Season's Kitchen, Inc.*, 145 B.R. 391, 402 (Bankr. D. Vt. 1992)."The plain language of the statute, as we understand it, limits our jurisdiction only if the FDIC in fact has an asset. Accordingly, we believe that the Bankruptcy Court, in the exercise of its jurisdiction to determine jurisdiction, must determine whether the FDIC in fact has an asset."*Id.*

FN6. In prior, unrelated litigation, FDIC-C conceded and the Third Circuit agreed that claims asserted against the FDIC in its corporate capacity are not subject to the jurisdictional bar under § 1821(d)(13)(D).*Rosa v. RTC*, 938 F.2d at 393.

FN7. The opening paragraph of the agreement begins as follows:
Washington Bancorporation, debtor in possession in the above-captioned case ("WBC"), and the Federal Deposit Insurance Corporation ("FDIC"), who appears solely in its capacity as receiver for the National Bank of Washington ("NBW") (hereafter the FDIC in its capacity as receiver for NBW shall be referred to as "FDIC-R"), .... WBC/FDIC-R Settlement at 1.

FN8. The opportunity for a so-called "purchase and assumption" transaction was implicitly recognized by WBC when it included paragraph G in the Settlement Agreement with FDIC-R. *See* II(B)(1)(a).

FN9."The FDIC belabors the obvious in its numerous citations which do no more than to confirm these propositions."Pls. Opp'n at 10.

FN10. Of course, WBC would describe the settlement agreement as between itself and the FDIC, rather than merely FDIC-R.

FN11. That section provides:
Except as provided in subparagraph (D), the Corporation may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation or the Corporation is substituted as a party.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
(Cite as: Not Reported in F.Supp.)

12 U.S.C. § 1819(b)(2)(B).

FN12. FDIC-C also contends that WBC lacks standing to assert the equitable defenses in Count II. However, the court finds that WBC has standing to challenge the assertion of the commercial paper claims with an allegation that such claims are barred by the WBC/FDIC-R Settlement under various equitable theories. This is not, as FDIC-C alleges, a case of an obligor challenging the assignment of claims against it. Under WBC's theory, FDIC-C is barred from acting in a separate capacity by inequitable conduct, and FDIC-C cannot assert the claims against WBC because of the Settlement Agreement.

FN13. To reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers. This is even more evident when the purchaser acquires a lawsuit when he buys a debt.
*Id.*

FN14. The dismissal of this count is without prejudice to WBC filing an objection to FDIC-C's claims once, from all sources, those commercial paper claims have been satisfied.

FN15. Indeed, WBC admits in its complaint that the court will reach this third claim "only in the event that the Court denies WBC's First and Second Claims for Relief," that is, only if the court finds that FDIC-R is separate from FDIC-C. Complaint at ¶ 34. By its own concession, WBC cannot now claim that factual issues remain.

FN16. Section 510(b) provides:
For the purposes of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interest that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.
11 U.S.C. § 510(b).

FN17. The philosophy behind this code section is that in bankruptcy where there is fraud or illegality in the sale of securities, it is the purchaser of the securities that must bear that risk. By allowing an equity holder asserting a rescission or tort damage claim to share pari passu with unsecured creditors, the unsecured creditors are forced to bear that risk.
*In re Wyeth,* 134 B.R. at 921.

FN18. The legislative history makes it clear that § 510(b) was enacted as a result of the thorny question which had caused conflicts in the courts as to whether an equity security-holder alleging fraud in the purchase of the security could share on the resulting fraud claim on an equal basis with general unsecured creditors--as opposed to the inferior position of equity holders.
*In re Blondheim Real Estate Co.,* 91 B.R. at 640-41 (citations omitted).

FN19. Section 510(c) provides:
[T]he court may--
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; ....
11 U.S.C. § 510(c).

FN20. Although the substantive laws of bankruptcy strive to produce what the drafters deem to be fair and just results for all creditors and other interested parties, often a narrow judicial interpretation would yield an inequitable result. In such situations, the bankruptcy court invokes its equitable powers "to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done."
Andrew DeNatale & Prudence B. Abram, *The Doctrine of Equitable Subordination as*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

*Applied to Nonmanagement Creditors,* 40 Business Lawyer 417, 419 (1985) (*quoting Pepper v. Litton,* 308 U.S. 295, 305 (1939)).

FN21. One of the central tenets of WBC's complaint against the FDIC is that the actions of FDIC-C and FDIC-R shall be treated as one. Although the court holds that this is not the case, even if FDIC-R's actions could be attributable to FDIC-C, WBC has failed to show any injury to other creditors.

D.D.C.,1996.
In re Washington Bancorporation
Not Reported in F.Supp., 1996 WL 148533 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ONEX AMERICAN HOLDINGS, LLC, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-CV-263 (SLR) |
| | ) | |
| RICHARD M. KIPPERMAN, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |
| | ) | |
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, | ) | Case No. 03-11402 (KG) |
| | ) | |
| Reorganized Debtor. | ) | |
| | ) | |

### CERTIFICATE OF SERVICE

I, Jeffrey R. Waxman, certify that I am not less than 18 years of age, and that service of the *Reply Brief of Appellant Onex American Holdings, LLC* was made on November 30, 2007 upon the parties listed below in the manner indicated.

### HAND DELIVERY

Richard L. Schepacarter, Esquire
Office of the United States Trustee
844 North King Street, Suite 2207
Wilmington, DE 19801

Christopher P. Simon, Esquire
Cross & Simon, LLC
913 N. Market Street, 11th Floor
Wilmington, DE 19801

Joel A. Waite, Esquire
Matthew Lunn, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801

**FIRST CLASS MAIL**

Peter W. Ito, Esquire
Baker & Hostetler LLP
303 E. 17th Avenue, Suite 1100
Denver, CO 80203

Andrew Kress, Esquire
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Catherine L. Steege, Esquire
Joel T. Pelz, Esquire
Peter A. Siddiqui, Esquire
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated:  November 30, 2007

COZEN O'CONNOR

_____
Jeffrey R. Waxman (No. 4159)

Doc#: USI:5110135v6