**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ONEX AMERICAN HOLDINGS, LLC, | ) | |
| | ) | |
| Appellant, | ) | Civil Action No. 07-CV-263 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD M. KIPPERMAN, as Trustee of the MAGNATRAX LITIGATION TRUST | ) | |
| | ) | |
| Appellee. | ) | |

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, | ) | Case No. 03-11402 (KG) |
| | ) | |
| Reorganized Debtor. | ) | |

**APPELLEE'S RESPONSE IN OPPOSITION TO THE**
**MOTION OF ONEX CORPORATION TO INTERVENE**

Appellee Richard M Kipperman, not individually but solely in his capacity as Trustee for the Magnatrax Litigation Trust (the "Trustee"), respectfully submits his Response in Opposition to the Motion of Onex Corporation to Intervene (the "Motion").

## INTRODUCTION

It is undisputed that Onex American Holdings LLC ("Onex American" or "Appellant"), the Appellant in this Court, no longer exists and in fact, has not been in existence for almost five years. Because it does not exist, Onex American had no standing when it moved the Bankruptcy Court earlier this year to re-open the Magnatrax Corporation (the "Debtor") chapter 11 case. When the Bankruptcy Court properly exercised its discretion and declined to re-open the Debtor's chapter 11 case, Onex American also had no standing to appeal. *Olympic Coast Inv. v. Seipel*, No. 05-36170, 2006 WL 3431874 at *10 (9th Cir. Nov. 29, 2006) ("[i]t is fundamental

that a suit brought in the name of that which is not a legal entity is a mere nullity."); *In re Midpoint Dev., L.L.C.*, 466 F.3d 1201, 1207 (10th Cir. 2006) (bankruptcy filing by entity that had ceased to exist was a nullity).

Onex American has ignored its lack of capacity or standing in both of its briefs on appeal. Instead of explaining how an entity which has not been in existence for approximately five years can have the capacity or standing to appear before this Court, its counsel has filed a motion to intervene on behalf of one of its other clients, Onex Corporation ("Onex"). This motion is obviously nothing more than a transparent attempt to cure the Appellant's jurisdictional deficiency. More importantly, neither the law nor the facts support Onex's request to intervene at this late stage for two reasons:

First, Onex's appeal could only be timely if Onex is able to intervene pursuant to Rule 2018 of the Federal Rules of Bankruptcy Procedure. But if Onex "was a shareholder of the Debtors whose equity was wiped out in the chapter 11 case," as it claims, then Onex also was a "party in interest" under 11 U.S.C § 1109(b) and Bankruptcy Rule 2018 cannot apply to it. Rather, as an alleged "party in interest", Onex had standing to participate in the Bankruptcy Court proceedings below and, significantly, to appeal the Bankruptcy Court's adverse decision itself. Having failed to timely appeal that decision, Onex has waived all of its challenges to the Bankruptcy Court's order and it cannot be allowed to intervene.

Second, even if Onex has a legal basis to intervene in this Court, this Court should still exercise its discretion and deny the Motion due to Onex's willful inaction. Onex has had full knowledge of the proceedings before both the Bankruptcy Court and this Court. Onex was well aware that Onex American was a dissolved limited liability company and that the Trustee challenged Onex American's standing. Despite such knowledge, Onex chose to sit on the

sidelines while the Trustee has devoted considerable time to challenging Onex American's standing to appeal. Thus, even if Onex had a legal basis to intervene, given Onex's deliberate inaction, this Court should exercise its discretion and deny Onex's request to do so.

## ARGUMENT

**I.      BANKRUPTCY RULE 2018 DOES NOT APPLY TO ONEX, RATHER AS A PARTY IN INTEREST ONEX DID NOT NEED TO INTERVENE TO CHALLENGE THE BANKRUPTCY COURT ORDER, BUT HAVING FAILED TO APPEAL THE ORDER, UNDER BANKRUPTCY RULES 8001 AND 8002 ONEX HAS WAIVED ANY CHALLENGE IT MAY HAVE HAD.**

Onex bases its request to intervene, as it must, upon Bankruptcy Rule 2018. But if, as Onex contends, Onex was a shareholder of the Debtors, then Bankruptcy Rule 2018 is inapplicable. The Bankruptcy Code and Rules provide two principle means for participation of interested parties in a chapter 11 case: Bankruptcy Code Section 1109 and Bankruptcy Rule 2018. Section 1109(b) provides that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). For those entities that do not qualify as a "party in interest" under Section 1109(b), Bankruptcy Rule 2018(a) provides that "[i]n a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."

It is well established that these two provisions are mutually exclusive and that Rule 2018(a) does not apply to those entities that are "parties in interest" under Section 1109(b). *Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re The Caldor Corp.)*, 303 F.3d 161, 172 (2d Cir. 2002); *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991); *S. Blvd., Inc. v. Martin Paint Stores (In re Martin Paint Stores)*, 207 B.R. 57, 62 (S.D.N.Y. 1997); *In re Allegheny Int'l, Inc.*, 107 B.R. 518, 524 (D. Pa. 1989) ("Rule 2018(a)

appears to apply to parties not governed by § 1109(b)"); *In re ANC Rental Corp., Inc.*, 278 B.R. 714, 719 (Bankr. D. Del. 2002) ("Federal Rule of Bankruptcy Procedure 2018(a) … allows the Court in its discretion to permit a party to be heard on a matter where it does not otherwise have standing."); *In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) ("Rule 2018(a) provides for intervention by entities not otherwise having a right to participate in the bankruptcy case under § 1109 or other provisions.").  Indeed, in Onex's principal case, *International Trade Administration*, the Second Circuit held that Rule 2018 does not apply to a "person aggrieved," "[r]ather, [Rule 2018] provides a formal mechanism that expands the right to be heard to a wider class."  936 F.2d at 747**.**  Thus, because Onex claims to have been a "shareholder of the Debtors whose equity was wiped out in the chapter 11 case," and shareholders are specifically included in the class of entities entitled to "appear and be heard on any issue" in a chapter 11 case under Section 1109(b), Rule 2018 does not apply and cannot be a basis for Onex's request to intervene.[1]

   Furthermore, because Onex may have been entitled to be heard in the Bankruptcy Court when Onex American presented its motion, but it did not appear or appeal the Bankruptcy Court order that Onex American now challenges on appeal, Onex has waived any challenge it may have had to that order.  *In re Perez*, 30 F.3d 1209, 1216 (9th Cir. 1994).  Bankruptcy Rule 8001(a) provides that "[a]n appeal from a judgment, order, or decree of a bankruptcy judge to a district court … shall be taken by filing a notice of appeal with the clerk within the time allowed by Rule 8002" and that such a notice of appeal must be filed by "each appellant."  Rule 8002 provides that "[t]he notice of appeal shall be filed with the clerk within 10 days of the date of the entry of the judgment, order, or decree appealed from," and that "[i]f a timely notice of appeal is

---

[1] Onex fully understood its right to be heard as a party in interest in the Debtors' bankruptcy without the need for intervention under Rule 2018, as evidenced by its previous filings in the case, in which Onex identifies itself as a "party in interest."  (*E.g.* Onex's Obj. to 3d Disclosure Statement at 1, (Bankr. Doc. 427), attached hereto as Ex. A.)

filed by a party, any other party may file a notice of appeal within 10 days of the date on which the first notice of appeal was filed, or within the time otherwise prescribed by this rule, whichever period last expires."

The Third Circuit has clearly stated that Rule 8002's time requirements are "strictly construed, requiring strict compliance with its terms," and that such requirements are jurisdictional in nature. *In re Universal Minerals, Inc.*, 755 F.2d 309, 311-12 (3d Cir. 1985) "Failure to file a timely notice of appeal thus deprives the district court of jurisdiction to review the bankruptcy court's order or judgment." *Id.* at 311-12. Indeed, a party in interest *only* invokes the appellate jurisdiction of the district court by properly and timely filing a notice of appeal, *Smith v. Dairymen, Inc.*, 790 F.2d 1107, 1111 (4th Cir. 1986), and any party that fails to timely appeal an order waives his challenges to the order. *In re Perez*, 30 F.3d 1209, 1216 (9th Cir. 1994) ("Under Bankruptcy Rules 8001 and 8002, a party waives appeals of a final order of the bankruptcy court by failing to file a notice of appeal within ten days."). Accordingly, a party in interest, having failed to timely file a notice of appeal, will not be permitted to join an appeal commenced by another party. *See, e.g., In re Frontier Airlines, Inc.*, 108 B.R. 277, 279 (D. Colo. 1989).

Thus, in *Frontier Airlines*, a district court denied a motion brought by four individuals to join a bankruptcy appeal because the proposed intervenors had failed to timely appeal the bankruptcy court's order. *Id.* In *Frontier Airlines*, an interested party had properly appealed a bankruptcy court's order confirming a plan of reorganization. *Id.* at 278-79. After commencement of the appeal, four individuals, acting *pro se*, attempted to join in the appeal. The debtor moved to strike the individuals' attempted joinder. *Id.* The court noted that none of the individuals had filed a "separate notice of appeal, nor did [they] move for an extension of

time in which to appeal." *Id.* at 279. The court further noted that "[t]he [bankruptcy] rules for filing a notice of appeal are mandatory and jurisdictional," and that "fundamental fairness requires that opposing parties and the court receive timely notice when a party desires to initiate an appeal. … To hold otherwise would eliminate the finality of bankruptcy orders and frustrate the central policy of the bankruptcy laws to promote the expedient administration of the bankrupt estate." *Id.* at 278-79. The district court, lacking jurisdiction over the individuals as a result of their failure to file notices of appeal, refused to permit the individuals' joinder. *Id.* at 279.

Similarly, in *In re Abdallah*, 778 F.2d 75 (1st Cir. 1985), the First Circuit held that both it and the district court lacked jurisdiction to hear a chapter 7 trustee and a creditor in an appeal of a bankruptcy court order denying a motion to sell property where they both failed to file timely notices of appeal, even though another party had appealed the same order. *Id*. at 76-77. The First Circuit explained that

> [c]ompliance with [Bankruptcy Rule 8002] is both mandatory and jurisdictional. Untimely notice of appeal deprives the district court of jurisdiction to review the bankruptcy court's order. … [T]his court's jurisdiction can only be based on a proper exercise of jurisdiction by the court below. We, therefore, are without jurisdiction over those appellants' appeals on these issues.

*Id.* at 77 (citations omitted).

In this case, Onex had full notice of the Bankruptcy Court's decision as it shares legal counsel with Onex American. Indeed, Onex's prior knowledge of these proceedings has been evidenced through representations made by its counsel to both this Court and the Bankruptcy Court. (Onex American's Reply Br. Re Motion to Enforce Plan at 11 n.7 (Bankr. Doc. 1753), attached hereto as Ex. B; App. Opening Br. at 13 n.10 (Doc. 11)). As it alleges it was a holder of equity in the Debtor, Onex was a party in interest under 11 U.S.C. § 1109(b) with the right to be heard in the Bankruptcy Court on the Bankruptcy Court's Order. Like the individuals seeking to participate in the appeals in both *Frontier Airlines* and *Abdallah*, Onex never filed a notice of

appeal. Having failed to file a notice of appeal, Onex has waived any objection it may have had to the Bankruptcy Court Order, *Perez*, at 1216, and this Court lacks jurisdiction to allow Onex to intervene in this appeal or to hear its arguments. *Universal Minerals,* 755 F.2d at 311-12. Accordingly, like the courts in both *Frontier Airlines* and *Abdallah*, this Court should refuse to permit Onex to participate in this appeal and should deny its Motion to intervene.

The only decision Onex relies upon to justify its failure to timely file a notice of appeal -- *Derivium Capital LLC v. U.S. Trustee*, No. 05-10845, 2006 WL 1317021 (S.D.N.Y. May 12, 2006) -- is easily distinguishable. In *Derivium*, the district court permitted the joinder of several individuals in an appeal of a bankruptcy court order converting the bankruptcy case from chapter 11 to chapter 7 where the conversion indirectly resulted in an increase in the individuals' tax liability. The individuals did not have notice of the effect of conversion on their tax liability until well after the appeal had begun. While the court did not discuss the jurisdictional requirements of Bankruptcy Rule 8001 and 8002, the court did explain that "[t]he [individuals] seeking leave to join the appeal did not appeal timely the Conversion Order independently because they did not receive IRS notifications until [well after the commencement of the appeal]." *Derivium*, 2006 WL 1317021 at *6.

The present case is easily distinguishable. Unlike the individuals in *Derivium*, Onex had actual notice of the Bankruptcy Court proceedings, and the alleged implications of the Bankruptcy Court's Order upon Onex are plain.[2] Thus, Onex's failure to join the proceedings below and to file a timely notice of appeal are fatal to its request to intervene in this appeal.

---

[2] The Trustee disputes Onex American's and Onex's description of the harm that they claim arises from the failure of the Bankruptcy Court to reopen the Debtor's case and hear Onex American's substantive motion to "enforce the plan." Onex American has misstated both the law and the facts in both of its briefs on appeal, employing hyperbole and inflammatory verbiage to explain how it contends it has been harmed. This overblown rhetoric is a transparent attempt to convince this Court to gloss over the jurisdictional deficiencies with Onex American's appeal and address the merits of its underlying motion to enforce. But the only issue before the Court is the narrow issue of whether the Bankruptcy Court abused its discretion when it

II.    **EVEN IF ONEX HAD A LEGAL BASIS TO INTERVENE, THE COURT SHOULD DENY THE MOTION BASED UPON ONEX'S DELIBERATE INACTION UP TO THIS POINT.**

Even if Bankruptcy Rule 2018 were applicable to Onex, this Court should exercise its discretion and refuse to permit Onex to intervene at this late stage in the appeal.  Bankruptcy Rule 2018 does not require the Court to permit intervention of an "interested entity," rather, it allows the Court to permit intervention at its discretion.  Fed. R. Bankr. P. 2018(a) ("*[A]s the court directs* and for cause shown, the court *may* permit any interested entity to intervene." (emphasis added)); *see also In re ANC Rental Corp., Inc.*, 278 B.R. 714, 719 (Bankr. D. Del. 2002) ("Federal Rule of Bankruptcy Procedure 2018(a) … allows the Court in its discretion to permit a party to be heard on a matter where it does not otherwise have standing.")  This Court should refuse to allow Onex to intervene for two reasons.

First, Onex knowingly and willingly chose not to initially participate in this appeal with full knowledge that Onex American was a dissolved limited liability company (Ex. B at 10-11) and that the Trustee had challenged Onex American's standing before the Bankruptcy Court. (Trustee's Obj. to Motion to Enforce Plan at 6-7 (Bankr. Doc. 1749) attached hereto as Ex. C.) Given the arguments made below, Onex reasonably should have expected that the Trustee would challenge Onex American's standing on appeal.  Despite such knowledge, Onex chose to not participate in this appeal, causing the Trustee to devote considerable time and resources presenting his standing argument on appeal.  Because of Onex's willful inaction and the resulting time and resources expended by the Trustee in addressing Onex American's lack of standing, the Court should not permit Onex now to intervene.  *Cf. Gruca v. U.S. Steel Corp.* 495 F.2d 1252,

---

declined to re-open the Debtors' chapter 11 case.  The question of how the motion to enforce should be decided is not before the Court because the Bankruptcy Court never reached that motion, having determined not to re-open the chapter 11 case.

1258 (3d Cir. 1974) ("By its very nature the doctrine [of laches] addresses itself to the sound discretion of the trial judge.")

Second, Onex has failed to present any evidence that it was a shareholder of the Debtor, and its interest as a defendant in an action brought by the Trustee is not the type of economic interest which the Plan or the Bankruptcy Code seeks to protect.  Onex made similar claims that it was a shareholder of the Debtor before the Bankruptcy Court and counsel for the Trustee similarly questioned those unsubstantiated allegations.  (Tr. Re Motion to Enforce Plan at 15-16, (Bankr. Doc.  1767) attached hereto as Ex. D.)  Yet again Onex claims it was a shareholder of the Debtor, and yet again Onex presents no evidence to support its claim.[3]  (Motion at 4.)

In fact, the only *substantiated* economic interest that Onex claims has been implicated here is its interest as a defendant in defeating the claims brought against it by the Trustee.  But neither the Bankruptcy Code nor the Debtors' Plan were intended to protect the interests of Onex to defeat claims made against it by the representative of Debtors' bankruptcy estate.  Because an individual may only have standing if the statute under which it seeks protection was intended to protect its interests, *In re Stone & Webster, Inc.*, 373 B.R. 353, 361 (Bankr. D. Del.2007) ("[t]o assert prudential standing, a party must belong to the class of the persons that the statute is intended to protect"), Onex cannot base its alleged standing on the fact that the Trustee has sued Onex.

Furthermore, the import of Onex's standing argument is that it was entitled to a release of the claims that might be asserted against it. The Debtors' Plan, however, explicitly provided that Onex was not entitled to a release and that all of the Debtors' claims against Onex were preserved and transferred to the Magnatrax Litigation Trust.  Because neither the Bankruptcy

---

[3]  Even if Onex had provided sufficient evidence that it was a shareholder of the Debtor, as explained more fully in the Trustee's Opening Brief, such an interest would not provide sufficient standing because Onex does not seek any remedy for the supposed injury to the Debtors' former shareholders.  (*See* Trustee's Br. at 11-13 (Doc. 13).)

Code nor the Debtors' Plan contemplated adjusting Onex's liability on the Assigned Causes of Action, regardless of who could bring such actions, Onex simply does not have an interest which warrants protection or intervention. *See, e.g.*, *In re ANC Rental Corp., Inc.*, 278 B.R. 714, 719 (Bankr. D. Del. 2002) ("[W]e decline to permit such intervention in this case. While [the movants] have an economic interest in [issues before the court], it is not the type of economic interest which the Bankruptcy Code seeks to protect. It is their interests as competitors of the Debtors which they are seeking to protect by opposing action by the Debtors which will improve the Debtors' chances of successfully reorganizing. Those interests are not in harmony with the Debtors or the creditors of these estates and there is no reason to let [the Movants] use this forum to advance their individual interests.")  Onex's Motion to intervene should be denied.

## CONCLUSION

For all of the foregoing reasons, the Trustee respectfully requests that this Court deny Onex Corporation's motion to intervene in this appeal and that this Court grant such other relief as may be just.

DATED:  December 10, 2007              CROSS & SIMON LLC


By:  /s/ Christopher P. Simon
    Christopher P. Simon (No. 3697)
    913 North Market Street, 11th Floor
    P.O. Box 1380
    Wilmington, DE 19899-1380
    Telephone: (302) 777-4200
    Facsimile: (302) 777-4224

    -and-

Catherine L. Steege, Esquire
Joel T. Pelz, Esquire
Andrew Nicoll, Esquire
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
Telephone: (312) 222-9350

-and-

Peter W. Ito, Esquire
BAKER & HOSTETLER LLP
303 East 17th Avenue, Suite 1100
Denver, Colorado 80203
Telephone: (303) 861-0600

Counsel for Richard M Kipperman,
Trustee for the Magnatrax Litigation Trust

# EXHIBIT A

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, et al., | ) | Case No. 03-11402 (PJW) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | **Hearing:  September 5, 2003 at 3:30 p.m.** |
| | ) | **Related Docket No.: 398** |

## OBJECTION OF ONEX CORPORATION TO DEBTORS' THIRD AMENDED AND RESTATED DISCLOSURE STATEMENT FOR DEBTORS' THIRD AMENDED AND RESTATED JOINT PLAN OF REORGANIZATION

Onex Corporation ("Onex"), a party in interest in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its undersigned attorneys, hereby objects (the "Objection") to the Debtors' Third Amended and Restated Disclosure Statement (the "Disclosure Statement") with respect to the Debtors' Third Amended and Restated Joint Plan of Reorganization (the "Plan") and respectfully states as follows:[1]

## PRELIMINARY STATEMENT

1.      Onex objects to the Disclosure Statement on the ground that it fails to provide "adequate information" within the meaning of, and as required by, section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq (the "Bankruptcy Code").

---

[1]    Capitalized terms used herein but not defined have the meanings ascribed to them in the Disclosure Statement.

2.     One of the important purposes of the Debtors' amended Disclosure Statement is to inform creditors of the establishment of a "Litigation Trust."  Apparently, the Litigation Trust is to be established to pursue any potential claims the Debtors may have against Onex and the Onex Affiliates, which claims are to be assigned to the Litigation Trust pursuant to the Plan. Onex adamantly denies any and all purported claims and states that, if any claims are brought by the Litigation Trust, Onex will vigorously defend against such meritless claims.  Indeed, the Committee has failed to articulate a legitimate factual and legal basis for the existence or amount of any claims against Onex or the Onex Affiliates.  Onex, a Canadian public company, expressly reserves all of its rights and defenses, should the Litigation Trust seek to pursue any claims against Onex or the Onex Affiliates in these chapter 11 cases.

3.     The Disclosure Statement fails to provide adequate information because it fails to describe adequately the nature of any purported claims which may be pursued by the Litigation Trust and the position of Onex and the Onex Affiliates as to such purported claims.

4.     In particular, under the Plan, Class 9 general unsecured creditors are permitted to "opt-in" to the Litigation Trust by investing up to twenty-five percent (25%) of their distributions under the Plan in the Litigation Trust; thereby providing the Trust with funds (up to a maximum of $1.325 million) with which to pursue purported claims against Onex and the Onex Affiliates. The Disclosure Statement, however, does not provide Class 9 creditors with adequate information with which to make the "opt-in" decision.  It fails to inform Class 9 creditors that Onex has formally rejected all of the Creditors' Committee's alleged claims and has refused a demand for payment by the Creditors' Committee on the grounds that, among other things, there is absolutely no valid basis for such claims and, despite having already expended over $1.5

million on its investigation, the Creditors' Committee has failed even to allege any factual basis whatsoever for any purported claims against Onex or the Onex Affiliates. The Committee, rather, has only asserted generalized allegations of alleged fraudulent transfers without any specificity as to any such claims.

5.    Accordingly, the Disclosure Statement is inadequate and should be amended to provide additional, relevant information to enable Class 9 creditors "to make an informed judgment about the plan," as required by section 1125 of the Bankruptcy Code.

### The Disclosure Statement Does Not Provide "Adequate Information"

6.    With respect to the Litigation Trust, the Disclosure Statement states:

> "The Litigation Trust is being formed to pursue the Assigned Causes of Action, which represents the rights of the Magnatrax Debtors to pursue and litigate any claims against Onex and Onex Affiliates. The Creditors' Committee has asserted that the Magnatrax Debtors may have potential claims against Onex and/or the Onex Affiliates. The Creditors' Committee has not provided any factual basis to support such claims, and Onex has advised the Magnatrax Debtors that Onex and the Onex Affiliates would vigorously contest any such claims. Accordingly, the Magnatrax Debtors believe that any action brought in respect of any such claim would involve expensive and protracted litigation."[2]

7.    This disclosure is inadequate in that it fails to inform Class 9 creditors of the following key facts:

  (i)    On August 1, 2003, counsel to the Creditors' Committee wrote to Onex and demanded that Onex make a payment under the Plan in settlement of purported claims against Onex and the Onex Affiliates;

  (ii)    The Creditors' Committee's written demand failed to articulate any specific factual basis for any of its alleged claims; and

---

[2] Disclosure Statement at Article V.D.17.

    (ii)    On August 26, 2003, counsel to Onex replied to such demand by advising that, among other things, (a) Onex vigorously denies any and all allegations that it is liable in any way whatsoever to the Debtors' estates or to creditors or interest holders in the Debtors' chapter 11 cases, (b) Onex declines to provide any form of payment under the Plan or otherwise, in respect of any such purported claims, and (c) Onex expressly reserves all of its rights, claims and defenses in connection with any such purported claims.

8.    These events constitute material developments in connection with the purported claims being advanced by the Creditors' Committee, which will form the basis of the Litigation Trust into which Class 9 creditors have been asked to invest up to twenty-five percent (25%) of their distributions under the Plan.  To the extent that Class 9 creditors must decide whether or not to "opt-in" to the Litigation Trust, such creditors must be advised, and section 1125 of the Bankruptcy Code mandates that such creditors be advised, of these key, material developments. Without notification of these developments, the Disclosure Statement does not enable Class 9 creditors, and in fact deprives Class 9 creditors of the right "to make an informed judgment about the plan," as required by section 1125 of the Bankruptcy Code.

9.    In addition, and as referenced in a footnote on page 15 of the Disclosure Statement, the Disclosure Statement should be amended to further clarify that given, among other things, (a) the Creditors' Committee failure to state any factual basis whatsoever for any of its purported claims against Onex or the Onex Affiliates and (b) Onex's outright refusal to make any payment in respect of any such purported claims, no value can be ascribed to the Litigation Trust or its contemplated recoveries at this time.

10.    Onex submits that the following revised paragraph (marked to show changes from the language currently contained in the Disclosure Statement) would provide creditors with

4

sufficient, relevant and non-biased information with respect to the Litigation Trust and the

matters referenced herein:

> "The Litigation Trust is being formed to pursue the Assigned
> Causes of Action, which represents the rights of the Magnatrax
> Debtors to pursue and litigate any claims **that might exist** against
> Onex and Onex Affiliates.  The Creditors' Committee has asserted
> that the Magnatrax Debtors may have potential claims against
> Onex and/or the Onex Affiliates.  The Creditors' Committee has
> not provided any factual basis to support **any** such claims **to the
> Magnatrax Debtors**, **Onex or the Onex Affiliates.  The Creditors'
> Committee has demanded in writing that Onex
> make a payment under the Plan in settlement of purported
> claims against Onex** and **the Onex Affiliates.  The Creditors'
> Committee's written demand failed to articulate any specific
> factual basis for any of its alleged claims.  In response, Onex
> has advised the Creditors' Committee that (a) Onex vigorously
> denies any and all allegations that it is liable in any way
> whatsoever to the Debtors' estates or to creditors or interest
> holders in the Debtors' chapter 11 cases,
> (b) Onex declines to make any payment in respect of any such
> purported claims, and (c) Onex expressly reserves all of its
> rights, claims and defenses in connection with any such
> purported claims.   In addition,** Onex has advised the Magnatrax
> Debtors that Onex and the Onex Affiliates would vigorously
> contest **and defend against** any such claims.  Accordingly, the
> Magnatrax Debtors believe that any action brought in respect of
> any such claim would involve expensive and protracted litigation.
> **For these reasons, no value can be ascribed to the claims
> asserted by the Creditors' Committee, or to the Litigation
> Trust or its contemplated recoveries, at this time.**"

## CONCLUSION

11.     As stated above, the Disclosure Statement fails to provide "adequate information"

in that, among other things, it fails to inform creditors of certain key, material developments in

connection with the claims asserted by the Creditors' Committee, which are to form the basis of

the Litigation Trust.  Accordingly, the Disclosure Statement should be amended, in the manner

suggested herein, so as to provide creditors with "adequate information" within the meaning of, and as required by, section 1125 of the Bankruptcy Code.

WHEREFORE, Onex respectfully requests that the Disclosure Statement not be approved until the Debtors have amended the Disclosure Statement to address the matters set forth in this Objection.

Dated: August 29, 2003                          Respectfully submitted,


                                                PAUL, WEISS, RIFKIND, WHARTON &
                                                GARRISON LLP
                                                Alan W. Kornberg, Esq.
                                                Maria T. Vullo, Esq.
                                                1285 Avenue of Americas
                                                New York, NY 10019-6064
                                                Tel No. (212) 373-3000
                                                Fax No. (212) 757-3990

                                                - and –

                                                COZEN & O'CONNOR


                                                By: /s/ Jeffrey R. Waxman____
                                                Mark Felger, Esq. (Bar ID No. 3919)
                                                Jeffrey Waxman, Esq. (Bar ID No. 4159)
                                                Chase Manhattan Centre
                                                1201 North Market Street
                                                Suite 1400
                                                Wilmington, Delaware 19801
                                                Tel No. (302) 295-2000

                                                Co-counsel for Onex Corporation

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, | ) | Case No. 03-11402 (KG) |
| | ) | |
| Reorganized Debtor. | ) | **Hearing Date:  March 27, 2007 at 3:00 p.m.** |

REPLY OF ONEX AMERICAN HOLDINGS, LLC
TO OBJECTION OF MAGNATRAX LITIGATION
TRUST AND IN FURTHER SUPPORT OF MOTION
FOR ORDER ENFORCING CHAPTER 11 PLAN

Onex American Holdings, LLC ("Onex Holdings"), by and through its undersigned counsel, Cozen O'Connor and Paul, Weiss, Rifkind, Wharton & Garrison LLP, respectfully replies to the Objection (the "Objection") of Richard M. Kipperman, trustee (the "Trustee") of the Magnatrax Litigation Trust (the "Trust"), to the Motion (the "Motion") of Onex American Holdings, LLC for Order Enforcing Chapter 11 Plan, and  in further support of the Motion, states as follows:

## PRELIMINARY STATEMENT

Unable to refute that the absolute priority rule imposes an absolute cap on creditor recoveries, the Trustee attempts to distract the Court from the central issue here:  whether the Plan should be enforced consistent with the statutory provision that authorized its confirmation – section 1129(b) of the Bankruptcy Code. The Trustee's assertion that Onex Holdings "asks this Court to re-write the plain language of the Plan[1] and create a limitation on the amount the Trust can recover" is false. (*See* Obj. 1.) Onex Holdings does not ask this Court to "create" a damages limitation; such a limitation already exists as a matter of law.  Indeed, to suggest otherwise

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Motion.

would result in the troubling notion that the Court confirmed and would sanction enforcement of a patently illegal distribution scheme that would enrich a very few creditors at the expense of the Debtors, other creditors and shareholders. The Trustee concedes – as he must – that the Court found at confirmation that the transfer of the Assigned Causes of Action to the Litigation Trust would not result in the Trust Beneficiaries "receiving more than 100% of the value of their claims." (Obj. 16, 18.) And such a finding was correct given the repeated representations by the Creditors' Committee that the *gross amount* (as opposed to *value*) of the claims to be pursued against the Onex entities was between $8 and $24 million. Indeed, under the Trustee's own valuation approach to contingent assets (Obj. 14-16), this Court and parties in interest would have concluded that, given litigation uncertainties, such claims would be *worth* substantially *less* and, therefore, the absolute priority rule handily satisfied.

Even though the alleged claims against Onex are all based on matters that occurred prepetition (let alone pre-confirmation), the Trustee now maintains that it was intended all along that creditors holding $12 million of claims can recover fifty (50) times that amount when other unsecured creditors received pennies and shareholder interests were wiped out. Section 1129(b), however, prohibits such an inequitable result; the Trustee's effort to transform the Plan into an illegal reorganization scheme should not be permitted.

## ARGUMENT

### A.    Onex Holdings Seeks to Enforce, Not Modify, the Plan.

1.    The Trustee asserts that, because the Plan granted him "the ability to pursue the Assigned Causes of Action," there "is no basis for this Court to limit the damage recovery." (*See* Obj. 2.) But whether the Plan resulted in assignment of *all* causes of action or permits pursuit of them is beside the point. The question here is whether the Trustee can seek a windfall recovery for a small group of unsecured creditors in a cramdown situation. The Trustee

is tellingly silent on this critical point. Nowhere – because he cannot – does the Trustee cite a single case in support of his contention that the Trust Beneficiaries can recover 50 times the amount of their allowed claims.

2.    Instead, he misrepresents the relief sought by characterizing the Motion as a challenge to the Plan. In reality, the opposite is true: Onex Holdings seeks enforcement of the Plan as confirmed; the Trustee seeks to transform the Plan into something that it is not.

### 1.    The Plain Language of the Plan Supports Onex Holdings.

3.    The Trustee's attempt to side-step the absolute priority rule is contrived. The question is not what was assigned, but what the Trust Beneficiaries may recover. The plain language of the Plan, the Confirmation Order, and the Bankruptcy Code make clear that their recovery is capped at 100% of their Allowed Class 9 Claims. (*See* App. 2 at ¶ S ("Magnatrax Debtors presented *uncontroverted evidence* at the Confirmation Hearing, and the Bankruptcy Court hereby finds, that the Plan . . . is fair and equitable . . . with respect to each of the Rejecting Classes [including Class 15]") (emphasis added).)

4.    Attempting to avoid this holding, the Trustee posits that the assignment to the Litigation Trust of "all the Debtors' causes of action against Onex Corporation and its affiliates" was "uncapped" and thus his pursuit of over $600 million in the Georgia Action comports with the Plan. (*See* Obj. 5.) Not so. The Trustee's interpretation produces two absurd results. *First*, it directly undermines the Court's ruling that the Plan was fair and equitable as to dissenting classes. *Second*, it alleges that the Plan transferred to the Trustee more rights than the Debtor possessed: if the Debtors had retained (rather than assigned) their causes of action the absolute priority rule would have prohibited the Debtors from recovering $600 million while paying unsecured creditors cents on the dollar and eliminating shareholder interests.

3

5.      As noted above, the Confirmation Order contained a specific finding that the Plan was fair and equitable. Rather than being read in conflict, the Plan and Confirmation Order must be read in harmony, if possible. (*See* App. 2 at ¶ 45 ("[t]he provisions of the Plan and of this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each . . . .").)

6.      However, even if the Trustee's alleged conflict between the Plan and Confirmation Order did exist, the Trustee is incorrect that the Plan would govern. (*See* Obj. 10.) To the contrary, the Confirmation Order controls: "[I]n the event there is any inconsistency, discrepancy or conflict between any Plan provision and any provision of this Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provision of this Confirmation Order shall govern and control." (App. 2 at ¶ 45.) Thus, the Confirmation Order's absolute cap on the Trust Beneficiaries' recoveries pursuant to section 1129(b) controls in any event, and warrants the relief requested by Onex Holdings.

2.      **Res Judicata Does Not Bar the Motion.**

7.      The Trustee's res judicata arguments are equally flawed. Res judicata does not bar the Motion because Onex Holdings does not seek to change or challenge the Plan, but rather it seeks to enforce the Plan as proposed and confirmed. *See In re Optical Technologies, Inc.*, 425 F.3d 1294, 1301-02 (11th Cir. 2005) (distinguishing dispute about plan interpretation from res judicata claims); *Miller* v. *United States*, 363 F.3d 999, 1006 (9th Cir. 2004) (res judicata does not bar interpretation of a plan). While the Trustee ignores this key distinction, this Court should not.

8.      Further, Onex Holdings' lack of objection to the Plan at confirmation underscores the need for relief here. The Creditors' Committee affirmatively represented to the Court and parties in interest, including Onex Holdings, that the "gross amount" of claims it

4

expected to pursue was between $8 million to $24 million.  Factoring in the risks associated with litigation recoveries, all parties and the Court could reasonably conclude that the Plan complied with the absolute priority rule.  (*See* Mot. ¶¶ 11, 13.)  Because the Trustee now disavows this record and the Court's section 1129(b) ruling, this Court should now reaffirm that the Plan was intended to, and does in fact, comply with the absolute priority rule.

9.    On the other hand, res judicata bars the Trustee's attempt to argue now that the Plan permits unlimited recoveries by the Trust Beneficiaries. *See CoreStates Bank, N.A.* v. *Huls America, Inc.*, 176 F.3d 187, 194 (3d Cir. 1999).  The Confirmation Order constitutes a final judgment, *Eastern Minerals & Chems. Co.* v. *Mahan*, 225 F.3d 330, 336 & n.11 (3d Cir. 2000), with respect to all parties to the chapter 11 case.  *First Union Commercial Corp.* v. *Nelson, Mullins, Riley and Scarborough* (*In re Varat Enter., Inc.*), 81 F.3d 1310, 1315 (4th Cir. 1996).  Any objection to the cap on senior creditor recoveries imposed by cramming down the Plan under section 1129(b) of the Bankruptcy Code Plan on junior interests must have been raised at confirmation or be lost – as it was here. *See In re Szostek*, 886 F.2d 1405, 1408 (3d Cir. 1989).  The Trustee is barred from seeking any recovery above the outstanding Allowed Class 9 Claims held by the Trust Beneficiaries pursuant to the confirmed cramdown Plan.

**B.    The Amount of the Trust's Recovery Is Capped As a Matter of Law.**

10.    The Trustee posits that the absolute priority rule applies only at the moment of confirmation and then falls away when the Plan is subsequently enforced.  This cannot be correct.  Cramdown is extraordinary relief and its legitimacy and contours are defined by the absolute priority rule.  Nor does Section 1129(b) or the Court's confirmation order permit a bait and switch:  a cramdown plan was presented to and confirmed by the Court and is binding on all parties.  Cramdown imposes a cap on senior class recoveries which the Trustee may not avoid after-the-fact.

5

11.     Seeking to side-step this obvious point, the Trustee now contends that the *value* of the Assigned Causes of Action – involving transactions and events that occurred years before the petition date – somehow skyrocketed between the Effective Date and commencement of the Georgia Action in May 2005.  This suggestion is ludicrous.

12.     What changed during those 18 months? *Nothing*.

13.     In an affidavit filed in the Georgia Action, the Trustee's counsel represented that the Creditors' "Committee undertook an investigation of the Debtors and the claims that might be brought against the Defendants in [the Georgia Action]." (Ito Aff. ¶ 3.)[2]  As stated in that same affidavit, "[w]hen the Trust was formed, I provided the documents that the Committee had obtained through Rule 2004 discovery to the Trustee."  (*Id.* ¶ 6.)[3]  Moreover, filings in this case by the Creditors' Committee make plain that its investigation focused on the

---

[2]    A copy of the Ito Affidavit is attached as Exhibit A.

[3]    Indeed, a substantial portion of the fees paid to counsel for the Creditors' Committee accounted for:

> an extensive investigation, analysis, and evaluation of the Debtors' business operations, as well as various acts and transactions engaged in pre-petition by the Debtors, including, but not limited to, (i) reviewing and analyzing documents related to Onex's acquisition of American Buildings Company in May 1999, (ii) reviewing and analyzing documents related to the Debtors' acquisition of Republic Builders in September 1999, (iii) reviewing and analyzing documents related to the Debtors' acquisition of Jannock Ltd. and the related transactions thereto that occurred or were deemed to occur on March 10, 2000, (iv) conducted legal research and analyses regarding the foregoing transactions . . . .

(Second Monthly Fee Application (the "Fee Application") of Foley & Lardner for Compensation for Services Rendered and Reimbursement of Expenses as Counsel to the Official Committee of Unsecured Creditors for the Period from June 1, 2003 through June 30, 3003 (Docket No. 324) at 7-8.  A copy of relevant excerpts from the Fee Application is attached as Exhibit B.)

very same matters about which the Trustee brings claims in the Georgia Action. (*See, e.g.,* Docket Nos. 186, 347.)

14.    In his initial disclosures (the "Initial Disclosures") filed in the Georgia Action, the Trustee stated that "the documents in the Trustee's possession, custody or control that the Trustee may use to support his claims" comprised documents produced to the Creditors' Committee by the Debtors and the Canadian Imperial Bank of Commerce. (Initial Disclosures 5-6.)[4]   In sworn responses to interrogatories served by Onex Holdings, among others, in the Georgia Action, the Trustee also has identified the documents on which he relied in formulating the allegations in his complaint in the Georgia Action as those documents produced to the Creditors' Committee in this case.   (*See* Plaintiff's Amended Objections and Amended Responses to the First Set of Interrogatories and Requests for the Production of Documents by the Onex Defendants No. 9, dated February 16, 2007 (the "Trustee's Response to Interrogatory No. 9"), at 20.)[5]

15.    In other words, the Trustee knew exactly as much as the Creditors' Committee did when he filed his complaint; thus, the morphing of $8 to $24 million of claims into $600 million of claims is never explained.  Nor can it be.

16.    Nor is the Trustee's analogy to the value of a stock distribution helpful. Unlike the Assigned Causes of Action, stock can increase in value due to the reorganized debtors' post-confirmation activities – a new business strategy, a merger or acquisition, a change in product line or market conditions.  The Assigned Causes of Action are what they were, and no post-confirmation activity transforms them.

---

[4]   A copy of the relevant excerpts from the Trustee's Initial Disclosures is attached as Exhibit C.

[5]   A copy of the Trustee's Response to Interrogatory No. 9 is attached as Exhibit D.

17.    Further, the Creditors' Committee's own representations to the Court refute the arguments the Trustee now makes. Specifically, the Creditors' Committee disclosed that "the *gross amount* of claims against Onex and the Onex Affiliates could range from approximately $8 million to approximately $24 million." (App. 3 at 98 (emphasis added).) Significantly, the Creditors' Committee estimated the *amount* of claims; it did not provide a valuation. An actual valuation would have been *lower*, not higher, because it would have taken into account litigation uncertainties. (*See* Obj. 15.)

C.    **The Trustee Is Bound by the Creditors' Committee's Representations.**

18.    The Creditors' Committee affirmatively represented to the Court and all parties in interest that the amount of the Assigned Causes of Action ranged from $8 million to $24 million. Such representations must be assumed to be accurate; otherwise the Creditors' Committee was party to a deception that was revealed when the Georgia Action was commenced 18 months after confirmation.

19.    The Creditors' Committee is a fiduciary and has a duty to make truthful representations to this Court and to its constituents. *Westmoreland Human Opp., Inc.* v. *Walsh*, 327 B.R. 561, 573 (W.D. Pa. 2005) ("Good faith, trust and candor are essential to ensure that the work of the committee does not come to a standstill and is completed for the benefit of all unsecured creditors."); *see In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (noting creditors' committee's fiduciary duty to its constituents). Representing to the Court a claims estimate of $8 million to $24 million when the Creditors' Committee intended to seek a $600 million recovery for the benefit of a handful of self-selected creditors would be scandalous.

20.    In any event, by electing to make statements in the Disclosure Statement, which the Court and parties in interest relied upon in considering the Plan, the Creditors' Committee subjected itself to claims of judicial estoppel. That the disclosures were voluntary,

8

and that the Disclosure Statement was the Debtors', are irrelevant. (*See* Obj. 19.) The Trustee

must live with the representations made to the Court and parties in interest concerning a critical

aspect of the cramdown Plan.

**D.    Onex Holdings Has Standing to Bring the Motion.[6]**

21.    Bankruptcy courts "are rarely receptive to defenses based on lack of

standing . . . . If a party believes itself affected by some event enough to take the trouble to raise

it as an issue, it can usually be assumed that that party has a sufficient interest in the issue to be

held to have standing to assert it. '[Bankruptcy courts] are very reluctant to allow standing to

become a means to avoid deciding difficult substantive issues put before [them] . . . .'" *In re*

*Esmizadeh*, 272 B.R. 377, 383 (Bankr. E.D.N.Y. 2002) (quoting *In re Verdi*, 241 B.R. 851, 859

(Bankr. E.D. Pa. 1999)) (citations omitted).

---

[6]    The Trustee's cursory assertion that this Court lacks subject matter jurisdiction over the Motion is baseless. (*See* Obj. 9 n.8.) Nowhere does the Trustee address the authorities set forth in the Motion.   (*See* Mot. ¶¶ 1-2, 29-32.)   And the one case cited by him is readily distinguishable. In *In re Commercial Loan Corp.*, No. 06 A 1530, 2007 WL 756382 (Bankr. N.D. Ill. Mar. 14, 2007), the court held it lacked jurisdiction over one state law claim because *it* did not arise under the Bankruptcy Code, but it did have jurisdiction over the remaining bankruptcy causes of action. *Id.* at *5-6 (also noting that applicable Seventh Circuit law applied a far more "constricted interpretation" of bankruptcy jurisdiction than that of the Third Circuit). Here, the Motion seeks enforcement of the Plan, which arises squarely under the Bankruptcy Code and therefore clearly falls within this Court's jurisdiction. (*See* Mot. ¶¶ 1-2, 29-32.)

Further, and contrary to the Trustee's contention, Onex Holdings does not seek an "end run around the District Court." (*See* Obj. p. 1.) By filing a $600 million action in Georgia, it in fact is the Trustee that seeks an end-run around the Plan confirmed by the Court. As set forth in the Motion, the Confirmation Order plainly grants this Court "exclusive jurisdiction over all matters arising out of, and related to, the Magnatrax Reorganized Cases and the Plan to the fullest extent permitted by law, including, but not limited to, jurisdiction over those items and matters set forth in Article X of the Plan . . . ." (App. 2 at 5.) Moreover, Onex Holdings filed a notice with the District Court making it aware of the Motion noting that "Onex Holdings does not intend that the filing of the Motion in the Bankruptcy Court will affect discovery or pending motion practice before this Court or otherwise delay the progression of the case in accordance with the Court's Scheduling Order set at the December 13, 2006 conference. Onex Holdings files this Notice simply to inform the Court of the status of the bankruptcy case. Onex Holdings seeks no relief at the present time with respect to this matter." (Notice of *Filing of Motion* ¶ 7.)

22.    In an attempt to elevate form over the Motion's substance and to avoid this Court's consideration of the irreconcilable positions taken by the Creditors' Committee and the Trustee, the Trustee asks that the Motion be dismissed on lack of standing. This argument should be rejected for two reasons.

23.    *First*, contrary to the Trustee's suggestion, that Onex Holdings has been dissolved does not preclude it from bringing this Motion just as it did not prevent the Trustee from suing Onex Holdings in the Georgia Action. (*See* Obj. 7.) Neither of the cases cited by the Trustee suggests otherwise.

24.    Although the Trustee relies on *Olympic Coast Inv., Inc.* v. *Seipel*, No. 05-36170, 2006 WL 3431874 (9th Cir. Nov. 29, 2006), to argue that a pleading filed on behalf of Onex Holdings is a mere nullity (*see* Obj. 7), he ignores the Ninth Circuit's holding – fully applicable here – that claims brought by a non-existent entity may nonetheless be maintained by another party that had the right to bring such claims. *Olympic Coast Inv., Inc.*, 2006 WL 3431874 at * 2 (remanding to district court to determine whether non-dissolved entity had the ability to sue in its individual capacity or as assignee of claims held by dissolved entity").

25.    *Holliman* v. *Midpoint Dev., L.L.C.* (*In re Midpoint Development, L.L.C.*), 466 F.3d 1201 (10th Cir. 2006), is completely inapposite. (*See* Obj. 7.) There, the Tenth Circuit held only that a company could not be a debtor under the Bankruptcy Code if it had ceased to exist prior to the petition date. *Holliman*, 466 F.3d at 1207. Here, Onex Holdings seeks merely to enforce a confirmed Plan.

26.    *Second*, even if Holdings' dissolution were relevant, Delaware law provides for the distribution of all assets of a dissolved limited liability company to its members. *See* 6 Del. C. § 18-804. In this case, Onex Corporation was distributed all assets of Onex

Holdings. Indeed, the Trustee's Objection concedes that Onex Corporation is a party in interest. (*See* Obj. 8 n.7 ("the Trustee assumes that Onex Corporation, which is a defendant in the Trust's pending District Court action, is the real movant here").)[7]

      27.    Onex Holdings would suffer serious injury if the Court allowed the Trustee to continue to pursue recoveries that violate the Plan. That Onex Holdings' equity interests were extinguished under the cramdown Plan serves as the basis for, rather than destroying, standing. By law, such extinguishment only could occur in accordance with the absolute priority rule which caps automatically the Trustee's potential recovery. Knocking the props out from under the cramdown Plan would directly and impermissibly harm Onex Holdings and such harm is more than sufficient to grant standing here.

      28.    Finally, the Trustee argues that Holdings lacks standing because adjudication of this Motion now will not affect Holdings' rights under the Plan. (*See* Obj. 7-9.) The Trustee has it backwards. Absent the relief sought by this Motion, the Trustee will continue to disregard the Bankruptcy Code, the Confirmation Order and the Plan, by pursuing an illegal recovery for the benefit of a few creditors at the expense of, among others, Onex Holdings.

---

[7]    Should this Court prefer, Onex Corporation could be substituted as the movant on the basis of 6 Del. C. § 18-804. In any event, four Onex employees who also are named as defendants in the Georgia Action were equity holders in the Debtors (*see* Mot. ¶ 6 n.3) and they indisputably have standing to bring the Motion.

WHEREFORE, Onex Holdings respectfully requests that the Court (i) grant the Motion; (ii) overrule the Objection; and (iii) grant Onex Holdings such other relief as the Court deems just and proper.

Dated:  March 22, 2007

COZEN O'CONNOR

Mark E. Felger (No. 3919)
Jeffrey R. Waxman (No. 4159)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000

- and -

PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
Alan W. Kornberg
Maria T. Vullo
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: (212) 373-3000

*Counsel for Onex American Holdings, LLC*

# EXHIBIT C

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNATRAX CORPORATION, et al., | ) | Case No. 03-11402 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 1737** |
| | ) | |
| | ) | |

**MAGNATRAX LITIGATION TRUST'S OBJECTION TO
ONEX AMERICAN HOLDINGS, LLC'S MOTION FOR
ORDER ENFORCING CHAPTER 11 PLAN (DOCKET NO. 1737)**

Richard M. Kipperman, not individually but solely in his capacity as Trustee (the "Trustee") for the Magnatrax Litigation Trust (the "Trust"), respectfully submits his Objection to Onex American Holdings, LLC'S ("Holdings") Motion for Order Enforcing Chapter 11 Plan (the "Motion").

## INTRODUCTION

The Order confirming the Debtors' Fifth Amended and Restated Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan")[1] is more than three years old. In fact, the Debtors' Plan has been completely consummated and the Debtors' cases are all closed. Despite the obvious untimeliness of its Motion, Holdings asks this Court to re-write the plain language of the Plan and create a limitation on the amount the Trust can recover in the causes of action assigned to it under the Plan (as defined in the Plan, the "Assigned Causes of Action"). Holdings' not so thinly-veiled attempt to do an end run around the District Court overseeing the litigation between the Trust and the Onex Corporation defendants ought to be summarily denied for several reasons.

---

[1] The Plan was attached as tab 1 to the appendix to the Motion.

As an initial matter, this Court lacks jurisdiction to consider the Motion because Holdings lacks standing to bring it. Holdings has no standing here for two reasons: (1) Holdings no longer exists as a legal entity and thus has no right to bring a motion in this Court; and (2) assuming Holdings ever had standing because all former equity interest holders of the Debtors (that Holdings now purports to represent) already have received all they are entitled to under the Plan, they have no stake in these cases or in any dispute over how the Plan's provisions relating to the Trust are interpreted or enforced.

But even if the Court glosses over the lack of standing, the Motion should nonetheless be denied for several additional reasons. First, there is no basis for this Court to limit the damage recovery another Court might award to the Trust based upon the Plan because the Plan clearly granted the Trust the ability to pursue the Assigned Causes of Action to their fullest recovery. Second, Holdings has waived any ground for challenging the Plan and the order confirming the Plan (the "Confirmation Order")[2] because it failed to object to the confirmation of the Plan or to appeal the Confirmation Order. Accordingly, Holdings is barred by *res judicata* from raising such challenges. Third, as the Court found in the Confirmation Order, the Plan complied with the absolute priority rule because those unsecured creditors that opted to become beneficiaries of the Trust did not receive more than 100% of the value of their claims on the Plan's effective date by virtue of the Plan's uncapped grant of the Assigned Causes of Action to the Trust. Finally, because neither the Trustee nor the Official Committee of Unsecured Creditors of Magnatrax Corporation (the "Committee") made any representation that limits the Trust's recovery, Holdings' request that the Trust be judicially estopped from pursuing the Assigned Causes of Action in their full, uncapped amount is without merit.

---

[2] The Confirmation Order is attached as tab 2 to the appendix to the Motion.

# BACKGROUND

The above-captioned debtors (the "Debtors") were manufacturers and sellers of pre-engineered metal building and other diversified construction products and services.  Prior to their bankruptcies, and at the direction of Onex Corporation (the ultimate shareholder of the Debtors), the Debtors pursued a risky strategy of growth through leveraged buyouts (the "LBOs").  The LBOs were structured to give Onex Corporation the benefit of the Debtors' upside potential, as ultimate shareholders of the Debtors, while limiting its downside exposure by forcing the Debtors to repay the costs associated with those acquisitions.  As a result of the large debt-load incurred in the LBOs, the Debtors were unable to sustain their operations during the moderate downturn in the construction market in 2002.  (Disclosure Statement p. 41).[3]

On May 12, 2003, the Debtors filed for bankruptcy.  Thereafter, the United States Trustee appointed the Committee.  Consistent with its duties pursuant to 11 U.S.C. § 1103(c)(2), the Committee investigated potential causes of action relating to the LBOs and ultimately concluded that the Debtors' bankruptcy estates had valid causes of action against Onex Corporation and its affiliates, including Holdings.

To facilitate a reorganization, the Committee supported a plan that assigned the causes of action against Onex Corporation and its affiliates to a litigation trust for the benefit of those unsecured creditors that chose to become beneficiaries of the Trust.  Those beneficiaries agreed to have a portion of their distribution given to the Litigation Trust to fund its expenses.  This agreement served as the basis for the Plan, which, as confirmed by the Court, provides for: (i) the Debtors to enter into a trust agreement (the "Trust Agreement") creating the Trust (Plan § 4.21(c)), (ii) the Debtors to  transfer to the Trust any and all causes of action that the Debtors

---

[3] The Disclosure Statement is attached as tab 3 to the appendix to the Motion.

may have against Onex Corporation or its affiliates (Plan § 4.21(b)); and (iii) the Debtors to pay to the Trust a portion of the cash distribution that would otherwise have been due to those general unsecured creditors that opted to become beneficiaries of the Trust.  (Plan § 3.10(c).)

The Plan also provided for the treatment of the Debtors' equity interest holders.  Pursuant to the Plan, "[o]n the Effective Date, all Magnatrax Equity Interests … shall be deemed cancelled and extinguished, and the holder(s) of Magnatrax Equity Interests will not receive any Distribution, or be entitled to retain any property or interest in property, on account of such Magnatrax Equity Interests."  (Plan § 3.16.)  On November 17, 2003, the Plan was confirmed. (Docket No. 694.)  On January 8, 2004, the Debtors established the Trust by executing the Trust Agreement.  (Trust Agreement p. 1.)  On January 20, 2004, the Plan became effective.  (Notice of Effective Date of Plan, Docket No. 847.)

Both the Plan and Trust Agreement describe the rights transferred to the Trust.  The Plan directed that, "[o]n the Effective Date, the Magnatrax Debtors shall irrevocably transfer the Assigned Causes of Action to the Litigation Trust, for and on behalf of the Trust Beneficiaries." (Plan § 4.21(b).)  The Assigned Causes of Action are defined to include "*all* right, title and interest of the Magnatrax Debtors and the Reorganized Magnatrax Debtors to pursue, litigate, settle or otherwise resolve *any Cause of Action* against Onex Corporation or any Onex Affiliate …."  (Plan § 1.20) (emphasis added).  The Plan defined Cause of Action as:

> without limitation, *any and all* actions, causes of actions, liabilities, obligations, suits, debts, indebtedness (for borrowed money or in the nature of a guarantee), dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, trespasses, damages, rights, executions, claims (as that term is defined in section 101(5) of the Bankruptcy Code), objections to claims, judgments and demands whatsoever, *whether known or unknown*, choate or inchoate, existing or hereafter arising, *suspected or unsuspected*, in law, equity or otherwise.

(Plan § 1.31) (emphasis added).

The Trust Agreement provided that "the Magnatrax Debtors hereby irrevocably transfer to the Litigation Trust … *all* the right, title and interests of the Magnatrax Debtors in the Litigation Trust Assets, to have and to hold unto the Litigation Trust and its successors and assigns forever." (Trust Agreement § 2.2.)  The Trust Agreement defined the Trust Assets to include the Assigned Causes of Action, as that term was defined by the Plan.  (Trust Agreement § 1.1, Plan § 1.86.)  Furthermore, the Trust Agreement declared that the primary purpose of the Trust is "maximizing the value of the Litigation Trust Assets for distribution … to Trust Beneficiaries."  (Trust Agreement § 2.3.)

This uncapped grant[4] to the Trust of all the Debtors' causes of action against Onex Corporation and its affiliates was clearly what the Debtors and Committee intended and communicated to all parties-in-interest, including Holdings.  As Debtors' counsel explained at the Plan's confirmation hearing:

> [I]n a spirit of compromise, to allow this case to move forward to confirmation on a consensual basis, the parties agreed … there would be certain causes of action … transferred to a litigation trust to be controlled by the litigation trustee who would be nominated by the Creditors' Committee.  And that that litigation trust would be financed by the creditors.  That if they felt there was a cause of action worth pursuing or that they -- if they were willing to contribute approximately 25 percent, roughly, of their distribution to this trust, that they would get the benefit of *whatever* this trust would produce.

(Confirmation Hearing Transcript ¶ 68-69) (emphasis added).[5]

Similarly, the Debtors' disclosure statement (the "Disclosure Statement") provided that "the Litigation Trust is being formed to pursue the Assigned Causes of Action, which represent

---

[4] The only limitation placed on the Trust's ability to pursue the Assigned Causes of Action found in the Confirmation Order, the Plan, the Trust Agreement, or the Disclosure Statement was that the Trust could not recover from parties released by the Plan.  (Plan § 4.21(f).)

[5] The Confirmation Hearing Transcript is attached as tab 7 to the appendix to the Motion.

the rights of the Debtors to pursue and litigate *any* claims against Onex and the Onex Affiliates."

(Disclosure Statement p. 97) (emphasis added).  The Disclosure Statement further provided that:

> The Litigation Trustee will have full authority to take any steps necessary to administer the Litigation Trust Agreement, including, without limitation, the duty and obligation to liquidate Litigation Trust Assets, transfer, sell, dispose of or otherwise resolve or compromise the Litigation Trust Assets, to make distributions therefrom to the Trust Beneficiaries, to pursue and settle any of the rights and claims with respect to the Litigation Trust Assets[.]"

(*Id.* at 103), and, that:

> On the Effective Date, the Magnatrax Debtors will irrevocably transfer to the Litigation Trust, for and on behalf of the Trust Beneficiaries, all of the Magnatrax Debtors' and the Reorganized Magnatrax Debtors' rights and standing to litigate, settle and otherwise resolve the Assigned Causes of Action.

(*Id.* at 104.)

Finally, in its Confirmation Order, this Court reiterated the expansive nature of the Assigned Causes of Action to be transferred to the Trust, stating:

> "[O]n the Effective Date, the Reorganized Magnatrax Debtors will transfer and assign, or cause to be transferred and assigned, to the Litigation Trust, *all their right, title and interest* in and to the Assigned Causes of Action.  The transfers of the Assigned Causes of Action by the Debtors to the Litigation Trust … (a) are or shall be legal, valid and effective transfers of the Assigned Causes of Action, (b) vest or shall vest the Litigation Trust with good title to such Assigned Causes of Action free and clear of all Liens, charges, Claims or encumbrances except as expressly provided in the Plan or this Confirmation Order …."

(Confirmation Order ¶ 7) (emphasis added).

## ARGUMENT

## I.    Holdings Lacks Standing To Seek The Relief Set Forth In The Motion.

This Court should not reach the merits of Holdings' Motion because Holdings does not have standing to bring the Motion for two reasons:  (i) Holdings is not a legal entity, and (ii) if it ever had any interest in these cases, those interests have been extinguished under the Plan.

Holdings was a Delaware limited liability company.  Delaware law provides that "[a] limited liability company formed under this chapter shall be a separate legal entity, the existence of which as a separate legal entity shall continue until cancellation of the limited liability company's certificate of formation."  Del Code Ann. tit. 6 § 18-201.  On December 13, 2002, Holdings filed with the Delaware Secretary of State a certificate of cancellation, canceling its certificate of formation and terminating its existence as a legal entity.  *See* Exhibit A hereto; *see also* Exhibit B (reflecting Holdings' status as a cancelled LLC).[6]  Holdings cancelled its status as a Delaware limited liability company prior to the filing of these cases.  It was not a legal entity at the commencement of the Debtors' bankruptcy and is not a legal entity now.  Because it is not a legal entity, Holdings cannot appear before this Court and bring the instant Motion.  *Olympic Coast Inv., Inc. v. Seipel*, No. 05-36170 , 2006 WL 3431874, *1 (9th Cir. November 29, 2006) ("It is fundamental that a suit brought in the name of that which is not a legal entity is a mere nullity."); *In re Midpoint Development, L.L.C.*, 466 F.3d 1201 (10th Cir. 2006) (where purported debtor, an Oklahoma limited liability company, did not file for Chapter 11 relief until after it had ceased to be a legal entity, its bankruptcy filing was a nullity and subject to dismissal).  Accordingly, the Court should find that Holdings does not have standing and deny the Motion.

Even if Holdings could legally bring the Motion, it still would not have standing to bring this Motion because the adjudication of the Motion, regardless of how the Court rules, will not disturb any of Holdings' rights under the Plan.  "Although bankruptcy courts are not Article III courts, they enforce constitutional limitations on standing."  *In re Tascosa Petroleum Corp.*, 196 B.R. 856, 863 n.5 (D. Kan. 1996); 7 Collier on Bankruptcy § 1109.04[4][a] (Alen N. Resnick &

---

[6]  The Trustee discovered the dissolution and cancellation of Holdings after unsuccessfully attempting to serve Holdings with a summons.  Despite Onex Corporation's active involvement in these cases, and the specific reference to Holdings in the Plan, to the best of the Trustee knowledge, Holdings never informed this Court of its dissolved and cancelled status.

Henry J. Sommer eds., 15th ed. 2004) ("[E]ven though section 1109(b) might appear to confer standing on any party in interest in any proceeding in a case, the section cannot be construed in a manner that would violate Article III's case or controversy requirement.").  As the Supreme Court explained, Article III's standing requirements have been reduced to three elements:

> First, the plaintiff must have suffered an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In this case, Holdings argues that "[a]bsent an order enforcing the Plan, pursuit of the Trust Beneficiaries' hoped-for litigation recoveries would trample upon the rights of Onex Holdings and other equity holders in flagrant violation of the Bankruptcy Code, the Confirmation Order and the Plan."  (Motion ¶ 32.)  That argument is absurd.  No possible ruling on the Motion could effect Holdings' rights as a former equity interest holder of the Debtors.[7]  The Plan provides that "[o]n the Effective Date, all Magnatrax Equity Interests … shall be deemed cancelled and extinguished, and the holder(s) of Magnatrax Equity Interests will not receive any Distribution, or be entitled to retain any property or interest in property, on account of such Magnatrax Equity Interests."  (Plan § 3.16.)  The Plan's effective date was January 17, 2004, and

---

[7] Arguably, Holdings was not an equity interest holder of the Debtors during these cases given that it did not legally exist and could not, therefore, own any property.  Del. Code Ann. tit. 6 §§ 18-203, 18-804(a) (providing that the cancellation of an LLC requires the distribution of all of the LLC's assets).  When it existed, Holdings was, however, an affiliate of Onex Corporation (Plan § 1.110) and the Trustee assumes that Onex Corporation, which is a defendant in the Trust's pending District Court action, is the real movant here.  The fact that Onex Corporation might like this Court to create a defense for it which does not presently exist, however, is not a legally-cognizable right or interest sufficient to create standing for its shill, the now-defunct Holdings.

Holdings' equity interest, if any, in the Debtors has been extinguished. Holdings no longer has any rights against the Debtors or the Debtors' estates. As a result, even if the Motion were granted, Holdings would not, and could not, receive any benefit. The only result would be to reduce recoveries to the creditors that hold beneficial interests in the Trust, and Holdings is not one of those creditors.

On the other hand, if the Motion is denied, Holdings would not be injured in any way, as its interests have long been extinguished. Indeed, it is quite telling that Holdings does not ask to have the beneficiaries of the Trust expanded to include additional creditors or equity holders. Instead, it asks that the existing beneficiaries' rights to recovery be reduced. This interesting request underscores what the real purpose of this motion is -- to provide a defense to Holdings' former affiliate, Onex Corporation -- but it also underscores why Holdings has no standing here.[8] Because (i) old equity holders' rights have been extinguished and they have no interest in the Trust; (ii) they will not suffer any injury if the Trust is allowed to pursue the Assigned Causes of Action in their uncapped amount; and (iii) any alleged injury cannot be redressed by granting the relief requested in the Motion, Holdings lacks Article III standing to bring the Motion and the Motion should be denied.[9]

## II.  If Granted, The Motion Would Require The Court To Enforce The Plan Contrary To Its Plain Language.

---

[8] This Court also lacks subject matter jurisdiction to rule on the Motion. As the court held in *In re Commercial Loan Corp.*, No. 06 A 1530, 2007 WL 756382, at * 5 (March 14, 2007), once an estate asset is transferred to a post-confirmation trust, that asset is no longer property of the estate and subject to the jurisdiction of the bankruptcy court.

[9] It is noteworthy that when the Trust moved to extend its existence, Onex Corporation objected and as this Court noted in overruling that objection, Onex Corporation had no standing to object to the administration of the Trust. *See* Transcript of 10/19/06 Hearing at 6 (attached hereto as Exhibit C). The pending Motion ought to be denied on the same grounds.

The Motion should be denied because granting the Motion would require the Court to interpret the Plan contrary to its plain language.   The Plan, the Confirmation Order, and the Disclosure Statement all provide that, in cases of any discrepancies, the Plan's terms shall govern.   (Plan § 11.19, Confirmation Order ¶ 46, Disclosure Statement p. iii.)   As a general principal, Chapter 11 plans are subject to interpretation "according to the rules governing the interpretation of contracts."   *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004).   Here, the Plan specifically provided that "the rights, duties and obligations arising under the Plan shall be governed by, and *construed and enforced* in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof."   (Plan § 11.11) (emphasis added).

Under Delaware law,

When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning."   *E.g., Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).   Only where the contract's language is susceptible of more than one reasonable interpretation may a court look to parol evidence; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.   *E.g., Citadel Holding Corp., v. Roven*, 603 A.2d 818, 822 (Del. 1992); *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc*., 702 A.2d 1228, 1232 (Del. 1997).

In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning.   *E.g., Lorillard Tobacco Co. v. Am. Legacy Found*., 903 A.2d 728, 739 (Del. 2006). Absent some ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it.   *Id.*   When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties to which the parties had not assented.   *Id.*

*Allied Capital Corp. v. GC-Sun Holdings, L.P*., 910 A.2d 1020, 1030 (Del. Ch. 2006).

In this case, the Plan is clear, and Holdings has failed to identify any ambiguity. Acknowledging the Plan's clarity on this issue, Holdings tellingly did not cite to the Plan's language granting the Trust the right to pursue the Assigned Causes of Action.   The Plan's

language granting the Assigned Causes of Action to the Trust is unambiguous and contains no limit to the amount of damages the Trust may seek.  The Plan provided that "the Magnatrax Debtors shall irrevocably transfer" "all right, title and interest of the Magnatrax Debtors and the Reorganized Magnatrax Debtors to pursue, litigate, settle or otherwise resolve" "any and all actions, causes of actions, … suits, … sums of money, … damages, … executions, … judgments and demands whatsoever, whether known or unknown, choate or inchoate, existing or hereafter arising, suspected or unsuspected, in law, equity or otherwise" "against Onex Corporation or any Onex Affiliate."  (Plan §§ 1.20, 1.31, 4.21(b) (substituting definitions in place of defined terms).)

Contrary to Holdings' allegations, the Plan did not limit the amount the Trust could seek as recovery on account of the Assigned Causes of Action.  (*See* Motion p. 14.)  Rather, the Plan grants the Trust the Debtors' rights to receive any and all sums of money, damages, executions, and judgments.  (Plan §§ 1.20, 1.31, 4.21(b).)  The Plan does not limit the recovery to the amount the Committee believed could be recovered at the Plan's confirmation hearing.  (*See* Motion p. 22.)  Instead, the Trust received rights to any and all known, unknown, suspected or unsuspected causes of action.  (Plan §§ 1.20, 1.31, 4.21(b).)

By its Motion, Holdings asks the Court to rewrite the Plan and insert a requirement that "under no circumstance may [the Trust] collect more than the aggregate amount of the Trust Beneficiaries' Allowed Claims."  (Motion p. 24.)  But if the Court were to grant this relief at this very late date, the Court would not be enforcing the plain language of the Plan, but contravening it.  Such an "interpretation" is contrary to the Plan's plain language, and in the absence of any ambiguity, is not permitted.

Moreover, to the extent that the Motion could be read to be a request to modify the terms of the Plan, that request would be untimely. It is well established that after a plan has been substantially consummated, a plan may no longer be modified. 11 U.S.C. § 1127(b). Here the plan not only has been substantially consummated, it has been completely consummated and the Debtors' cases are now closed. Thus, there is no basis at this late date for the Court to modify the Plan's language.

### III. Holdings' Challenges To The Plan's Plain Language Are Waived And Barred By The Doctrine Of *Res Judicata.*

While Holdings couched its Motion as a motion to enforce the provisions of the Plan, the Motion is actually a challenge to the Plan. But having failed to raise any objection to the Plan's plain language at the Confirmation Hearing, or to appeal the Confirmation Order, Holdings has now waived any right it might have previously held to challenge the Plan and its current challenge is barred by the doctrine of *res judicata.*

The case law is well established that "[i]f a [party] fails to protect its interests by timely objecting to a plan or appealing the confirmation order, the [party] is foreclosed from challenging any of the plan's provisions, even if such a provision is inconsistent with the Code." *Miller v. United States*, 363 F.3d 999, 1004 (9th Cir. 2004) (quoting *In re Pardee*, 193 F.3d 1083, 1086 (9th Cir. 1999)); *In re Andersen*, 179 F.3d 1253, 1258 -1259 (10th Cir. 1999) ("Absent timely appeal, the confirmed plan is *res judicata* and its terms are not subject to collateral attack. … Although the provision at issue did not comply with the [Bankruptcy] Code, it is now too late for [a party in interest] to make the argument that [it earlier] failed to timely raise."); *Donaldson v. Bernstein*, 104 F.3d 547, 554 (3rd Cir. 1997) ("It is true that 'a confirmation order is *res judicata* as to all issues decided or which could have been decided at the hearing on confirmation.'" (quoting *In re Szostek,* 886 F.2d 1405, 1408 (3d Cir. 1989)); *In re*

*Varat Enterprises, Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) ("[F]ederal courts have consistently applied *res judicata* principles to bar a party from asserting a legal position after failing, without reason, to object to the relevant proposed plan of reorganization or to appeal the confirmation order."); *see also In re Travelstead*, 227 B.R. 638, 653 (D. Md. 1998) (holding that party in interest had waived all objections to chapter 11 plan of confirmation on the basis of the absolute priority rule by failing to raise them prior to confirmation of the plan).

Onex Corporation was intimately involved with these cases, the Plan, and formation of the Trust. Through the course of these cases, Onex Corporation had six attorneys from two law firms appear on its behalf. Onex Corporation filed an objection to an early version of the Disclosure Statement (Docket No. 427), and was permitted to include five pages of comments in the Disclosure Statement specifically dealing with the formation of the Trust and the Assigned Causes of Action, which is a greater volume than the Debtors or Committee devoted to the subject. (Disclosure Statement pp. 5, 6, 99-102). Not once did Onex Corporation (or Holdings for that matter) argue that the Assigned Causes of Action must be capped in order to comply with the absolute priority rule. Given Onex Corporation's intimate involvement in the bankruptcy and its failure to object to or appeal from the confirmation of the Plan, Holdings has waived any challenge to the Plan's propriety, and *res judicata* prevents Holdings' current collateral attack on the Plan and the Confirmation Order.

## IV. The Uncapped Grant Of The Assigned Causes Of Action Does Not Violate The Absolute Priority Rule.

Even if Holdings' collateral attack on the confirmed Plan were timely and not barred by the doctrine of *res judicata*, it would still fail as the Plan does not violate the absolute priority rule. The premise of Holdings' argument is that the Trust must be limited to a recovery equal to the claims of the creditors that received beneficial interests in the Trust because if the Trust's

recovery is not so limited these creditors will receive more than the amount of their claims, in violation of the absolute priority rule. (Motion ¶ 39) The fundamental problem with Holdings' argument, however, is that the each of the creditors that opted into the Trust have already received their distributions under the Plan -- a distribution of a percentage of the beneficial ownership in the Trust. *Cf. Commercial Loan Corp.*, 2007 WL 756382, at *5. Under the Code, that distribution had to be valued "as of the effective date of the plan," and not some later future date when the Trust might recover from the Defendants in the pending action. 11 U.S.C. §§ 1129(b)(2)(B)(i) & (2)(C)(i); *see also* H.R. Rep. No. 95-595, 95th Cong., 1st Sess., at 415-16 (1997) (advising that to comply with section 1129(b) of the Bankruptcy Code "the holder of an unsecured claim is not permitted to receive property of a value as of the effective date of the plan on account of such claim that is greater than the allowed amount of such claim").

Indeed, requiring that distributions under a plan be valued as of the effective date keeps the bankruptcy court from having to value property distributed to creditors throughout the property's entire future existence and recognizes that the value of some types of property will appreciate or fluctuate in value. For example, many chapter 11 plans, including this Plan, result in new equity being issued to senior classes. Holdings' method of waiting until property appreciates and then claiming such appreciation causes the plan post-effective date to violate the absolute-priority rule would make such stock plans unworkable. Indeed, granting the Motion could result in Holdings (or unsecured creditors) having the right to demand that the Plan's Class 6 Claimants return a portion of their stock should its value exceed the amount of the Class 6 Claimants' allowed claim.

Indeed, nowhere in its Motion has Holdings attempted to value the Assigned Causes of Action *as of the effective date* of the Plan. To undertake such a valuation requires the

recognition that the Assigned Causes of Action were (and currently are) merely unliquidated claims entirely dependant upon a future successful judgment or settlement and collection and, as such, are contingent assets.  In determining the present value of contingent assets, like the valuation of contingent liabilities, the potential future asset must be discounted to account for the possibility that the future contingency may never occur.  *In re Total Technical Services, Inc.*, 150 B.R. 893, 900-01 (Bankr. D. Del. 1993) ("The court will determine the fair value of Services' assets within a realistic framework, and a contingent liability or asset will be discounted according to the validity and collectibility of the liability."); *In re Taylor*, 228 B.R. 491, 502 (Bankr. M.D. Ga. 1998) (in determining the value of contingent assets and liabilities "the value of such assets or liabilities must be reduced to present value based on the likelihood that the contingency will occur.").  The following explanation from the Seventh Circuit regarding the valuation of contingent liabilities equally applies to the valuation of contingent assets.

> There is a compelling reason not to value contingent liabilities on the balance sheet at their face amounts, even if that would be possible to do because the liability, despite being contingent, is for a specified amount (that is, even if there is no uncertainty about what the firm will owe *if* the contingency materializes). By definition, a contingent liability is not certain- and often is highly unlikely-ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real.

*In re Xonics Photochemical, Inc.,* 841 F.2d 198, 200 (7th Cir.1988) (emphasis in original).  *See also F.D.I.C. v. Bell,* 106 F.3d 258, 264 (8th Cir. 1997) ("To correctly value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real."); *In re Chase & Sanborn Corp.,* 904 F.2d 588, 594 (11th Cir. 1990) ("It is well established, however, that a contingent liability cannot be valued at its potential face amount; rather, it is necessary to discount it by the probability that the contingency will occur and the liability become real."); *In re Davis*, 169 B.R. 285, 302 (E.D.N.Y. 1994) ("In order to

value a contingent liability, a bankruptcy court must determine the likelihood that the contingency will occur, and multiply the total debt guaranteed by that probability."); *In re WRT Energy Corp.*, 282 B.R. 343, 400 (Bankr. W.D. La. 2001) ("The court concludes that the fair value of a contingent liability is properly determined by multiplying total debt guaranteed by the probability that the debtor would be required to make good on the guarantee.").

In valuing causes of action, courts must consider the likelihood of success, the amount of the potential judgment if successful, and the collectibility of such a judgment. *See, e.g., In re Apex Automotive Warehouse, L.P.*, 238 B.R. 758, 771-72 (Bankr. N.D. Ill. 1999). Furthermore, in valuing property as of a date that has already occurred, courts should not use hindsight because information unknown until later would not affect a property's value on the valuation date. *In re WRT Energy Corp.*, 282 B.R. 343, 400 (Bankr. W.D. La. 2001) ("The court further concludes that this evaluation must be made as of the date of the valuation and without the benefit of hindsight.").

In this case, as this Court found in the Confirmation Order, the Plan was fair and equitable to rejecting classes of interest holders as required by 11 U.S.C. § 1129(b)(1). To the extent that such a holding required the Court implicitly to find that the transfer of the Assigned Causes of Action would not result in unsecured creditors receiving, as of the Plan's effective date, more the 100% of the value of their claims as Holdings argued (Motion pp. 19-20), such a holding was well supported given the unknown scope of the potential causes of action against Onex Corporation and its affiliates.

In fact, according to Onex Corporation's own representations included in the Disclosure Statement, the Assigned Causes of Action were worthless on the Plan's effective date. Onex Corporation stated:

(i) Onex adamantly denies any and all allegations that it is liable in any way whatsoever to the [Magnatrax] Debtors' estates or to creditors or interest holders in the [Magnatrax] Debtors' chapter 11 cases, (ii) Onex declines to provide any for111 of payment under the Plan or otherwise, in respect of any such purported claims, (iii) Onex reiterates that it will vigorously defend against any claims by the Creditors' Committee (or anyone else) arising out of the unfortunate economic circumstances that led to these chapter 11 filings, and (iv) Onex expressly reserves all of its rights, claims and defenses in connection with any such purported claims, including its right to seek affirmative relief against any person that asserts claims that lack factual basis. *For these reasons, no value can he ascribed to the claims asserted by the Creditors' Committee, or to the Litigation Trust or its contemplated recoveries.*

…

*There is no basis for any recovery against Onex or the Onex Affiliates*, let alone the $8 million to $24 million range suggested by the Creditors' Committee.

(Disclosure Statement pp. 99-102) (emphasis added).    Furthermore, Onex Corporation specifically refuted several allegations that might have given rise to liability.  (*Id.*)

Though the Creditors' Committee took a more measured approach to the valuation of the Assigned Causes of Action, it still recognized their contingent nature.  Its statement included in the Disclosure Statement read:

The value of the claims against Onex and the Onex Affiliates is difficult to ascertain with any reasonably certainty because of the amount of discovery and investigation yet to be completed. *Based upon the limited discovery* obtained to date, the Creditors' Committee estimates that the gross amount of claims against Onex and the Onex Affiliates could range from approximately $8 million to approximately $24 million.  Of course, in light of the uncertainty and risks associated with litigation, the amount of the actual recovery on such claims is uncertain. Those Class 9 General Unsecured Creditors (other than a holder of an Insured Claim and a holder of a Senior Lender Deficiency Claim) who elect to fund the Trust will share in the recovery, if any, resulting from the contemplated litigation.

…

Ultimately, the Litigation Trustee will have to further review the potential causes of action and decide whether to commence litigation against Onex.

(Disclosure Statement pp. 98-99, 103 (emphasis added).)

In light of Onex Corporation's representation that the Assigned Causes of Action were worthless, and its intent on doggedly defending itself, the Court was justified in finding a lower probability, as of the Plan's effective date, of a recovery on the Assigned Causes of Action. Accordingly, the Court had ample support to find, by a preponderance of the evidence, *In re Armstrong World Industries, Inc.*, 348 B.R. 111, 120 (D. Del. 2006), that, given the chance of recovery, the value of the Assigned Causes of Action was such that no unsecured creditor was receiving more than 100% of the value of its claim as of the Plan's effective date by virtue of such creditor's receipt of a beneficial interest in the Trust.

## V.    The Trust Should Not Be Judicially Estopped From Pursuing The Assigned Causes of Action In Their Full, Uncapped Amount.

There is no basis for Holding's argument that the Trust should be judicially estopped from pursuing the Assigned Causes of Action in their full, uncapped amounts. In its Motion, Holdings cited several inapposite cases holding that debtors who fail to fully disclose causes of action as property of their bankruptcy estates are judicially estopped from pursuing such causes of action after their bankruptcy cases have concluded. Holdings interprets those inapplicable cases to support its incorrect conclusion that because the Committee allegedly failed to fully disclose the nature of the Assigned Causes of Action transferred to the Trust by the Debtor, the Trust and its beneficiaries are estopped from asserting the Debtors' Assigned Causes of Action to their fullest extent. Holdings is wrong on both the law and the facts.

The cases Holdings cites are based on the fact that prepetition causes of action are rightfully property of a debtor's bankruptcy estates, and that a debtor should not be able to cheat his or her estate out of its rightful property by failing to fully disclose such property during the bankruptcy case. *See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314 (3d Cir 2003); *Oneida Motor Freight, Inc. v. United Jersey Bank,* 848 F.2d 414 (3d Cir.

1988); *Rosenshein v. Kleban*, 918 F. Supp. 98 (S.D.N.Y. 1996); *In re Okan's Foods, Inc.*, 217 B.R. 739 (Bankr. E.D. Pa. 1998). Such cases are not dispositive here for several reasons. First, unlike those cases cited by Holdings, the Assigned Causes of Action in this case were not retained by the Debtors, but rather administered for the benefit of the Debtors' creditors under the Plan through distribution of the Assigned Causes of Action to the Trust. Second, the cited cases impose the disclosure requirement on the plan proponent, and neither the Committee nor the Trust nor the Trust's beneficiaries were proponents of the Plan. Thus, they had no disclosure obligations under the Plan and made no representations in the Plan or Disclosure Statement. *See generally* 11 U.S.C. § 1125. Furthermore, Holdings fails to cite to any cases where a party has been judicially estopped from pursuing a cause of action on account of a representation that the party did not itself make.

Finally, in alleging that "repeated representations were made to creditors, Onex Holdings and this Court that the Assigned Causes of Action were worth approximately $8 million to $24 million[,]" (*see* Motion at 22), Onex Holdings severely perverts the statements of the Creditors Committee. The Creditors' Committee fully explained that:

> [t]he value of the claims against Onex and the Onex Affiliates is difficult to ascertain with any reasonably certainty because of the amount of discovery and investigation yet to be completed. *Based upon the limited discovery* obtained to date, the Creditors' Committee estimates that the gross amount of claims against Onex and the Onex Affiliates could range from approximately $8 million to approximately $24 million. *Of course, in light of the uncertainty and risks associated with litigation, the amount of the actual recovery on such claims is uncertain.* Those Class 9 General Unsecured Creditors (other than a holder of an Insured Claim and a holder of a Senior Lender Deficiency Claim) who elect to fund the Trust will share in the recovery, if any, resulting from the contemplated litigation.
>
> …
>
> Ultimately, the Litigation Trustee will have to further review the potential causes of action and decide whether to commence litigation against Onex.

(Disclosure Statement pp. 98-99, 103 (emphasis added).)  The Committee repeatedly warned that it was providing only a rough estimate of the expected recovery based upon its limited discovery and that further investigation would be required by the Trustee.  Now Holdings, a party which when it was still actually in existence was intimately involved with the fraudulent LBOs and thus, possessed infinitely more information regarding Onex Corporation's potential liability than the Committee could ever have had, argues that they were deceived.  The Committee simply did not make the representations Holdings claimed were made, and the representations it did make clearly indicate that the Assigned Causes of Action had an uncertain value.  Such representations were true and do not provide any basis to limit the Trustee's recovery in Assigned Causes of Action.

To the extent Holdings' Motion can be read to be an attempt to revoke confirmation of the Plan, Holdings' Motion also is without merit.  The Code is clear that a confirmation order may be revoked "if and only if" the order was procured by fraud and the motion to revoke is made within 180 days after the entry of the confirmation order.  Apart from the lack of any fraud, Holdings' Motion is clearly untimely and therefore must be denied.  *See, e.g.*, *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 460 (7th Cir. 1988); *In re Genesis Health Ventures, Inc.*, 340 B.R. 729, 733-34 (D. Del. 2006).

## CONCLUSION

For all of the foregoing reasons, the Magnatrax Litigation Trust respectfully requests that

the Court deny the Motion and grant such further relief as is proper and just.

Dated:  March 20, 2007
       Wilmington, Delaware             CROSS & SIMON, LLC


                     By:   /s/ Christopher P. Simon
                         Christopher P. Simon (No. 3697)
                         913 North Market Street, 11th Floor
                         P.O. Box 1380
                         Wilmington, DE 19899-1380
                         (302) 777-4200
                         (302) 777-4224 Facsimile

                         -and-

                         Peter W. Ito, Esquire
                         BAKER & HOSTETLER LLP
                         303 East 17th Avenue, Suite 1100
                         Denver, CO 80203
                         (303) 861-0600

                         -and-

                         Catherine L. Steege
                         Joel T. Pelz
                         Peter A. Siddiqui
                         JENNER & BLOCK LLP
                         330 N. Wabash Avenue
                         Chicago, IL 60611
                         (312) 222-9350

                         *General Counsel for Richard M Kipperman,*
                         *Trustee of the Magnatrax Litigation Trust*

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .  Case No. (03-11402KG)
                                .
    MAGNATRAX CORPORATION,       .
                                .  824 North Market Street
                                .  Wilmington, DE  19801
                    Debtor.      .
                                .
                                .
                                .  April 13, 2007
. . . . . . . . . . . . . . ..  2:00 p.m.


TRANSCRIPT OF ORAL ARGUMENT
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:                 Cozen O'Connor
                                By:  JEFFREY R. WAXMAN, ESQ.
                                1201 N. Market Street, Suite 1400
                                Wilmington, DE  19801

                                Paul Weiss & Rifkind Wharton
                                 & Garrison
                                By:  ALAN W. KORNBERG, ESQ.
                                    MARIA T. VULLO, ESQ.
                                    STACEY SHORTALL, ESQ.
                                    JEREMY S. GLADSTONE, ESQ.
                                1285 Avenue of the Americas
                                New York, NY  10019




Audio Operator:                 Matt Yovino



Proceedings recorded by electronic sound recording, transcript
Produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

2

```
APPEARANCES:  (Cont.)

For the Trustee:            Jenner Block, LLP
                           By:  CATHERINE L. STEEGE, ESQ.
                                JOEL T. PELZ, ESQ.
                           333 N. Wabash Avenue
                           Chicago, IL,  60611-7603

                           Baker & Hostetler
                           By:  PETER W. ITO, ESQ.
                           303 East 17th Avenue
                           Suite 1100
                           Denver, CO  80203-1264
                           (Telephonic)

                           Cross & Simon
                           By:  CHRISTOPHER P. SIMON, ESQ.
                           913 North Market Street
                           11th Floor
                           Wilmington, DE,  19801

For Richard M. Kipperman:  By:  RICHARD M. KIPPERMAN, ESQ.
```

3

1           THE COURT:  Counsel, good afternoon.  Please be

2   seated.  Welcome, everyone, and we also have Mr. Ito on the

3   telephone, I believe.

4           MR. ITO:  Good afternoon, Your Honor, Peter Ito on

5   behalf of Richard M. Kipperman, Litigation Trustee.

6           THE COURT:  Yes.  Welcome, Mr. Ito.  Good afternoon,

7   Mr. Waxman.

8           MR. WAXMAN:  Good afternoon, Your Honor.  Your Honor,

9   there are three things on the agenda for today.  There is the

10  motion to reopen the case.

11          THE COURT:  Yes.

12          MR. WAXMAN:  And then, there is the motion to enforce

13  the plan.  And then, Your Honor, yesterday we filed a motion

14  for relief to file a supplemental reply.

15          THE COURT:  And that, of course, I'm granting.

16          MR. WAXMAN:  Thank you, Your Honor.

17          THE COURT:  My philosophy is I'd rather parties file

18  replies and put me at least at the advantage of knowing what

19  their arguments are going to be.  So, I'll be very liberal on

20  something like that, and I am granting that.

21          MR. WAXMAN:  Thank you, Your Honor.  Your Honor, to

22  my left is my co-counsel, starting with Alan Kornberg.

23          THE COURT:  Welcome.

24          MR. WAXMAN:  Maria Vullo.

25          THE COURT:  Hello.

4

1          MR. WAXMAN:  Jeremy Gladstone and Stacey Shortall.

2          THE COURT:  Yes.

3          MR. WAXMAN:  Mr. Kornberg will be handling the two

4  motions which are going to be addressed today.

5          THE COURT:  Thank you.

6          MR. WAXMAN:  So, with that, I'll turn it over.

7          THE COURT:  Thank you, Mr. Waxman.  Mr. Kornberg,

8  welcome.

9          MR. KORNBERG:  Good afternoon, Your Honor.  Thank

10  you.

11          THE COURT:  I have read these papers several times,

12  even most of the appendices.  And, let me just talk up front

13  about what my concern is and probably people won't be

14  surprised.  Why isn't this an advisory opinion at this point,

15  that you're seeking from the Court?  The thought being, if

16  there's no recovery then these issues don't even -- won't even

17  come before -- wouldn't even come before me for a decision.

18  And, that kind of is my thinking so I thought I would at least

19  alert the parties for where I am on the matters.

20          MR. KORNBERG:  Well, I appreciate that, Your Honor,

21  and --

22          THE COURT:  And, I'm not trying to foreclose your

23  arguments at all, or shortcut them, but at least you'll know

24  what's in the back of my mind.

25          MR. KORNBERG:  I understand, Your Honor.  I

5

1  appreciate that.  If we can start with the motion to reopen the

2  Chapter 11 case, Your Honor, I think that logically is the

3  first matter to be heard.  Obviously, we're here today to

4  reopen this Chapter 11 case for a very limited and specific

5  purpose and that is for the Court to hear and determine Onex's

6  motion for an order enforcing the Chapter 11 plan against the

7  litigation trust and the litigation trustee.

8           THE COURT:  Yes.

9           MR. KORNBERG:  Your Honor may recall that the Court

10 closed the cases of all of the affiliated debtors other than

11 Magnatrax Corporation by order dated June 23, 2006.  And, that

12 order is Exhibit 10 in our voluminous appendix.

13          THE COURT:  Yes.

14          MR. KORNBERG:  The Court thereafter closed the

15 Magnatrax Corporation case by order dated November 8, 2006 and

16 that appears as Exhibit 11.  Notably, in the November 8th order

17 the Court specifically provided that it would retain

18 jurisdiction, and this is a quote, "over any and all orders

19 entered in the reorganized debtors Chapter 11 case including

20 but not limited to the confirmation order."  That's in the

21 fourth decretal paragraph.  And, in the fifth decretal

22 paragraph the Court expressly retained jurisdiction over the

23 litigation trust, the litigation trust agreement, and the plan.

24 So, the Court has the power and the discretion to reopen these

25 Chapter 11 cases, not only because of this Court's prior

6

1  orders, but because Section 350(b) of the Bankruptcy Code says

2  it may do so for cause, and under Bankruptcy Rule 5010 a case

3  may be reopened by the debtor or another party in interest, and

4  Onex, of course, was a shareholder in the Chapter 11 case and

5  therefore has standing to seek to reopen the case.

6        The Third Circuit has made it clear that the decision

7  to reopen a Chapter 11 case is permitted to the discretion of

8  the Court, that's <u>In Re:  Zinchek</u> (sic).  And, that decision,

9  which is from 2005, makes clear also that the Court has broad

10 discretion in deciding whether to reopen the case.  And, if

11 there are similar proceedings pending elsewhere that case tells

12 us the Bankruptcy Court should make a determination as to which

13 is the most appropriate forum to adjudicate the issues raised

14 by the motion to reopen.  And, this may go to the concern that

15 Your Honor expressed at the outset that the reason that we are

16 here is that we want the confirmation order issued by this

17 Court to be enforced as written and to maintain the integrity

18 of what took place during the Chapter 11 case.

19        There can be no question that the Court retains the

20 power to enforce its own orders.  And that, of course, is what

21 we are seeking today.  But, in this case the Bankruptcy Court

22 specifically retained jurisdiction to determine exactly the

23 kind of controversy that we have present today.  I'll be

24 referring a lot to the Chapter 11 plan in this case.  That is

25 Exhibit 1 in our appendix.  And, in Article 10 which is the

1  Retention of Jurisdiction, there are a number of provisions

2  starting at Page 54.  Specifically, Your Honor, Article 10D, as

3  in David, provides that the Court retains exclusive

4  jurisdiction to "hear and determine any dispute arising under

5  the plan, arising under any of the plan documents" and plan

6  documents is defined to include the litigation trust agreement,

7  or the confirmation order, or the interpretation,

8  implementation, or enforcement of the plan in any of the plan

9  documents and the confirmation order.  Yet under Article 10I at

10 Page 55 the Court retains jurisdiction to restrain interference

11 by any person with the implementation or enforcement of the

12 plan, the confirmation order, or any other order of the

13 Bankruptcy Court.  In Article 10J, to issue such orders as may

14 be necessary or appropriate to construe, enforce, implement,

15 execute, and consummate the plan, or maintain the integrity of

16 the plan following the consummation.

17        And, Your Honor, the confirmation order itself, which

18 is Exhibit 2, in Decretal Paragraph 5 on Page 21 provides that

19 the Court retain exclusive jurisdiction over all matters

20 relating to, leaving out some text, but includes the plan,

21 including those specified in Article 10 of the plan.  And,

22 those are the provisions that we just went through a moment

23 ago.

24        As was the case in Zinchek, the Bankruptcy Court is

25 well suited to provide the best interpretation of its own

8

1  order.  And, not surprisingly, many other cases observed that

2  the Bankruptcy Court is the best Court to determine the meaning

3  of its own confirmation order.  Even though we have litigation

4  pending in the District Court, and Your Honor is quite right,

5  that is the Court that will determine if there's any liability.

6  On a related question concerning the trustee's standing as a

7  representative of the estate, which was litigated there, the

8  District Court recognized that the amount of damages

9  recoverable by the litigation trustee rested upon, "Bankruptcy

10 principles."  And, Your Honor, we submit that this is the best

11 Court to determine and elucidate those principles, particularly

12 because they turn on interpretation and implementation of the

13 Bankruptcy Code's cram down powers, which very much were at

14 stake and at issue in the confirmation.

15       THE COURT:  Now, I understood though when he was

16 talking about Bankruptcy principles that he was talking more

17 about the substantive law as opposed to if you -- well, not

18 that is -- I'm not suggesting that this is simply procedural,

19 your issue, but that he wasn't talking about the principles of

20 the confirmation plan, or the plan of confirmation, or this

21 Court's order, that he was talking about, you know, the

22 substance surrounding the lawsuit before him.

23       MR. KORNBERG:  No, Your Honor, I think the question

24 was the question whether the trustee can recover more than that

25 which was owed to unsecured creditors was the issue.  And, we

1  read that language and I think it's clearly intended to go to

2  this very issue, which is under Bankruptcy Law principles, and

3  frankly, I mean, the Bankruptcy Law principles as they were

4  applied in this case, can creditors recover in a Chapter 11

5  case 50 times what they were owed when they went into the

6  Bankruptcy case?  And, Your Honor, the best Court to determine

7  the cram down principles, the best Court to determine how those

8  principles were played out in this case is this Court.  And,

9  that is one of the reasons this Court, as any Court would do,

10 would retain jurisdiction to determine the effect of its own

11 confirmation order.

12        And, Your Honor, I would submit that the trustee

13 himself has recognized that this is the appropriate Court in

14 which to resolve issues relating to the litigation trust.  As

15 Your Honor may recall, the trustee filed on November 1, 2006,

16 not all that long ago, a motion which he ultimately chose not

17 to pursue to expand the litigation trust agreement so that all

18 unsecured creditors, not just the opt ins, could benefit from

19 any recoveries he sought in the Georgia litigation.

20 Implicating some of the same issues, frankly, that are before

21 the Court today.  So, I think the trustee's recognized that

22 these are the sorts of issues that this Court, which confirmed

23 the plan and is in the best position to interpret its meaning,

24 is the right Court.

25        With respect to the objections that the trustee has

1  lodged to reopening the case.  First, he argues that Onex does

2  not have standing.  And, we believe mistakenly relies on the

3  case of In Re: Alpex Computer Corp., that's A-l-p-e-x.  It's a

4  Tenth Circuit decision from 1995.  In that case a patent

5  infringer who's a defendant in litigation, but that was not a

6  party to the Chapter 11 case, was not a party in interest,

7  wanted the case reopened to promote a particular construction

8  of the Chapter 11 plan.  Very different circumstances.  Here,

9  Onex has standing because it was a shareholder.  Indeed, as

10  described in Footnote 3 of Onex's substantive motion it

11  invested more than 117 million dollars in cash in these

12  debtors.  The plan completely wiped out that investment relying

13  upon cram down powers, and it's not credible to argue that Onex

14  doesn't have standing to make sure that those cram down

15  protections that the law provides to it are enforced.  The

16  trustee also mistakenly relies on In Re: Commercial Loan

17  Corporation.  Thereto, the defendant, the unlucky law firm, was

18  a stranger to the Bankruptcy case.  It was not a creditor, it

19  did not represent the debtor, it was simply not a party in

20  interest.  And so, the Court was reluctant to permit a stranger

21  to the Bankruptcy case to come back after the fact and reopen

22  it for their own purposes.  And, in that case also the Court

23  acknowledged that unlike the Third Circuit the Seventh Circuit

24  did not have post-confirmation jurisdiction to consider the

25  claims at issue because of the constricted interpretation

11

1 related to jurisdiction employed by the Seventh Circuit.

2        And, finally, the trustee makes an argument that Onex

3 American Holdings, the name of the movant here, filed a

4 certificate of dissolution and therefore it has no standing.

5 Well, that certainly did not stop the trustee from suing Onex

6 American Holdings for 600 million dollars in Georgia.  And,

7 anyway, it's irrelevant because under Delaware liability law,

8 of course, the assets of that entity are distributed to its

9 members, in this case Onex Corporation, I think the trustee

10 refers to that himself in his papers.  And, in any event, if

11 there is any doubt about standing we have four unlucky

12 employees, Messrs. Schwartz, Hilson, Wright, and Gauvin, who

13 are individual shareholders, therefore parties in interest in

14 the Chapter 11 case.  And, not only did they lose their stock

15 as well, but they are named defendants in the trustee's action.

16        In sum, Your Honor, we would urge the Court to

17 exercise its discretion to reopen the case to hear these

18 important issues.  Your Honor is the best suited to interpret

19 the confirmation order and the plan.  The plan and the

20 confirmation order specifically reserved jurisdiction for those

21 purposes.  Onex was a party in interest in the Chapter 11 case,

22 with standing to invoke Your Honor's jurisdiction.  And, as we

23 will describe in the main motion to be heard before the Court

24 today, we need your assistance to maintain the integrity of the

25 Chapter 11 plan and the confirmation order.  There are

12

1  important issues at stake concerning the disclosures made to

2  the Court during confirmation, upon which Onex, other parties,

3  and the Court relied, and we'd like Your Honor to compare that

4  to the trustee's inconsistent positions now taken in the action

5  he brought against Onex and others in Georgia.  So, for those

6  reasons we would respectfully request that Your Honor reopen

7  the case for the limited purpose we seek.

8          THE COURT:  Thank you, Mr. Kornberg.  Mr. Ward.

9          UNIDENTIFIED ATTORNEY:  Simon.

10          THE COURT:  Mr. Simon, forgive me.

11          MR. SIMON:  That's okay, I used to work with Mr.

12  Ward, Your Honor, he's much better looking than I am.

13          THE COURT:  That's right.  No, not true.

14          MR. SIMON:  Your Honor, --

15          THE COURT:  He's (indiscernible) and he's a lot

16  older.

17          MR. SIMON:  Your Honor, it's good to see you.  At

18  this time I want to see the podium to Ms. Steege.

19          THE COURT:  Thank you.

20          MR. SIMON:  Thank you.

21          THE COURT:  And, is that pronounced Steege?

22          MS. STEEGE:  Steege, Your Honor.

23          THE COURT:  Steege.  Welcome, Ms. Steege.

24          MS. STEEGE:  Thank you, Your Honor.

25          THE COURT:  Now, just as I kind of announced where my

13

1  thinking was on the -- I suppose the advisory opinion aspect, I

2  have to tell you that depending upon where we get on the second

3  motion, I think that there's an awfully valid reason for this

4  Court to be deciding the ultimate issues, should they come

5  before me when it's appropriate, and I'm not saying that's not

6  right now, but at such time as it's appropriate, this Court

7  ought to be enforcing its confirmation order, and interpreting

8  it it seems to me as opposed to a District Court in Georgia.

9       MS. STEEGE:  Your Honor, we don't disagree that the

10 Court would be the Court to enforce the confirmation order, if

11 that's what this motion's are about.  That's not really what

12 they're about.  What we think the main event about, their main

13 motion about, is seeking to ask you to revoke the confirmation

14 order that the Bankruptcy Court entered three plus years ago.

15 With respect to the motion to reopen the case, the first

16 question any Federal Court has to ask itself, obviously, is if

17 it has jurisdiction to hear on that.  And, notwithstanding the

18 laundry list of retention of jurisdiction provisions found in

19 the plan and in the Court's confirmation order, the case law is

20 clear that those provisions don't create jurisdiction if it

21 doesn't otherwise exist in connection with the underlying

22 dispute.  The Court can't write its own jurisdictional ticket

23 is how I think the Appellate Courts referred to that.

24      And, here, I think there's two independent reasons

25 why this Court should not be reopening this case, because there

14

1  isn't cause, because there isn't jurisdiction at this

2  particular point in time for Your Honor to get into these

3  issues.  And, as Your Honor correctly pointed out, you may

4  never get there.  We certainly hope you do, we certainly hope

5  that there is 600 million dollars to fight over, but we're not

6  there yet.  And, the first reason is the reason that Your Honor

7  stated, as a Federal Court you can't issue advisory opinions.

8  Now, you have to ask yourself, if this Court was the Court to

9  decide that issue in the first place, the Onex defendants

10  raised the issue of the cap on damages and how it intersected

11  with fraudulent conveyance law of this Court's confirmation

12  order, and the like.  They raised that in the first instance in

13  the Georgia Court.  And, the Georgia District Court said, "I'm

14  going to deal with that when and if it's appropriate to deal

15  with a damage award."  And, I would agree with Your Honor that

16  his statement about Bankruptcy principles was dealing with

17  things like principles under Section 548 and 547, and Section

18  550 of the Recovery Provisions, and how he might deal with

19  those things.  But, he correctly I think recognized that that

20  wasn't really an issue that was to be decided on a motion to

21  dismiss and to be decided at that point before liability was

22  determined.  So, I think coming here after the fact I think

23  creates -- if connote's (sic) the correct word when you're

24  dealing with two Federal Courts, it creates a real question

25  about why they had moved the dispute to another forum, and I

15

think that's inappropriate, out of a matter of respect between
the two sister Courts.  But, in addition, I think it also
raises the point that Your Honor made which is that they're
seeking an advisory opinion at this juncture in the litigation.

I also think that there is a serious question about
the standing of Onex American Holding to file this motion.
Onex American Holding is a party that has filed this motion.
It's not just generally Onex, all four individual directors
that we sued.  They're not here today.  It's Onex American
Holding.  And, the starting point to figure out who can bring a
motion to reopen a case is Rule 5010 of the Federal Rules of
Bankruptcy Procedure.  And, that rule states that a debtor has
a right to seek to reopen a case.  The debtor is not here
asking that this case be reopened, has not joined in this
motion.  And, it indicates that a party in interest may seek to
reopen a case.  Typically, and that Tenth Circuit case that we
cite in our responsive papers talks about the fact that
generally a party in interest is a creditor who has some
dispute that comes up after confirmation that needs to be
addressed with respect to the debtor's Bankruptcy.  They say,
well, they have standing because they were shareholders.  Well,
Onex American Holding dissolved in December of 2002.  They
don't dispute that.  Under Delaware Limited Liability Law,
Section 18203, because they did not condition the effectiveness
of this dissolution on a later date or a later event it was

16

1 gone.  So, it was not a shareholder as of the petition date.

2 It was never a party in interest in these Bankruptcy

3 proceedings.

4        Now, maybe members of that entity somehow succeeded

5 to the equity interests but those members are not here and we

6 don't really have any evidentiary base.  They say it's Onex

7 Corporation, I don't know that for a fact, I speculate it is

8 somebody within the Onex family.  But, I don't know and I

9 haven't seen the papers.  We discovered this dissolution quite

10 after the fact after we had named them out as party, and after

11 they had appeared on their behalf without raising the issue, we

12 then found out about it through some documents that were as I

13 understand it produced in discovery.  So, that entity never

14 existed, wasn't a party in interest at the start of the

15 Bankruptcy case.

16        So then, they say, well, okay, let's just ignore all

17 that and pretend somebody else filed this motion.  We don't

18 think Your Honor should do that, we think that's inappropriate,

19 particularly given the other jurisdictional issues.  But, if

20 Your Honor was to do that and say, "Okay, we'll pretend that

21 this was Onex Corporation that filed this motion or one of the

22 individuals who had some money or equity interest they say at

23 the time of the filing of the Bankruptcy," although I will

24 note, Your Honor, with respect to those four individuals they

25 were not disclosed as shareholders of Magnatrax Corporation on

17

1  the initial filing listing who were the shareholders.  The

2  shareholders were listed as Onex American Holdings, a CIBC

3  entity, and then a teacher's pension fund out of Ontario.  But,

4  in any event, if we pretend they're here, they're no longer

5  here as shareholders, Your Honor.  The Court confirmed a plan

6  that became effective on January 20th of 2004 that extinguished

7  the interests of all shareholders of Magnatrax Corporation.

8  So, they are no longer today an equity holder in this case.

9  So, they can't rest their standing on the status that they no

10  longer had.  And, just parenthetically, in the Bankruptcy --

11  pardon me, in the District Court, when we have pointed out that

12  they were actually the parties managing Onex, they were the

13  sponsors of Onex, they had, you know, claimed that they had

14  nothing to do with it, they weren't really involved.  So, I

15  mean it's interesting that they're taking a different position

16  here.

17          So, if they don't have standing as an equity holder,

18  which I don't think they do, then they must be resting their

19  standing on the fact that they're a defendant in this lawsuit

20  that's pending in Georgia.  And, that's where I think the Tenth

21  Circuit case that we cite, the <u>Alpex Computer</u> case, comes into

22  play.  Because there the effects of that case were that the

23  defendant in a lawsuit was coming into Bankruptcy Court and

24  saying, "Since the disclosure statement described these patent

25  infringement actions and the value of claims in the case" in a

18

1  particular amount, I think it was two million dollars there,

2  "we, Nintendo, we're going to be nice, we're going to toss in

3  3.9 million dollars," and Bankruptcy Judge made them take that.

4  The Bankruptcy Court opened the case but then denied the

5  motion.  When they were on their way up to the Court of Appeals

6  the debtor's estate, the trust struck it rich, they got a 200

7  million dollar judgment out of the New York Court.  They're up

8  in the Tenth Circuit and Nintendo is still arguing, "Well, the

9  Court should have granted our motion," and the Court I think

10 said that they have quite a bit of chutzpah in asking for that,

11 and found that they really did not have standing to come in and

12 reopen the case, and went through I think a fairly careful

13 analysis of why a defendant in litigation with a trust formed

14 out of a bankruptcy doesn't really have standing.  Whatever

15 their rights are to defend themselves, whatever Onex American

16 Holdings, if it has any rights since it doesn't exist, or Onex

17 Corporation, or these other individuals, those rights are being

18 recognized by the District Court in Georgia and they're, you

19 know, very vigorously defending themselves there.  And so, this

20 Court shouldn't be interjecting itself at this point in this

21 (indiscernible).

22       And so, we would submit that there's a jurisdictional

23 problem with reopening the case, and given that we think the

24 motion ought to be denied and we ought not to get to the

25 question of whether what they're asking for today is some form

19

1  of interpretation of Your Honor's order or as we would submit

2  really a request that you vacate that order and start all over

3  again.  Thank you, Your Honor.

4         THE COURT:  Thank you.  Mr. Kornberg, I assume that

5  your individuals are shareholders because of the dissolution,

6  because that was --

7         MR. KORNBERG:  No, they were actually shareholders.

8         THE COURT:  They were at the time?

9         MR. KORNBERG:  Directly.  Yes, Your Honor.

10         THE COURT:  Okay.

11         MR. KORNBERG:  And, indeed, again, I think to make a

12  big point of the dissolution that took place, it's okay for

13  them -- for Onex American Holdings to be sued for 600 million

14  dollars, it's just not okay for Onex American Holdings to come

15  to this Court and say, "You know, my rights were taken away

16  under Bankruptcy plan because of a record and representations

17  made and now I can't enforce the plan according to the record

18  that was made."  I mean, Your Honor, it really sticks in our

19  craw to suggest that there's no standing because we were at the

20  receiving end of a cram down plan which eradicated those

21  interests based on a very specific record made by not only the

22  debtor but by the creditor's committee, and the same counsel

23  that represents the litigation trust made affirmative

24  representations which enabled the Court to find that a Section

25  1129(b) was complied with.  That was the mechanism that

20

1  resulted in the equity interests, 117 million dollars of them

2  being wiped out.  To suggest that we don't have standing

3  because that was effectuated and now the parties are changing

4  their positions about whether the plan confirmed with cram down

5  is really I think outrageous.  There are many, many situations

6  where after the fact parties in interest are before the Court

7  to make sure that the integrity of the Chapter 11 process is

8  respected and a confirmation order enforced.  That's all we're

9  asking be done here.

10         But, let me also point out that the party in interest

11 cases that were cited most often do involve creditors coming

12 back into court, but we all know that Section 1109 of the

13 Bankruptcy Code does not define party in interest selectively.

14 It includes specifically equity security holders, and that's

15 what we have here.

16         Your Honor, I heard two conflicting things.  On the

17 one hand the trustee apparently believes that the Judge in the

18 District Court in Georgia was concerned about the applicability

19 of Section 548.  Well, if that's the case, and I think Your

20 Honor expressed his view that perhaps that he was going to --

21         THE COURT:  Yes, that was a concern.

22         MR. KORNBERG:  Then the specific question we have

23 here today is not before the Georgia Court.  It hasn't been

24 addressed by the Georgia Court.  We have never gone into the

25 Georgia Court and said, "Please interpret the Chapter 11 plan

21

1  for us."  What we did, so there's no mystery about it, is we

2  filed a motion to dismiss the entire case.  That motion was

3  granted in part and denied in part.

4          THE COURT:  Right.

5          MR. KORNBERG:  We were hoping the whole litigation

6  would go away.  Obviously, that didn't happen.  We are now

7  coming into this Court to say, "Well, there's an aspect of

8  their litigation that is violating, in direct violation of the

9  plan that was confirmed and of the record that was made and we

10 think this Court should be vitally interested in maintaining

11 the integrity of the process," frankly, just the way Judge

12 Walsh did in the forklift case that we submitted to the Court

13 and parties on Wednesday night.  So, we think there can be no

14 question that there is discretion here to open this case and

15 that it should be exercised.  These are vitally important

16 issues in terms of what took place in this Court with respect

17 to a cram down plan.

18          And, we just also add that our interest, and this is

19 not theoretical and it's not premature, for the Onex entities

20 to be facing a 600 million dollar lawsuit, and the

21 extraordinary expense and scope of that litigation, versus what

22 should be properly a 12 million dollar lawsuit, is like night

23 and day.  This would have an enormous practical effect on Onex.

24 But, in any event, Your Honor, we believe that the plan should

25 be enforced.  It's not an advisory opinion to say there's a

22

controversy about what the plan means.  And, this is I think

under all of the authorities and particularly in the Third

Circuit which does have a different view of its retained

jurisdiction, there can be no dispute that Your Honor has the

jurisdiction to interpret the Court's own orders.  That is

<u>Black Letter Law</u> and that's all we're seeking.

THE COURT:  And, I don't think the litigation trust

is disagreeing with you on that, that this Court has

jurisdiction.  I think their issue is the timing and whether or

not Onex has the standing to assert.

MR. KORNBERG:  Well, as to the standing issue, Your

Honor, we were a party directly agreed by the confirmation

order.  And, that's the point of time that you should look at

this.  There was a record made and specific findings made that

said, "Onex, sorry, but because this debtor is hopelessly

insolvent and because no creditors are going to be paid in

full, you have to give up your stock."  I can't imagine a more

aggrieved party by the entry of that confirmation order.  Now,

we didn't object to the confirmation because a record was made.

We can talk about that a little later in some detail.  But, we

certainly were a party aggrieved by the confirmation order, our

interests were wiped out.  That's number one.

Number two, frankly, Your Honor, we filed a motion to

dismiss in the Georgia action, we've already recited what the

history was.  If we sit back and do nothing and wait for the

1  years that it may take to resolve that litigation and come back

2  into this court, I assure you that the litigation trustee will

3  say what he has already said in his papers, which is it's too

4  late to come back to this Court.  So, Your Honor, we brought

5  this at we think the appropriate time.  It will very much

6  affect the conduct of the litigation in Georgia.  It is not a

7  hypothetical, it's not an advisory opinion.  I can't really

8  fathom the argument that says there may be a plan violation

9  but, you know, we don't have to deal with it now.  I think we

10  do, Your Honor.

11        THE COURT:  Well, I'm going to do something a little

12  bit unusual.  And that is, I'd like you to proceed with your

13  argument as to why this is timely to be brought at this point,

14  your motion.  And, I'm talking about Item Number 2 on the

15  Agenda, which is your motion to enforce the confirmation plan.

16  Because, for example, part of your argument was, you know, if

17  this was a 12 million dollar lawsuit it would be one thing,

18  but, in fact, it may turn out to be a zero dollar lawsuit,

19  depending on what happens in Georgia, in which case all of the

20  consequences of what I might decide on a motion would be

21  meaningless.  At the same time if it's a 600 million dollar

22  recovery it creates a whole different set of issues including

23  perhaps the revocation of the confirmation order and bringing

24  into play other interested parties who might be entitled to

25  share in the recovery.

1          MR. KORNBERG:  Your Honor, I don't believe, and I

2     think the trustee has argued this, that the Court has the power

3     to revoke the confirmation order.  I think it is, frankly, too

4     late in the day to do that.  We didn't seek that relief.  I

5     don't know under what theory one could possibly at this point

6     seek revocation.  And, we don't need revocation, what we need

7     is enforcement.  Your Honor, again, how a litigation is

8     conducted, whether it's 12 million dollars at stake versus 600

9     million, it is just day and night.  There is a huge difference.

10          THE COURT:  Well, is there any question in your mind

11    that the litigation trust has the authority to bring

12    litigation?  In other words, from the Court's standpoint what

13    I'm hearing is, "Your Honor, they have the power to bring

14    litigation, they're just not allowed to collect."

15          MR. KORNBERG:  Your Honor, let me put it in my words.

16          THE COURT:  Yes.

17          MR. KORNBERG:  The Court in Georgia has ruled that

18    they can bring the litigation and the debtor's claims were

19    assigned to them.  That's one issue.  The issue then is what

20    are they entitled to recover in that litigation?  And, there is

21    obviously a vast difference.  We say that on the record

22    presented and the plan confirmed it's limited to the allowed

23    amount of the trust beneficiaries, which is approximately 12

24    million dollars.  They say, "No, we," and let me just say that

25    I think what is very, very troubling and another reason why the

1 Court needs to intervene now is after the Chapter 11 case was

2 over, years after it was over, almost two years to the day,

3 they filed a complaint saying, "Only kidding about the gross

4 amount of the claims, we really want 600 million dollars,"

5 which is in our view a clear violation of the confirmation

6 order, a clear violation of the representations that were made,

7 and clear violation of the record that Judge Walsh relied on.

8 So, that the violation that's occurring under the Chapter 11

9 plan is here and now and should be addressed now.  And, we

10 think, frankly, it is the Court's responsibility in the

11 interest of maintaining the integrity of its own proceedings to

12 enforce those orders now under both principles of judicial

13 estoppel and equitable estoppel.

14         So, there is a violation going on now, Your Honor,

15 and I don't think it is fair to Onex to say, "Oh, well, why

16 don't you wait and see how the whole thing turns out in two

17 years."  I don't think that we should be put through the

18 expense and aggravation and uncertainty of having to postpone

19 this to another day when we believe that the plan is being

20 violated now.  And, I hope I will be able to convince Your

21 Honor of that.

22         THE COURT:  Thank you.  Ms. Steege, come back up and

23 again give me the trust's position on the timing.  Here's

24 what's troubling me and perhaps I'm not articulating it very

25 well, but you have a right to bring the litigation.

1           MS. STEEGE:  Yes, Your Honor.

2           THE COURT:  But, we're being told that you only have

3    the right to bring the litigation to recover 12 million

4    dollars.  And, I don't know that it's this Court's -- it's

5    proper for this Court to be telling a Georgia Court that the

6    litigation will be brought but you can only award damages up to

7    a certain amount, and that's what I would be doing.

8           MS. STEEGE:  Yes, Your Honor.  And, what they're

9    really asking you to do is to give them the release that Judge

10   Walsh -- if Your Honor saw, and you mentioned you went through

11   the lengthy appendix, the confirmation transcript was there, I

12   mean, it's a lot of discussion about the releases, and one of

13   the things Judge Walsh really was not that comfortable with was

14   the notion of granting releases in the context of this case

15   where parties really weren't contributing very much for those

16   releases.  And, it was very plainly made clear that the Onex

17   parties were being carved out of any releases, and now they're

18   coming in and they're saying, "We actually really do think

19   we're entitled to that release and we're going to argue that we

20   should get that release by virtue of this plan enforcement,"

21   which we would contend is really revocation of confirmation,

22   modification of the plan, whatever you want to call it, it's

23   changing what the playing was, and a plan that clearly assigned

24   all of the causes of action over this to this trust for

25   pursuit.  Debtor's counsel said it.  We've put it in the trust.

1   They can spend their money to investigate it, pursue it, and

2   collect whatever's available.  His words were, "whatever is

3   available."  So, all of this pounding on the table about

4   enforcing their right to only have a 12 million dollar claim

5   brought against them, that is not anything that's remotely

6   close to what is in this plan of reorganization, what was said

7   at the confirmation hearing.  There is no basis under which one

8   would construe what occurred here as some creation by the

9   Bankruptcy Court of a cap on liability or a personal release of

10  Onex's liabilities to the trust, whatever they may be

11  determined to be, by the Georgia District Court.

12          And, I think, Your Honor, all of the table pounding

13  aside about enforcing this plan you have to ask yourself, the

14  lawsuit was filed in May of 2005, they filed a motion to

15  dismiss, they filed several motions to dismiss in the Georgia

16  Court.  The Georgia Court addressed this issue, issued an

17  opinion in September of this past year, 2006.  If this was such

18  a clear violation of the plan and the Court's confirmation

19  order, why have we waited, why have we put the Georgia Court

20  through all of this?  And, in point in fact, they asked the

21  Georgia Court to interpret the plan.  They asked the Georgia

22  Court to find that the confirmation order which created the

23  litigation trust was inappropriate under Section 1129 and 1123

24  because they contended that not all unsecured creditors opted

25  into it, that that somehow voided it and made it inappropriate

28

1  under a variety of cases that they discuss.  Now, the Georgia

2  Court rejected that.  But, they have, in fact, gone to that

3  Court and sought rulings from that Court which would have had

4  the effect of interpreting what this Court has done previously.

5        So, I don't think they're really coming here in a

6  timely manner and saying, "You've got to enforce your order

7  because they've just gone out and done something that we don't

8  like."  Which is what I think gets back to the whole question

9  that Your Honor asked to begin with.  Which is, why are we

10  doing this now?  You really should not be doing it now.

11  Anything you would be doing would be advisory, it would be in

12  effect interjecting into the Georgia litigation, there is a

13  District Court Judge who is presiding over it and making

14  rulings, some for them, some for us, it's how it goes in these

15  things.  And, that's really the Court that ought to get there.

16  And then, at some point we hope hopefully when there is a

17  judgment for the benefit of creditors here, if they really

18  believe that there is an enforcement issue with respect to the

19  plan, they can always bring that back in front of Your Honor.

20  We'll probably have many of the same arguments we have here

21  today, but then at that point it'll be appropriate for Your

22  Honor to decide that from a jurisdictional perspective and Your

23  Honor can have the satisfaction of knowing that what you're

24  doing is actually going to make a difference as opposed to

25  ruling hypothetically about what may or may not come to pass.

29

1          THE COURT:  Thank you, Ms. Steege.  Mr. Kornberg,

2 yes.

3          MR. KORNBERG:  Your Honor, I have just one brief

4 point.

5          THE COURT:  Please.

6          MR. KORNBERG:  And, I'm sorry, I normally don't like

7 to keep popping up.

8          THE COURT:  No, no, I'm fine with it.

9          MR. KORNBERG:  I just want to be clear, we are not

10 asking this Court to tell the Georgia Court to do anything.

11 Let me be very clear.

12          THE COURT:  Okay.

13          MR. KORNBERG:  And, let me also be very clear that we

14 filed, when we filed the motion before Your Honor we filed it

15 with the District Court in Georgia to make sure that the Judge

16 was aware of what we had done.  We're not in any way saying

17 that the Bankruptcy Court should tell the District Court what

18 to do, but we are asking Your Honor to tell the litigation

19 trustee what to do.  And, if we get to the merits of the motion

20 I'll take Your Honor through the litigation trust agreement

21 which makes it very, very, very clear that the plan determines

22 what goes on here, not the litigation trust agreement.

23          And so, we are asking Your Honor to correct a

24 violation that is ongoing by the trustee and to order the

25 trustee to do or not do something.  We're not asking you to

1  interfere with the Georgia action.

2          And, finally, Your Honor, I'm not sure I understand

3  the trustee's position.  Are we too early?  Or are we too late?

4  I think in a way it doesn't really matter.  We contend there's

5  a plan violation going on now.  We did try to get rid of the

6  whole litigation.  We filed that motion in Georgia, just to

7  give you a sense of the time frame, we filed our motion to

8  dismiss in August 2005.  They brought -- well, the plan was

9  confirmed in 2003, November 17, 2003.  The litigation trustee

10 waited two years, well not quite two years, waited until may

11 10th, 2005 to bring the Georgia action.  We filed a motion to

12 dismiss on August 1.  The Court didn't rule in Georgia until

13 September of 2006.  And, I don't think, Your Honor, we'd have

14 to be challenging their lawsuit in any multiple jurisdictions

15 at one time but we're here now because the trustee is in our

16 view clearly violating this Chapter 11 plan.  This would not be

17 an advisory opinion nor would it be an improper encroachment

18 upon the Georgia Court's jurisdiction.

19         THE COURT:  So, just to kind of summarize, you're not

20 seeking, clearly, to enjoin the prosecution of the Georgia

21 litigation?

22         MR. KORNBERG:  Clearly not, Your Honor.  In fact, let

23 me be clear that in the notice that we filed with the Georgia

24 Court we said we will conduct that case, it will not interfere

25 at all, discovery is raging.  We will continue with that.  We

31

1  are not trying to enjoin enforcement, we're saying just enforce

2  the plan against the trustee so that when the trustee gets to

3  distribute whatever he may recover it will be the amount of the

4  allowed claims and no more.

5           THE COURT:  But, isn't that the whole point here?

6  The word "when"?  And, when is not now.

7           MR. KORNBERG:  But, Your Honor, they've already said

8  we're too late to seek the relief before Your Honor.

9           THE COURT:  Well, they may say that but I'm not

10 necessarily saying that, in fact, as I've indicated my concern

11 is that you're too early.

12          MR. KORNBERG:  Well, but, Your Honor, I think that

13 the Third Circuit cases are clear that there is an interest

14 that the Court has, aside -- let me just say, the fact that we

15 --

16          THE COURT:  In the integrity of the order.

17          MR. KORNBERG:  Exactly.  And, there is on file an

18 amended complaint by the trustee that says, "I want 600 million

19 dollars from these folks."  That is a violation of the

20 confirmation order, the plan, and the litigation trust

21 agreement.  And, that violation exists today.  The fact that

22 the trustee may not make his recovery for awhile I think is

23 really neither here nor there from the stand point of this

24 Court maintaining the integrity of its orders and its rulings.

25 And, I assure you that we'll have all kinds of complaints later

32

1  on that we waited too long if we don't seek and obtain this

2  relief today.  But, again, it would not interfere with the

3  conduct of the Georgia action in any way.

4          THE COURT:  So, what Onex is basically saying is, "Go

5  forward with the litigation with the understanding that the

6  recovery is limited to 12 million dollars"?

7          MR. KORNBERG:  Correct.  That the recovery is limited

8  by the terms of the plan.  And, to the extent that you think

9  the litigation trustee, that you are not bound by the plan

10 we'll have a Bankruptcy Court order that makes that clear.  It

11 will have a practical effect I think on the litigation in the

12 sense that if the parties believe they're litigating over 12

13 million versus 600 million it may be quite a different lawsuit

14 and the expense may be quite different.  And, I would be

15 lacking candor if I didn't say that that is obviously one of

16 the things that motivates us.

17         THE COURT:  Yes.

18         MR. KORNBERG:  We've had horrific, horrific expense

19 here.

20         THE COURT:  And, I suspected, obviously, that it

21 would -- that part of Onex's concern was the parameters of the

22 litigation and the dynamics and how to settle the case and how

23 to resolve the case short of trial and that sort of thing.

24         MR. KORNBERG:  Clearly.  But, in terms it would be we

25 are not asking for this Court to in any way to restrain the

1  conduct of that litigation.

2          THE COURT:  Thank you, Mr. Kornberg.  Ms. Steege, I'm

3  happy to hear anything further that you would like to state, or

4  nothing.  I mean, I think you've covered the points.  But, if

5  there's anything else I don't want you to feel foreclosed from

6  speaking.

7          MS. STEEGE:  No, Your Honor.

8          THE COURT:  Thank you.  Okay.  I think what I'd like

9  to do because I find it helpful to me, let's take a 15-minute

10 recess and then I can kind of gather my thoughts a little bit

11 and come back.  And, if I'm able to rule I will, and if not

12 then I'll so indicate that we'll proceed with, you know, an

13 under submission ruling.  So, I'll be back in a few minutes.

14 Fifteen minutes.  Let's just say 3 o'clock.  Thank you,

15 counsel.

16                          (Recess)

17          THE CLERK:  Please rise.

18          THE COURT:  Please be seated.  Thank you very much. I

19 appreciate your indulgence because the case has been presented

20 well by both sides and one of my problems and something that I

21 have to guard against I think is that I love to decide things

22 and on occasion I have to be careful not to decide something

23 that I shouldn't and I do think that that is the situation

24 here.  I do think that a decision as to whether or not this

25 case can proceed would be an advisory opinion.  I am troubled

34

1   by the effect that a 600 million dollar recovery or a recovery

2   significantly in excess of the dollar amount of the claims of

3   the beneficiaries of the liquidation trust that a large

4   recovery would impact the integrity of the plan.

5          But, at the same time at this point with a case

6   proceeding I think it would be an inappropriate interference by

7   this Court in pending litigation in Georgia.  Having said that,

8   and ruling that it is inappropriate for the Court to reach the

9   merits at this time, I do think that under the proper

10  circumstances the Court would reopen the case to consider the

11  merits of the arguments that Onex has made.  So, I'm certainly

12  not foreclosing that.  I am a little bit concerned about the

13  status of the movant here as a dissolved limited liability

14  company whose charter in effect has been canceled at this

15  point.  But, because I'm not addressing the merits at this time

16  and therefore am not reopening the case at this time for the

17  limited purpose that Onex sought to reopen it, I don't have to

18  reach that issue.  But, I wanted to go back and look at the

19  Delaware Code because I think there are some issues that might

20  make it difficult if not impossible for the LLC itself to raise

21  the issues that it has raised in this proceeding at this time.

22         So, I mean the Third Circuit has said on occasion,

23  there is a case, the In Re:  Combustion Engineering case where

24  the Court said, "You know, people can sue, in effect, but that

25  doesn't mean that they'll collect."  And, in the

1 <u>Combustion Engineering</u> on case it was addressing indemnities

2 and it wasn't clear at that time in that case that the

3 indemnification provisions would ever be invoked because there

4 had not been a recovery at that time in that case that

5 implicated those indemnities.  And, I think that's the

6 situation that we have here and I'm not trying to avoid a

7 decision, but I think it would be inappropriate for this Court,

8 with litigation pending in the District Court in Georgia, to

9 make a ruling that would impact that case which is properly

10 proceeding at this point.  What impact and ultimate judgment

11 recovery will have on what has transpired previously in this

12 Court and on the confirmation plan and the confirmation order,

13 I think there are some issues that have been raised that

14 interest the Court very much, but this isn't the time for the

15 Court to be making that decision.

16         So, I'm going to at this point deny the motion for

17 reopening without prejudice and I'm going to rule that the

18 merits of the motion to compel the compliance with the plan is

19 not right for adjudication.  And, accordingly, I've leave the

20 parties to proceed with the litigation in the District Court in

21 Georgia, and when and if appropriate to return to this Court

22 for further proceedings.  Any questions?  Okay.  Then I'll

23 issue an order in accordance with the ruling and I thank

24 counsel and we'll stand in recess, perhaps for good, and if not

25 then I'll see you back here.  Thank you very much, counsel.

36

1          ALL:  Thank you, Your Honor.

2          MR. ITO:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4                    * * * * *

5

6

7              C E R T I F I C A T I O N

8

9          I, Marlene A. Fattore, certify that the foregoing is

10    a correct transcript from the official electronic sound

11    recording of the proceedings in the above-entitled matter, and

12    to the best of my ability.

13

14    /s/ Marlene A. Fattore       Date:   April 18, 2007

15    MARLENE A. FATTORE

16    J&J COURT TRANSCRIBERS, INC.

17

18

19

20

21

22

23

24

25